IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| GREGORY ROBINSON, | ) | Electronically filed, |
| | ) | |
| Petitioner, | ) | No. |
| | ) | |
| vs. | ) | CAPITAL CASE |
| | ) | |
| WAYNE CARPENTER, Warden, | ) | |
| Riverbend Maximum Security | ) | |
| Institution | ) | |
| | ) | |
| Respondent. | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS

Robert L. Hutton
Glankler Brown, PLLC
6000 Poplar Avenue
Suite 400
Memphis, TN 38119
Ph: 901-525-1322
Fax: 901-525-2389
rhutton@glankler.com

P. Benjamin Duke
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
Ph: 212-841-1072
Fax: 646-441-9072
bduke@cov.com

Attorneys for Petitioner
GREGORY ROBINSON

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

PROCEDURAL HISTORY ..................................................................................... 3

BACKGROUND ................................................................................................... 14

GROUNDS SUPPORTING THE PETITION FOR RELIEF ................................. 16

FALSE TESTIMONY AND BRADY CLAIMS CONCERNING SHIPP'S NOVEMBER 5
STATEMENT .................................................................................................. 16

GROUND NO. 1:    The State Violated Gregory Robinson's Constitutional Rights by
Eliciting and Failing to Correct Jarvis Shipp's False Testimony
Denying That He Had Received Any Promises from the State. ..................... 16

A.    The Prosecution Promised Shipp Consideration for His Testimony and Then
Knowingly Elicited Shipp's False Testimony Denying "Any Promises" by
the State. .......................................................................................................... 19

B.    The Tennessee Court of Criminal Appeals Denied Robinson's Claim Based
on the Wrong Materiality Standard. ................................................................ 28

C.    Shipp's False Testimony was Material Under the Correct *Napue* Standard. ........... 30

D.    Shipp's False Testimony Was Material Because the Jury Had to Find Him
Credible to Return a First-Degree Murder Conviction Under the State's
Theory, and the Other Evidence Against Robinson Was Dubious. ........................ 35

GROUND NO. 2:    The State Violated Gregory Robinson's Constitutional Rights Under
*Brady v. Maryland* by Withholding Shipp's November 5 Statement. ............. 40

A.    It Is Undisputed That Shipp's November 5 Statement Constitutes *Brady*
Material. ........................................................................................................... 41

B.    The Prosecution Failed to Disclose the November 5 Statement to Defense
Counsel. ........................................................................................................... 42

C.    Shipp's November 5 Statement Was Material. ................................................ 51

D.    This Court Must Review Robinson's Brady Claim *De Novo*, Because the
Tennessee Courts Applied the Wrong Burden of Proof and Their Decisions
Were Therefore Not "On the Merits" Under AEDPA. ................................... 55

E.   Even if the Post-Conviction Court Decision Was "On the Merits," Robinson Is Entitled to Relief Because the Decision Rests on an Unreasonable Determination of the Facts and an Unreasonable Application of the Law ............... 56

**TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE DURING THE GUILT/INNOCENCE PHASE OF ROBINSON'S TRIAL** ............................................................... 60

**GROUND NO. 3:**   Trial Counsel Rendered Ineffective Assistance By Failing to Use Jarvis Shipp's November 5 Statement to Cross-Examine Him. .................... 60

**GROUND NO. 4:**   Trial Counsel Rendered Ineffective Assistance When They Opened the Door to Sergeant Ashton's Hearsay Testimony About Shaun Washington. ....................................................................... 63

A.   Trial Counsel Elicited Harmful Hearsay Testimony From Sergeant Ashton. ........... 64

B.   The Tennessee Court of Criminal Appeals Misapplied Clearly Established Federal Law Concerning *Strickland*. ......................... 65

**GROUND NO. 5:**   Trial Counsel Rendered Ineffective Assistance as a Result of Their Objectively Unreasonable and Uninformed Decision To Call Officer Richard Parker as a Tattoo Expert, Thereby Undercutting Robinson's Misidentification Defense. ......................................................... 67

A.   Robinson's Counsel Presented Multiple Witnesses Who Testified That Robinson Was Not a Member of the Gangster Disciples. ........................ 69

B.   Trial Counsel Called Sergeant Parker as a "Tattoo Expert" Even Though They Knew His Testimony Would Harm Robinson. ................................ 69

C.   At the Post-Conviction Hearing, Officer Parker Testified That He Was Unprepared For His Trial Testimony. ....................................... 73

D.   Counsel's Decision to Call Officer Richard Parker as a Tattoo Expert Despite Knowing He Would Undermine Robinson's Misidentification Defense Constituted Ineffective Assistance Under *Strickland*. .............................. 74

E.   Even if the Tennessee Court Decision Was "On The Merits," Robinson is Entitled to Relief Because the Decision Involved an Unreasonable Determination of the Facts and An Unreasonable Application of the Law. ............ 77

**GROUND NO. 6:**   Trial Counsel was Ineffective in Failing to Object to the Accomplice Jury Instruction. ............................................................ 78

A.   Trial Counsel Was Ineffective in Failing to Object to the Inclusion of Defense Witnesses in the Accomplice Instruction. ................................. 81

B.   Trial Counsel Was Ineffective in Failing to Object to the Trial Court's Failure to Include Jarvis Shipp in the Accomplice Instruction. ................................ 82

C.   Trial Counsel Was Ineffective in Failing to Object to the Trial Court's Omission of Shaun Washington From Its Accomplice Instruction. ......................... 84

**GROUND NO. 7:**   Trial Counsel Was Ineffective in Failing to Object to Prosecutorial Vouching During Closing Argument. .............................................. 85

**GROUND NO. 8:**   Trial Counsel Was Ineffective in Failing to Identify, Investigate, and Interview Possible Witnesses. ......................................................... 89

A.   Robinson's Trial Counsel Abdicated Their Duties by Relying Almost Exclusively on a Non-Lawyer Investigator to Investigate the Case and Interview Possible Witnesses. ................................................... 90

B.   Trial Counsel Knew About, But Failed to Develop or Present at Trial, Compelling Evidence in Support of Robinson's Defense That Prentiss Phillips Alone Gave the Order to Kill Green. .......................................... 91

C.   Trial Counsel Failed to Interview Multiple Witnesses Who Would Have Testified That Prentiss Phillips Threatened to Kill and Had a Motive to Kill Vernon Green. ........................................................................ 93

D.   Trial Counsel Rendered Ineffective Assistance of Counsel by Failing to Conduct the Reasonably Diligent Investigation Required Under *Strickland* and Its Progeny. ...................................................................... 94

E.   Even if the Tennessee Court Decision Was "On The Merits," Robinson is Entitled to Relief Because the Decision Involved an Unreasonable Determination of the Facts and An Unreasonable Application of the Law. ............. 97

**GROUND NO. 9:**   Trial Counsel Was Ineffective in Failing to Adequately Prepare to Present Evidence They Had Promised the Jury About Robinson's Claim That He Did Not Flee After the Crime. ................................. 99

**GROUND NO. 10:**  Trial Counsel Was Ineffective in Failing To Object to References the State Made to Robinson's Decision Not to Testify. ..................................... 101

A.   During Guilt/Innocence Phase Closing Argument, The State Improperly Referenced Robinson's Decision Not to Testify. .................................... 101

B.   The Court of Criminal Appeals Decision Is Contrary to Established Federal Law. ...................................................................................... 102

**GROUND NO. 11:**  Trial Counsel Was Ineffective in Failing To Object to the State's Improper Use of Facts Not In Evidence And Misstatements of Law During Closing Argument. .......................................................... 103

**GROUND NO. 12:** Trial Counsel Was Ineffective in Failing to Object to the Lack of Foundation for Testimony of Jarvis Shipp and Chris James. ...................... 105

**GROUND NO. 13:** Trial Counsel Was Ineffective in Failing to Object to Cumulative and Prejudicial State Evidence About the Crime Scene Discovery and the Victim's Body. .............................................................................................. 108

**GROUND NO. 14:** Trial Counsel Was Ineffective in Failing to Request That Robinson Be Allowed to Sit at Counsel Table and in Failing to Challenge the Local Rule. .................................................................................................................. 112

**GROUND NO. 15:** Trial Counsel Rendered Ineffective Assistance Related to Jury Selection. ........................................................................................................ 114

    A.   Trial Counsel Failed to Adequately Examine and Seek to Excuse a Deputy Jailer From the Jury. .................................................................................. 115

    B.   Trial Counsel Conducted Inadequate Voir Dire. ...................................... 118

    C.   Trial Counsel Did Not Object to Improper Jury Instructions and Information Given to the Jury During Voir Dire. ........................................................ 119

    D.   Trial Counsel Did Not Obtain the Use of a Jury Questionnaires and Did Not Seek to Use the Services of a Jury Consultant. ...................................... 120

    E.   The Court of Criminal Appeals' Ruling Improperly Glossed Over Counsel's Deficiencies At Jury Selection, Contrary to Established Federal Law. ................. 121

    F.   This Court Must Review Robinson's Ineffective Assistance Claims De Novo, Because the Tennessee Courts Applied the Wrong Burden of Proof at Post-Conviction, and Their Decisions Were Therefore Not "On the Merits" and Are Not Entitled to Deference Under AEDPA. ............................................... 123

**GROUND NO. 16:** Trial Counsel Rendered Ineffective Assistance by Failing to Obtain Expert Testimony to Confirm That the Photo Array Was Unduly Suggestive and by Failing to Prepare Adequately for Robinson's Suppression Hearing. .................................................................................. 124

**GROUND NO. 17:** The Cumulative Effect of Counsel's Errors Constitutes Ineffective Assistance of Counsel. ................................................................................. 127

**OTHER VIOLATIONS OF ROBINSON'S CONSTITUTIONAL RIGHTS BY THE STATE AT THE GUILT/INNOCENCE PHASE OF HIS TRIAL** ........................................................... 128

**GROUND NO. 18:** The State Violated Robinson's Due Process Rights by Using Inherently Contradictory and Irreconcilable Factual Theories in Robinson and Co-Defendant's Trials for the Same Crime. .......................... 128

    A.    The State Presented Conflicting Theories About Who Ordered the Murder at Robinson and his Co-Defendant Prentiss Phillips' Trials. ...................................... 129

    B.    The State's Use of Contradictory and Irreconcilable Theories Violated Robinson's Due Process Rights and Rendered his Conviction Unfair. .................. 134

**GROUND NO. 19:**  The State Violated Gregory Robinson's Constitutional Rights by Withholding the Transcript of the Hearing on Shipp's Motion to Suppress His Initial Statement to Police. ....................................................... 140

**GROUND NO. 20:**  The State Violated Robinson's Due Process Rights by Failing to Instruct the Jury on the Lesser Included Offenses of Facilitation and Solicitation. ................................................................................................ 141

**GROUND NO. 21:**  Jury Instructions Defining "Intentionally," "Knowingly," "Direct," "Circumstantial," and "Reasonable Doubt" Lowered the State's Burden of Proof Violating Robinson's Due Process Rights. ........................ 147

**GROUND NO. 22:**  The Trial Court Erred By Denying Robinson's Motion for a Mistrial After Impermissible Identification Testimony ............................................. 154

    A.    Following a Prejudicial and Impermissible "Show-Up" Identification and Related Testimony, The Trial Court Refused to Grant a Mistrial .......................... 154

    B.    The Tennessee Court of Criminal Appeals Misapplied Clear Federal Law Regarding Mistrials Following Improper and Prejudicial Evidence. ...................... 156

**GROUND NO. 23:**  The Trial Court's Admission of the Victim's Skull and Gruesome Photos Violated Robinson's Right to Due Process. ...................................... 158

**GROUND NO. 24:**  The Trial Court's Denial of Robinson's *Batson* Challenge Violated His Right to Due Process. ................................................................................... 162

**GROUND NO. 25:**  Robinson's Trial Was Rendered Unfair Because of the Presence of a Biased Juror. ................................................................................................. 166

    A.    A Deputy Jailer on the Jury Perjured Herself During *Voir Dire* and Maintained Improper Extraneous Contacts During Trial. ...................................... 166

    B.    The State Courts Ignored Key Facts Regarding Juror Boyd's Bias. ...................... 167

**GROUND NO. 26:**  The Trial Court's Denial of Robinson's Motion for Individual and Sequestered Voir Dire Violated His Right to an Impartial Jury and to Due Process. ............................................................................................... 169

**GROUND NO. 27:**  The Trial Court Erred by Permitting Identifications Derived From an Impermissibly Suggestive Photo Array. ...................................................... 172

**GROUND NO. 28:** The State Violated Robinson's Due Process Rights Because There Was Insufficient Evidence of His Guilt. ...................................................... 173

**GROUNDS RELATED TO THE PENALTY PHASE** ............................................................ 174

**GROUND NO. 29:** Trial Counsel Provided Ineffective Assistance During the Mitigation Portion of the Penalty Phase. ........................................................ 174

    A.   Robinson's Trial Counsel Relied Upon Unqualified Mitigation Specialists Without Any Supervision and Failed to Obtain an Adequate Mitigation Report. ...................................................................................... 176

    B.   Trial Counsel Failed to Prepare Mitigating Witnesses. ........................................... 177

    C.   Robinson's Trial Counsel Failed to Identify the Need for and Conduct Full Neuropsychological Testing. ...................................................................... 178

    D.   This Court Must Review Robinson's Ineffective Assistance Claims De Novo, Because the Tennessee Courts Applied the Wrong Burden of Proof at Post-Conviction, and Their Decisions Were Therefore Not "On the Merits" and Are Not Entitled to Deference Under AEDPA. ...................................................... 179

    E.   Under Clearly Established Federal Law, Trial Counsel's Preparation of Robinson's Mitigation Case Was Deficient and Resulted in Prejudice to Robinson at the Penalty Phase. ................................................................. 180

**GROUND NO. 30:** Robinson's Trial Counsel Was Ineffective Because They Continued Their Representation of Robinson After His Conviction Despite a Conflict of Interest. ........................................................................ 184

**GROUND NO. 31:** Robinson's Counsel Failed to Object to the Fact that the Jury Instructions Failed to State That the Jurors Could Consider Any Aspect of Robinson's Record. .................................................................. 186

**GROUND NO. 32:** The Prosecutor, and Not Jury, Determined Aggravating Circumstance, and Robinson's Counsel Failed to Object. ...................................................... 188

**GROUND NO. 33:** The Cumulative Effect of Counsel's Errors Constitutes Ineffective Assistance of Counsel For the Penalty Phase. ........................................... 189

**GROUNDS FOR RELIEF BASED UPON APPELLATE COUNSEL'S INEFFECTIVE ASSISTANCE DURING ROBINSON'S DIRECT APPEAL** ...................................................... 191

**GROUND NO. 34:** Appellate Counsel Was Ineffective Because They Failed to Challenge the Tennessee Supreme Court's Finding That the Medical Examiner's Testimony Corroborated Shipp. ................................................................. 191

**GROUND NO. 35:** Appellate Counsel Was Ineffective Because They Failed to Challenge the Inclusion of Robinson's Witnesses in the Accomplice Jury Instruction. ................................................................. 194

**GROUND NO. 36:** Appellate Counsel Was Ineffective Because They Failed to Challenge the Trial Court's Rulings Regarding the Admissibility of Lack of Flight Evidence. ................................................................. 194

**GROUND NO. 37:** Appellate Counsel Was Ineffective Because They Failed to Challenge the Local Rule that Requires Court Permission for Defendants to Sit at the Table with Counsel. ................................................................. 195

**GROUNDS CONCERNING THE SYSTEMIC FAILURE OF THE JUDICIAL SYSTEM** ...................... 196

**GROUND NO. 38:** Tennessee's Rules for Considering Aggravating Circumstances Are Unconstitutional. ................................................................. 196

**GROUND NO. 39:** The Under-Representation of Women as Grand Jury Forepersons In Shelby County and the Failure of Counsel to Raise that Issue Violated Robinson's Sixth and Fourteenth Amendment Rights. ................................................................. 197

**GROUND NO. 40:** Death Sentences Are Imposed Arbitrarily and Capriciously In Tennessee. ................................................................. 200

**GROUND NO. 41:** Tennessee's Appellate Review Process In Death Penalty Cases Does Not Ensure That Capital Punishment Is Not Imposed Arbitrarily And Capriciously. ................................................................. 203

**GROUND NO. 42:** Administration of Lethal Injection Constitutes Cruel and Unusual Punishment. ................................................................. 205

**GROUND NO. 43:** Tennessee's Use of the Death Penalty Violates International Treaties, Laws, and Norms. ................................................................. 206

**CUMULATIVE ERROR** ................................................................. 211

**GROUND NO. 44:** Robinson Should be Granted Relief Because of Cumulative Error. ............. 211

**PRAYER FOR RELIEF** ................................................................. 212

# TABLE OF AUTHORITIES

**Page**

CASES

*Abdul-Kabir v. Quarterman*,
550 U.S. 233 (2007).................................................................187

*Adams v. Comm'r of Correction*,
71 A.3d 512, 520 (Conn. 2013) ...............................................29

*Anderson v. Butler*,
858 F.2d 16 (1st Cir. 1988), *aff'd sub nom. Massachusetts v. Anderson*, 536 N.E.2d
1353 (Mass. 1990) ...................................................................96

*Apprendi v. New Jersey*,
530 U.S. 466 (2000).................................................................189

*Arave v. Creech*,
507 U.S. 463 (1993).................................................................197

*Atkins v. Virginia*,
536 U.S. 304 (2002).................................................................210

*Barber v. Tennessee*,
513 U.S. 1184 (1995)...............................................................197

*Bates v. Bell*,
402 F.3d 635 (6th Cir. 2005) ...................................................87

*Batson v. Kentucky*,
476 U.S. 79 (1986)............................................................ *passim*

*Baxter v. Rose*,
523 S.W.2d 930 (Tenn. 1975)..................................................182

*Beasley v. United States*,
491 F.2d 687 (6th Cir. 1974) ................................95, 125, 126

*Beck v. Alabama*,
447 U.S. 625 (1980)...............................142, 145, 146, 147

*Bell v. Miller*,
500 F.3d 149 (2d Cir. 2007).....................................................75

*Berger v. United States,*
    295 U.S. 78 (1935).............................................................129, 135, 138, 139

*Blystone v. Pennsylvania,*
    494 U.S. 299 (1990)...............................................................................187

*Blythe v. Hinckley,*
    173 U.S. 500 (1899)...............................................................................208

*Boone v. Paderick,*
    541 F.2d 447 (4th Cir. 1976) ..............................................................33, 34

*Brady v. Maryland,*
    373 U.S. 83 (1963).............................................................................*passim*

*Brimmer v. State,*
    29 S.W.3d 497 (Tenn. Crim. App. 1998).................................................182

*Cage v. Louisiana,*
    498 U.S. 39 (1991)...........................................................................148, 150

*Campbell v. Louisiana,*
    523 U.S. 392 (1998)...............................................................................199

*Carter v. Bell,*
    218 F.3d 581 (6th Cir. 2000) .................................................................156

*Chambers v. Armontrout,*
    907 F.2d 825 (8th Cir. 1990) ...................................................................95

*Chapman v. California,*
    386 U.S. 18 (1967).......................................................................18, 39, 113

*Clemons v. Mississippi,*
    494 U.S. 738 (1990)...............................................................................203

*Combs v. Coyle,*
    205 F.3d 269 (6th Cir. 2000) .......................................................68, 75, 78

*Commonwealth v. Collins,*
    434 N.E.2d 964 (Ma. 1982) .....................................................................32

*Commonwealth v. Strong,*
    761 A.2d 1167 (Pa. 2000) (Castille, J., concurring) ................................32

*Conyers v. State,*
    790 A.2d 15 (Md. 2002) .....................................................................29, 31

*Cool v. United States,*
409 U.S. 100 (1972)................................................................79, 82

*Cooper v. State,*
847 S.W.2d 521 (Tenn. Crim. App. 1992) ...............................182

*Crawford v. Washington,*
541 U.S. 36 (2004)........................................................................65

*Cullen v. Pinholster,*
131 S. Ct. 1388 (2011)...............................................................183

*Cuyler v. Sullivan,*
446 U.S. 335 (1980)...................................................................185

*Davis v. Florida,*
473 U.S. 913 (1985)...................................................................171

*Davis v. United States,*
160 U.S. 469 (1895)...................................................................150

*Deck v. Missouri,*
544 U.S. 622 (2005).............................................................112, 113

*Dobbs v. Zant,*
506 U.S. 357 (1993).............................................................128, 190

*Douglas v. Workman,*
560 F.3d 1156 (10th Cir. 2009) ..................................................31

*Dow v. Virga,*
729 F.3d 1041 (9th Cir. 2013) ....................................................29

*Drake v. Kemp,*
762 F.2d 1449 (11th Cir. 1985) (J. Clark concurring).............139

*Duren v. Missouri,*
439 U.S. 357 (1979)...................................................................199

*Edwards v. Lamarque,*
475 F.3d 1121 (9th Cir. 2007) .............................................125, 126

*Enmund v. Florida,*
458 U.S. 782 (1982)...................................................................210

*Estelle v. McGuire,*
502 U.S. 62 (1991)...............................................................150, 159

*Estelle v. Williams,*
    425 U.S. 501 (1976)................................................................................112

*Flanagan v. United States,*
    465 U.S. 265 (1984)................................................................................186

*Floyd v. Meachum,*
    907 F.2d 347 (2d Cir. 1990)......................................................................87

*Freeman v. Class,*
    95 F.3d 639 (8th Cir. 1996) ......................................................................66

*Furman v. Georgia,*
    408 U.S. 238 (1972) (per curiam)......................................................200, 206

*Gaines v. Kelly,*
    202 F.3d 598 (2d Cir. 2000)......................................................................55

*Getsy v. Mitchell,*
    495 F.3d 295 (6th Cir. 2007) ..................................................................211

*Giglio v. United States,*
    405 U.S. 150 (1972)......................................................................... *passim*

*Godfrey v. Georgia,*
    446 U.S. 420 (1980)................................................................................197

*Goodwin v. Johnson,*
    632 F.3d 301 (6th Cir. 2011) ..................................................................181

*Gregg v. Georgia,*
    428 U.S. 153 (1972)........................................................................200, 205

*Griffin v. California,*
    380 U.S. 609 (1965)................................................................................102

*Groseclose v. Bell,*
    895 F. Supp. 935 (M.D. Tenn. 1995), *aff'd*, 130 F.3d 1161 (6th Cir. 1997) ........................211

*Haliym v. Mitchell,*
    492 F.3d 680 (6th Cir. 2007) ..................................................................182

*Harned v. Henderson,*
    588 F.2d 12 (2d Cir. 1978)........................................................................55

*Harrington v. Richter,*
    131 S. Ct. 770 (2011)..............................................................................183

*Harris v. Lafler*,
553 F.3d 1028 (6th Cir. 2009) ........................................................42, 54

*Harris v. Reed*,
894 F.2d 871 (7th Cir. 1990) ................................................................96

*Hellard v. State*,
629 S.W.2d 4 (Tenn. 1982)..................................................................101

*Hendricks v. Calderon*,
70 F.3d 1032 (9th Cir. 1995) ..............................................................181

*Hicks v. State*,
983 S.W.2d 240 (Tenn. Crim. App. 1998) ...........................................56

*Hobby v. United States*,
468 U.S. 339 (1984)....................................................................199, 200

*Holloway v. Arkansas*,
435 U.S. 475 (1978)..............................................................................186

*House v. Bell*,
547 U.S. 518 (2006)..............................................................................203

*Houston v. Dutton*,
50 F.3d 381 (6th Cir. 1995) ................................................................197

*Irvin v. Dowd*,
366 U.S. 717 (1961)......................................................................170, 171

*Jackson v. Brown*,
513 F.3d 1057 (9th Cir. 2008) ..............................................................31

*Jackson v. Virginia*,
443 U.S. 307 (1979)..............................................................................173

*Johnson v. California*,
545 U.S. 162 (2005)........................................................162, 164, 165

*Jones v. Chappell*,
Case No. CV 09-02158-CJC (C.D. Cal. 2013)...................................206

*Judge v. State*,
539 S.W.2d 340 (Tenn. Crim. App. 1976) ............................................87

*Keeble v. United States*,
412 U.S. 205 (1973)..............................................................................146

*Kyles v. Whitley*,
 514 U.S. 419, 444 (1995) ............................................................33, 51, 141

*In re Kemmler*,
 136 U.S. 436 (1890).....................................................................205

*Kimmelman v. Morrison*,
 477 U.S. 365 (1986).....................................................................188

*LaCaze v. Warden of Louisiana Correction Institute for Women*,
 645 F.3d 728 (5th Cir. 2011), *amended by,* 647 F.3d 1175 (5th Cir. 2011) ...............32, 33, 52

*Lankford v. Idaho*,
 500 U.S. 110 (1991)......................................................................7

*Lundy v. Campbell*,
 888 F.2d 467 (6th Cir. 1989) ...........................................................211

*Malave v. Smith*,
 559 F. Supp. 2d 264 (E.D.N.Y. 2008) ..................................................55

*Maples v. Stegall*,
 340 F.3d 433 (6th Cir. 2003) ...........................................55, 123, 179

*Maynard v. Cartwright*,
 486 U.S. 356 (1988)......................................................................197

*McCleskey v. Kemp*,
 481 U.S. 279 (1987)...............................................................187, 203

*McDonough Power Equipment, Inc. v. Greenwood*,
 464 U.S. 548 (1984)...............................................................168, 169

*McKoy v. North Carolina*,
 494 U.S. 433 (1990).....................................................................202

*Miller v. Webb*,
 385 F. 3d 666 (6th Cir. 2004) ..........................................................123

*Montgomery v. Peterson*,
 846 F.2d 407 (7th Cir. 1988) ...........................................................95

*Morgan v. Illinois*,
 504 U.S. 719 (1992)......................................................................122

*Napue v. Illinois*,
 360 U.S. 264 (1959)........................................................... *passim*

*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) (J. Brennan concurring) .................................................170

*Palmer v. Bagley*,
  330 F. App'x 92 (6th Cir. 2009) ...................................................................146

*The Paquete Habana*,
  175 U.S. 677 (1900) .......................................................................................209

*Parker v. Dugger*,
  498 U.S. 308 (1991) .......................................................................................203

*Parker v. Gladden*,
  385 U.S. 363 (1966) .......................................................................................170

*Penry v. Lynaugh*,
  492 U.S. 302 (1989) .......................................................................................187

*Pike v. State*,
  No. E2009-00016-CCA-R3-PD, 2011 WL 1544207 (Tenn. Crim. App. Apr. 25,
  2011) ..............................................................................................................183

*Pough v. United States*,
  442 F.3d 959 (6th Cir. 2006) ..........................................................................55

*Powers v. Ohio*,
  499 U.S. 400 (1991) ................................................................................162, 199

*Pulley v. Harris*,
  465 U.S. 37 (1984) .........................................................................................205

*Rickman v. Dutton*,
  864 F. Supp. 686 (M.D. Tenn. 1994) ..............................................................34

*Ring v. Arizona*,
  536 U.S. 584 (2002) .........................................................................................7

*Robinson v. State*,
  No. W2011-00967-CCA-R3-PD, 2013 WL 1149761 (Tenn. Crim. App. Mar. 20,
  2013) ................................................................................................... *passim*

*Roe v. Flores-Ortega*,
  528 U.S. 470 (2000) .......................................................................................191

*Rompilla v. Beard*,
  545 U.S. 374 (2005) .......................................................................................181

*Roper v. Simmons,*
    543 U.S. 551 (2005)...................................................................210

*Rosales-Lopez v. United States,*
    451 U.S. 182 (1981)...................................................................121

*Rose v. Mitchell,*
    443 U.S. 545 at n.2 (1979).........................................................199

*Rosencrantz v. Lafler,*
    568 F.3d 577 (6th Cir. 2009) .......................................................29

*Russell v. State,*
    532 S.W.2d 268 (Tenn. 1976)......................................................105

*Schad v. Arizona,*
    501 U.S. 624 (1991)...................................................................146

*Shell v. Mississippi,*
    498 U.S. 1 (1990)......................................................................197

*Shih Wei Su v. Filion,*
    335 F.3d 119 (2d Cir. 2003).........................................................29

*Silva v. Woodford,*
    279 F.3d 825 (9th Cir. 2002) ........................................................55

*Simmons v. United States,*
    390 U.S. 377 (1972)..................................................126, 156, 172

*Sims v. Livesay,*
    970 F.2d 1575 (6th Cir. 1992) .....................................................126

*Skipper v. South Carolina,*
    476 U.S. 1 (1986)..................................................................7, 184

*Smith v. Cain,*
    __ U.S. __, 132 S. Ct. 627 (2012)..................................................52

*Smith v. Groose,*
    205 F.3d 1045 (8th Cir. 2000) ..............................................137, 138

*State v. Adkins,*
    725 S.W.2d 660 (Tenn. 1987).......................................................202

*State v. Akins,*
    867 S.W.2d 350 (Tenn. Crim. App. 1993) ..............................167, 169

*State v. Banks*,
    564 S.W.2d 947 (Tenn. 1978).........................................................................111

*State v. Bondurant*,
    4 S.W.3d 662 (Tenn. 1999)..........................................................................199

*State v. Brimmer*,
    876 S.W.2d 75 (Tenn. 1994).........................................................................201

*State v. Brown*,
    836 S.W.2d 530 (Tenn. 1992)........................................................................107

*State v. Carter*,
    988 S.W.2d 145 (Tenn. 1999)........................................................................186

*State v. Ducker*,
    27 S.W.3d 889 (Tenn. 2000)........................................................150, 151, 152

*State v. Ferguson*,
    2 S.W.3d 912 (Tenn. 1999)............................................................................51

*State v. Groseclose*,
    615 S.W.2d 142 (Tenn. 1981)........................................................................202

*State v. Harris*,
    989 S.W.2d 307 (Tenn. 1999)........................................................................197

*State v. Heard*,
    No. W2001-02605-CCA-R3-CD, 2003 WL 22718439 (Tenn. Crim. App. Nov. 6,
    2003) ...........................................................................................107, 108

*State v. Henley*,
    774 S.W.2d 908 (Tenn. 1989).....................................................................86, 87

*State v. Holton*,
    126 S.W.3d 845 (Tenn. 2004)........................................................................189

*State v. Hutchinson*,
    898 S.W.2d 161 (Tenn. 1994)........................................................................201

*State v. Jackson*,
    52 S.W.3d 661 (Tenn. Crim. App. 2001)............................................................14

*State v. Johnson*,
    632 S.W.2d 542 (Tenn. 1982)........................................................................201

*State v. Meeks*,
    No. 01C01-9308-CC-00248, 1994 WL 548714 (Tenn. Crim. App. Oct. 6, 1994)...............126

*State v. Nesbit,*
　978 S.W.2d 872 (Tenn. 1998) ........................................................................109

*State v. Page,*
　81 S.W.3d 781 (Tenn. Crim. App. 2002) .........................................150, 151, 152

*State v. Phillips,*
　76 S.W.3d 1 (Tenn. Crim. App. 2001) ......................................................... *passim*

*State v. Rice,*
　184 S.W.3d 646 (Tenn.2006) ........................................................................113

*State v. Robinson ("Robinson II"),* 146 S.W.3d 469 (Tenn. 2004) ..................... *passim*

*State v. Robinson,* No. W2001-01299-CCA-R3-DD, 2003 WL 21946735 (Tenn. Crim.
　App. Aug. 13, 2003) ................................................................................ *passim*

*State v. Schiefelbein,*
　230 S.W.3d 88 (Tenn. Crim App. 2007) ...........................................................107

*State v. Stephenson,*
　878 S.W.2d 530 (Tenn. 1994) ........................................................................188

*State v. Tarter,*
　No. E2005-01013-CCA-R3-CD, 2006 WL 568158 (Tenn. Crim. App. Mar. 8, 2006) ..........87

*State v. Taylor,*
　771 S.W.2d 387 (Tenn. 1989) ..................................................................201, 202

*State v. Thompson,*
　No. W1998-00351-CCA-R10-CD, 2000 WL 912715 (Tenn. Crim. App. Aug. 9,
　2001) ...........................................................................................115, 116

*State v. Transou,*
　928 S.W.2d 949 (Tenn. Crim. App. 1996) ...................................................103, 105

*State v. Wilkins,*
　No. W1999-01462-CCA-MR3-CD, 2000 WL 1229156 (Tenn. Crim. App. Aug. 18,
　2000) ..................................................................................................15

*Stovall v. Denno,*
　388 U.S. 293 (1967) .........................................................................126, 172

*Strickland v. Washington,*
　466 U.S. 668 (1984) ............................................................................ *passim*

*Strickler v. Greene,*
　527 U.S. 263 (1999) ......................................................................29, 40, 51

xvii

*Stumpf v. Houk,*
   653 F.3d 426 (6th Cir. 2011) ..........................................................137

*Stumpf v. Mitchell,*
   367 F.3d 594 (6th Cir. 2004) ..........................................................137

*Stumpf v. Robinson,*
   722 F.3d 739 (6th Cir. 2013) ..........................................................137

*Tassin v. Cain,*
   517 F.3d 770 (5th Cir. 2008) ............................................................33

*Taylor v. Louisiana,*
   419 U.S. 522 (1975) .......................................................................199

*Thompson v. Calderon,*
   120 F.3d 1045 (9th Cir. 1997) .................................................138, 139

*Thompson v. Oklahoma,*
   487 U.S. 815 (1988) .......................................................................210

*Trop v. Dulles,*
   356 U.S. 86 (1958) .........................................................................210

*Trujillo v. Sullivan,*
   815 F.2d 597 (10th Cir. 1987) ........................................................171

*Turner v. Louisiana,*
   379 U.S. 466 (1965) .......................................................................170

*United States v. Agurs,*
   427 U.S. 97 (1976) ................................................................... *passim*

*United States v. Alzate,*
   47 F.3d 1103 (11th Cir. 1995) ..........................................................29

*United States v. Atkinson,*
   297 U.S. 157 (1936) ..........................................................................80

*United States v. Bagley,*
   473 U.S. 667 (1985) (plurality opinion) ........................................ *passim*

*United States v. Boyle,*
   283 F. App'x 825 (2d Cir. 2007), *aff'd*, 566 U.S. 938 (2009) ..............139

*United States v. Cronic,*
   466 U.S. 648 (1984) ...............................................................128, 190

*United States v. Debango*,
780 F.2d 81 (D.C. Cir. 1986) ........................................................95

*United States v. DeCoster*,
487 F.2d 1197 (D.C. Cir. 1973) ....................................................95

*United States v. Frady*,
456 U.S. 152 (1982) ......................................................................80

*United States v. Gale*,
314 F.3d 1 (D.C. Cir. 2003) ..........................................................30

*United States ex rel. Hampton v. Leibach*,
347 F.3d 219 (7th Cir. 2003) ........................................................96

*United States v. Harris*,
165 F.3d 1062 (6th Cir. 1999) ....................................................157

*United States v. Higgs*,
353 F.3d 281 (4th Cir. 2003) ......................................................139

*United States v. Mason*,
293 F.3d 828 (5th Cir. 2002) ........................................................31

*United States v. Perry*,
438 F.3d 642 (6th Cir. 2006) ......................................................168

*United States v. Talley*,
164 F.3d 989 (6th Cir. 1999) ......................................................157

*United States v. Young*,
470 U.S. 1 (1985) ..........................................................................80

*United States v. Young*,
470 US.1 (1985) ......................................................................80, 87

*Victor v. Nebraska*,
511 U.S. 1 (1994) ................................................................148, 150

*Wainwright v. Witt*,
469 U.S. 412 (1985) ....................................................................168

*Walker v. Engle*,
703 F.2d 959 (6th Cir. 1983) ......................................................211

*Weeks v. Jones*,
26 F.3d 1030 (11th Cir. 1994) ................................................55, 56

*Wiggins v. Smith,*
    539 U.S. 510 (2003)...........................................................180, 181, 191

*Williams v. Martin,*
    618 F. 2d 1021 (4th Cir. 1980) ...............................................183

*Williams v. Taylor,*
    529 U.S. 362 (2000).................................................................136, 190

*Wilson v. Mitchell,*
    250 F.3d 388 (6th Cir. 2001) ..................................................173

*Wilson v. Morgan,*
    477 F.3d 326 (6th Cir. 2007) ..................................................157

*Wilson v. Workman,*
    577 F.3d 1284 (10th Cir. 2009) ........................55, 56, 123, 180

*In re Winship,*
    397 U.S. 358 (1970)................................................................148, 150

*Zant v. Stephens,*
    462 U.S. 862 (1983)................................................................205

*Zuern v. Tate,*
    336 F.3d 478 (6th Cir. 2003) ..................................................157

**STATUTES**

28 U.S.C. § 2254......................................................................*passim*

28 U.S.C. § 2255......................................................................55

Tenn. Code Ann. § 39-11-403(a) (1997) ...............................142

Tenn. Code Ann. § 39-13-204(i).............................................*passim*

Tenn. Code Ann. § 39-13-206(c)(1)(D)..................................204

Tenn. Code Ann. § 39–12–102(a) (1997) ...............................143

Tenn. Code Ann. § 40–30–110(f) (West 2014) .......................56

Tenn. Const. Art. I, § 9 ..............................................................................102

U.S. Const. Art. VI...........................................................................206, 208

U.S. Const. amend. V.............................................................2, 102, 153, 203

U.S. Const. amend. VI .................................................................. *passim*

U.S. Const. amend. VIII................................................................3, 184, 205

U.S. Const. amend. XIV .................................................................. *passim*

OTHER AUTHORITIES

*ABA Standards for Criminal Justice: Discovery and Trial by Jury* (3d ed.), Jury
    Instructions § 15-4.4(a) ....................................................................119

American Declaration of the Rights and Duties of Man, OEA/Ser.L/V.II 23, doc. 21, rev.
    6 (1948) ......................................................................................207

Amnesty Int'l, *Death Sentences and Executions 2011* (2012) ...........................203, 204

*Commentary to ABA Standards for Criminal Justice: Prosecution and Defense Function*
    (2d ed.), The Defense Function § 4–4.1.................................................182

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or
    Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.......................................207

International Convention on the Elimination of All Forms of Racial Discrimination, arts.
    5, 6 and 7, Dec. 21, 1965, 660 U.N.T.S. 195 .........................................207

International Covenant on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N.
    GAOR Supp. (No. 16), U.N. Doc. A/6316 (Dec. 16, 1966), 999 U.N.T.S. 171,
    *entered into force* Mar. 23, 1976 .....................................................207

Protocol 13 of the Convention for the Protection of Human Rights and Fundamental
    Freedoms, Nov. 4, 1950, Europe.T.S. No. 5; 213 U.N.T.S. 221 ...........................209

Restatement (Third) of Foreign Relations Law of the United States § 111(1)..........................209

Report of the Human Rights Committee, Volume I: Eighty-fifth Session (17 October-3
    November 2005), Eighty-sixth Session (13-31 March 2006), Eighty-Seventh Session
    (10-28 July 2006), 1 December 2006, A/61/40 .....................................208

Rules of Practice and Procedure for Shelby County Criminal Court, Rule 8.05 .................. *passim*

Tenn. R. Crim. P. 6(g)...........................................................................194, 195

Tenn. R. Evid. § 803(1.1) ......................................................................66

Tenn. R. Prof. Conduct 1.7(a) ........................................................................185

Tenn. Sup. Ct. R. 12(1)...............................................................................204

Tenn. Sup. Ct. R. 13....................................................................................201

Universal Declaration of Human Rights, G.A. Res. 217A(III), U.N. Doc. A/810 (1948) .........207

1989 ABA Guidelines § 11.4.1(c) .............................................................181

2003 ABA Guidelines ¶ 10.10.2(C)...........................................................120

2003 ABA Guidelines ¶ 10.7 ....................................................................181

**PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner GREGORY ROBINSON, currently being held in custody by Warden Wayne Carpenter on death row at Riverbend Maximum Security Institution in Nashville, Tennessee, respectfully petitions this Court under 28 U.S.C. § 2254 for relief from his unconstitutionally obtained conviction and sentence.

## INTRODUCTION

1.     In November 1998, Petitioner Gregory Robinson was convicted of aggravated kidnapping and first degree murder, and sentenced to death, for the gang killing of Vernon Green which was carried out by members of the Gangster Disciples in Memphis's Bellevue Park. At trial, the State did not contend that Robinson was present at the park when the killing occurred, but rather relied on co-defendant Jarvis Shipp's testimony that Robinson was a senior gang officer who had the authority to order the murder.

2.     During post-conviction proceedings, the Tennessee Court of Criminal Appeals denied relief under the Fifth and Fourteenth Amendment to the U.S Constitution even though that court found:

- the Shelby County prosecutors knowingly elicited false testimony from Shipp that he had not been promised anything for his testimony;

- the prosecutors not only failed to correct that false testimony, in violation of their absolute obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), but also vouched for its truthfulness in their summations to the jury;

- the 17-page transcript of the prosecutors' closed-door pretrial meeting with Shipp, who himself then faced a capital trial for Vernon Green's murder, proved that the lead prosecutor had assured Shipp that his testimony would help "save [his] life" and had

promised to give Shipp consideration for "anything you do to help us get . . . Gregory [Robinson]."

- Robinson's lead trial counsel never received or knew about the 17-page meeting transcript, which did not come to light until Robinson's post-conviction counsel obtained it in 2007, and lead trial counsel therefore could not use it to impeach Shipp on cross-examination or otherwise support Robinson's defense.

3.      Despite these facts, and with barely any analysis, the Tennessee Court of Criminal Appeals dismissed the significance of the prosecutors' impropriety and denied Robinson relief, ruling that the State's concealed promise of consideration was not material.

4.      In doing so, the Tennessee Court of Criminal Appeals applied an incorrect legal standard of materiality under *Napue* and flouted clearly established Fourteenth Amendment and Fifth Amendment law from the U.S. Supreme Court, which required the opposite result.

5.      The Tennessee Courts also deprived Robinson of his rights under the Fifth and Fourteenth Amendment by denying Robinson's *Brady* claim regarding Shipp's statement even though there was overwhelming evidence that the State failed to turn the clearly material statement over to the defense.

6.      Robinson was also deprived of his constitutional rights because his appointed counsel provided him with ineffective assistance of counsel due to multiple failures and omissions throughout the pre-trial, trial, post-trial, and appellate phases of this case. The prosecution and trial court also introduced numerous other errors.

7.      Robinson in entitled to a *de novo* adjudication of his *Brady* claim and other claims that concerned facts found in during Tennessee post-conviction proceedings, because the Post-Conviction Court applied a "clear and convincing" burden of proof to the claim, which is higher

than the federal standard of preponderance of the evidence. Therefore, the decision was not "on the merits" and there is no deference under AEDPA.

8. The following facts, among others, establish that Robinson's convictions must be vacated, and he must be granted a new trial.

## PROCEDURAL HISTORY

9. Robinson is being held in custody by Warden Wayne Carpenter on death row at Riverbend Maximum Security Institution in Nashville, Tennessee.

10. Robinson invokes the Court's jurisdiction pursuant to 28 U.S.C. § 2254. Robinson seeks this Court's protection and intercession because the Tennessee state courts have violated, and unreasonably and arbitrarily refused to correct violations of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, resulting in Robinson's unconstitutional conviction and sentence of death. Robinson request that this Court afforded him all the protections provided by the United States Constitution, federal habeas corpus statutes, the Rules governing § 2254 cases in the United States District Courts, and all other pertinent statutes, court rules, and case law. Robinson seeks an order granting this petition for writ of habeas corpus.

11. On November 21, 1998, after a three-day trial in the Criminal Court of Tennessee, 30th Judicial District of Memphis, Division X, No. 97-13179-80, in Shelby County, Tennessee, a jury convicted Petitioner Gregory Robinson of First Degree Murder and Especially Aggravated Kidnapping. (Tr. 9 at 713-14.)[1] Robinson pleaded not guilty to these charges.

---

[1] References to the trial and post-conviction records are as follows:

| Original Trial | (Tr. [Vol. No.] [Page No.]) |
| Post-Conviction Record of Appeal | (P-C [Vol. No.] at [Page No.]) |
| Post-Conviction Hearing Exhibits | (P-C [Ex. No.] at [Page No.]) |

(continued…)

12.     On November 23, 1998, the jury sentenced Robinson to death for the first degree murder conviction. (Tr. 17 at 135-136.)

13.     Robinson did not testify at any pre-trial hearing, trial, or post-trial hearing.

14.     Timely motions for a new trial were denied.

15.     Robinson appealed from the judgment of conviction to the Court of Criminal Appeals of Tennessee at Jackson, No. W2001-01299-CCA-R3-DD. Robinson raised the following grounds on appeal: (a) he was deprived of due process because the State used irreconcilable theories in his trial and the subsequent trial of co-defendant Prentiss Phillips; (b) the Trial Court erred by admitting into evidence the victim's actual skull and numerous gruesome photographs of the victim's body; (c) the evidence was insufficient as a matter of law to sustain the guilty verdict in both the guilt/innocence and penalty phases; (d) the trial court erred by failing to instruct the jury on lesser included offenses of First-Degree Murder and Especially Aggravated Kidnapping—namely, facilitation and solicitation; (e) the trial court's aggravating circumstances instruction was unconstitutional and the evidence was insufficient to support the jury's finding that there were aggravating circumstances; (f) the trial court erred by preventing the sentencing jury from considering relevant mitigating evidence; (g) the jury instructions defining intentional and knowing conduct and direct and circumstantial evidence improperly lowered the State's burden of proof; (h) the State failed to disclose a "wink and a nod" agreement with the prosecution's key witness, Jarvis Shipp, that it would not seek the death

| Post-Conviction Supplemental Record | (R. Supp. __) |
| Final Amended Petition | Pet. Cl. [Claim No.] |
| Supplement to Final Amended Petition | Supp. Pet. [Claim No.] |

penalty against him; (i) the State failed to disclose the transcript of the hearing on Shipp's motion to suppress his statement to police; (j) the trial court erred by allowing a suggestive photo array into evidence and related testimony about out of court identifications; (k) the trial court erred in denying Robinson's motion for a mistrial after the testimony of Nichole Black; (l) the Trial Court erred when it refused to recess the trial overnight following Officer Richard Parker's testimony about Robinson's tattoos; (m) the State vouched for witnesses during closing argument; (n) the State argued facts not in evidence during closing argument; (o) the State improperly commented on Robinson's decision not to testify during closing argument; (p) the State improperly introduced victim impact proof during the guilt/innocence phase of the trial; (q) the State improperly asked a defense witness about Robinson's prior arrest during the penalty phase; (r) the State improperly suggested that it was the intention of Robinson to have the victim's identity obliterated; (s) the State made improper statements to the jury during voir dire; (t) the Trial Court erred by failing to find a prima facie case for violation of *Batson v. Kentucky*, 476 U.S. 79 (1986); (u) the Trial Court erred by not calling a mistrial due to juror bias and perjury; (v) the Trial Court erred by allowing prejudicial and inaccurate information about aggravating circumstances reach the jury; (w) the Trial Court erred in denying Robinson's motion for individual and sequestered voir dire of the venire; (x) cumulative error; (y) the Court should have granted Robinson's motion for a new trial and motions for judgment of acquittal; (z) the aggravating circumstances in his case did not outweigh the mitigating circumstances beyond a reasonable doubt; (aa) Robinson's death sentence was disproportionate generally; (bb) proper application of comparative proportionality required vacatur Robinson's death sentence; (cc) the Court erred in denying his motion to dismiss; (dd) his death sentence is unconstitutional because the prosecutor, not a grand jury, made the decision to seek the death penalty; (ee) the death

penalty is unconstitutional; (ff) lethal injection is unconstitutional; (gg) the system of capital punishment in Tennessee is unconstitutional; (hh) the sentencing for Especially Aggravated Kidnapping was flawed.

16.     On August 13, 2003, the Tennessee Court of Criminal Appeals unanimously reversed Robinson's convictions and death sentence. The Court held that a new trial was required because the State failed to charge the lesser included offenses of solicitation and facilitation. The Court also found that Robinson was deprived of due process as it relates his death sentence because the State used irreconcilable theories in his trial and the subsequent trial of another defendant, Prentiss Phillips, and that Robinson's death sentence was disproportionate. The Court remanded for a new trial without the possibility of a death sentence and on that basis prohibited the State from seeking the death penalty on remand or arguing that Robinson was the highest ranking Gangster Disciple at the meeting preceding the homicide or that he was ranked higher than Phillips.

17.     The Court of Criminal Appeals also held that the Trial Court erred in two other ways: by denying Robinson's motion for a mistrial after the testimony of Nichole Black, and by admitting into evidence the victim's actual skull and a photograph of the victim's body during the guilt/innocence phase of the trial. However, the Court held that it was unnecessary to determine whether either of these errors required reversal, since the Court remanded for a new trial based on other errors. The opinion of the Tennessee Court of Criminal Appeals is not published in the South Western Reporter Third, but can be found at *Robinson v. State* ("*Robinson I*"), No. W2001-01299-CCA-R3-DD, 2003 WL 21946735 (Tenn. Crim. App. Aug. 13, 2003).

18.     The State appealed the judgment of the Tennessee Court of Criminal Appeals on the following grounds: (1) imposition of the death penalty in defendant's case is not

comparatively disproportionate to its imposition in other cases; (2) the State did not present inconsistent theories in the separate trials of the defendant and a co-defendant; (3) the lack of instructions to the jury on facilitation and solicitation was not error; (4) the trial did not abuse its discretion in its evidentiary rulings. Robinson raised all the claims he raised before the Tennessee Court of Criminal Appeals, described in paragraph 15.

19.     The Tennessee Supreme Court reversed the Tennessee Court of Criminal Appeals decision on September 28, 2004, and reinstated Robinson's convictions and death sentence. The opinion of the Tennessee Supreme Court can be found at *State v. Robinson* ("*Robinson II")*, 146 S.W.3d 469 (Tenn. 2004).

20.     Robinson then filed a petition for writ of certiorari in the United States Supreme Court, No. 04-8496. Robinson argued in his petition that certiorari should be granted because (1) a prosecutor's use of inconsistent, contradictory evidence and argument at the trial of Robinson and at the later trial of another defendant raises important questions about the use of such prosecutorial tactics and the Tennessee Supreme Court's decision conflicts with the precedents of the U.S. Supreme Court and appellate courts; (2) the Tennessee Supreme Court's ruling on the Trial Court's aggravating circumstances instruction conflicted with the U.S. Supreme Court's ruling in *Ring v. Arizona*, 536 U.S. 584 (2002); (3) the Tennessee Court's vicarious application of the aggravating circumstance instruction conflicted with the U.S. Supreme Court's decisions in *Lankford v. Idaho*, 500 U.S. 110 (1991) and the line of *Skipper v. South Carolina*, 476 U.S. 1 (1986) and progeny.

21.     The United States Supreme Court denied Robinson's petition for writ of certiorari on February 27, 2006.

22.     On September 27, 2005, while Robinson's direct appeal to the U.S. Supreme Court was pending, Robinson filed a Petition for Relief from Conviction or Sentence (P-C 1 at 1-18), followed by an Amended Petition for Post-Conviction Relief on June 24, 2008 (*id.* at 19-162).

23.     A Supplement to Amended Petition for Post-Conviction Relief was filed on October 20, 2009. (P-C 2 at 167-78.)

24.     On Post-Conviction, Robinson raised the following grounds: (a) the State elicited and failed to correct false testimony of Jarvis Shipp (Supp. Pet. Cl. 1-3); (b) the State failed to produce material required to be disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963), that was not disclosed until post-conviction proceedings (Am. Pet. Cl. 1-3); (c) trial counsel rendered constitutionally ineffective assistance to Robinson during the guilt/innocence phase of his trial because they:

(i)      elicited identification testimony that opened the door to Sergeant Aston's Testimony (Am. Pet. Cl. 26),

(ii)     failed to object to prejudicial vouching by the prosecution for Shipp and James in the closing argument (Am. Pet. Cl. 23),

(iii)    made the unreasonable and uninformed decision to call Officer Parker (Am. Pet. Cl. 4-5),

(iv)     failed to object to the lack of foundation for James and Shipp's testimony ((Am. Pet. Cl. 25, 29),

(v)      failed to object a jury instruction indicating that Robinson's witnesses needed to be corroborated if the jury determined they were accomplices (Am. Pet. Cl. 18),

(vi)    failed to object to an accomplice jury instruction that did not include Shipp (Am. Pet. Cl. 19),

(vii)    failed to object to an accomplice jury instruction that did not include Shaun Washington (Am. Pet. Cl. 20),

(viii)    failed to object to prosecutorial references to Robinson's decision not to testify (Am. Pet. Cl. 22),

(ix)    failed to object to prosecutorial references to prejudicial facts not in evidence (Am. Pet. Cl. 24),

(x)    failed to object to cumulative and prejudicial evidence about the crime scene discovery and victim's body (Am. Pet. Cl. 27),

(xi)    failed to request that Robinson be allowed to sit at the counsel table and failed to challenge the local rule (Am. Pet. Cl. 43-44),

(xii)    failed to adequately prepare Robinson's defense by failing to identify, investigate, and interview possible witnesses (Am. Pet. Cl. 6-8),

(xiii)    failed to adequately prepare to present evidence they had promised the jury about Robinson's claim that he did not flee (Am. Pet. Cl. 31-32);

(d) trial counsel rendered constitutionally ineffective assistance to Robinson because they failed to adequately prepare for Robinson's suppression hearing (Am. Pet. Cl. 9-10); (e) trial counsel rendered constitutionally ineffective assistance to Robinson during jury selection of his trial because they:

(i)    failed to adequately examine and seek to excuse a deputy jailer from the jury (Am. Pet. Cl. 35),

(ii)    failed to conduct constitutionally adequate voir dire (Am. Pet. Cl. 36-38),

(iii)     failed to object to improper jury instructions and information given to the jury during voir dire (Am. Pet. Cl. 39),

(iv)     failed to obtain the use of jury questionnaires or seek the services of a jury consultant (Am. Pet. Cl. 40);

(e) trial counsel rendered constitutionally ineffective assistance to Robinson during the penalty phase of Robinson's trial because they:

(i)     had no rational theory of mitigation (Am. Pet. Cl. 11-12),

(ii)     failed to supervised unqualified mitigation specialists or to prepare an adequate mitigation report (Am. Pet. Cl. 13-15),

(iii)     failed to prepare mitigating witnesses (Am. Pet. Cl. 14),

(iv)     failed to identify the need for and to conduct full neuropsychological testing (Am. Pet. Cl. 16-17),

(v)     failed to object to the prosecution improperly overtaking the role of jury (Am. Pet. Cl. 34);

(f) Robinson's right to counsel was violated because the Trial Court allow trial counsel to continue representing Robinson after a conflict of interest arose (Am. Pet. Cl. 41-42);

(g) Robinson's appellate counsel rendered constitutionally ineffective assistance to Robinson because they:

(i)     failed to challenge the Tennessee Supreme Court's finding that the medical examiner's testimony corroborated Shipp (Am. Pet. Cl. 21),

(ii)     failed to challenge the accomplice instruction that Robinson's witnesses needed to be corroborated if the jury determined they were accomplices (Am. Pet. Cl. 18),

(iii) failed to challenge Trial Court's ruling regarding the admissibility of lack of flight evidence (Am. Pet. Cl. 33),

(iv) failed to challenge the local rule that required court permission for defendants to sit at the table with counsel on appeal (Am. Pet. Cl. 45);

(h) the underrepresentation of women as grand jury forepersons in Shelby County and the failure of counsel to raise that issue (Am. Pet. Cl. 46-48); (i) Tennessee's failure to ensure adequate trial counsel and resources ensured that Robinson would not receive a fair trial (Am. Pet. Cl. 50); (j) the discretion afforded the DA in Tennessee to seek the death penalty is arbitrary and capricious (Am. Pet. Cl. 51); (k) imposition of the death penalty would violate the constitutional right to life (Am. Pet. Cl. 52); (l) imposition of death penalty would violate international law (Am. Pet. Cl. 53-55); (m) lethal injection is cruel and unusual punishment (Am. Pet. Cl. 58); (n) Tennessee's comparative proportionality review is inadequate (Am. Pet. Cl. 56-57); (m) the cumulative effect of the errors rendered Robinson's verdict fundamentally unfair (Am. Pet. Cl. 59).

25. The Post-Conviction Court held evidentiary hearings on November 9, 10, and 12, 2009, and January 25-26, March 9-12, and March 30-31, 2010 (the "Post-Conviction Hearing").

26. The Post-Conviction Court entered an order denying relief on February 25, 2011. (P-C 6 at 908-1031.)

27. On appeal, Robinson raised all the post-conviction issues described in Paragraph 24 and also argued that if the Tennessee Court of Criminal Appeals accepted the Post-Conviction Court's irrational finding that Shipp's November 5 statement was disclosed by the State to Robinson's co-trial counsel, Steffen Schreiner, but that Schreiner had not disclosed the statement to Robinson's lead trial counsel, Joseph Ozment, that Schreiner had rendered ineffective assistance of counsel.

28.     The Tennessee Court of Criminal Appeals affirmed the Post-Conviction Court's denial of relief on March 20, 2013. The opinion of the Court is not published in the South Western Reporter Third, but can be found at *Robinson v. State* ("*Robinson III"*), No. W2011-00967-CCA-R3-PD, 2013 WL 1149761 (Tenn. Crim. App. Mar. 20, 2013).

29.     An Application for Permission to Appeal from the Judgment of the Court of Criminal Appeals was timely made to the Supreme Court of Tennessee on May 20, 2013, No. W2011-00967-CCA-R3-PD. Robinson raised the following grounds in that application: (a) the lower court's ruling on the materiality of Shipp's uncorrected false testimony conflicts with the law established under *Napue v. Illinois*, 360 U.S. 264 (1959); (b) the lower court's rejection of his *Brady* claim was erroneous as a matter of fact and law; (c) the lower court misapplied *Strickland's* prejudice prong and incorrectly found that trial counsel's deficient performance did not prejudice his defense.

30.     On August 14, 2013, the Tennessee Supreme Court denied Robinson's Application for Permission to Appeal the Court of Criminal Appeals' decision.

31.     Robinson then filed a petition for writ of certiorari in the United States Supreme Court on December 20, 2013. Robinson raised the following grounds in the petition: (a) whether, under *Napue v. Illinois*, 360 U.S. 264 (1959), the prosecution's knowing use of false testimony is material when "there is *any* reasonable *likelihood* that the false testimony *could have* affected the judgment of the jury," as this Court has consistently held, or whether there must be "*a* reasonable *probability* . . . that the outcome of the trial *would have* been different," as the Tennessee Court of Criminal Appeals required; (b) whether a witness's false testimony that he received no assurances from the government is *per se* immaterial whenever the witness admits to a unilateral "hope" of favorable treatment; and (c) whether uncorrected false testimony by the prosecution's

key witness denying promises of favorable treatment in return for his testimony is material, where the witness's credibility is central to the prosecution's capital murder theory.

32. The petition for writ of certiorari was denied on April 28, 2014.

33. Other than the two petitions for writs of certiorari in the United States Supreme Court described in paragraphs 20 and 31, *supra*, Robinson has not previously filed any type of petition, application, or motion in a federal court regarding the convictions that he challenges in this petition.

34. Robinson has no remaining mechanisms for asserting his claims in state court and does not have any petition or appeal now pending in any state or federal court for the judgment that he is challenging.

35. Robinson was represented by the following attorneys in the following stages of judgment that he is challenging:

- Pre-trial, trial, and sentencing: Joseph S. Ozment (1448 Madison Avenue, Memphis, Tennessee 38104),Steffen G. Schreiner (369 N. Main Street, Memphis, Tennessee 38103);

- On appeal: Edmund L. Carey, Jr. (401 Bowling Ave, Unit 6, Nashville, TN 37205), Robert C. Brooks (5100 Poplar Ave, Ste 2700, Memphis, Tennessee 38137);

- Post-conviction in the criminal court: Office of the Post-Conviction Defender (530 Church Street, Suite 600, Nashville, TN 37243), Covington & Burling LLP (The New York Times Building, 620 Eighth Avenue, New York, NY 10018);

- Post-conviction on appeal to the Tennessee Court of Criminal Appeals: Covington & Burling LLP (The New York Times Building, 620 Eighth Avenue, New York, NY 10018); Office of the Post-Conviction Defender (530 Church Street, Suite 600, Nashville, TN 37243);

- Post-conviction appeal to the Tennessee Supreme Court: Covington & Burling LLP (The New York Times Building, 620 Eighth Avenue, New York, NY 10018); Donald Dawson (1703 Cedar Lane, Nashville, TN 37212).

# BACKGROUND

36.     This case arises from the kidnapping and murder of Vernon Green on the night of April 30-May 1, 1997. On April 30, two children of members of the "Gangster Disciples" and the "Vice Lords," rival gangs active at the Hurt Village Apartments in Memphis, got into an altercation, which escalated into an altercation involving both Gangster Disciples and Vice Lords. *Robinson II*, 146 S.W.3d at 474. Thereafter, the Gangster Disciples summoned other gang members to a so-called "aid and assist" meeting, resulting in a crowd of dozens of people at the Hurt Village apartment of Natalie, Nichole, and April Black. *Id.* Green was observed standing at the corner of a nearby building, allegedly raising suspicion that he was acting as a lookout for the Vice Lords. *Id.* Gangster Disciples were dispatched to seize Green and bring him forcibly to the apartment, where he was beaten in one of the apartment's bedrooms. Thereafter, six Gangster Disciples drove him by car to Bellevue Park in Memphis, where they shot him to death. *Id.*

37.     Robinson was *not* one of the six men who took Green to Bellevue Park; nor has the State ever contended that he was. At least six defendants other than Robinson were charged and convicted between May 1997 and November 1999 for crimes in connection with the death of Vernon Green. Prentiss Phillips was convicted of first degree murder and especially aggravated kidnapping in October 1999, and was sentenced to life without the possibility of parole. *State v. Phillips*, 76 S.W.3d 1, 2 (Tenn. Crim. App. 2001). Antonio Jackson was convicted of facilitation of murder and especially aggravated kidnapping, and received consecutive 25-year sentences for each conviction. *See State v. Jackson*, 52 S.W.3d 661 (Tenn. Crim. App. 2001). Jarvis Shipp pled guilty to facilitation of murder and of especially aggravated kidnapping and received concurrent sentences of 15 and 12 years, respectively. (*See* P-C 7, Ex. 5.) Kevin Wilkins was convicted of first degree murder (later overturned on appeal) and especially aggravated kidnapping, and was

sentenced to life without the possibility of parole plus 25 years. *See State v. Wilkins*, No. W1999-01462-CCA-MR3-CD, 2000 WL 1229156 at *1 (Tenn. Crim. App. Aug. 18, 2000). Charles Pool and Charlie Golden each pled guilty to conspiracy to commit first degree murder and received sentences of 15 years. (Pool also pled guilty to especially aggravated kidnapping.) (P-C 8, Ex. 8; P-C 8, Ex. 9.)

38.     Of all the defendants charged in connection with Green's death, only Robinson received a death sentence. Robinson was represented at his trial by appointed counsel, Joseph Ozment and Steffen Schreiner. Ozment, the lead attorney, had practiced law for only six years and had never before been the lead attorney in a capital case, and Schreiner, junior co-counsel, had never handled a capital case. (P-C 16 at 9.)

39.     At trial, there was no evidence that Robinson even knew Vernon Green or had met him prior to the night of the murder. No direct physical evidence against Robinson was presented. The State did not contend that Robinson lived in Hurt Village, nor was it even suggested that he had been present at or involved in the altercation that led to the "aid and assist" call. Rather, the prosecution contended that Robinson was a member of the Gangster Disciples from another area of Memphis who had gone to the Black apartment in response to the "aid and assist" call on April 30. The State's theory at trial was that Robinson (1) participated in the seizure and beating of Green after arriving at the Black apartment, (2) served as the gang's "chief of security" for the entire city, and (3) said, "Y'all know what to do," to gang members before Green was taken from the apartment. The State contended that "Y'all know what to do" was an order by Robinson directing the others to kill Green.

15

**GROUNDS SUPPORTING THE PETITION FOR RELIEF**

**FALSE TESTIMONY AND BRADY CLAIMS
CONCERNING SHIPP'S NOVEMBER 5 STATEMENT**

**Ground No. 1:** **The State Violated Gregory Robinson's Constitutional Rights by Eliciting and Failing to Correct Jarvis Shipp's False Testimony Denying That He Had Received Any Promises from the State.**

40.     The State violated Robinson's Fifth and Fourteenth Amendment rights by eliciting and exploiting false testimony from the prosecution's key witness, Jarvis Shipp. Shipp, unlike Robinson, was present at the park where Green was murdered, and faced a potential capital prosecution at the time of Robinson's trial. In response to the prosecutor's explicit question, Shipp falsely denied under oath before the jury that he had received "any promises" in exchange for his testimony. In fact, the prosecutor had only days earlier promised to "take into consideration" "whatever you do to help us get Gregory [Robinson]" in Shipp's own case and had assured Shipp that testifying against Robinson "will" "help [him] save [his] life." The existence of this promise, and the falsity of Shipp's testimony denying it, however, were not proven until post-conviction proceedings in this case, when the 17-page transcript of the prosecutors' closed-door meeting with Shipp on November 5, 1998 (the "November 5 Statement") surfaced for the first time. (P-C 8, Ex 12), attached as Ex. 1.[2]

41.     In *Napue v. Illinois*, 360 U.S. 264 (1959), the U.S. Supreme Court clearly established that the State violates a defendant's due process rights when it "knowingly uses false evidence at trial or, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* at 269. A conviction obtained through the knowing use of false testimony must be

---

[2] For the Court's convenience, certain key documents that support this petition are attached hereto. Where the exhibit is also contained in the record, the citation will be as follows: "Citation, attached as Ex #"

set aside if: (1) a State's witness testified falsely; (2) the State knowingly used such testimony or allowed it to go uncorrected; and (3) the testimony was material. *See Napue*, 360 U.S. at 269-71.

42.     On post-conviction appeal, the Tennessee Court of Criminal Appeals acknowledged both (1) that Shipp testified falsely at Robinson's trial by denying the existence of "any promises" by the State, and (2) that the prosecutor knowingly elicited and failed to correct this false testimony. The Court of Criminal Appeals stated:

> [T]he transcript of the November 5th meeting reflects an assurance from the prosecutor that Mr. Shipp's testimony would "help [him] save [his] life." This assurance was contrary to the testimony of Mr. Shipp that was elicited by the State at trial. The State also argued during closing arguments that Mr. Shipp did not receive a deal in exchange for his testimony.

*Robinson III*, 2013 WL 1149761, at *63 (alterations in original). In short, the Tennessee Court of Criminal Appeals held that Shipp testified falsely and that the State knowingly used the false testimony. Thus, for purposes of this Court's habeas review, the first two prongs of Robinson's claim for relief under *Napue v. Illinois* have already been adjudicated in Robinson's favor.

43.     In a brief paragraph, however, the Tennessee Court of Criminal Appeals rejected Robinson's *Napue* claim on the grounds that Shipp's false testimony was not "material." The sole basis cited for this conclusion was the fact that Robinson's lead trial counsel – though unaware of the existence of the November 5 Statement – managed to get Shipp to admit on cross-examination that he "hoped" the prosecutors would withdraw the death penalty in light of his testimony. *Id.* Without further analysis, the Court of Criminal Appeals stated:

> [W]e cannot conclude that a reasonable probability exists that the outcome of the trial would have been different but for the State's conduct and the use of the challenged testimony.

*Id.*

44.    In the *Napue* context, however, the U.S. Supreme Court has clearly established that false testimony elicited and uncorrected by the State is material, and a new trial must be granted if the testimony "*could . . . in any reasonable likelihood* have affected the judgment of the jury." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, *v. Illinois*, 360 U.S. at 271) (emphasis added). By applying the "reasonable probability" standard quoted above, the Tennessee Court of Criminal Appeals used the wrong materiality standard to Robinson's claim. The court's ruling that the false testimony was not material rested on its application of the wrong legal standard for materiality.

45.    The difference between these standards is not mere semantics. To the contrary, the U.S. Supreme Court has made clear that the precise wording of the *Napue* standard has real substantive import. In *United States v. Agurs*, 427 U.S. 97 (1976), the Court emphasized that the "any reasonable likelihood" standard is much less burdensome for defendants than the "reasonable probability" standard applied here by the Tennessee Court of Criminal Appeals. *Id.* at 104. Indeed, there is "little, if any, difference" between that standard and a requirement that the government, as "the beneficiary of a constitutional error," "*prove beyond a reasonable doubt* that the error complained of did *not* contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967), *reh'g denied*, 386 U.S. 987 (1967) (emphases added). *Cf. United States v. Bagley*, 473 U.S. 667, 680 (1985) (plurality opinion) ("[T]he fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt.").

46.    The Supreme Court has clearly explained why the materiality standard in the *Napue* context is much more stringent (from the State's perspective) than the "reasonable probability" standard. As stated in *Agurs*, the Court has "consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair." 427 U.S. at 103.

Eliciting or failing to correct false testimony is not only gross "prosecutorial misconduct," but is also a fundamental "corruption of the truth-seeking function of the trial process." *Id*. at 103-04.

47.     The Tennessee Court of Criminal Appeals' decision was erroneous even under the "reasonable probability" standard. And under the correct standard – which this Court should apply *de novo* – Shipp's false testimony was plainly material as a matter of law. The only rationale the Tennessee Court of Criminal Appeals provided for its ruling was Shipp's admissions on cross-examination of his "*expectations* of an agreement" and "hope[]" that "the prosecutors would withdraw the death penalty." *Robinson III*, 2013 WL 1149761, at *63. The U.S. Supreme Court explicitly rejected this argument in *Napue*, 360 U.S. at 270. Furthermore, the Tennessee court disregarded other clearly established rulings of the Supreme Court, compelling the conclusion that the prosecution's eliciting and use of Shipp's false testimony against Robinson was material.

48.     The Tennessee court's decision was thus "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under *Napue* and its progeny, Robinson is entitled to a new trial.

A.     **The Prosecution Promised Shipp Consideration for His Testimony and Then Knowingly Elicited Shipp's False Testimony Denying "Any Promises" by the State.**

49.     As described above, the Tennessee Court of Criminal Appeals held on post-conviction appeal in this case that the prosecution at Robinson's trial elicited false testimony from Jarvis Shipp denying that he had received any promises from the State in exchange for his testimony. *Robinson III*, 2013 WL 1149761, at *63. The prosecutors not only failed to correct Shipp's false testimony – as it was their obligation to do – but also sought to exploit that testimony by improperly vouching for its truth in their summations to the jury. They further

compounded the resultant prejudice to Robinson in post-trial motions, by misrepresenting to the trial court in Robinson's case that no such promises had been made, and by failing to mention or reveal the contents of the November 5 Statement, in which their promises to Shipp were memorialized.

50.     The testimony of Jarvis Shipp, who was separately under indictment and faced the death penalty for the murder of Green, was critical to the prosecution's case against Robinson. In particular, Shipp provided the only testimony at trial concerning Robinson's purported rank within the Memphis Gangster Disciples. (Tr. 6 at 256-257.) The prosecution's entire case hinged on the claim that, based on his purported rank, Robinson had the authority to order the Gangster Disciples at the Black apartment to kill Green.

### a)     Shipp's False Testimony at Robinson's Trial

51.     In May 1997, however, Shipp gave a detailed statement (the "May 1997 Statement") to the police, describing his own involvement in the Green murder but failing even to so much as mention Robinson or identify Robinson in a photo spread. Shipp identified several other gang members who had been present at the Black apartment: Kevin Foley ("Kaos"), the Gangster Disciples "Governor" of Memphis; Prentiss Phillips, the highest-ranking gang official for Hurt Village; and the six gang members (including Shipp) who took Green to the park. (P-C 8, Ex. 16, at 3), attached as Ex. 2. Shipp's statement said that Phillips had called the aid and assist meeting, directed Shipp to seize Green, and that Kaos spoke to Phillips on his cell phone. (*Id.* at 3-6.) Shipp, however, "had not once mentioned [Robinson's] name" in the statement. *Robinson III*, 2013 WL 1149761, at *8. Shipp was also presented with multiple photo spreads, from which he identified Prentiss Phillips and several other Gangster Disciples. (P-C 8, Ex. 16 at 7-9), attached as Ex. 2. After he identified Phillips, he said that Phillips was "the say so" who

was "giv[ing] the orders." (*Id.* at 7.) He was shown photo spread GG which contained a picture of Robinson, but Shipp did not point him out. (*Id.* at 9.) The May 1997 Statement was provided by Shipp to police less than one month after the murder took place.

52.     Approximately a year-and-a-half later, on November 5, 1998 – just two weeks before Robinson's trial – Shipp met with State prosecutors and agreed to testify in exchange for a promise by the State to "take into consideration whatever you do to help us get Gregory [Robinson] and Prentiss [Phillips]." (P-C 8, Ex 12), attached as Ex. 1. Assistant District Attorney (ADA) Paula Wulff prepared the November 5 Statement transcribing that meeting, including the following colloquy between Shipp and ADA Missy Branham:

> Branham:     Ok, now, we probably will want you to testify at this thing.
>
> Shipp:       Yes, Mam [sic].
>
> Branham:     Are you up for it?
>
> Shipp:       If it going to help save my life [sic]?
>
> Branham:     *Yeah, it will. I can't make any deals right now but we will certainly take into consideration whatever you do to help us get Gregory [Robinson] and Prentiss [Phillips].*
>
> Shipp:       Thank you.

(*Id.* at 15-16) (emphasis added). As reflected in the November 5 Statement, Shipp also sought protection from other participants in the crime "if I do any time or whatever," reflecting his expectation that he would not face the death penalty (or even a lengthy jail term). (*Id.* at 16.)

53.     The November 5 Statement records an extensive interview in which Shipp, for the first time, implicated Robinson in the events surrounding the murder. Robinson's lead trial counsel, however, never saw this statement until post-conviction proceedings, and was unaware

of this exchange when cross-examining Shipp or at any time during Robinson's trial. *Robinson III*, 2013 WL 1149761, at *60.[3]

54. At trial, Shipp was the prosecution's star witness, testifying that Robinson was present at the Black apartment; that Robinson was the Gangster Disciples' chief of security for the city of Memphis; and that Robinson ranked above Prentiss Phillips. (Tr. 6 at 249, 255-57, 270.)

55. Near the conclusion of the direct examination, ADA Wulff elicited Shipp's express disavowal of "any promises" from the State:

> Q: Okay. You've been very courageous in your testimony. Has everything that you've told the jury today been truthful?
>
> A: Yes, ma'am.
>
> Q: Has the State made any promises regarding your testimony?
>
> A: No, ma'am.

(Tr. 6 at 295.)[4]

56. On cross-examination, Shipp admitted that his testimony contradicted his May 1997 statement, and that he did not know at that time that the State intended to seek the death

---

[3] As explained in Ground No. 2 *infra*, the Tennessee Court of Criminal Appeals' ruling that the November 5 Statement was turned over to the junior lawyer representing Mr. Robinson, and that no one else on the defense received it, is irrational and irreconcilable with the rest of the factual record. There is no evidence whatsoever in the record of trial and direct appeal in Robinson's case that any counsel for Robinson was aware of the existence of the November 5 Statement or its contents. This ruling, however, is irrelevant to Robinson's *Napue* claim (Ground No. 1), because the prosecution had an affirmative duty not to elicit or use false testimony regardless of whether defense counsel had the November 5 Statement.

[4] Shipp also testified falsely during voir dire, before the court but outside the presence of the jury, that no promises had been made regarding his testimony: "Q. And I have explained to you that you're still set for trial February 22nd and the State of Tennessee is still seeking the death penalty against you; is that correct? A. Yes Sir. Q. And at this time there is no other offer, there is no deal or any promises to you regarding your testimony; is that correct? A. Yes Sir." (*Id.* at 228.)

penalty against him. (Tr. 7 at 312.) Even though ADA Branham had promised Shipp consideration for his testimony, when asked if the State "wanted" him to testify against Robinson, he evasively responded, "*[e]vidently*, yes" – as though he could only infer that fact because he was on the stand. (*Id.* at 306-07) (emphasis added). In this colloquy, Shipp never mentioned his November 5 meeting with the prosecutors.

57.     Unaware of the November 5 Statement, Robinson's lead counsel was not able to demonstrate on cross-examination that Shipp's denial of any promises was false. Instead, Shipp again falsely denied that the prosecution made any promises regarding his testimony, and Robinson's counsel was only able to extract an acknowledgment of a "hope" for some benefit:

> Q:     And you feel that if you help them convict Robinson that they might not seek [the] death penalty against you, right?
>
> A:     No, because they still – I still could go to trial and they still [could] get the death penalty.
>
> Q:     But you're hoping that they consider that, correct?
>
> A:     Yes.
>
> Q:     And you're hoping that that consideration will result in you not looking at a death-penalty situation, correct?
>
> A:     Correct.
>
> Q:     So you expect to have a benefit from this?
>
> A:     If it's in the will.
>
>                                        * * *
>
> Q:     Well, you're not up here testifying for your health, are you, sir?
>
> A:     I'm up here testifying to tell the truth on my behalf and on behalf of the victim's family.

(*Id.* at 305-07.)

**The State's Reliance on Shipp's False Testimony and Improper Vouching in Summation to the Jury**

58.     During closing arguments, ADA Wulff improperly vouched for Shipp's purported veracity, asserting to the jury that Shipp "didn't get a deal, *but he told you the truth.*" (Tr. 14 at 18) (emphasis added). Wulff further asserted that Shipp's purpose for testifying was to "help the victim's family" – a claim of noble motive that would have been laughable had the State's explicit promise of consideration been revealed. (*Id.* at 17.) This statement thus compounded the prosecution's concealment of its promises to Shipp.

59.     In her summation to the jury, ADA Branham emphasized the same theme of Shipp's credibility:

> [I]f you know what someone can do, if you know the kind of orders they can give and you know what the consequences are, you make that decision to tell the truth and get up there, you know, maybe we should cut him some slack. We haven't yet, but maybe we should. That took a lot of guts.

(*Id.* at 92.) In fact – as the Tennessee Court of Criminal Appeals held – Shipp did *not* just "tell the truth," and the State *had* "cut [Shipp] some slack" by promising him life-saving consideration in exchange for his testimony.

c)     **The State's Continued Concealment of Its Promises to Shipp During Robinson's Post-Trial Motion for a New Trial and on Direct Appeal.**

60.     The prosecutors' misrepresentation and concealment of the State's promise to Shipp continued after Robinson's trial, in post-trial proceedings on the Motion for a New Trial filed by Robinson's direct appellate counsel. In that motion, Robinson's appellate counsel argued that the State had failed to disclose an agreement between Shipp's counsel, Gerald Skahan, and the State that the State would not seek the death penalty against Shipp in exchange for Shipp's testimony. (Tr. 20 at 72-73.)

61.     During the hearing on Robinson's Motion for a New Trial, ADA Braham made repeated representations to the court denying that any promises had been made to Shipp or his counsel. Branham avowed: "There is no hiding, [t]here is no attempting to keep anything from anybody. It was known to the parties that Jarvis Shipp was going to be a witness. *There were no offers made to him.*" (Tr. 20 at 75) (emphasis added). ADA Braham further represented categorically that "[t]here was nothing to be revealed that could have been revealed that wasn't revealed." (*Id.*)[5]

62.     ADA Branham's statements to the Trial Court were false. During the November 5, 1998 meeting, ADA Branham assured Shipp that his testimony "will" help save his life. She offered to take into consideration whatever Shipp did to help the State get Robinson. Shipp accepted that offer, saying "Thank you."

63.     Moreover, ADA Branham represented to the Court that she repeatedly spoke with Shipp's counsel, but failed to reveal the fact that she had met personally with Shipp (and his counsel) just days before Robinson's trial. It was obvious at this point that none of Robinson's counsel had a copy or were aware of the November 5 Statement, which otherwise would have been front and center in this post-trial proceeding. Yet Branham never mentioned or referred to

---

[5] Skahan's testimony at the post-trial motion hearing must be discounted and, in any event, has no bearing on the falsity of the State's representations and failure to mention or produce the November 5 Statement in this context. As Shipp's counsel, Skahan had no interest in helping Robinson, since a new trial for Robinson would have undermined the value of Shipp's testimony to the State in securing Robinson's conviction, and could have reduced the amount of consideration bestowed on Shipp for his testimony. Skahan had the same incentive as Shipp and his testimony was therefore similarly unhelpful to Robinson: When a promise is "not guaranteed" but "contingent on the Government's satisfaction," that "serve[s] only to strengthen any incentive to testify falsely in order to secure a conviction." *Bagley*, 473 U.S. at 683 (plurality opinion) (citation omitted).

that document or divulged its contents. In denying Robinson's post-trial motion, the Trial Court accepted Branham's factual representations. (Tr. 22 at 4.)

64. On direct appeal, Robinson again raised the argument that there was an undisclosed agreement. Before the Tennessee Supreme Court, the State "concede[d] that a prosecutor clearly deprives a defendant of due process by knowingly using false evidence or argument to obtain a conviction or sentence." 146 S.W.3d at 495 (citing *Giglio*, 405 U.S. at 153-54). But because the November 5 Statement – and the proof it contained of an actual promise of consideration by the prosecution – was not in the record on direct appeal, the Tennessee Supreme Court held: "While Shipp may have *hoped* that his testimony would result in favorable treatment, *the record does not establish that an agreement existed between the State and Shipp* at the time of [Robinson's] trial." *Id.* at 514 (emphases added). Consequently, the court rejected Robinson's appellate claim "[i]n the absence of any proof that an agreement indeed existed at the time of Shipp's testimony at [Robinson's] trial." *Id.* The Supreme Court thus made a clear distinction between "hoping" for something and having an actual promise or agreement with the State: mere "hoping" for a result is different in kind from proof of an agreement with the State.

65. During discovery in Tennessee Post-Conviction proceedings in the fall of 2007, Robinson's Post-Conviction Counsel discovered Shipp's November 5 Statement, and the November 5 Statement became part of the record of Robinson's case for the first time.[6] With the

---

[6] As set forth in Ground No. 2, *infra*, the Tennessee Court of Criminal Appeals' finding that the State provided a copy of the November 5 Statement to the junior co-counsel representing Robinson (who then supposedly failed to tell anyone else about its existence) is (i) not subject to AEDPA deference, and (ii) unreasonable and irreconcilable with the other undisputed facts in the record. Robinson's *Napue* claim, however, does not depend on reversal of the aforementioned finding. To the contrary, there is no dispute that the November 5 Statement was not in the record prior to 2007, and even the Tennessee Courts agreed that Robinson's lead counsel (who cross-examined Shipp) had no knowledge of the November 5 Statement or its contents. The State (continued…)

post-conviction introduction of the November 5 Statement, the proof of the State's actual agreement with Shipp is now in evidence. On the basis of the undisputed record of Robinson's trial and Shipp's November 5 statement, the Tennessee Court of Criminal Appeals acknowledged that the prosecution improperly elicited Shipp's false testimony:

> During the November 5th meeting, the prosecutor told Mr. Shipp that she could not "make any deals right now." However, she also told Shipp that his testimony at petitioner's trial would help save his life and that they would take into consideration his actions in helping them "get" petitioner and Phillips. While no formal agreement between the State and Mr. Shipp existed before he testified, the transcript of the November 5th meeting reflects an assurance from the prosecutor that Mr. Shipp's testimony would "help [him] save [his] life." This assurance was contrary to the testimony of Mr. Shipp that was elicited by the State at trial. The State also argued during closing arguments that Mr. Shipp did not receive a deal in exchange for his testimony.

*Id*. at *63 (alterations in original).

66.      The Tennessee court thus held that (i) the November 5 Statement reflects an actual promise of consideration by the State, and (ii) Shipp's testimony elicited by prosecutors denying "any promises" by the State was false. The prosecutors knew that it was false because only days earlier they had themselves met with Shipp and made him a promise to "certainly take it into consideration whatever you do to help us get Gregory." (P-C 8, Ex 12, at 15-16), attached as Ex. 1. And, knowing the critical importance of Shipp's credibility to their case against Robinson, they used Shipp's false denial by affirming to the jury in closing arguments that Shipp "told you the truth." In fact, as Court of Criminal Appeals has now acknowledged, Shipp lied.

---

deprived Robinson of a fair trial under *Napue* by eliciting and failing to correct Shipp's false testimony in obtaining Robinson's conviction.

**B.    The Tennessee Court of Criminal Appeals Denied Robinson's Claim Based on the Wrong Materiality Standard.**

67.    Despite the post-conviction proof that the State *had agreed* to "certainly take into consideration" Shipp's testimony and elicited and used false testimony by Shipp denying any promises by the State, the Tennessee Court of Criminal Appeals refused Robinson any relief, this time on the grounds that the State's misconduct was not "material."[7]

68.    The court addressed the materiality issue in a single short paragraph:

> Nevertheless, we cannot conclude that the challenged testimony was material and deprived petitioner of a fair trial. Lead counsel's cross-examination of Mr. Shipp regarding his expectations of an agreement with the State based on his trial testimony was extensive. Mr. Shipp admitted that he hoped the prosecutors would withdraw the death penalty based upon his testimony against petitioner. Based upon Mr. Shipp's admissions, we cannot conclude that a reasonable probability exists that the outcome of the trial would have been different but for the State's conduct and the use of the challenged testimony.

*Id*. Thus, the court based its denial of relief solely on the conclusion that, in its words, there was no "reasonable probability" that "the outcome of the trial would have been different" absent the misconduct. However, the Tennessee Criminal Court of Appeals applied the wrong materiality standard to Robinson's *Napue* claim, in violation of clearly established federal law as determined by the Supreme Court.

69.    Under *Napue* and its progeny, a conviction must be set aside "if there is *any* reasonable likelihood that the false testimony *could have* affected the judgment of the jury." *Id.* (emphases added); *accord Giglio v. United States*, 405 U.S. 150, 154 (1972) ("A new trial is

---

[7] Robinson raised his *Napue* claim in the post-conviction trial court prior to the evidentiary hearing on his post-conviction petition for relief. The Post-Conviction Court, however, failed to address this claim in its opinion. On post-conviction appeal, the State conceded, and the Tennessee Court of Criminal Appeals held, that Robinson had properly preserved the issue, notwithstanding the lower court's failure to address it. *Robinson III*, 2013 WL 1149761, at *62.

required if 'the false testimony *could . . . in any reasonable likelihood* have affected the judgment of the jury.'" (quoting *Napue*, *v. Illinois*, 360 U.S. at 271) (emphasis added)).

70.     The Tennessee Court of Criminal Appeals applied a different "reasonable probability" standard, one that applies to a failure to disclose exculpatory evidence under *Brady v. Maryland*, but *not* to a claim under *Napue*. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999) (*Brady* non-disclosure violation material "if there is *a reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding *would have* been different") (quoting *Bagley*, 473 U.S. at 676.). As the Supreme Court made clear in *Agurs*, however, the *Napue* materiality standard is more "strict" (from the government's perspective) than the materiality threshold in an ordinary *Brady* case, and Courts have repeatedly held the same. *Agurs,* 427 U.S. at 104; *Rosencrantz v. Lafler*, 568 F.3d 577, 584 (6th Cir. 2009) ("materiality assessment is less stringent" (for the defense) for *Napue* claims)); *United States v. Alzate*, 47 F.3d 1103, 1109-10 (11th Cir. 1995) ("[a] different and more defense-friendly standard of materiality applies where the prosecutor knowingly used [or failed to correct] … false testimony"); *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) (noting that "courts apply a less demanding materiality standard to *Napue* errors" in favor of defendants); *Adams v. Comm'r of Correction*, 71 A.3d 512, 520 (Conn. 2013) ("[T]he materiality standard [for *Napue* claims] is significantly more favorable to the defendant."); *Conyers v. State*, 790 A.2d 15, 39 (Md. 2002) ("[a] different standard of materiality applies" depending on whether there is perjured testimony).

71.     Indeed, the *Napue* materiality test has been described as "a veritable hair trigger for setting aside the conviction." *United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003); *see also Shih Wei Su v. Filion*, 335 F.3d 119, 126-27 (2d Cir. 2003) (describing relief under *Napue* as

"virtually automatic" once false testimony is established). Here, the Tennessee court failed to acknowledge or cite the applicable case law, and failed to consider whether there was "*any* reasonable likelihood that the false testimony *could have affected* the judgment of the jury" – an inquiry that the Supreme Court and numerous other courts have recognized is significantly less difficult to meet, and therefore more favorable to Robinson. Had the Tennessee Court of Criminal Appeals applied this clearly established standard of materiality under *Napue*, *Giglio*, and their progeny – as this Court must now do – the materiality of Shipp's false testimony elicited by the State would have been inescapable.

      **C.**    **Shipp's False Testimony was Material Under the Correct *Napue* Standard.**

    72.    The Tennessee Court of Criminal Appeals' materiality analysis relied entirely on the observation that Shipp was cross-examined on his "*expectations* of an agreement" and "admitted that he *hoped* the prosecutors would withdraw the death penalty." *Robinson III*, 2013 WL 1149761, at *63. These observations cannot support a conclusion that the Shipp's false testimony was not material. To the contrary, under the correct standard, Shipp's false testimony was material as a matter of law.

    73.    The Tennessee court ignored clearly established law by relying on the mere fact that Robinson's lead trial counsel – lacking knowledge of the November 5 Statement and thus unable to *prove* that Shipp's had lied about the State's promise – tried to cross-examine Shipp on his hope of some benefit from testifying. In *Napue* itself, the Supreme Court held that the prosecutor's undisclosed promise to a witness was material and granted a new trial, even though (i) the defendant's counsel cross-examined the witness extensively about whether he was going to receive consideration for his testimony, and (ii) the witness admitted that he had told the defendant's counsel that he would not testify unless he got consideration for it, and that a public

defender told him that "he was going to do what he could" to get the witness's sentence reduced. 360 U.S. at 269. After trial, it was revealed that, contrary to the witness's denial on the stand, the prosecutor had promised to recommend a reduction of the witness's sentence that would be "if possible effectuated." *Id.* at 266.

74.     In reversing Napue's conviction, the Supreme Court held that "the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner" could not "turn[] what was otherwise a tainted into a fair trial." *Id.* at 270. To the contrary, the fact that a *prosecutor* in particular had promised consideration was crucial because the jury "might well have concluded that [the witness] had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case." *Id.*

75.     Other courts have recognized that, from the perspective of what may affect the jury's deliberations, a promise by the government and a witness's mere unilateral hope of benefits are fundamentally different in kind. For example, the Ninth Circuit has recognized that "evidence of an explicit promise of assistance by the trial prosecutor likely would have carried far greater weight than any speculative benefit [the witness] might have thought he could achieve on his own." *Jackson v. Brown*, 513 F.3d 1057, 1077 (9th Cir. 2008); *see also Douglas v. Workman*, 560 F.3d 1156, 1175 (10th Cir. 2009) ("[A]lthough Mr. Powell's counsel attempted to impeach Smith on the issue of his motive to testify, he was stonewalled by Smith's repeated denials of the existence of a deal, and stymied from rebutting those denials by the State's failure to produce relevant impeaching evidence."); *United States v. Mason*, 293 F.3d 828, 829 (5th Cir. 2002) (rejecting government's argument that agreement was immaterial because witness testified that he "might get leniency or something" for his testimony); *Conyers v. State*, 790 A.2d 15, 40-

41 (Md. 2002) (evidence of agreement material despite "vigorous efforts by [defendant's] lawyers to portray [the witness] as a jailhouse snitch out to get a deal"); *Commonwealth v. Strong*, 761 A.2d 1167, 1180 (Pa. 2000) (Castille, J., concurring) ("Suggesting to the jury that a witness's testimony was influenced by a unilateral hope for mercy is far less effective than concrete evidence that the witness was given an actual assurance of fair treatment and consideration in a case where any such consideration meant the prospect of avoiding a life sentence."); *Commonwealth v. Collins*, 434 N.E.2d 964, 971 (Ma. 1982) (evidence of agreement material even though "[i]t is true that the jury heard Hunt express a hope that he would receive lighter treatment as a result of his testimony").

76.     As noted above, the Tennessee Supreme Court's own opinion on direct appeal in Robinson's case reflects a recognition that a "hope" for some benefit is not the same as an agreement. 146 S.W.3d at 514 (absent agreement with the State, the fact that "Shipp may have *hoped* that his testimony would result in favorable treatment" was immaterial). Once the fact of an actual promise by the State to Shipp was established, however, the Tennessee Court of Criminal Appeals declared that a mere hope was enough to dissolve that distinction. This blatant double standard is at odds with clearly established law.

77.     Other U.S. Court of Appeals decisions since *Napue* confirm the principle that, when a witness's false testimony conceals a prosecutor's actual promise of consideration, cross-examination revealing some interest or expectation on the witness's part cannot render the prosecutor's undisclosed promise immaterial. In *LaCaze v. Warden of Louisiana Correction Institute for Women*, 645 F.3d 728 (5th Cir. 2011), *amended by,* 647 F.3d 1175 (5th Cir. 2011), the Fifth Circuit granted the defendant a new trial based on an undisclosed agreement with a witness to testify in exchange for the State declining to prosecute his son even though cross-

examination revealed that the witness had an agreement with the State to reduced charges against himself in exchange for his testimony. *Id.* at 736. The court held the fact that one agreement was revealed did not render the other immaterial. *Id.* at 736.

78.     Similarly, in *Boone v. Paderick*, 541 F.2d 447 (4th Cir. 1976), the prosecutor's actual undisclosed promise of consideration was held to be material and the defendant was granted a new trial even though the witness acknowledged on cross-examination that a representative of the State told him that "it would be better for [him] to help them" and that the witness had not been arrested or prosecuted in connection with an offense that he freely admitted committing. *Id.* at 449 n.2.

79.     The undisputed record facts here are even more egregious. Shipp not only testified to a mere "hope" of some benefit, but also denied that he had any promises from the State and, in practically the same breath, made self-serving claims that he was testifying for the benefit of the victim's family. Lacking the November 5 Statement, Robinson's lead trial counsel had no concrete evidence to challenge those claims.

80.     In denying Robinson relief, the Tennessee Court of Criminal Appeals also ignored other clearly established law on materiality in the *Napue* context. The U.S. Supreme Court has instructed that the "likely damage" of undisclosed evidence (which includes uncorrected false testimony) is "best understood by taking the word of the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 444 (1995). In *LaCaze*, for example, the Fifth Circuit held that uncorrected false testimony was material, based in part on the fact that "the State here 'capitalized on this misrepresentation in [its] closing argument' by repeatedly arguing that [the witness] had not received a deal that would give him a reason to lie." 645 F.3d at 737 n.1 (quoting *Tassin v. Cain*, 517 F.3d 770, 779 (5th Cir. 2008)).

81.     Here, after eliciting Shipp's false denial of "any promises," both of the prosecutors at Robinson's trial took pains to endorse Shipp's credibility – indeed, as the State Courts found, to improperly vouch for Shipp by falsely assuring the jury that he "didn't get a deal, but he told you the truth." (Tr. 14 at 18.) Branham went even further in her rebuttal summation, lauding Shipp's purported "decision to tell the truth and get up there" and arguing that "maybe [the State] should cut him some slack. We haven't yet, but maybe we should. That took a lot of guts. And it took a lot of nerve." (*Id.* at 92.) The "word of the prosecutor[s]" in this case was unmistakable, and confirms beyond doubt that Shipp's false testimony was material.

82.     The Tennessee Court of Criminal Appeals also ignored that Shipp had a particularly strong incentive to lie because the State's promises to him were "not guaranteed" but "contingent on the Government's satisfaction," which "served only to strengthen any incentive to testify falsely in order to secure a conviction." *Bagley*, 473 U.S. at 683 (plurality opinion); *see also Boone*, 541 F.2d at 451 (overturning defendant's conviction based on false testimony concealing a contingent promise, and holding that the tentativeness of the promise increased its materiality because "the more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor"); *Rickman v. Dutton*, 864 F. Supp. 686, 705 (M.D. Tenn. 1994) ("[A] co-defendant who testifies with only a reasonable expectation or understanding of leniency, but not a formal agreement, has an even more powerful incentive to testify falsely in order to facilitate a conviction and curry favor with a prosecutor.") The State's promises to Shipp were contingent on "whatever you do to help us get [Robinson]," without any warning or reminder that "whatever you do" should be truthful. (P-C 8, Ex. 12 at 15-16), attached as Ex. 1.

83.     As the above-cited authorities make clear, there is also no basis under law for the Tennessee Court of Criminal Appeals' implicit distinction between a "formal agreement"

guaranteeing some measure of leniency and the kind of explicit pretrial promise of consideration that the prosecutors gave Shipp in this case. To the contrary, *Napue* and subsequent cases clearly establish that a contingent promise of consideration provides a more powerful incentive to lie – and thus has, if anything, a *more* material impact on the defendant's trial – than a "done deal." The court's decision ignored that fundamental principle.

> **D.**  **Shipp's False Testimony Was Material Because the Jury Had to Find Him Credible to Return a First-Degree Murder Conviction Under the State's Theory, and the Other Evidence Against Robinson Was Dubious.**

84.  On the above bases alone, Shipp's false testimony at Robinson's trial was material as a matter of law. But it also bears emphasis that the material impact of the State's *Napue* violation was heightened by the crucial nature of Shipp's testimony to the State's first-degree murder theory and the frailty of the State's dubious other evidence against Robinson. This is not a case in which the evidence against the defendant was overwhelming even without the lying witness's testimony. To the contrary, it is undisputed that Robinson was not even at the scene of the homicide. Rather, the prosecution's capital murder theory hinged entirely on its contention that Robinson ordered the killing by implied oral command, and that he had the authority in the gang to give such a command.

85.  Shipp's testimony was critical to the prosecution's effort to link Robinson to Green's murder on the basis of his putative authority in the Gangster Disciples. Shipp was the only witness to testify that Robinson was a high-ranking member of the Gangster Disciples. In finding on direct review that there was sufficient evidence to sustain Robinson's conviction for first-degree murder, the Tennessee Supreme Court relied on Shipp's testimony that Robinson "was a high ranking Gangster Disciple." *Robinson II*, 146 S.W.3d at 507. It further relied on the fact that "the Gangster Disciples was an organization structured according to rank and that orders

given by those of superior rank should be obeyed," thus allowing the crucial inference that the ultimate murderer "carried out the order of [Robinson]." *Id*. at 508.

86. Furthermore, Shipp's credibility was squarely at issue in the trial because he had previously given a different account of the murder – one in which he did not mention Robinson and even failed to point him out in a photo spread. With Robinson's life hinging on the jury's assessment as to which of Shipp's stories to believe, the jurors heard uncontroverted false testimony by Shipp assuring them that the State had not given him "any promises" of consideration for his testimony, and the prosecution used that false denial repeatedly in summation to vouch for Shipp's honesty.

87. The only other witness who testified to Robinson's involvement in the murder was Chris James. James was a highly unreliable witness. He was a relatively new member of the Gangster Disciples who personally knew only one of the 20 to 30 gang members at the Black apartment. (Tr. 5 at 107.) And James admitted that he had even never seen Robinson before the night of the murder. (Tr. 6 at 157-59.) On its face, his identification testimony was highly questionable.

88. Furthermore, during the meeting James was severely beaten on the head by multiple gang members for failing to assist Shipp during the altercation earlier that day. (Tr. 5 at 113-14.) According to Shipp's November 5 Statement (which Robinson's lead counsel never saw), James's "head was really big and his eyes were swollen and his mouth was open. There was a knot on his forehead like this, like boxing" as a result of the beating. (P-C 8, Ex. 12 at 14.), attached as Ex. 1. Indeed, had Robinson's counsel had the November 5 Statement, he could have used that description to impeach James's credibility.

89.     Like Shipp, James gave a statement to the police in May 1997 ("the James Statement") in which he did not mention Robinson. Instead, he ascribed to someone named "Shaun" the actions he would later testify were done by Robinson (P-C 7, Ex. 7.), attached as Ex. 3.[8] On cross-examination, James said that he thought that Robinson's name was Shaun on the night of the murder because Green called Robinson "Shaun." (Tr. 6 at 157-59.) He offered no explanation as to why Robinson would have been called both "Greg" and "Shaun." A far more plausible explanation is that Green *knew* someone named Shaun – not Robinson – was beating him, and begged Shaun to stop.

90.     James's testimony was also marred by several other inconsistencies. For example, he initially testified that Robinson "put a nine [millimeter pistol] in my face" to warn him not to say anything, but later recanted after being confronted with his earlier statement, and admitted that Phillips delivered this threat. (Tr. 5 at 112; Tr. 6 at 155-156.) He testified at trial only that Mr. Robinson hit Green with his fist, and did not mention a broom, although he specifically affirmed in the James Statement that "Shaun" had used a broom and that multiple Gangster Disciples attacked Green. (Tr. 5 at 111; Tr. 6 at 190-92.) James also contradicted his previous account by testifying that Mr. Robinson stayed in the Black apartment after other Gangster Disciples left with Green; in the James Statement he stated that Shaun left with Green. (Tr. 5 at 122); (P-C 7, Ex. 7 at 5), attached as Ex. 3.

91.     James further testified that, while he was being beaten, Robinson went upstairs in the apartment with Green; but in his earlier statement and at the trial of Kevin Wilkins, he testified that two other individuals (not Robinson or "Shaun") had gone upstairs. (Tr. 5 at 114-

---

[8] The James Statement spells Shaun as "Shawn," but the trial transcript refers to "Shaun" at all times.

115; Tr. 6 at 193.) When confronted with the inconsistencies between his current testimony and his testimony at the trial of Wilkins, James had no explanation. Instead, he exclaimed: "Man, that's another trial, man. That's a whole new trial." (Tr. 6 at 193.)

92.     The prosecution conceded in closing argument that James was "not a rocket scientist" and had "difficulty in understanding things." (Tr. 14 at 13-14.) On direct appeal, the Tennessee Supreme Court observed that James was "a rather inarticulate witness who was prone to cryptic responses." *Robinson II*, 146 S.W.3d at 498.

93.     James's testimony was also limited in scope. He was not asked about Robinson's rank in the gang, and he did not attribute any rank to him. *Id.*, 146 S.W.3d at 496.

94.     Given James's deficiencies as a witness, it is unsurprising that the Court of Criminal Appeals did not cite or rely on his testimony in support of its incorrect conclusion that Shipp's false testimony was immaterial. In contrast, the Trial Court referred to Shipp's testimony as "devastating." (Tr. 23 at 113.)

95.     Finally, the testimony of Robinson's counsel during the Post-Conviction Hearing also shows the critical importance of Shipp's false testimony to the trial. Robinson's lead trial counsel, Ozment, testified about Shipp's November 5 Statement: "[i]t offends me that I wasn't given that document, and it offends me that you could think that this cross-examination could not have been a far better cross-examination had I had that document and had a significantly different impact on the jury had I had that document to cross-examine…." (P-C 16 at 80.)

96.     Robinson's co-trial counsel, Schreiner, testified that the defense's "theory with regards to Shipp was him coming in to testify against Robinson was not done as had stated out of concern for the victim's family. That was not true. That was done out of a sincere desire to save

his own life. This transcript confirms that he had already saved his life by the time he testified. We did not know that." (P-C 15 at 289.)

97.     The importance of the false testimony under these circumstances is not changed by Robinson's counsel's *attempt* to cross-examine Shipp on his motive for testifying. Shipp grudgingly admitted that he "hoped" for favorable treatment (not because he had any reason to *expect* such benefits, but simply "if it's in the will," as he fatalistically put it). (Tr. 305-07.) But "the fact that the jury was apprised of other grounds for believing that [Shipp] may have had an interest in testifying against petitioner" did not "turn[] what was otherwise a tainted trial into a fair one." *Napue*, 360 U.S at 270.

98.     Had the jury known that Shipp met with ADAs Wulff and Branham just before Robinson's trial and that they had promised Shipp that his testimony "will" help save his life and that he would earn consideration for "anything he did to get Gregory" – without even warning Shipp that he had to tell the truth – the jury "might well have concluded that [the witness] had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case." *Napue*, 360 U.S. at 270. No court following U.S. Supreme Court precedent could conclude that there was no "reasonable likelihood that the false testimony could have affected the judgment of the jury," or that the State proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," as the U.S. Supreme Court described the false testimony materiality standard in *Chapman*, 386 U.S. at 24.

99.     Accordingly, the Tennessee Court of Criminal Appeals' decision to deny Robinson's request for a new trial was must be overturned, and a new trial must be granted.

**Ground No. 2:** **The State Violated Gregory Robinson's Constitutional Rights Under *Brady v. Maryland* by Withholding Shipp's November 5 Statement.**

100.    The State violated Robinson's due process rights under the Fifth and Fourteenth Amendments by failing to disclose the transcript of Shipp's November 5 Statement to the defense prior to trial. Robinson's trial counsel could have used this favorable evidence to impeach Shipp – a key prosecution witness – for falsely testifying that the State did not make any promises to him in exchange for his testimony, and on the basis of other material revelations contained in the November 5 Statement.

101.    To establish a violation under *Brady v. Maryland*, 373 U.S. 83 (1963), a defendant must show that "[1] the evidence at issue [was] favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence [was] suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). There is prejudice under *Brady* when "there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281.

102.    All three elements of a *Brady* violation are present here. First, the November 5 Statement was plainly favorable to Robinson because it showed that the prosecution had promised Shipp that his testimony would help save his life. Second, the record demonstrates that the State failed to disclose the statement to Robinson's counsel prior to trial. Third, the State's failure to disclose the November 5 Statement was material because Shipp was a critical witness whose testimony was highly dependent on his credibility.

103.    The Tennessee Courts rejected Robinson's *Brady* claim, despite crediting the testimony of Robinson's lead trial counsel, Joseph Ozment, that he had not seen the November 5 Statement at the time of trial. The Tennessee Courts found that the State had disclosed the November 5 Statement to Robinson's other lawyer at the time, Steffen Schreiner, who then failed

to provide the statement to Ozment. In the alternative, the Tennessee Courts held that the November 5 Statement was not material.

104.    Robinson is entitled to a *de novo* adjudication of his *Brady* claim, because the Post-Conviction Court applied a "clear and convincing" burden of proof to the claim, which is higher than the federal standard of preponderance of the evidence. Because the Tennessee Court applied a higher burden of proof, the decision was not "on the merits" and was contrary to established federal law. In the absence of a state court decision on the merits, no deference is due under AEDPA.

105.    In the alternative, the Tennessee Courts' adjudication constituted (1) an "unreasonable determination of the facts" under 28 U.S.C § 2254(d)(2) as to the finding that the State turned over Shipp's November 5 Statement; and (2) an "unreasonable determination of the facts" and/or an "unreasonable application" of the clearly established law of *Brady* and its progeny under 28 U.S.C. § 2254(d)(2) as to the alternative holding of immateriality.

**A.    It Is Undisputed That Shipp's November 5 Statement Constitutes *Brady* Material.**

106.    As explained in Section A of Ground No. 1 above, Shipp's November 5 Statement shows that ADA Branham promised Shipp that his testimony "will" help him save his life. Branham further promised that the State would "certainly take it into consideration whatever you do to help us get Gregory [Robinson]…." (P-C 8, Ex 12, at 15-16), attached as Ex. 1.

107.    The November 5 Statement thus constitutes *Brady* material favorable to Robinson, because it shows that a key prosecution witness had a strong incentive to testify against Robinson. The November 5 Statement also contains numerous other statements by Shipp that Robinson's trial counsel could have used for impeachment and other purposes at trial – if they had known about the Statement's existence.

108. It is firmly established that *Brady* applies to any formal agreement or "less formal, unwritten or tacit agreement[s], so long as the prosecution offers the witness a benefit in exchange for his cooperation." *Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir. 2009) (quoting *Bagley*, 473 U.S. at 678).

109. Accordingly, the State did not contest in post-conviction proceedings that the November 5 Statement was Brady material. Nor did the Post-Conviction Court or the Tennessee Court of Criminal Appeals dispute that *Brady* required the State to turn Shipp's November 5 Statement over to the defense. It has therefore been adjudicated.[9] *See Robinson III*, 2013 WL 1149761, at *60-*61; (P-C 6 at 1018.)

**B.    The Prosecution Failed to Disclose the November 5 Statement to Defense Counsel.**

110. The trial record in this case alone eliminates any plausible basis for doubt that the prosecution in Robinson's case failed to turn over the November 5 Statement, and cagily concealed the existence of the November 5 Statement at multiple points when it became obvious that the defense did not have it. This occurred not only at trial, but also at the post-trial motion stage, when Robinson made a motion for a new trial on the grounds that, *inter alia*, the State had made an undisclosed agreement with Shipp in exchange for his testimony. Throughout the hearing on that motion, ADAs Branham and Wulff made repeated representations in court concerning what had occurred in their pretrial dealings with Shipp. Yet they never mentioned or revealed that a 17-page transcript of their November 5 meeting with Shipp existed, even though

---

[9] Even though defense counsel is not required to request *Brady* material, *see Harris*, 553 F.3d at 1033 ("*Brady* thus applies to relevant evidence… whether the accused asked for it or not."), Robinson's trial counsel did so in this case. The November 5 Statement fell squarely within the scope of two separate requests for *Brady* material filed by Robinson's counsel prior to his trial. (P-C 8, Ex. 24(A)-(B).)

it was obvious that Robinson's trial counsel did not have it and the Statement itself was critically at odds with what the prosecutors had represented.

111.    Had the prosecution revealed the November 5 Statement then, it would have demonstrated beyond dispute – as the Tennessee Courts have now acknowledged and held – that the prosecution had in fact made a promise to "certainly take it into consideration whatever you do to help us get Gregory [Robinson]," and a new trial necessarily would have been granted at that point. Instead, the November 5 Statement never surfaced at any point until Post-Conviction, and the truth that a promise to Shipp had in fact been made remained secret.

112.    The post-conviction record in this case provides still more overwhelming evidence that the State failed to disclose Shipp's November 5 Statement. All of Robinson's counsel at trial and on direct appeal testified at the Post-Conviction Hearing that they had never seen the November 5 Statement while they were representing Robinson. The defense counsel for two other defendants against whom Shipp testified (at separate trials) also affirmed that they had never received or found it.

113.    Furthermore, at Robinson's trial, the State did not disclose or refer to the November 5 Statement when it came time for the State to make a record of all prior Shipp statements that it had provided to defense counsel. To the contrary, ADA Wulff made a point of telling the trial court on the record, in the presence of Robinson's counsel, the State had only one 10-page statement, which plainly referred to the 10-page May 1997 statement by Shipp – not the November 5 Statement.

114.    No reference to the November 5 Statement appears in the record of pretrial, trial, post-trial, or direct appeal proceedings in this case, or in the trial proceedings of the other defendants against whom Shipp testified. This is true even though the question whether the State

had made a pretrial promise to Shipp in exchange for his testimony was a hotly contested issue at both the trial and post-trial motion stages and on direct appeal. It was obvious that defense counsel did not have the November 5 Statement, and the prosecutors had a continuing obligation to produce it. They never did.

115. The only evidence to the contrary is the 2009 testimony at the Post-Conviction Hearing of ADA Paula Wulff, whose responsibility it was in 1998 to disclose the statement. Wulff's long-after-the-fact, self-serving contention that she gave the November 5 Statement to defense attorney Schreiner cannot outweigh the mountain of contemporaneous and post-conviction evidence showing that the November 5 Statement was not disclosed.

116. Robinson's lead trial counsel, Ozment, stated during the Post-Conviction Hearing that he was "100 percent certain in my mind that [Shipp's November 5 Statement] was not given to us at the time of trial." (P-C 16 at 16.) The Post-Conviction Trial Court credited this testimony.

117. Ozment's certainty stemmed from the importance of Shipp's November 5 Statement:

> I guarantee you that even in 1998, even though I had been practicing law six years, had this document been [in possession of trial counsel], Shipp would have been asked about this document. I have never seen it until [post-conviction defense counsel] showed it to me, and I will stand by that whether or not my file is around or not.

(*Id.* at 15-16.)

118. Schreiner, who second-chaired the defense of Robinson, also testified unequivocally that he had not received the November 5 Statement prior to trial. (P-C 15 at 288, 300.) Like Ozment, Schreiner explained that the November 5 Statement would have had an enormous impact on the defense's case, because the document proved defense counsel's theory

that the State had promised Shipp consideration for his testimony: "[I]t is the confirmation of that which we suspected. This seals the deal." (P-C 15 at 288-289.) He further testified:

> If Mr. Ozment had told me that Shipp got a deal, he is singing in order to avoid the death penalty and we got that on tape, there's a transcript of that, I need it for our cross-examination. That would have been a seminal event in the case. . . . [T]his Shipp – this November 5th Shipp statement is very very, highly unusual. Because it contains a done deal prior to trial. And that's big. Very big.

(P-C 15 at 340-341.)

119.    Schreiner also testified that he would not have forgotten about receiving the November 5 Statement, given that it was so close to the trial. (P-C 15 at 295.) He explained:

> A:    [T]his is a capital murder case. This is my first capital murder case and it seems a bit late in the day to be picking up statements of witnesses or co-defendants who are about to be testifying in six days for trial.
>
> Q:    That's something you would read, correct?
>
> A:    Oh, yeah.
>
> Q:    And then once you read it, you wouldn't forget it because of the nature of it.
>
> A:    This statement would have within days made the rounds through the building to every other lawyer who was interested in our case.

(P-C 15 at 341-342.)

120.    The Post-Conviction Court did *not* find that Schreiner's testimony was not credible. Rather, the Post-Conviction Court merely characterized Schreiner's recollection as "not as clear." (P-C 6 at 1021.) But as the above-quoted testimony reflects, this characterization is belied by the emphatic, unqualified testimony that Schreiner gave on this issue. The Tennessee Courts' notion that – despite his own clear testimony – Schreiner received a critical document from Wulff days before trial; stuffed it in his briefcase; and never read it, told anyone about it, or

gave it to anyone, is so speculative and unduly slanted in the State's favor as to be both irrational and unworthy of any deference.

121.    Moreover, on top of the above testimony of Robinson's trial counsel, Robinson's counsel on his motion for a new trial and on direct appeal, Ted Carey and Robert Brooks, also testified at the Post-Conviction Hearing that they had never seen the November 5 Statement while representing Robinson. (P-C 15 at 210, 258-260.)

122.    Carey confirmed that he could "state unequivocally" that the November 5 Statement was not contained in trial counsel's file. (*Id*. at 211.). The reason for his certainty is that he and Brooks had noticed that Shipp's testimony in later trials of Robinson's co-defendants reflected Shipp's understanding that the State was not going to seek the death penalty against him. They were therefore questioning whether there was "something that he testified to in the Robinson trial that changed that or was there something that wasn't disclosed or that was misrepresented at the Robinson trial?" (P-C 15 at 217-18.) Carey and Brooks thoroughly scoured the entirety of the original trial counsel's case file for any document evincing a reason why the death penalty would have been taken off the table. (P-C 15 at 211, 260.) The November 5 Statement was not there.

123.    Over the State's objection, three attorneys for two of Robinson's co-defendants, Antonio Jackson and Prentiss Phillips, were permitted to testify during the post-conviction proceedings as an offer of proof by Robinson. All three attorneys testified that they also had not received the November 5 Statement at the time of their clients' trials, even though Shipp was a key State witness in the prosecution of both co-defendants. (P-C 15 at 268, 273; P-C 16 at 95.) There was no rational basis for the Post-Conviction Court's exclusion of this plainly relevant testimony.

124.     Howard Waggerman, Jackson's trial attorney, and William Johnson, Prentiss Phillips' trial attorney, both reviewed their cross-examinations of Jarvis Shipp and testified unequivocally that, had they had received the November 5 Statement, they would have used that document and the scope of their cross-examinations would have been different. (P-C 15 at 268; P-C 16 at 96.)

125.     The written record corroborates the testimony of all of these witnesses.

126.     First, none of the trial proceedings in the Robinson, Jackson, or Phillips cases contains any reference to the November 5 Statement.

127.     Second, neither the prosecution nor the defense at Robinson's trial made any mention of the November 5 Statement when they jointly made an in-court record of the Shipp *Jencks* material – *i.e.*, prior statements by Shipp – that had been disclosed to the defense.[10]

128.     At the conclusion of ADA Wulff's direct examination of Shipp, Ozment announced for the record: "Your honor, I have *one* 10-page statement of Jencks." (Tr. 6 at 296) (emphasis added). This was a reference to Shipp's May 1997 statement. It is undisputed that ADA Wulff was in the room when Ozment made this announcement. Yet Wulff did not identify the November 5 Statement as additional *Jencks* material that had been disclosed.

129.     To the contrary, ADA Wulff responded by making a representation to the court concerning her disclosure of the same May 1997 statement as *Jencks* material:

> Your honor, I'm about to provide Jencks material to the defense counsel. This would be for a statement made by Jarvis Shipp, and it was made on Tuesday, May 27, 1997, at the conclusion of his direct testimony. It's a 10-page statement. However, it appears that defense counsel already has a copy of this statement.

---

[10] The State has not disputed (and indeed, it is indisputable) that the November 5 Statement qualified as *Jencks* material.

(Tr. 6 at 296.)

130. This exchange leaves no doubt that both sides understood that Robinson's trial counsel had a single prior statement by Shipp: the May 1997 statement. There is no logical explanation for Wulff's failure at this point to provide a copy of the November 5 Statement.

131. At the Post-Conviction Hearing, Ozment confirmed that, if he had been given the November 5 Statement as *Jencks* material, he "would have announced that on the record certainly." (P-C 16 at 15.) Indeed, the very purpose of making a record of *Jencks* material is to eliminate any doubt concerning what has and has not been disclosed. Thus, Ozment's omission of any reference to the November 5 Statement – with Schreiner sitting in the courtroom at the time – demonstrates beyond doubt that Wulff was on notice that the defense did not know about the November 5 Statement. Again, the prosecution was under a continuing obligation to provide this document. The absence of any mention of the November 5 Statement in the context of this *Jencks* exchange – in which Wulff made much of the fact that she was providing a single document *even though Ozment already had a copy of it* – demonstrates that the November 5 Statement was not and had not been disclosed.

132. The transcript of the hearing on Robinson's motion for a new trial further confirms the fact that the November 5 Statement was not disclosed. On this motion, Carey contended on Robinson's behalf that ADA Branham had failed to disclose a pretrial agreement between Shipp and the State. In response, ADA Branham did *not* argue that the State's pre-trial promises to Shipp had been disclosed via the November 5 Statement; instead, she flatly denied that there were any promises: "There were no offers made to him." (Tr. 20 at 75.) As the Tennessee Courts have now held, this statement was false. In fact, Branham had made *at least* an offer of *consideration* in exchange for Shipp's testimony that would "help me save my life."

Shipp accepted that offer on November 5, 1998, before testifying against Robinson. He even said, "Thank you." (P-C 8, Ex. 12 at 15-16), attached as Ex. 1.

133.    At the post-trial motion hearing, Branham went on to argue about a *single* Shipp statement, the May 1997 statement: "[T]he facts which were related by Shipp from the stand were the same as were related in *his statement*." (Tr. 20 at 76) (emphasis added). In response, Carey argued that Shipp had not related the same facts because he had omitted Robinson from "his statement" – plainly referring to the May 1997 Statement (*i.e.*, the statement in which Robinson was not mentioned).

134.    Like Wulff's statements on the record at the time of the *Jencks* exchange, this colloquy – during which both the State and defense referred to a single May 1997 statement in which there was no promise to Shipp – makes sense only if the November 5 Statement had *not* been disclosed. The defense was plainly unaware of it, and ADA Branham failed to mention it.

135.    The only evidence at the Post-Conviction Hearing that the State had disclosed Shipp's November 5 Statement to Robinson's trial counsel was the testimony of ADA Wulff – an attorney who – as the Tennessee Court of Criminal Appeals has now held – have elicited Shipp's false testimony and then improperly vouched for the truth of that false testimony in summation to the jury.

136.    Against this backdrop, Wulff's self-serving post-conviction testimony is totally illogical – at best, a transparent confabulation – and cannot rationally be reconciled with the hard facts of the indisputable record. ADA Wulff assertion that she telephoned Ozment's office when the statement was ready, and that Schreiner then came to the Criminal Court Division 10 to pick it up sometime the week of November 10, 1998 (the week before Robinson's trial started) (*id.* at

43), contradicts the testimony of seven different attorneys (four for Robinson and three for his co-defendants).

137. Wulff's account also flies in the face of the indisputable record, made during Robinson's trial by both the defense and prosecution, that the *only* Shipp-related *Jencks* material disclosed was the May 1997 statement. At the 2009 Post-Conviction Hearing in this case, ADA Wulff's only explanation for the omission of any mention of the November 5 Statement was that "they had been given a copy of it the week before." (P-C 14 at 78.) But the same was true of the May 1997 statement, which Wulff nevertheless made sure to describe on the record. ADA Wulff's conduct at the *Jencks* exchange cannot be logically squared with a prior disclosure of the November 5 Statement.

138. This account also cannot be reconciled with the prosecution's statements concerning a single Shipp statement – and their denial of facts that the November 5 Statement later put the lie to – at the post-trial motion hearing. ADA Branham's representation that there were "no offers made" to Shipp concealed the truth of an actual offer and acceptance of a promise of consideration reflected on the November 5 Statement. It is unreasonable to suppose that the prosecutor would have expected to get away with such a statement if the November 5 Statement had been disclosed. The lack of any reference to the November 5 Statement in response to that representation, or at any time during post-trial motion proceedings, made it obvious to the prosecution that Robinson's then-counsel had no knowledge of its existence.

139. The State is also committing an ongoing *Brady* violation by its failure to turn over the audiotape of its November 5, 1998 meeting with Jarvis Shipp. Based on the transcript that ADA Wulff produced from the tape, there can be no doubt that the audiotape contains material exculpatory evidence. The audiotape should have been disclosed to Robinson's trial counsel in

November 1998 along with the transcript, and post-conviction counsel should have received a copy of the tape when they received access to the District Attorney's files in September 2007. A copy of it should have been maintained in the State's file for Robinson's case, *see State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). Robinson was entitled to receive an audio copy of the tape itself, so that his counsel could review it for material discrepancies between it and the transcript prepared by an interested prosecutor and memorialized in the November 5 Statement. It has still not been produced.

### C.    Shipp's November 5 Statement Was Material.

140.    The November 5 Statement demonstrates that a key prosecution witness had a powerful incentive to lie: the State promised him that his testimony against Robinson "will" help save his life. Combined with the important substantive discrepancies between the November 5 Statement and from Shipp's testimony at Robinson's trial, the statement is material, *i.e.*, there is a "reasonable probability" that the outcome of the trial would have been different if the evidence had been disclosed. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

141.    When assessing materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U. S. at 434; *cf. Smith v. Cain*, __ U.S. __, 132 S. Ct. 627, 630 (2012) (holding that undisclosed *Brady* material containing witness statements of doubt required reversal notwithstanding witness's detailed testimony at trial).

142.    This standard of materiality is met here. As discussed in Ground No. 1 above, Shipp was an important witness; his credibility was a key issue; and the prosecution's promises to him – just days before trial – gave Shipp a powerful incentive to lie. Had the jury been aware

of these promises, at least one member might have rejected his testimony. "[E]vidence of any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility and the jury was entitled to know of it" *Giglio*, 405 U.S. at 155.

143.    The materiality of the November 5 Statement was underscored by Shipp's false testimony that the State did not make any promises to him; the State's deliberate effort to elicit that cleansing (at the time, before its falsity became known); and the prosecution's improper vouching for this testimony in summation to the jury.

144.    It is no answer for the State to contend that the defense was able to cross-examine Shipp about whether he had a deal and was able to elicit an admission that he "hoped" for a deal. The November 5 Statement would have allowed the defense to establish definitively that Shipp already had a deal – a promise of consideration sweetened with an explicit assurance that "anything [he did] to help us get Gregory" "will" help him "save my life" – and was *lying* about the issue. This would have been devastating to Shipp's credibility – and to the prosecution's credibility for eliciting this false testimony. *See* Ground No. 1, *supra*. Shipp's testimony that he "hoped" to get consideration does not render the undisclosed agreement immaterial. *See LaCaze*, 645 F.3d at 736 (finding undisclosed agreement with a witness to testify in exchange for the State declining to prosecute his son material under "reasonable probability standard" even though cross-examination revealed that the witness had an agreement with the State to reduce charges against himself in exchange for his testimony).

145.    The November 5 Statement also contains several inconsistencies with Shipp's trial testimony on key substantive issues. Defense counsel could have used these inconsistencies as powerful impeachment material to undermine the credibility of Shipp's testimony.

146.     First, Shipp changed his testimony on why he failed to identify Robinson in photo spread GG to police shortly after the Green murder. At trial, Shipp claimed that he did not implicate Robinson because he feared that Robinson was not "playing with a full deck" – *i.e.*, it was an intentional omission driven by fear of a dangerous man. (Tr. 7 at 328.) But in the November 5 Statement, Shipp initially stated that he would have identified Robinson if he had seen him, (P-C 8, Ex. 12 at 3), attached as Ex. 1, and later stated "I don't know," (*id* at 5.) Shipp's failure to identify Robinson to the police initially was an important issue at trial. Robinson's trial counsel could have used these inconsistencies – together with the State's promises to Shipp – to demonstrate that Shipp's claimed fear of Robinson was a recently fabricated deception and that, in fact, Shipp did not identify Robinson in 1997 because Robinson was simply not present at the Black apartment on the night of the murder.[11]

147.     Second, the November 5 Statement reflects that Shipp told prosecutors that he was afraid to give statements to the police because he "did not want to give it on" – *i.e.*, incriminate – Antonio Jackson. (P-C 8, Ex.12 at 3), attached as Ex. 1. There is no mention of any fear of Robinson. Defense counsel could therefore have used this to further attack the reliability of Shipp's assertion at trial that he feared Robinson.

148.     Third, the November 5 Statement highlighted Shipp's uncertainty about the purported rank of Robinson within the Gangster Disciples, which was a central issue at trial on which the State proffered no evidence except through Shipp's testimony. Shipp's trial testimony confidently parroted the State's theory that Robinson was above Phillips. (Tr. 6 at 270.) In the

---

[11] Shipp also contradicted himself as to where Robinson lived. In the November 5 Statement, he told prosecutors, "[i]f I am not mistaken he is from Mitchell Heights? They say he has an apartment in Frazier." (*Id.* at 7.) At trial, Shipp testified that Robinson was *from* Frazier, but lived in Mitchell Heights. (Tr. 6 at 249.)

November 5 Statement, however, Shipp stated that Phillips ranked higher in connection with the events at issue because they occurred within Phillips' territory (although Robinson was purported to rank higher in the gang generally). This inconsistency was material because Shipp was the only witness who testified in support of the State's theory at trial that Robinson was a high-ranking Gangster Disciple and therefore had the authority to order Green's murder. *See* Ground No. 1, *supra*.[12] There is a reasonable probability that, if the jury had heard that in fact Shipp believed *Phillips* was the top-ranking gang authority, they would have embraced the theory that the State itself trumpeted at Phillips' subsequent trial: namely, that Phillips alone ordered the murder. *See* Ground No. 18, *infra* (State's unconstitutional use of inconsistent theories at Robinson's and Phillips' trials).

149.    In light of the critical importance of Shipp's testimony and the Sixth Circuit's holding that "[c]onsiderable authority from the Supreme Court and our court indicates that a defendant suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness," *Harris*, 553 F.3d at 1034, Shipp's November 5 Statement was material under *Brady* as a matter of clearly-established federal law. Robinson's conviction therefore must be overturned.[13]

---

[12] The inconsistency is particularly telling because, as the Tennessee Supreme Court discussed on direct appeal, the State deliberately did not use Shipp on its direct case against Phillips at his separate trial – at which the State claimed Phillips was "calling the shots" in the apartment. *Robinson II*, 146 S.W.3d at 496.

[13] As noted above, ADA Branham compounded the prejudice at trial by later concealing the existence of the November 5 Statement from Robinson's post-trial counsel and therefore depriving Robinson of the ability to use the statement in support of his motion for a new trial and on direct appeal.

**D.** **This Court Must Review Robinson's Brady Claim *De Novo*, Because the Tennessee Courts Applied the Wrong Burden of Proof and Their Decisions Were Therefore Not "On the Merits" Under AEDPA.**

150.    AEDPA only requires deference to state court decisions if the habeas claims were "adjudicated on the merits in State court." *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (quoting 28 U.S.C. § 2254(d)).

151.    One circumstance in which a state court's decision is *not* "on the merits" is when the State uses a burden of proof that is higher than the federal standard. *Wilson v. Workman*, 577 F.3d 1284, 1297 (10th Cir. 2009). In that circumstance, the State court has not necessarily decided that the federal standard was not satisfied. *Id.*

152.    In the absence of AEDPA-based deference, the federal standard for proving a constitutional violation in a habeas proceeding is a preponderance of the evidence. *See Weeks v. Jones*, 26 F.3d 1030, 1047 (11th Cir. 1994) (defendant needs to prove his *Brady* claim by a preponderance of the evidence on habeas); *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) ("[I]t is the petitioner's burden to prove his custody is in violation of the Constitution….This burden of proof must be carried by a preponderance of the evidence.") (internal quotation marks and citation omitted); *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006) (petitioners in 28 U.S.C. § 2255 cases must sustain their contentions by a preponderance of the evidence); *Gaines v. Kelly*, 202 F.3d 598, 601 (2d Cir. 2000) ("To obtain habeas relief petitioner must demonstrate by a preponderance of the evidence that his federal constitutional rights were violated."); *Harned v. Henderson*, 588 F.2d 12, 22 (2d Cir. 1978) (applying preponderance standard pre-AEDPA); *Malave v. Smith*, 559 F. Supp. 2d 264, 273 (E.D.N.Y. 2008); *cf.* 28 U.S.C. § 2254(e)(1) (requiring a petitioner to satisfy a "clear and convincing" standard where there was a prior state court adjudication).

153.     In this case, as required by Tennessee law, the Post-Conviction Court required that Robinson "establish the factual allegations contained in his petition *by clear and convincing evidence*." *Robinson III*, 2013 WL 1149761, at *56 (citing Tenn. Code Ann. § 40–30–110(f) (West 2014)) (emphasis added). Under Tennessee law, "[e]vidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence." *Id.* (quoting *Hicks v. State*, 983 S.W.2d 240, 254 (Tenn. Crim. App. 1998)). Since that burden of proof is higher than the federal requirement of a preponderance of the evidence, the State court did not decide whether the federal standard was satisfied, but instead imposed a heavier standard of proof on Robinson, thereby tilting the proof requirement in the State's favor.

154.     The Tennessee Court of Criminal Appeals was not the fact-finder. It "may not reweigh or reevaluate the evidence or substitute our inferences for those drawn by the post-conviction court." Additionally, the "credibility of the witnesses and weight and value to be afforded their testimony are questions to be resolved by the post-conviction court." *Id.*, at *56 (citation omitted). The Tennessee Courts therefore did not adjudicate Robinson's *Brady* claim on the merits.

155.     In the alternative, application of the wrong burden of proof was "contrary to" law, and also results in *de novo* review of the claim. *See Wilson*, 577 F.3d at 1297; *Weeks*, 26 F.3d at 1047.

**E.     Even if the Post-Conviction Court Decision Was "On the Merits," Robinson Is Entitled to Relief Because the Decision Rests on an Unreasonable Determination of the Facts and an Unreasonable Application of the Law.**

156.     The ruling of the Post-Conviction Court that ADA Wulff turned over Shipp's November 5 Statement to Schreiner constituted an unreasonable determination of the facts under AEDPA. The Tennessee Court of Criminal Appeals affirmance of the Post-Conviction Court's

ruling on that issue was not an independent de novo factual finding and therefore suffers from the same defect that infects the Post-Conviction Court's ruling. Furthermore, under AEDPA, the Tennessee Courts' alternative rulings that any failure to disclose the November 5 Statement was immaterial constitute unreasonable applications of clearly established federal law.

157. In finding that the State gave the November 5 Statement to Schreiner (and in speculating based on that finding that Schreiner incompetently failed to read or hand off the document to anyone else for years thereafter), the Post-Conviction Court relied solely on the self-serving testimony of ADA Wulff, while disregarding the contrary testimony of seven other witnesses and flouting the inescapable logical conclusions that the clear written record required.

158. The Post-Conviction Court provided a perfunctory explanation that it "credit[ed] the testimony of Wulff," citing certain details of ADA Wulff's testimony, such as her recollection that Schreiner used a "soft shell brief case." (P-C 6 at 1019-21.) That recollection in particular is patently irrelevant because Wulff could have remembered Schreiner's brief case without having turned over the November 5 Statement. The Post-Conviction Court's reliance on such irrelevant details further highlights the logical infirmity of its finding.

159. Moreover, the Post-Conviction Court found Ozment's testimony "credible as well," even though he testified unequivocally that the November 5 Statement had *not* been disclosed.

160. The Tennessee Court of Criminal Appeals purported to resolve this inconsistency by positing that Wulff turned over the statement to Schreiner, but that Schreiner failed to share the statement with Ozment (or, for that matter, anyone else). *Robinson III*, 2013 WL 1149761, at *60. In support of this conclusion, the Court of Criminal Appeals cited the Post-Conviction Court's finding that Schreiner's testimony was "not as clear." *Id*. As noted above, however, the

record of Schreiner's post-conviction testimony negates any reasonable basis for this characterization of his testimony on the critical question whether he received the November 5 Statement. Schreiner's testimony was in fact "clear" on this critical point: he had never seen the November 5 Statement and he would have acted on it if he had seen it. (P-C 15 at 288-89; P-C 16 at 340-41.)

161.    The Tennessee Courts' putative factual scenario requires the fanciful inference that Schreiner must have taken the November 5 Statement from ADA Wulff but then forgotten about it or never told his senior co-counsel, Ozment, about its existence – and that Schreiner never mentioned or gave the document to anyone else at any time. Such an inference is utterly implausible given the importance of Shipp as a witness and the usefulness of the November 5 Statement to the defense.

162.    Furthermore, this finding confounds the factual record and requires acceptance of the notion that, in other instances when the November 5 Statement should have been produced or at least mentioned, the document was either affirmatively concealed by the State or inexplicably and unjustifiably ignored. The Tennessee Courts' finding of such egregious incompetence by Schreiner cannot explain away all of the other overwhelming evidence of non-disclosure, including (a) the omission of the November 5 Statement from the *Jencks* material identified by the parties on the record; and (b) the fact that none of the attorneys for Robinson's co-defendants ever saw the statement.

163.    The Tennessee Court of Criminal Appeals affirmed the exclusion of evidence that the counsel of Robinson's co-defendants had not received the November 5 Statement was irrelevant, finding that "[t]estimony from counsel of co-defendants…did not have a tendency to make Ms. Wulff's testimony that she personally gave a copy of transcript to co-counsel more or

less probable." *Robinson III*, 2013 WL 1149761, at *61-*62. This is irrational on its face. The fact that the State failed to disclose the November 5 Statement to counsel for two other defendants establishes a clear and meaningful pattern with simple explanatory power: the State either forgot about its existence (and thus failed to disclose it on three separate occasions) or intentionally withheld the document repeatedly as a strategy to protect its ability to obtain multiple defendants' convictions based on Shipp's testimony. In either scenario, a single error or decision explains the failure to disclose on three separate occasions. In contrast, the hypothesis adopted by the Post-Conviction Court – that the State turned it over to Robinson's counsel (who forgot about it or did nothing with it) but then failed to turn it over to counsel for Robinson's co-defendants – is wildly improbable and totally at odds with the indisputable factual record of Robinson's trial, post-trial motions, and direct appeal.

164. The decision of the Tennessee Court to credit ADA Wulff's testimony was also unreasonable because, as the Court of Criminal Appeals found, ADA Wulff elicited Shipp's perjurous denial of "any promises" and then argued for that lie in closing argument at Robinson's trial. *Robinson III*, 2013 WL 1149761, at *63, *68 (recognizing that an agreement *had* occurred between the State and Shipp, despite ADA Wulff's insistence to the contrary in front of the jury).

165. The Tennessee Courts' determination that the State had turned over Shipp's November 5 Statement thus rested entirely on the testimony of an attorney who was effectively found to have suborned perjury. In contrast, the same courts applied a lopsidedly unfavorable presumption of defense counsel incompetence in order to arrive at their logically unsustainable supposition about Schreiner's mind-boggling ineptitude. Because the factual record leaves room for only one logically sustainable conclusion – namely, that the November 5 Statement was not

turned over by the State – the Tennessee Courts' decisions constitute an unreasonable determination of the facts and, pursuant to AEDPA, must be overturned.

166.    In addition, the Tennessee Courts' determination that Shipp's November 5 Statement was not material was an unreasonable application of clearly established federal law. Similar to its ruling on Robinson's *Napue* claim, the Tennessee Court of Criminal Appeals' finding of immateriality was based solely on "lead counsel's extensive cross[-]examination of Shipp at trial regarding his prior statement to police and Shipp's concession that he hoped to save his life by testifying." *Id.* at *61. For the reasons identified in Section C above, the November 5 Statement was material and the state court's holdings to the contrary were unreasonable.

### TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE DURING THE GUILT/INNOCENCE PHASE OF ROBINSON'S TRIAL

**Ground No. 3:     Trial Counsel Rendered Ineffective Assistance By Failing to Use Jarvis Shipp's November 5 Statement to Cross-Examine Him.**

167.    Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland v. Washington*, 466 U.S. 668, 687 (1984) because of trial counsel's failure to use the November 5 Statement during the cross-examination of Jarvis Shipp.

168.    Because the Tennessee Court of Criminal Appeals affirmed the Post-Conviction Court's finding that Schreiner received, but never passed on or mentioned the November 5 Statement, and that Robinson's lead counsel, Ozment, did not know about the November 5 statement, the Tennessee Court of Criminal Appeals concluded that Schreiner rendered deficient performance under *Strickland*, 466 U.S. at 687, in not providing the November 5 Statement to Ozment (or anyone else). But the court nonetheless denied Robinson's ineffective assistance

claim on that ground, based upon its conclusion that the deficiency did not result in any prejudice. *Robinson III*, 2013 WL 1149761, at *69.

169.    This holding, which is based upon an illogical and wildly improbable set of factual premises, constitutes a violation of clearly established law and must be overturned. If Robinson's trial counsel really did what the Tennessee Courts conjured up to explain away the State's failure to disclose the November 5 Statement, then Robinson's conviction cannot stand because he was deprived of his constitutional right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland*.

170.    The U.S. Supreme Court has recognized that the right to counsel encompasses the right to "reasonably effective assistance" – that is, assistance within the range of competence demanded of attorneys in criminal cases. *Strickland*, 466 U.S. at 687. Effective representation of a criminal defendant entails "basic duties" including "a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* at 688. To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate that counsel's performance was deficient and that the deficiency prejudiced the defense. *Id.* at 687. To establish deficiency, the defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 688. To prove prejudice, a defendant must establish a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694.

171.    The Tennessee Court of Criminal Appeals' rulings with respect to Schreiner imply an incompetence and dereliction of basic duties that cannot possibly fall within the range of competence demanded of attorneys in criminal cases. If ADA Wulff provided the statement to Schreiner prior to trial, then he necessarily must have failed to share the statement with Ozment

and somehow contrived to keep it out of trial counsel's files so that neither of Robinson's appellate attorneys would ever see it.

172.     Furthermore, Schreiner was in the courtroom when Ozment declared that he had only the May 1997 Statement and conducted his cross-examination of Shipp without reference to the November 5 Statement. (Tr. 6-7 at 296-323.) Schreiner must have sat silently with knowledge of the November 5 Statement while Shipp testified repeatedly – and falsely – that he had not received "any promises" whatsoever from the prosecution. (Tr. 6-7 at 295, 306-07.) No conceivable legal strategy could explain such failures, which manifestly fall below the minimum standard of competence required of counsel in capital cases.

173.     To this extent, the Tennessee Court of Criminal Appeals agreed. *Robinson III*, 2013 WL 1149761, at *69. Under the Tennessee Court's factual assumptions – which Robinson maintains cannot be squared with logic or reality – Ozment's failure of supervision in allowing his junior co-counsel to make such an egregious error would be no less deficient.

174.     Contrary to the Tennessee Court of Criminal Appeals' ruling, however – and as explained under Grounds Nos. 1 and 2 above – the mere fact that Shipp was cross-examined in some fashion does not alleviate the prejudice stemming from defense counsel's failure to use a critical piece of evidence – the November 5 Statement – that would have exposed Shipp's lies and demonstrated the overweening incentive that the State had provided to testify falsely against Robinson.

175.     The failure to ensure that the November 5 Statement was available and known to Ozment deprived Robinson of a critical source of cross-examination material and proof that the State's key witness had testified falsely, in response to direct questions by the prosecutor, concerning the absence of consideration for his testimony. As explained in Section C of Ground

2 it is clearly established that when the jury is not aware that the government offered consideration for the testimony of a witness that was critical to their case, there is a reasonable probability that it affected the outcome of the trial.

176.    Therefore, the Tennessee Court of Criminal Appeals ruling that Schreiner's failure to share that statement with Ozment is not prejudicial is an unreasonable application of *Strickland,* and Robinson must be granted a new trial.

**Ground No. 4:    Trial Counsel Rendered Ineffective Assistance When They Opened the Door to Sergeant Ashton's Hearsay Testimony About Shaun Washington.**

177.    Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at 687, because his trial counsel opened the door to hearsay testimony.

178.    Robinson's trial counsel torpedoed their own defense theory at trial by inviting and opening the door to damaging hearsay testimony by Police Sergeant William Ashton about *other* non-testifying witnesses' identification of Robinson's photograph during the homicide investigation.

179.    Counsel's error in opening the door to otherwise inadmissible testimony was particularly prejudicial because Robinson's defense theory hinged on the contention that the identifications of Robinson by James and Shipp were false or mistaken, and because the State had introduced no testimony concerning any other identification.

180.    This blunder had no strategic justification and was so inconsistent with the standards of reasonably competent and diligent representation that the Post-Conviction Court found, under the *Strickland* standard, that Robinson's counsel were "ineffective in eliciting this testimony." (P-C 6 at 977.)

181.     Trial counsel's error in opening the door to such damaging testimony constituted ineffective assistance, and violated Robinson's Sixth and Fourteenth Amendment rights to effective counsel. The Tennessee Court's ruling that counsel's deficient performance in this regard was not prejudicial constitutes an unreasonable application of well-established federal law.

## A.     Trial Counsel Elicited Harmful Hearsay Testimony From Sergeant Ashton.

182.     On direct examination by the State, Sergeant Ashton testified regarding James's identification of Robinson in a photo spread (labeled "GG") provided to James during the police investigation of the homicide. (Tr. 7 at 331-39.) Ashton admitted, however, that James had identified Robinson only as "Shaun," never referring to Robinson by his real name. (*Id.* at 338.) The State was prohibited from introducing James's contemporaneous statement, however, because it had failed to produce that document to trial counsel as *Jencks* material when James testified. (Tr. 6 at 180.) There was no testimony or other evidence that James had ever seen Robinson prior to April 30, 1997, much less that James knew him. Moreover, Sergeant Ashton gave no testimony concerning any other identification of Robinson by any other witness.

183.     Even though Robinson's first-line defense theory was that the identifications of Robinson by James and Shipp were false or mistaken, and the State had introduced no testimony concerning any other identification, trial counsel threw open the door to hearsay evidence concerning such identifications by asking Sergeant Ashton on cross-examination if any witness *other than James* had identified Robinson's photograph in photo spread GG. (Tr. 7 at 343-44.) Trial counsel asked that question even though counsel were fully aware of Sergeant Ashton's testimony at a pretrial suppression hearing that, indeed, another witness named Shaun Washington had identified Robinson in the photo spread. (Tr. 4 at 33.)

184. Even when, at trial, Sergeant Ashton expressed some uncertainty as to whether other witnesses had identified Robinson, defense counsel inexplicably asked for a recess so that Ashton could check his records. (Tr. 7 at 344.) On returning to the stand, Sergeant Ashton testified that, in fact, Shaun Washington had identified Robinson in the "GG" photo spread. (*Id.* at 346.)

185. The State capitalized on this hearsay evidence on re-direct examination by eliciting testimony that Washington had identified Robinson as MacGreg and that he was "very sure of himself" when he identified Robinson. (Tr. 7 at 354.)

**B.    The Tennessee Court of Criminal Appeals Misapplied Clearly Established Federal Law Concerning *Strickland*.**

186. The Post-Conviction Court found that trial counsel was deficient in eliciting testimony regarding Washington's identification of Robinson. (P-C 976-77.) The Tennessee Court of Criminal Appeals concluded, however, that trial counsel's decision to elicit Shaun Washington's identification was reasonable because evidence about the large number of people present at the apartment on the night of victim's murder and the large number of witness interviews by the police had already been presented. *Robinson III*, 2013 WL 1149761, at *70. That holding was completely nonsensical, however, since trial counsel could have stopped questioning Ashton after establishing that large number of people were present at the apartment and a lot of people looked at the photo spread. There is no rational argument that trial counsel's additional decision to let the jury know about Washington's identification helped Robinson.

187. It is beyond doubt that, absent trial counsel's failure, the identification of Robinson by a non-testifying witness never would have been presented to the jury. The evidence was rank hearsay and therefore inadmissible. *See Crawford v. Washington*, 541 U.S. 36, 52-53

(2004); Tenn. R. Evid. § 803(1.1). The Tennessee Courts did not dispute that premise. *See Robinson II*, 146 S.W.3d at 493.

188.    To open the door to such evidence is on its face an unreasonable trial strategy that falls well beneath the standard of reasonable competence for capital defense counsel articulated in *Strickland* and subsequent U.S. Supreme Court precedents. *See, e.g., Freeman v. Class*, 95 F.3d 639, 643 (8th Cir. 1996) (defense counsel offering hearsay implicating defendant into evidence is "not a reasonable trial strategy" under *Strickland* and is "almost incredible").

189.    In addition to falling short of *Strickland*'s standards of competence, counsel's failure in allowing this testimony was also prejudicial to Robinson's defense. Hearsay testimony about Washington's identification directly undercut Robinson's contention that Shipp's and James's identifications of him were false or otherwise untrustworthy, and the testimony that Washington had claimed Robinson was "MacGreg" could hardly have been more damaging. Indeed, the State's only evidence linking Robinson to that alias was Shipp's highly suspect assertion. (Tr. 6 at 245.)

190.    Moreover, Robinson's defensive case depended on the jury crediting the multiple defense witnesses who later testified that Robinson in fact was *not* the person known as "MacGreg." (Tr. 7 at 448-50; Tr. 8 at 531-32, 542, 572-74.) Trial counsel's blunder therefore not only increased from two to three the number of witnesses identifying Robinson as present at the Black apartment but also sucker-punched his own defensive case before it had even started.

191.    In post-conviction proceedings, the Post-Conviction Court agreed that trial counsel's behavior with respect to Sergeant Ashton's testimony was both deficient and prejudicial, therefore satisfying both prongs of *Strickland*. (P-C 6 at 976-77.) The court denied

Robinson relief on this ground, however, by declaring that the Ashton testimony was not "overly" prejudicial – as if *some* prejudice is not too much in a death-penalty case. (*Id.*)

192. *Strickland*, of course, contains no standard of "too much" or "just enough" prejudice. 466 U.S. at 694-96. Rather, a court must inquire as to the "totality of the evidence" before the jury, recognizing that a verdict "only weakly supported" by evidence – as when identifications of dubious credibility are the keystone to a guilty verdict – are "more likely to have been affected by errors" than better-supported evidence. *Id.* at 695-96.

193. In this case, trial counsel's introduction of Washington's hearsay identification of Robinson was not an "isolated, trivial" matter. *Id.* It went to the heart of Robinson's defense. Nor was the introduction of the Washington identification an unfortunate but unavoidable result of sound trial strategy on the part of the defense. It was an inexplicably calculated and thought-out effort to introduce an identification that trial counsel should have known, based on testimony at the suppression hearing, would be repeated if the door were opened to it. More to the point, the Washington identification had no conceivable exculpatory purpose, yet trial counsel highlighted it by seeking a recess so that Sergeant Ashton could retrieve his notes.

194. There is, therefore, a probability likelihood that the outcome of Robinson's trial would have been different absent counsel's deficiency, and Robinson is entitled to relief on this ground.

**Ground No. 5:** **Trial Counsel Rendered Ineffective Assistance as a Result of Their Objectively Unreasonable and Uninformed Decision To Call Officer Richard Parker as a Tattoo Expert, Thereby Undercutting Robinson's Misidentification Defense.**

195. Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at

687, because his trial counsel called Officer Richard Parker to the stand even though they knew Officer Parker would testify that Robinson's tattoos might be gang tattoos.

196.   Defense counsel is ineffective if they knowingly elicit harmful opinions or other testimony that undermines their case and if they fail to make a reasonably diligent pretrial investigation so that they can avoid doing so. *See Combs v. Coyle*, 205 F.3d 269, 287-88 (6th Cir. 2000) (citing *Strickland*, 466 U.S. at 691).

197.   In this case, Robinson's trial counsel violated that clearly established precedent. Robinson's counsel called Officer Parker to the stand to testify about Robinson's tattoos even though it he told counsel *before he was called to the stand* that after meeting with prosecution he was going to testify that Robinson's tattoos might be gang-related.

198.   Trial counsel's decision to call Officer Parker even after he told them his testimony would not be favorable to the defense was even more inexplicable because his testimony was unnecessary. The State did not introduce any evidence that Robinson's tattoos were gang-related.

199.   Officer Parker's testimony during the Post-Conviction Hearing revealed that trial counsel had failed to adequately prepare Officer Parker for his trial testimony. He stated that he learned for the first time that he had been subpoenaed to appear in court the day that he testified, and that he did not know the trial concerned a gang-related murder until immediately before he testified.

200.   If Robinson's trial counsel had adequately prepared Officer Parker or made the obvious decision not to call Officer Parker after he told them that his testimony would harm Robinson, they could have avoided the devastating impact that the testimony of Parker – as the defense's own witness – concerning Robinson's tattoos had on Robinson's case.

**A.** **Robinson's Counsel Presented Multiple Witnesses Who Testified That Robinson Was Not a Member of the Gangster Disciples.**

201.    Robinson's primary defense was focused on the argument that Robinson was misidentified and was not a member of the Gangster Disciples.

202.    To support Robinson's misidentification defense at trial, counsel called numerous fact witnesses who testified that (i) Robinson was not a member, let alone a high-ranking officer, of the Gangster Disciples (Tr. 8 at 516, 524, 562, 565, 569); (ii) a person known as "MacGreg" was at the Black apartment on the night of April 30, 1997, and had taken many of the action attributed to Robinson my the prosecution (Tr. 8 at 581; Tr. 7 at 448-49; Tr. 8 at 493, 532, 576-77, 582, 587-88); (iii) Robinson was not the person known as "MacGreg" (Tr. 7 at 448-49; Tr. 8 at 546, 572-74); and (iv) "MacGreg" had a distinctive set of tattoos, including a six-point star in the web of his hand and "to the world blow" on his left arm, and twelve or thirteen gold teeth in his mouth with "a six point star on the gold." (Tr. 7 at 448-50; Tr. 8 at 496-98, 542-43; 572-74.)

203.    Trial counsel had Robinson remove his shirt and display his teeth to the jury, in order to demonstrate that his tattoos and teeth did not match the descriptions provided by these witnesses. (Tr. 8 at 504-07.)

204.    On its direct case, the State never claimed that Robinson's tattoos were gang-related, and there was no evidence in the record suggesting any connection between Robinson's tattoos and the Gangster Disciples.

**B.** **Trial Counsel Called Sergeant Parker as a "Tattoo Expert" Even Though They Knew His Testimony Would Harm Robinson.**

205.    As its last witness, the defense called Officer Richard Parker, an active member of the Gang Task Force of the Memphis Police Department's Organized Crime Unit. (Tr. 9 at 609.) Before testifying, Sergeant Parker met briefly with the prosecution. (Tr. 9 at 613-14.) Following

his conference with the prosecution, Sergeant Parker testified, first describing typical Gangster Disciples tattoos. (*Id*. at 611.) Parker then testified that Robinson's tattoos could be Gangster Disciples tattoos. (*Id*. at 613-14.) The following exchange took place on direct examination:

> Q.    Okay. Now, let me ask this. I'm going to pass these [photographs of Robinson's tattoos] up. I talked to you earlier today about this and you looked at those, right?
>
> A.    Yes, sir, I did.
>
> Q.    And you examined both of those photographs out in the hallway for me on two different occasions, right?
>
> A.    Yes, sir.
>
> Q.    And you also identified those photographs to Ms. Branham and Ms. Wulff, correct?
>
> A.    Yes, sir.
>
> Q.    And the first time you looked at those photographs when I showed them to you you indicated to me that you did not believe those were gang tattoos; is that correct?
>
> A.    Yes, sir, that's correct.
>
> Q.    And then you talked to Ms. Wulff and Ms. Branham, correct?
>
> A.    Yes, sir.
>
> Q.    And then you came to the conclusion that one of those tattoos might have – you're not positive but it might have some gang affiliation?
>
> A.    Yes, sir, it might.
>
> Q.    But you can't say for sure?
>
> A.    No, sir, I can't say for sure. But like I said, it has the inference.

(*Id.* at 613-14.)

206.     This exchange clearly shows that Robinson's counsel knew before he started questioning Officer Parker that Officer Parker had decided based on a conversation with ADA Wulff and Branham to testify that Robinson's tattoos might be related to the Gangster Disciples.

207.     Sergeant Parker went on to explain that one of Robinson's tattoos, which said "Mom," might have been altered from "MMM," which was an acronym for the Gangster Disciples' motto, in order to obscure Robinson's gang affiliation. (*Id.* at 615-16.) He later revealed to the jury that the Gangster Disciples' motto was "money making murder, money, manipulation, and mayhem." (*Id*. at 620.)

208.     On cross-examination, the prosecution compounded the harm inflicted by the above testimony as Officer Parker told the jury that (i) gang members sometimes "hide" or "camouflage" their tattoos in order to disguise their gang affiliations (*id.* at 624); (ii) gang members might attempt to erase or change existing tattoos and that there was evidence that Robinson's tattoo could have been altered (*id.* at 624-29); and (iii) gold teeth worn by gang members could be removed or exchanged for others with a different appearance (*id.* at 630). Further, Officer Parker testified that the current "trend" was for gang members, including higher-ranking gang members, not to have tattoos. (*Id.*) Finally, Officer Parker now confirmed his opinion that several of Robinson's tattoos appeared to be gang-related. (*Id.* at 626-27.)

209.     On re-direct, Sergeant Parker admitted that he was not testifying as "somebody that knows how tattoos are added to or removed or anything" and his comments about Robinson possibly altering his tattoos were "just pure speculation." (*Id.* at 631.) Sergeant Parker confirmed that one of his regular job duties was to testify for the prosecution. (*Id.* at 632.)

210.     After Officer Parker's testimony, Ozment asked for a recess to find an expert in tattoo alteration and removal, to rebut the testimony of Parker – his own witness. (*Id.* at 633-34.)

Having allowed Robinson's defense to be wrecked, trial counsel made a last-ditch attempt to salvage it by claiming that "[t]here's no way I could have anticipated that the State would claim that my client has changed all his teeth and changed his tattoos," (*Id.*) by requesting leave to find and present *another* expert on "tattoo alterations and removal." (Tr. 9 at 638.)

211.    The trial court rejected the request, admonishing Ozment twice that - to the contrary - he "should have been able to anticipate that." (*Id.*) With no other witnesses and no rebuttal to his own expert's adverse testimony, trial counsel thereupon rested Robinson's case. (*Id.* at 642-643.)

212.    The disastrously prejudicial impact of Parker's testimony was highlighted by the State open its summation with the Gangster Disciples' inflammatory motto – "money, manipulation, and murder" – which was revealed for the first time during trial counsel's direct examination of Officer Parker and would not otherwise have been introduced. (Tr. 14 at 9.) In addition, the State relied upon Parker's testimony in its summation to argue that Robinson's tattoos were gang-related. (*Id.* at 25-26.) Ozment compounded the damage by spending part of his closing statement trying to rebut his own witness's testimony. Acknowledging that Officer Parker was "not the optimal witness you might want for a defense," Ozment highlighted the irrationality of calling Parker to testify and thereby shattered his own credibility before the jury:

> I'm sure it would look real good for this officer if he went back to OCU and word got out that, you know, your testimony that these weren't gang tattoos walked this man that we say is a gang member. Yeah, that would look real good with his peers, wouldn't it? That'd look good with his peers. I walked a black gang member, head of the Gangster Disciples of Memphis, Tennessee because I went and supported the defense theory. Yeah, yeah, that would look real good with his peers. That'd look great with the State of Tennessee.

(*Id.* at 32.)

**C.** **At the Post-Conviction Hearing, Officer Parker Testified That He Was Unprepared For His Trial Testimony.**

213. At the Post-Conviction Hearing, Officer Parker testified that, on the date of his trial testimony, he learned for the first time that he had been subpoenaed to appear in court that evening after a full day in the field. (P-C 17 at 11.) Parker arrived at the court around 6 p.m. in field attire, not dressed for court. (*Id.*) Shortly before testifying, Officer Parker had his first contact ever with trial counsel, and still did not even know that he would be testifying as an expert witness. (*Id.* at 11-13.) Officer Parker then briefly looked at photographs of Robinson's tattoos – also for the first time ever – but trial counsel did not provide him with any context in which to review these photos. (*Id.* at 12.) He did not tell Officer Parker that this was a Gangster Disciples or capital murder case, nor did he ask him whether the tattoos could mean anything related to the Gangster Disciples. (*Id.* at 12-13.)

214. Officer Parker further testified that when he met with the prosecution, they informed him that the case involved the Gangster Disciples and allowed him to view the tattoos more closely and in that context. (*Id.* at 13-14.) He did not find out the case was a capital case until after he finished testifying. (*Id.* at 14.) Officer Parker finished his post-conviction testimony by stating that the preparation he received was unusually slapdash: "I was rushed in, like I said, it was in the midst of me, you know, my work hour, and I was out in the field and I was told to proceed down to the court by my supervisor. I wasn't explained as to why I was to, just to go to court." (*Id.*)

215. During the Post-Conviction Hearing, Schreiner, in contrast, testified that he was present "when Ozment was on the phone talking to this officer assuring us that Robinson's tattoos were in no way, shape or form gang related tattoos. I have a memory fragment of, I think,

Mr. Watson even going down to the jail and photographing Robinson because for some reason the image of a Polaroid comes up." (P-C 15 at 316.)

216.     Trial counsel's lack of preparation is further demonstrated by the fact that on Robinson's Motion for New Trial, Robinson's counsel made a proffer of witnesses that trial counsel may have been able to call if the Trial Court had granted a continuance following Officer Parker's testimony. They proffered that the records clerk for Robinson's dentist would have testified that three months before Green's murder, Defendant had six gold crowns installed in his mouth without any letters or designs on them. (Tr. 20 at 26-32.) Counsel also proffered that Jason Owens, an employee of Trilogy, a tattoo and piercing shop, would have testified that he had never seen a cover-up or erasure of a tattoo that was not detectable in some fashion. (*Id.* at 33-36.) This shows that if trial counsel had adequately prepared they certainly would not have called Officer Parker, an active duty police officer to testify in Robinson's defense.

**D.     Counsel's Decision to Call Officer Richard Parker as a Tattoo Expert Despite Knowing He Would Undermine Robinson's Misidentification Defense Constituted Ineffective Assistance Under *Strickland*.**

217.     The Tennessee Court of Criminal Appeals affirmed the Post-Conviction Court's finding that trial counsel sufficiently vetted Officer Parker, based on Schreiner's testimony that Ozment spoke with the Officer on the phone and that both he and Ozment spoke with Officer Parker right before he testified. *Robinson III*, 2013 WL 1149761, at *74.

218.     As explained under Ground No. 2, the Tennessee courts' decisions were not "on the merits" since the Post-Conviction Court required Robinson to prove that his trial counsel did not adequately prepare Officer Parker by clear and convincing evidence, rather than judging that claim on the proper "preponderance of the evidence" standard. Therefore, the Court should not give AEDPA deference to the Tennessee Courts' rulings on this issue.

219.     Robinson's trial counsel had a fundamental duty to avoid eliciting harmful testimony from witnesses at trial. With respect to the defense's own expert witnesses, counsel must conduct a reasonably diligent pretrial investigation of any such witness to avoid eliciting harmful opinions or other testimony at trial. *See Combs v. Coyle*, 205 F.3d 269, 287-88 (6th Cir. 2000) (granting habeas for ineffective assistance when defense called expert witness who undermined defense's case) (citing *Strickland*, 466 U.S. at 691). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S.at 691. An uninformed decision to call an expert witness who then undermines the defense's case constitutes ineffective assistance of counsel. *See Bell v. Miller*, 500 F.3d 149, 156-57 (2d Cir. 2007) (defense counsel's pretrial failure to consult with a medical expert constituted ineffective assistance of counsel).

220.     In *Combs*, 205 F.3d at 288, the Sixth Circuit granted a new trial on ineffective-assistance grounds, based upon defense counsel's presentation of an expert witness whose opinion testimony effectively destroyed the defendant's intoxication defense. The court held that counsel's failure to have questioned the expert regarding his opinion prior to trial was "inexcusable," regardless of whether counsel "should have known or instead actually knew" the expert's opinion. *Id.* Because such expert testimony undercut a significant defense argument at trial, counsel's use of the expert at trial was clearly prejudicial. *Id.* at 290-91.

221.     Here, trial counsel's decision to call Officer Parker was patently unreasonable because the trial transcript leaves no doubt that Ozment knew that Officer Parker's testimony would damage Robinson's defense. Remarkably, Ozment directly elicited the negative testimony by asking: "And then you talked to Ms. Wulff and Ms. Branham, correct?" Parker agreed and Ozment followed up with: "[T]hen you came to the conclusion that one of those tattoos might

have – you're not positive but it might have some gang affiliation?" (Tr. 9 at 613-14.) The only possible explanation for Ozment's question is that he knew that Officer Parker would testify that Robinson's tattoo might be gang-related. Pressing forward with Parker's testimony on the vain hope that the jury would credit only Parker's initial, uninformed response before meeting with prosecutors cannot be passed off as part of a reasonable trial strategy. No reasonably competent counsel would beckon disaster in this manner.

222. Trial counsel was also deficient because, as Officer Parker testified, they did not prepare him at all for his testimony. Ozment's direct examination supports Officer's Parker testimony that he looked at the photographs of Robinson's tattoos for the first time right before he testified. During Ozment's attempt to show the jury that Officer Parker's testimony contradicted what he previously told Ozment, he never stated that Officer Parker looked at the photos before the day he testified even though it would have strongly supported Ozment's point. (Tr. 9 at 613-14.) Even if Schreiner's post-conviction testimony is credited, it is plain that counsel did not conduct a reasonable preparation of Officer Parker or make a strategically informed decision to call him despite what they knew he would say.

223. The irrationally of trial counsel calling an active member of the Memphis Police Department's Organized Crime Unit who they knew would testify that their client had gang tattoos was compounded by the fact that he was an unnecessary witness. The State never claimed that Robinson's tattoos were gang-related, and there was no evidence in the record suggesting any connection between Robinson's tattoos and the Gangster Disciples. (Tr. 9 at 617.)

224. Trial counsel's decision to call Officer Parker caused severe prejudice to Robinson. Parker's testimony destroyed a key element of Robinson's misidentification defense and undermined the credibility of the multiple defense witnesses who testified that Robinson was

not a member of a gang. Parker's testimony that tattoos and gold teeth could be altered offered the jury the only arguably rational explanation for the mismatch between Robinson's tattoos and other witnesses' descriptions of "MacGreg." If not for Parker's testimony, the jury would have heard no evidence whatsoever that could explain that mismatch. There is plainly a reasonable probability that, in the absence of Officer Parker's testimony, the outcome of Robinson's trial would have been different.

225.    Furthermore, the prejudice stemming from trial counsel's reckless decision to call Officer Parker did not stop when his testimony ended. To the contrary, the State began its summation by dramatically reminding the jury of the Gangster Disciples' code – "money making murder, money, manipulation, and mayhem," which Parker's testimony alone introduced into the trial. (Tr. 14 at 9.) Ozment's desperate attempts in his summation to attack the credibility of his own expert witness only exacerbated the harmful impact of the testimony. (Tr. 14 at 30-34, 60, 63-66, 78.)

226.    In light of the above, this Court should conclude that counsel's failure was both objectively unreasonable and prejudicial under *Strickland*, and a new trial should be granted.

**E.      Even if the Tennessee Court Decision Was "On The Merits," Robinson is Entitled to Relief Because the Decision Involved an Unreasonable Determination of the Facts and An Unreasonable Application of the Law.**

227.    The Tennessee Court of Criminal Appeals found that trial counsel was not deficient in "failing to anticipate that Officer Parker would change his testimony following a brief conversation with the prosecutors." *Robinson III*, 2013 WL 1149761, at *75. The Court completely ignored that Ozment did not need to *anticipate* that Officer Parker would change his testimony since there is no doubt from the trial transcript that Ozment knew that Officer Parker was going to testify that Robinson's tattoos might be gang tattoos.

228.    The Tennessee Court of Criminal Appeals' decision to credit the Post-Conviction Court's finding that trial counsel met with Officer Parker before the day of his testimony was also an unreasonable determination of the facts. As discussed in Section D, the trial transcript also unambiguously supports Officer Parker's testimony that he did not look at the pictures of Robinson's tattoos right before his testimony, but the Tennessee court decisions also ignored that when finding that Officer Parker spoke on the phone with Ozment before the day he testified. Additionally, the Post-Conviction Court based its findings on the incorrect factual premise that Officer Parker "even went to the jail to photograph [Mr. Robinson's] tattoos." (P-C 6 at 974.) In fact, trial counsel's investigator – not Officer Parker – took these photographs. (P-C 15 at 316.)

229.    Finally, the Tennessee Court of Criminal Appeals' finding that, even if trial counsel had been deficient in calling Officer Parker to testify, it did not prejudice Robinson because Officer Parker's testimony at most, indicated a mere possibility of an alteration, that he was not an expert on the alteration of tattoos, and that he only changed his mind about whether Robinson's tattoos were gang-related after he met with the prosecution was an unreasonable application of the law. Those quibbles concerning Officer Parker's testimony do not change the fact that Robinson's trial counsel presented Officer Parker as a tattoo expert and then elicited testimony from him that undermined the basis of their defense strategy. *Combs*, 205 F.3d at 290-91.

**Ground No. 6:    Trial Counsel was Ineffective in Failing to Object to the Accomplice Jury Instruction.**

230.    Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at 687, because his trial counsel failed to object to the Trial Court's accomplice jury instruction. (Tr. 15 at 11.)

231.     The Tennessee Court of Criminal Appeals acknowledged on Post-Conviction that Robinson's trial counsel was deficient for failing to object to the Trial Court's accomplice jury instruction, because that instruction was defective in *two* fundamental respects: it included witnesses who testified for the defense and *did not include* Jarvis Shipp who admitted being present at the park where Vernon Green was murdered. The Court of Criminal Appeals thus held that, with respect to this failure by trial counsel, the first prong of *Strickland* – unreasonably deficient performance – had been satisfied. *Robinson III*, 2013 WL 1149761, at *82.

232.     The instruction at Robinson's trial stated:

> In this case it is a question for the jury to determine whether the witnesses, Jarvis Shipp, James Lee White Carradine, Sepecus Triplett or Steve Hardin, was an accomplice in this alleged crime. If you find from the proof that the witness was an accomplice, then the defendant cannot be convicted upon the uncorroborated testimony of this witness. If you find that the witness was not an accomplice, then you will judge the weight to be given to his testimony just as you do that of the other witnesses in the case.

(Tr. 15 at 11.) The Tennessee courts in this case have acknowledged – and it has therefore already been adjudicated for purposes of review here – that the above instruction was legally defective, because (a) Jarvis Shipp was an accomplice as a matter of law, and the jury should have been so instructed, and (b) the other witnesses mentioned in the instruction were defense, *not* prosecution, witnesses, and should not have been included in the instruction at all.

233.     The Court of Criminal Appeals ruling that this grossly defective instruction was not prejudicial disregarded the U.S. Supreme Court's holding in *Cool v. United States*, 409 U.S. 100, 104 (1972)*,* which granted the defendant a new trial on the grounds that an instruction concerning accomplices testifying for the defense improperly lowered the government's burden of proof. The instruction in *Cool* was substantively similar – and arguably less defective – than the unlawful instruction delivered by the Trial Court.

234.	The Court of Criminal Appeals ruling also greatly, and unreasonably, underestimated the importance of Jarvis Shipp to the prosecution's case. As discussed in Ground Nos. 1 and No. 2, Shipp was the only witness who testified that Robinson was a high-ranking Gangster Disciple and therefore had the authority to order Green's murder.

235.	Finally, the instruction was also flawed because it did not include Shaun Washington as an accomplice, even though Sergeant Ashton testified that Washington had identified Robinson and there was a significant amount of evidence that Washington was culpable in Green's murder. The omission of Washington from the instruction was clearly prejudicial since it allowed the jury to assume that Washington's hearsay identification could be credited without corroboration, and it thereby compounded the prejudice inflicted by Sergeant Ashton's testimony.

236.	For these reasons, the Tennessee Court of Criminal Appeals' ruling that trial counsel's failure to object to the admittedly flawed accomplice instruction, ignored clearly established federal law and was an unreasonable application of *Strickland*, 466 U.S. at 687.[14]

---

[14] The Trial Court use of the accomplice instruction was also plain error. "[E]specially in criminal cases," a court may "notice errors to which no exception has been taken" if they are "obvious," or if they "seriously affect the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160 (1936); *see also United States v. Young*, 470 U.S. 1, 15 (1985) (quoting *Atkinson*). The plain-error doctrine may be used to correct "particularly egregious errors" where a "miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 and 163 n. 14 (1982). The use of such a deeply flawed accomplice instruction was an egregious error that seriously undermined the fairness and integrity of Robinson's trial.

**A.  Trial Counsel Was Ineffective in Failing to Object to the Inclusion of Defense Witnesses in the Accomplice Instruction.**

237.  Trial counsel failed to object to the inclusion of James Lee White Carradine, Sepacus Triplett, and Steve Hardin in the accomplice jury instruction even though they testified on behalf of Robinson and therefore should not have been included in the instruction.

238.  The Post-Conviction court held that trial counsel should have objected to the jury instruction (P-C 6 at 986-987), and the Court of Criminal Appeals agreed. *Robinson III*, 2013 WL 1149761, at *82. Nonetheless, both courts below concluded that counsel's error was not prejudicial. (P-C 6 at 986-987); *Robinson III*, 2013 WL 1149761, at *82. The Court of Criminal Appeals held counsel's error was not prejudicial because "the testimony of [Carradine, Hardin, and Triplett] that petitioner was not at the apartment on the night of the murder was corroborated at trial by April Black and Federico Mason." *Robinson III*, 2013 WL 1149761, at *82.

239.  The Criminal Court of Appeals' holding ignores the fact that testimony that Robinson was not present at the Black apartment was not the only matter to which Carradine, Hardin, and Triplett testified. Among other things, Triplett, for instance, testified that Prentiss Phillips was "in charge" (Tr. 8 at 538); Hardin testified that MacGreg was not Robinson and had a "blondish beard (Tr. 574);" Carradine testified that MacGreg was not Robinson and had different gold in his mouth than Robinson and that MacGreg also had tattoos on his neck, body and arms including the word "MacGreg" on his right forearm and the words "to the world blow" on his left arm. (Tr. 7 at 448-49; Tr. 8 at 497-98.) Each of these pieces of evidence was an important part of Robinson's defense that was not corroborated by April Black, Federico Mason, or others.

240.   In light of the lack of corroboration of those key points, the accomplice instruction was clearly prejudicial and the Tennessee Court of Criminal Appeals holding otherwise violated clearly established federal law.

241.   The instruction given by the trial court in Robinson's case is similar to the instruction given in *Cool*, 409 U.S. at 102. In *Cool*, an accomplice testified on behalf of the defendant and offered testimony that exculpated the defendant. The trial court gave the following instruction: "If the testimony carries conviction and you are convinced it is true beyond a reasonable doubt, the jury should give it the same effect as you would to a witness not in any respect implicated in the alleged crime and you are not only justified, but it is your duty, not to throw this testimony out because it comes from a tainted source . . ." *Id.* at 102. The Court reversed the defendant's conviction, holding that the instruction impermissibly interfered with the defendant's Sixth Amendment right to offer exculpatory testimony of an accomplice because it required the jury to make a preliminary determination about the testimony. *Id.* at 104. The Court also held that by "creating an artificial barrier to the consideration of relevant defense testimony," the trial court reduced the government's burden of proof. *Id.*

242.    Given the similarity of those facts to Robinson's case, the Tennessee Court of Criminal Appeals' ruling is an unreasonable application of clearly established law and Robinson must be granted a new trial.

**B.    Trial Counsel Was Ineffective in Failing to Object to the Trial Court's Failure to Include Jarvis Shipp in the Accomplice Instruction.**

243.   On direct appeal, both the Tennessee Court of Criminal Appeals and the Tennessee Supreme Court held that the trial court should have instructed the jury that Jarvis Shipp was an accomplice as a matter of law. *See Robinson I*, 2003 WL 21946735 at *13; *Robinson II*, 146 S.W.3d at 489. The Tennessee Supreme Court, however, found that the issue

was waived because trial counsel had failed to object to the trial court's instruction. *Robinson II*, 146 S.W.3d at 489.

244. The Post-Conviction Court correctly found that trial counsel's performance in failing to object to the jury instruction was constitutionally deficient under the first prong of *Strickland*. (P-C 6 at 987-988.) Nonetheless, the court held that the error was not prejudicial based on the court's view that Shipp's testimony was corroborated by other witnesses. (*Id.*) The Court of Criminal Appeals affirmed on the same ground. *Robinson III*, 2013 WL 1149761, at *82.

245. The court's finding of no prejudice, however, bespeaks a basic misunderstanding as to the nature of the supposed corroboration. Other witnesses at trial corroborated only certain aspects of Shipp's testimony. For instance, although Chris James, like Shipp, identified Robinson as having been present at the Black apartment on the night of the murder, and Dr. Deering's testimony corroborated some of Shipp's description of the murder. Critically, however, no witness corroborated Shipp's testimony regarding Robinson's alleged position in the Gangster Disciples, even though that testimony was a critical element of the State's case.

246. The fact that some of Shipp's testimony was corroborated by others does not alleviate the prejudice resulting from the impact of the flawed instruction on the jury's consideration of the critical evidence as to which Shipp was the sole – highly suspect – proponent. There is no dispute that Robinson did not kill Vernon Green by his own hand and was not present when Vernon Green was actually murdered. Rather, Robinson's conviction hinged on the allegation that he had the authority to *order* the murder; and Shipp was the only source of *any* evidence at trial concerning Robinson's purported position in the Gangster Disciples. Thus, counsel's error in failing to object and allowing uncorroborated testimony regarding Robinson's

rank and position to be credited by the jury without corroboration struck at the heart of the case. There is a reasonable likelihood that, had the jury been correctly instructed concerning Shipp's status as an accomplice, the outcome of Robinson's trial would have been different. The state court failed to recognize this fundamental unfairness, which mandates a new trial.

<p style="text-indent: 2em;">C.     <strong>Trial Counsel Was Ineffective in Failing to Object to the Trial Court's Omission of Shaun Washington From Its Accomplice Instruction.</strong></p>

247.     As discussed above in Ground No. 4, hearsay evidence concerning Shaun Washington's identification of Robinson was introduced as a result of trial counsel's incompetence in cross-examining Sergeant Ashton.

248.     On direct appeal, Robinson contended that Washington's identification should have been treated as accomplice testimony, and Washington should have been named in the trial court's jury instruction on accomplice testimony. *See Robinson II*, 146 S.W.3d at 510. The Tennessee Supreme Court did not reach that issue, but rather held that because trial counsel had failed to request that Washington be included in the trial court's accomplice instruction, the issue was waived on direct appeal. *Id.*

249.     On Post-Conviction, the Tennessee Court of Criminal Appeals ruled that trial counsel was not ineffective in failing to request that Shaun Washington be listed as a potential accomplice in the jury instruction, on the ground that, to be considered an accomplice, it must be possible to indict that person of the offense. *Robinson III*, 2013 WL 1149761, at *81. The trial record negates any such basis for the State court's ruling, however, because, as discussed above, there was ample evidence that Washington was involved in the crime.

250.     In reality, there was substantial evidence in the record that, although he was not prosecuted by the State, Washington played a significant role in connection with Vernon Green's death. On cross-examination, Shipp admitted that he failed to mention Shaun Washington in his

confession given to the police. (See Tr. 7 at 313.) Moreover, Shipp testified at the subsequent trial of Antonio Jackson that Shaun Washington's car was one of two used to transport the group of men (not including Robinson) with Vernon Green from the apartment to Bellevue Park, where the execution took place. (*See* P-C 7, Ex. 3 at 737-38.)

251.   Trial counsel's failure to object was prejudicial. Washington's status as one of only three witnesses identifying Robinson as being present the night of Vernon Green's death means that the jury members in their deliberations may have given considerable weight to the hearsay identification reported through Sergeant Ashton (at counsel's misguided invitation). Washington's identification of Robinson undermined the central theory of his case that he was not present the night of the murder. A reasonable probability therefore exists that the failure to include Washington in the accomplice jury instruction affected the outcome of Robinson's case.

**Ground No. 7:   Trial Counsel Was Ineffective in Failing to Object to Prosecutorial Vouching During Closing Argument.**

252.   Robinson's trial counsel was ineffective under the Sixth and Fourteenth Amendments and *Strickland*, by failing to raise any objection to the prosecution's improper vouching for Shipp and James in summation to the jury.

253.   In her summation to the jury, ADA Wulff asserted that Chris James was "an honest man" who "was merely telling [you] the truth [about] what happened to him." (Tr. 14 at 13-14.) Despite her knowledge that Shipp had lied on the stand by denying any "promises" for his testimony, ADA Wulff also vouched for Shipp's character, reiterating and attempting to validate his testimony that he was testifying "to help the victim's family." (*Id.* at 17.) She went on to aver that "[Shipp] didn't get a deal, but *he told you the truth*." (*Id.* at 18) (emphasis added).

254.     During the prosecution's rebuttal argument on summation, ADA Branham exacerbated Wulff's vouching with more of her own. She continued to vouch for the truth of Shipp's testimony and emphasized that he did not have an agreement with the State:

> [I]f you know what someone can do, if you know the kind of orders they can give and you know what the consequences are, you make that decision to tell the truth and get up there, you know, maybe we should cut him some slack. We haven't yet, but maybe we should. That took a lot of guts. And it took a lot of nerve.

(*Id.* at 92.)

255.     On direct appeal, the Tennessee Supreme Court held that trial counsel waived the issue of the prosecution's vouching for Shipp and James by failing to object. *Robinson II*, 146 S.W.3d at 518.

256.     Since the prosecution's repeated assertions that Shipp and James were telling the truth were manifestly improper statements of personal opinion, the Post-Conviction Court agreed with Robinson by finding that trial counsel was indeed deficient for failing to object to the State's repeated vouching. (P-C 6 at 991.) But the Post-Conviction Court ruled that the error was not prejudicial to Robinson. (*Id.* at 991-92.)

257.     On post-conviction appeal, the Tennessee Court of Criminal Appeals held that trial counsel's decision not to object was not deficient because it could have been a tactical decision, and that even if trial counsel's performance was deficient in this respect, such deficiency did not result in prejudice. *Robinson III*, 2013 WL 1149761, at *79.

258.     Tennessee law prohibits vouching for a witness because "[e]xpressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." *State v. Henley*, 774 S.W.2d 908, 911

(Tenn. 1989); *see Judge v. State*, 539 S.W.2d 340, 343-346 (Tenn. Crim. App. 1976) (reversing conviction based on prosecutor's improper statement regarding his personal opinion during closing arguments). A prosecutor cannot tell the jury that she believes a witness is telling the truth. *See State v. Tarter*, No. E2005-01013-CCA-R3-CD, 2006 WL 568158, at *6 (Tenn. Crim. App. Mar. 8, 2006) ("the prosecutor's statement that [the witness] told the truth amounted to improper vouching.")

259.    In light of the above-cited Tennessee authorities, there is no doubt that if Robinson's counsel had objected to the State's repeated vouching for Shipp and James, the trial court as a matter of law *must* have (and therefore presumptively *would* have) sustained their objection.

260.    Trial counsel's failure to object could not have been the product of an informed tactical *decision*, because at the time of Robinson's trial, trial counsel was not aware that contrary to the prosecutors' statements, Shipp did get a deal to testify and therefore had a motive other than to help the victim's family. In any event – given the grave risk of prejudice that vouching presents – there is no rational justification for counsel's passivity in the face of the prosecution's blatant vouching for the testimony of the two most critical witnesses against Robinson at trial.

261.    Indeed, it is clearly established law that the prosecution's vouching for its witnesses can greatly prejudice the jury. *See Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005) (quoting *United States v. Young*, 470 US. 1, 18-19 (1985) (granting writ of habeas corpus for new penalty phase hearing and holding that "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence"). *See also Floyd v. Meachum*, 907 F.2d 347, 354 (2d

Cir. 1990) (granting writ of habeas corpus because prosecution's voucher for witness's credibility "invited the jury to view its verdict as a vindication of the prosecutor's integrity rather than as an assessment of guilt or innocence based upon evidence presented at trial").

262.    The Tennessee courts' refusal to acknowledge the prejudicial impact of the prosecutors' vouching constitutes an unreasonable application of *Strickland*. Shipp and James were the only witnesses for the State who were in Blacks' apartment on the night of the murder. Shipp's and James' credibility and reliability were highly suspect, and the State's proof depended on the jury's acceptance of those two witnesses' testimony as fact. James had been beaten on the head on the night of April 30, and his testimony was confused and inconsistent. Shipp had radically changed his previous account of events on the eve of Robinson's trial and was an admitted accomplice in the murder of Green. Knowing that there was ample reason for the jury to question Shipp's and James's testimony, both Wulff and Branham improperly sought to buttress their testimony with their own credibility as prosecutors and officers of the State.

263.    Additionally, as discussed in Ground No. 1, the State's vouching for Shipp constituted deliberate prosecutorial misconduct by ADA's Wulff and Branham. The prosecutors knew that they had made Shipp a promise of consideration in exchange for his testimony, which would "help him save [his] life." They *had* in fact "cut him some slack," yet they falsely told the jury that Shipp's testimony was "the truth" even though – as the Tennessee Court of Criminal Appeals' post-conviction ruling has confirmed – Shipp lied by denying that he had received "any promises" from the prosecutors for his testimony.

264.    If this Court were to endorse the Tennessee court's conclusory holding that the improper prosecutorial vouching was not prejudicial here, it would effectively gut the content of the clearly established law recognizing the prejudicial impact of vouching. The circumstances of

this case present a clear instance in which the prejudice standard of *Strickland* has been met, and this Court should therefore grant Robinson relief.[15]

**Ground No. 8:** **Trial Counsel Was Ineffective in Failing to Identify, Investigate, and Interview Possible Witnesses.**

265.    Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and *Strickland*, 466 U.S. at 687, because his trial counsel also failed to identify, investigate, and interview witnesses who would have testified that Robinson's co-defendant Prentiss Phillips had a deep-seated personal motive to murder the victim, Vernon Green. As the Tennessee Supreme Court held, the head of the Memphis Gangster Disciples (known as "Kaos") told Phillips and Shipp before leaving the Nichole Black apartment that "what y'all do now is *personal*." *Robinson II*, 146 S.W.3d at 497. Robinson did not know Vernon Green, and Kaos had declared that Green's fate was *not* dictated by gang-related concerns. Only Phillips knew Green and had a long-standing personal animus against him.

266.    The U.S. Supreme Court held in *Strickland* that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691.

267.    Failing to comply with this obligation, Robinson's trial counsel relied almost exclusively on an investigator, whom they did not adequately supervise, to locate and interview witnesses. As a consequence of this failure, counsel never located or interviewed multiple witnesses who could have been found with even modest effort, and who would have testified that

_____

[15] The prosecution's vouching was also plain error. The prosecution's repeated vouching for the honesty of the only two prosecution witnesses who testified that Robinson was at the apartment and statement that Shipp did not get consideration from the State even though he did was an egregious error that seriously undermined the fairness and integrity of Robinson's trial.

another defendant, Prentiss Phillips, had had confrontations with Green over a girl prior to the murder night, and that Phillips personally wanted Green dead. Testimony regarding Phillips' motive would have buttressed the other evidence that Phillips, not Robinson, alone gave the order to murder Green. Indeed, the State itself aggressively contended as much at Phillips' subsequent trial, claiming that Phillips was solely responsible for ordering the murder. *See* Ground No. 18, below.

268. Robinson's trial counsel, however, failed to investigate and find that evidence, and they were consequently unprepared to present this highly probative witness testimony at their client's trial. The failure to present this evidence could not have been the result of a strategic decision, because it was entirely consistent with the defense theory that trial counsel themselves half-heartedly promised, but failed to support with any evidence, at Robinson's trial. To the contrary, it was a gross dereliction of trial counsel's basic obligation to investigate and prepare Robinson's defense. Their failure to conduct the reasonable investigation that would have led to these witnesses and other evidence was both deficient and prejudicial under *Strickland*.

A. **Robinson's Trial Counsel Abdicated Their Duties by Relying Almost Exclusively on a Non-Lawyer Investigator to Investigate the Case and Interview Possible Witnesses.**

269. As the trial transcript itself reveals, Robinson's trial counsel relied almost exclusively on a private investigator to identify, locate, and interview witnesses, while providing the investigator with little or no direction. Trial counsel never even spoke to these witnesses until the midst of trial – and then only for a few minutes each in the hallway outside the courtroom.

270. Following the State's proof, trial counsel Ozment asked for a "fifteen or twenty minute – maybe thirty minute recess" for him to interview eight defense witnesses. (Tr. 7 at 437-

38.) Ozment revealed to the court that, while his private investigator had rounded up these witnesses, neither Ozment nor his co-counsel, Schreiner, had ever spoken with any of them. (*Id.*)

271. After a few minutes' recess, Mr. Robinson's counsel proceeded to present the entire defensive case over the course of less than a single day. (Tr. 7 at 441-642.) In testimony at the Post-Conviction Hearing, Ozment admitted that he relied on the investigator and did not even try to interview all the State's witnesses or the victim's friends and family. (P-C 16 at 25-26, 35-39.) Schreiner admitted that he never went "with [the investigator] on any part of his investigation" or "interview or prepare witnesses with him." (P-C 15 at 299.) Trial counsel also relied heavily on the investigator to communicate with Robinson.

### B. Trial Counsel Knew About, But Failed to Develop or Present at Trial, Compelling Evidence in Support of Robinson's Defense That Prentiss Phillips Alone Gave the Order to Kill Green.

272. At Robinson's trial, the prosecution contended that Robinson was the "ranking" officer of the Gangster Disciples at the Black apartment and that he ordered Vernon Green's killing because Green was a suspected spy for a rival gang. (*See e.g.,* Tr. 14 at 2-6, 15-17, 91.) Trial counsel did not ignore this prosecution theory and rely solely on the defense that Robinson was not present at the Black apartment at all. Rather, in his opening statement, Ozment told the jury that the evidence would show that Prentiss Phillips, not Robinson, was in charge of the meeting that night:

> In fact, I believe what the proof is going to show is that most of the orders – even if this were the man, that this man was not in charge because I think the proof from the State's own witnesses are going to ultimately show that the person in charge of this Gangster Disciple meeting was a man by the name of Prentiss Phillips. And I think you're going to hear that Prentiss Phillips gave the orders in relation to this, that Prentiss Phillips gave orders and picked six to take this man out.

(*Id.* at 8-9.) Similarly, during the motion for judgment of acquittal, trial counsel argued that Phillips, not Robinson, ordered the kidnapping of Green. (Tr. 7 at 433.)

273.    Thus, trial counsel did *not* make a strategic decision to disregard the State's proof on this issue. Rather, they contended that Phillips alone was responsible for ordering Green's murder, but failed to investigate, develop, or present evidence to suppress that contention.

274.    Trial counsel was aware even before Robinson's trial that compelling evidence of Phillips' exclusive responsibility for the murder was available to them. On April 27, 1998 –over six months before Robinson's trial began – Charles Pool stated under oath during his guilty plea that he had learned that Green was killed because of a personal grudge between Phillips and Green, revolving around a dispute over a girl. (P-C 8, Ex. 8 at 38-39.) Shortly thereafter, on May 18, 1998, Charles Golden similarly affirmed during *his* sworn guilty plea that, while in jail, he had learned that Phillips had Green murdered because of a girl, but had made it look like it was gang related. (P-C 8, Ex. 9 at 24-25.)

275.    At the Post-Conviction Hearing, both of Robinson's trial counsel acknowledged that they had reviewed transcripts from the guilty pleas of Pool and Golden at the time. (P-C 16 at 34-35; P-C 15 at 303.)

276.    Trial counsel also had access to other facts directly identify Phillips as the person who ordered Green's murder. In a statement given to police two days after Green's death, Denise Hurt, a friend of Green, averred that Phillips was "a leader" of the Gangster Disciples and that Phillips himself told her that "he had one of his G's [Gangster Disciples] to do it." (P-C 8, Ex. 19 at 1.) Hurt also told police that at one point Phillips had threatened to kill her. (*Id.*) At the Post-Conviction Hearing, lead counsel Ozment stated that Hurt's police statement looked familiar, but could not remember if he or the investigator even spoke with her. (P-C 16 at 38.)

**C.** **Trial Counsel Failed to Interview Multiple Witnesses Who Would Have Testified That Prentiss Phillips Threatened to Kill and Had a Motive to Kill Vernon Green.**

277. Had trial counsel taken reasonable steps to follow up on known information or pursue readily available leads, they would have obtained even more compelling evidence that Phillips had a jealous rivalry with Vernon Green, and had even expressly threatened to kill Green before – including on the night immediately preceding Green's murder. At the Post-Conviction Hearing, Jeffery Chambers, a co-worker of Green's at the United Methodist daycare center, testified that prior to the murder Phillips and Green argued every time they were around each other. (P-C 14 at 121.) Chambers said that Green used to "check" Phillips all the time, explaining that "checking" meant talking about someone's "body, how they look, their clothes." (*Id.*) None of Robinson's attorneys or their investigators ever spoke with Chambers. (*Id.* at 122.)

278. Denise Hurt (also known as "Niseyann"), who had given the police statement inculpating Phillips, testified at the Post-Conviction Hearing that she was a close friend of Green's, but that before Green's murder Phillips had become obsessed with her and "didn't want nobody to like be around me or nothing like that." (*Id.* at 125, 128.) Hurt further testified that, on the night before the murder, "Prentiss told me and [another friend] if we does not leave Vernon alone, *he was going to kill us.*" (*Id.* at 129) (emphasis added). They rebuffed Phillips, telling him that "we're not fixing to stop being friends with Vernon" and then going to a night club with Green despite Phillips' threat. (*Id.*) Two days later – on the day following Green's murder – Phillips bragged to Hurt that "him and his G's took [Green] to this park . . . and did what they was supposed to did to him." (*Id.* at 130.)

279.    Hurt testified that she spoke to the police on the day of Green's murder, but that nobody else spoke to her about the case after that, even though she was in Memphis the entire time. (*Id.* at 132.)

280.    Randy Rodgers also testified at the Post-Conviction Hearing, stating that he was Green's best friend and had two children with Phillips' sister. (*Id.* at 135.) He said that Phillips was at odds with Green because of Hurt. (*Id.* at 136 (referring to Hurt as "Niseyann").) A week before Green's murder, Rodgers was throwing a football with Green and saw and heard Phillips shout at Green, "[B]oy, I'm going to get you, boy." (*Id.* at 137.) After Green's murder, a police officer came to speak with Rodgers, but no one else talked to him about the murder after that. (*Id.* at 138.)

281.    Nicole Banks, who was dating Green at the time of his murder, also testified at the Post-Conviction Hearing that Green called her only two days before his murder and told her he was very upset with Phillips. (P-C 15 at 141.) She stated:

> [T]he reason I knew he was so upset because he was doing a whole lot of cussing talking about this Prentiss, this nigga been messing with my family. And he was just doing a lot of BS'ing and that's not his demeanor at all. . . . So I was real concerned. You know, I knew something was going to happen because he was just too upset about it. And I have never heard him speak that way of nobody.

(*Id.*) After Green's death, no defense investigator or attorney spoke with Banks. (*Id.* at 142.)

**D.    Trial Counsel Rendered Ineffective Assistance of Counsel by Failing to Conduct the Reasonably Diligent Investigation Required Under *Strickland* and Its Progeny.**

282.    The U.S. Supreme Court has held that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In order to fulfill this duty, "[c]ounsel must conduct

appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *United States v. DeCoster*, 487 F.2d 1197, 1204 (D.C. Cir. 1973) (footnote omitted). Further, "[d]efense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner." *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974) (citation omitted). While a tactical decision may be protected from an ineffective assistance of counsel claim, "[t]he complete failure to investigate potentially corroborating witnesses . . . can hardly be considered a tactical decision." *United States v. Debango*, 780 F.2d 81, 85 (D.C. Cir. 1986).

283.    Courts have found deficient performance where counsel failed to conduct an adequate investigation and have concluded that such shortcomings were prejudicial, warranting a new trial. In *Montgomery v. Peterson*, 846 F.2d 407, 412-16 (7th Cir. 1988), the Seventh Circuit found that defense counsel's failure to investigate the only available disinterested alibi witness constituted ineffective assistance of counsel. The court held that defense counsel's performance fell below the standards of reasonableness, even though he put on twelve alibi witnesses, noting that "[w]here the state's case consists chiefly or solely upon the word of an accomplice, Illinois courts have recognized the great importance to the defendant of evidence of direct contradiction or material corroboration from other sources." *Id.* at 413-414. Moreover, defense counsel's failure to secure the testimony of the alibi witness was prejudicial and undermined confidence in the outcome of the trial, requiring a new trial. *Id.* at 414-416; *see also Chambers v. Armontrout*, 907 F.2d 825, 831 (8th Cir. 1990) (failure to interview witnesses whose testimony would have provided the only justification for a self-defense instruction on a charge of murder required new trial on *Strickland* grounds).

284. Courts have also found deficient performance where counsel promised the jury that certain evidence would be presented, yet failed to present such evidence. For example, the Seventh Circuit granted habeas relief where counsel told the jury during opening statements that the defendant would testify and that evidence would be presented showing the defendant was not in a gang, yet never presented such evidence. *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 257-60 (7th Cir. 2003). Similarly, in *Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990), the Seventh Circuit granted a new trial after finding that counsel's decision not to present evidence of a theory – "a decision made without interviewing the witnesses, after preparing the jury for the evidence through the opening, and without consultation with" the defendant – constituted "unreasonable professional conduct." *Id.* at 879. Furthermore, courts have found that defense counsel's failure to produce a witness in support of a defense theory introduced in opening statement is a "speaking silence" that is prejudicial as a matter of law. *See, e.g., Anderson v. Butler*, 858 F.2d 16, 18-19 (1st Cir. 1988), *aff'd sub nom. Massachusetts v. Anderson*, 536 N.E.2d 1353 (Mass. 1990).

285. Moreover, as explained in Ground No. 2, the Tennessee courts' rejection of Robinson's post-conviction ineffective assistance claim on this ground was not "on the merits," because the Post-Conviction Court required Robinson to prove his trial counsel's failure to adequately identify, investigate, and interview potentially exculpatory witnesses by clear and convincing evidence, rather than applying the correct "preponderance of the evidence" standard. Therefore, the Court should not accord deference under AEDPA to the Tennessee courts' ruling on this issue. Trial counsel's performance was clearly deficient, and that deficiency resulted in prejudice to Robinson's defense.

286.     The record shows that trial counsel relied so heavily on their lay investigator that they did not even interview witnesses they were intending to call until the State rested its case. As a result of their woeful lack of preparation and seat-of-the-pants attempt to throw together a defense, trial counsel did not present any evidence at all about Phillips' motive and stated desire to kill the victim. That failure occurred even though they were clearly on notice that such evidence was available to them – as evidenced by their admitted awareness of Pool's and Golden's guilty pleas – and they attempted, albeit incompetently, to invoke Phillips' sole responsibility as part of their putative "strategy." Trial counsel's failure was not a strategic choice, but a violation of basic standards of competent capital representation mandated by the Constitution.

287.     Counsel's deficient performance was prejudicial under *Strickland*, 466 U.S. at 696, because Phillips' powerful motive and prior explicit threats to kill Green would have corroborated the witnesses who testified that Phillips gave the order. Trial counsel compounded that prejudice by promising the jury evidence about Phillips in their opening statement that counsel totally failed to deliver. Because both of the *Strickland* requirements – deficient performance and prejudice – have been established, Robinson is entitled to a new trial on this ground as well.

**E.      Even if the Tennessee Court Decision Was "On The Merits," Robinson is Entitled to Relief Because the Decision Involved an Unreasonable Determination of the Facts and An Unreasonable Application of the Law.**

288.     Even if AEDPA deference were accorded to the State court decisions, relief still should be granted because the Tennessee Court of Criminal Appeals' adoption of the Post-Conviction Court's finding that trial counsel's investigation was adequate, *Robinson III*, 2013

WL 1149761, at *73, constitutes an unreasonable determination of the facts and an unreasonable application of the law.

289.    The Tennessee Court Criminal Court of Appeals' found that trial counsel sufficiently investigated Prentiss Phillips' motive to murder Green based on the perfunctory statement that the investigator would have "attempted to interview any witnesses identified through discovery" and many witnesses in gang cases refuse to speak to counsel. *Id.* It also found that trial counsel was not deficient because they called witnesses who testified that Phillips was in charge of the meeting. *Id.* Finally, the Tennessee Court of Criminal Appeals found that trial counsel provided the investigator with sufficient direction and interviewed those witnesses necessary to support Robinson's theory of defense. *Id.*

290.    The Tennessee Court's decision is unreasonable for multiple reasons. First, the Tennessee Court of Criminal Appeals' determination that the investigator would have investigated any witnesses regarding Prentiss Phillips identified in discovery contradicts Ozment's statement (which the court also credited) that Ozment did not believe that Phillips' motivation for ordering the victim's death was relevant since trial counsel's theory was that Robinson was not at the apartment. *Id.* Ozment essentially admitted that he did not pursue evidence against Phillips.

291.    The Tennessee Criminal Court of Appeals' holding that trial counsel's performance was not deficient because trial counsel introduced some witnesses who testified that Phillips gave the order is ignores what Ozment actually said in his opening statement. He stated that "the proof *from the State's own witnesses* are [sic] going to ultimately show that the person in charge of this Gangster Disciple meeting was a man by the name of Prentiss Phillips." (Tr. 14 at 8-9) (emphasis added).

292. The Tennessee Criminal Court of Appeals' determination that trial counsel provided the investigator with direction and interviewed the necessary witnesses is an unreasonable determination of the facts since the Tennessee courts did not even address the incontrovertible evidence from the trial transcript that trial counsel interviewed eight witnesses right before they testified, or Ozment and Schreiner's admissions during the post-conviction hearing that they did little or no investigating themselves. *Id.*

293. Accordingly, the Tennessee Court of Appeals' ruling that trial counsel was not deficient was an unreasonable application of the law and determination of the facts. That deficiency was prejudicial for the reasons stated in Section D.

**Ground No. 9: Trial Counsel Was Ineffective in Failing to Adequately Prepare to Present Evidence They Had Promised the Jury About Robinson's Claim That He Did Not Flee After the Crime.**

294. Robinson was deprived of his right to effective assistance of counsel under the Sixth Amendment and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at 687, because his trial counsel failed to adequately prepare to present evidence showing that Robinson did not flee after the crime.

295. In his opening statement, Robinson's lead trial counsel told the jury that he would present evidence to show that after Vernon Green's murder, Robinson voluntarily came to the Shelby County Justice Center and thus was not fearful of being arrested for any crime. (Tr. 14 at 8.) Trial counsel explained to the court that this evidence would be valuable because, just as a jury can infer guilt from a defendant's flight, lack of flight implies the opposite. (Tr. 8 at 595.)

296. But when it came time to present this evidence, trial counsel was unprepared: although trial counsel had wanted a court clerk to testify as to Robinson's presence in court on May 7 and September 9, 1997, counsel failed to subpoena the correct clerk. The clerk whom trial

counsel was prepared to present was from the wrong court division and was therefore unwilling and unable to testify about records from a court division in which she did not work. (Tr. 8 at 596.) Without the appropriate clerk, the trial court found that the records could not be authenticated, and did not allow them into evidence to show that Robinson had actually been present in court on the days in question. (Tr. 9 at 601-602.) Without the benefit of a witness to sponsor the introduction of the court records regarding Robinson's presence in court following the murder, the trial court also ruled that the records were not relevant. (Tr. 8 at 597-600.)

297.    The Post-Conviction Court rejected Robinson's ineffective assistance claim on this ground, finding that even had trial counsel properly prepared, the trial court would still have found the evidence not relevant. (*See* P-C 6 at 978.) That finding, however, ignores the possibility that Robinson's trial counsel could have sought to vet their strategy with the court before making representations to the jury as to what evidence would be presented. Instead, trial counsel cavalierly promised the jury that it would present evidence that Robinson did not flee, and then undermined the jury's confidence by failing to deliver on that promise.

298.    On Post-Conviction, the Tennessee Court of Criminal Appeals held that even if trial counsel's actions were not deficient because trial counsel presented testimony of Danny Dewayne Williams, who was with Robinson when he was arrested. *Robinson III*, 2013 WL 1149761, at *76-*77. Based on that testimony, trial counsel argued during closing that Robinson had not fled the jurisdiction eight or nine months after the murder of Green. *Id.* The Court admitted that "evidence that petitioner actually came to the 'very justice center' might have been stronger evidence of lack of flight," but nonetheless held that the evidence trial counsel presented was enough to avoid both deficiency and prejudice. *Id.*.

299.     While it is not the role of a court reviewing ineffective assistance claims to adopt "20-20 hindsight," trial counsel's choices must not be "uninformed because of inadequate preparation." *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982) (internal quotation marks and citation omitted). There was a world of difference between the specific and persuasive evidence that Ozment promised the jury and the weak, half-hearted showing that trial counsel actually made. The jury was told it would hear compelling evidence that, after Green's murder, Robinson voluntarily appeared at the Shelby County Justice Center, showing that he was not fearful of being arrested of any crime and had no consciousness of any guilt. (Tr. 14 at 8.) The Tennessee Court of Criminal Appeals held that mere evidence that Robinson remained in the Memphis metropolitan area was sufficiently similar to what was promised to absolve trial counsel of their failure and wipe away any prejudice to Robinson. But the probative value of the evidence that Ozment failed to deliver was significant, and the harm to Ozment's credibility was likely exacerbated when all he could offer was the fact that Robinson did not flee Memphis altogether. The Court of Criminal Appeals' ruling is objectively unreasonable and should be overturned.

**Ground No. 10:   Trial Counsel Was Ineffective in Failing To Object to References the State Made to Robinson's Decision Not to Testify.**

300.     Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at 687, because his trial counsel failed to object to statements the prosecution made during closing argument that referred to Robinson's decision not to testify.

**A.     During Guilt/Innocence Phase Closing Argument, The State Improperly Referenced Robinson's Decision Not to Testify.**

301.     During closing argument in the guilt/innocence phase of Robinson's trial, ADA Wulff, attempting to bolster the credibility of Jarvis Shipp, stated:

> And you know what he closed his statement with, ladies and gentlemen? He said, I'm doing this, I'm telling you the truth to help me, but I'm also doing this to help the victim's family. Did you hear that from anybody else? – anybody else who sat in this chair and said, I pled to this, you know, I was there? Did anyone else exhibit any remorse? Did anyone say, I want to do the right thing. I want to do – I want to assist this family in the grief that they're exhibiting, that they're feeling in this matter. No one else did.

(Tr. 14 at 16-17.)

302.    This extensive rhetorical questioning as to whether "anybody else" testified was an unmistakable reference to Robinson. The State was not trying to emphasize how few witnesses it had to support its theory; rather, quite plainly, the State was openly blaming "anyone else" for not having "sat in this [witness] chair" to explain his version of events. In the context of Robinson's trial, this could only have been a reference to Robinson.

### B. The Court of Criminal Appeals Decision Is Contrary to Established Federal Law.

303.    The Court of Criminal Appeals ruled that Robinson's counsel's failure to object was a "tactical decision" on the part of the defense, and that, in any case, "the trial court would have overruled the objection." *Robinson III*, 2013 WL 1149761, at *80. The court therefore upheld the post-conviction court's denial of relief to Robinson on this issue.

304.    Robinson has a fundamental constitutional right not to testify. *See* U.S. Const. amends. V & XIV; Tenn. Const. Art. I, § 9. The State may not comment on a defendant's decision to invoke this right by not taking the stand to testify at his trial. *See, e.g.*, *Griffin v. California*, 380 U.S. 609 (1965). The State's argument in its closing at Robinson's trial therefore violated his clearly established federal rights.

305.    Trial counsel's failure to object to this violation was deficient. To the extent that trial counsel was making a "tactical" decision – itself a dubious conclusion of the Court of

Criminal Appeals – that "tactical" decision deprived Robinson of the full benefit of one of the most fundamental and well-established rights under our Constitution. Counsel's failure to protect that right even by merely lodging a brief objection simply does not reflect the modicum of "skill and knowledge" required by *Strickland*. Moreover, counsel's failure on this front prejudiced Robinson because the jury was not given an appropriate curative instruction to remedy the prejudice. *See State v. Transou*, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996) (holding trial court removed prejudice caused by prosecutor's comment by giving a "detailed curative instruction"), and the issue was not preserved for appeal; *see also Robinson II*, 146 S.W.3d at 519 (noting in connection with this issue that "the failure to contemporaneously object waives the issue"). The Court of Criminal Appeals' determination that the "trial court would have overruled" any objection is rank speculation and is not rooted in the underlying facts or governing law. *Robinson III*, 2013 WL 1149761, at *80.[16]

**Ground No. 11: Trial Counsel Was Ineffective in Failing To Object to the State's Improper Use of Facts Not In Evidence And Misstatements of Law During Closing Argument.**

306.    Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at 687, because his trial counsel failed to object when the State improperly and repeatedly argued facts not in evidence during summation.

---

[16] The State's improper comments in summation about Robinson's decision not to testify also constituted plain error on the part of the trial court. The Trial Court's disregard for Robinson's fundamental right not to testify was an egregious error that seriously undermined the fairness and integrity of Robinson's trial.

307. Specifically, the State offered that Jarvis Shipp's testimony itself "was a death sentence right then and there... [H]e's got to watch his back every day for the rest of his live." (Tr.. 14 at 17-18.)

308. The State argued that "[Chris James and Jarvis Shipp] haven't conferred…. They haven't talked. They haven't met…..These men have not conferred in their testimony in any way." (Tr.. 14 at 19.)

309. The State argued that Sepacus Triplett "is in the realm of confinement with other people who are involved in the Gangster Disciples Organization," and therefore "all of a sudden now has a clear memory about his involvement." (Tr. 14 at 21.)

310. And finally, the State told the jury: "[T]here was a murder, because there was an execution of a person. And the State has a duty to . . . determine who is responsible for that." (Tr. 14 at 84.)

311. It is the jury, not the State, which has the responsibility and the duty to place blame and arrive at a determination of guilt. This misstatement of law recast the entire trial and the State's summation of evidence, presenting the jury with a *fait accompli* of which the jurors were reduced to mere spectators. Because the State had "determined who is responsible," the State implicitly argued that its presentation of evidence, its argument, and its vouching for witness credibility were all fact which the jury should accept at face value.

312. And with respect to the State's pronouncements of evidence in summation -- with respect to Shipp's "death sentence," the suggestion that Shipp and James hadn't conferred, and that Triplett's testimony had been influenced by the gangster disciples -- none of those "facts" had any basis in evidence appearing in the record.

313. Under Tennessee law, reference to facts not in evidence during summation is improper. *See, e.g., Russell v. State*, 532 S.W.2d 268, 271 (Tenn. 1976) (closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried").

314. Nonetheless, Robinson's trial counsel failed to object to these improper references. That failure prevented Robinson from raising the issue on direct appeal. *Robinson II*, 146 S.W.3d at 519 (claims of error rejected because trial counsel failed to object).

315. Counsel's failures to object simply do not reflect the "skill and knowledge" required under *Strickland*. 466 U.S. at 685. Moreover, counsel's failure on this front prejudiced Robinson because the jury was not given an appropriate curative instruction to remedy the prejudice, *see State v. Transou*, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996) (holding trial court removed prejudice caused by prosecutor's comment by giving a "detailed curative instruction").[17]

**Ground No. 12: Trial Counsel Was Ineffective in Failing to Object to the Lack of Foundation for Testimony of Jarvis Shipp and Chris James.**

316. Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at 687, because trial counsel failed to object to the lack of foundation for two key aspects of

---

[17] The State's improper comments in summation also constitute plain error on the part of the trial court. Robinson raised this issue on direct appeal, and the Tennessee Supreme Court rejected his claims as having been waived by counsel's failure to object. *Robinson II*, 146 SW.3d at 518. In this case, it is difficult to see how the state's improper comments regarding the jury's role (and the soundness of the state's "determination" of Robinson's guilt), as well as the state's reference to evidence that simply did not exist, could possibly be anything but an "egregious" occurrence that seriously undermines the fairness and integrity of Robinson's trial.

Christopher James' testimony and Shipp's testimony about Robinson's position in the Gangster Disciples.

317. Trial counsel failed to move to strike James' improper testimony that when he heard Robinson allegedly say "Y'all know what to do," this meant that Kevin Wilkins and Jarvis Shipp were going to kill Green. (Tr. 5 at 119.)

318. Trial counsel subsequently failed to move to strike James' unfounded assertion that Robinson was a Gangster Disciple. (*Id*. at 134-135.) The record reflects that no foundation was laid for James to testify to either statement.

319. Shipp was the only State witness who testified about the hierarchy of the Gangster Disciples and Robinson's alleged position of "Chief of Security" over all of Memphis, the third highest position in the Memphis Gangster Disciples. (Tr. 6 at 246-251, 270.) Although Shipp testified that he was formerly a member of the Gangster Disciples (*id*. at 232), the State laid no other foundation to establish how Shipp was qualified to testify about the supposed hierarchy and functioning of the gang.[18]

320. On Post-Conviction, the Tennessee Court of Criminal Appeals affirmed the Post-Conviction Court's ruling that trial counsel was not deficient for failing to object to James and Shipp's statements. *Robinson III*, 2013 WL 1149761, at *71. It found that James' statements were rationally based on his own perceptions and that Shipp's statement was based on his experience as a member of the Gangster Disciples. *Id*.

321. Under Tennessee Law, "[g]enerally, non-expert witnesses must confine their testimony to a narration of the facts based on first-hand knowledge and avoid stating mere

---

[18]Trial counsel for Robinson did establish through cross-examination that Shipp himself was "Chief of Security" for one neighborhood in Memphis. (Tr. 7 at 308.)

personal opinions regarding the facts about which they have testified." *State v. Brown*, 836 S.W.2d 530, 550 (Tenn. 1992) (citation omitted). Accordingly, "the admission of lay opinion testimony is limited to those situations wherein the jury could not readily draw its own conclusions on the ultimate issue, without the aid of the witness's opinion testimony." *State v. Schiefelbein*, 230 S.W.3d 88, 130 (Tenn. Crim App. 2007) (citation omitted).

322.    Therefore, it is clear that trial counsel should have objected to James's and Shipp's statements.

323.    James's statement that he thought "Y'all know what to do" meant that Kevin Wilkins and Jarvis Shipp were going to kill Green was clearly his personal opinion. The jury could have just as readily drawn its own conclusions about Robinson's alleged statement.

324.    The same is true of James' testimony about whether Robinson was a member of the Gangster Disciples; the jury should have been allowed to determine that itself based on James's descriptions of his actions.

325.    Trial counsel also should have objected to Shipp's statement. His statement that Robinson was the third highest ranking Gangster Disciple in Memphis and was in charge even though the meeting took place in Prentiss Phillips' territory, required special knowledge of the organizational structure of the Gangster Disciples. (Tr. 6 at 246-251, 270.)

326.    Trial counsel was also deficient because if they had been adequately prepared they could have introduced evidence raising a reasonable doubt as to whether Robinson could possibly be the third highest ranking member of the Memphis Gangster Disciples. A Gangster Disciples member named Robert Walker testified for the State in a prosecution involving the Memphis Gangster Disciples arising from a murder in 1997 in *State v. Heard*, No. W2001-02605-CCA-R3-CD, 2003 WL 22718439 (Tenn. Crim. App. Nov. 6, 2003). Walker testified that

he – not Gregory Robinson – was the chief of security for the Memphis Gangster Disciples in 1997. *Id.* at *2.

327.    Trial counsel's failure to object to the statements was highly prejudicial under the clearly established law of *Strickland* and fundamentally tainted Robinson's trial.

328.    If James's testimony had been stricken there would not have been any evidence that Robinson intended for the Gangster Disciples to kill Green and the evidence therefore would have been insufficient to convict him of murder.

329.    Shipp's statement was the only evidence in the record that established Robinson's purported rank in the Gangster Disciples. Shipp's testimony on this critical element of the State's case was entirely uncorroborated. Robinson's rank was critical to the State's theory of criminal responsibility. If he was not a purported high-ranking member of the Gangster Disciples, then his alleged statement that "Y'all know what to do" with Green would have been meaningless and could not rationally be construed as an "order" that other Gangster Disciples could have been expected to follow.

**Ground No. 13:    Trial Counsel Was Ineffective in Failing to Object to Cumulative and Prejudicial State Evidence About the Crime Scene Discovery and the Victim's Body.**

330.    Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at 687, because trial counsel failed to object to victim impact testimony and gruesome photographs about the victim's body introduced by the prosecution during the guilt/innocence phase.

331.    Trial counsel failed to object when the victim's sister, Christina Green, testified that she had a photograph placed on her brother's tombstone and that she missed him. (Tr. 5 at

98.) Trial counsel should have objected and moved for a mistrial because Ms. Green's testimony was irrelevant and not admissible during the guilt/innocence phase of trial.

332.    While Tennessee law allows limited victim-impact testimony during capital penalty phase hearings, *State v. Nesbit*, 978 S.W.2d 872, 890-91 (Tenn. 1998), it does not allow such evidence to be presented during the guilt/innocence phase. Because victim impact testimony may be "so unduly prejudicial that it renders the trial fundamentally unfair," the State must give notice of its intent to use victim impact testimony during the penalty phase and the trial court must hold a hearing to determine if the evidence is admissible. *Id.* at 891.

333.    Trial counsel was aware that victim impact testimony was not admissible during the guilt/innocence phase of trial. Before Ms. Green's testimony about missing her brother and the photograph on his tombstone, trial counsel objected to her testimony about Green's funeral on the grounds that it was victim impact testimony and moved for a mistrial. The trial court sustained that objection but did not grant a mistrial. (Tr. 5 at 94-97.)

334.    Trial counsel's failure to object to additional victim impact testimony was highly prejudicial, but, on direct appeal, the Tennessee Supreme Court held that trial counsel had waived the issue as a result of that failure. *See Robinson II*, 146 S.W.3d at 519.

335.    On post-conviction, the Tennessee Court of Criminal Appeals affirmed the Post-Conviction Court's denial of relief on this claim. *Robinson III*, 2013 WL 1149761, at *73. The Court admitted that the testimony of Green's sister was irrelevant, but held that Robinson's counsel's failure to object was not prejudicial. *Id.*

336.    Because of the emotional nature of Ms. Green's testimony, there is a reasonable probability that trial counsel's failure to object to her testimony and move for a mistrial with respect to this unchallenged testimony affected the outcome of Robinson's trial. Accordingly, the

Tennessee Court of Criminal Appeals' ruling that Robinson failed to show prejudice was contrary to the clearly established law of *Strickland*.

337.    Additionally, the State opened its case against Robinson with a series of witnesses who testified at length about the discovery and condition of Vernon Green's body and sought to have numerous gruesome photos of Green's body admitted.

338.    The State first called Raymond Pearson and Coria Williams, who were members of a walking club that found Vernon Green's body in the early morning on May 1, 1997. (Tr. 5 at 8, 10, 12, 23, 41-45.) Three photographs of Green's body were admitted into evidence during Mr. Pearson's testimony. (*Id.* at 8, 10, 12.) Seven additional photographs of Green's body were admitted into evidence during the testimony of Ms. Williams, a police officer who was off duty at the time. (*Id.* at 23, 41-45.) After that, Alvin Peppers, the crime scene officer, testified and some of the photos were shown to the jury again.

339.    Coria Williams stated that the fourth photograph she identified (Tr. 5 at 44, referencing Ex. 8), which depicted the victim's bleeding buttocks, made her think that "some sexual contact had also been made." (*Id.*.) Alvin Peppers, the crime scene officer also testified that "the face of the body was so mutilated that there was nothing that we could identify" and the "left eye was hanging out of the socket," without drawing any objection by trial counsel (*Id.* at 58-60.)

340.    Even though the photos and testimony were all irrelevant because Robinson was not at the scene of the murder and the State did not introduce any testimony indicating that Robinson had instructed a certain manner of killing, trial counsel did not object until the prosecution tried to introduce the eighth photograph.

341.     The State later called Dr. Thomas Deering, a forensic pathologist and assistant medical examiner in Shelby County, who performed the autopsy on the body of Vernon Green. (Tr. 7 at 359-60, 363.) Over trial counsel's objection, Dr. Deering used the victim's actual skull to show the location of the bullet wounds to his head. (*Id.* at 375-79.) Trial counsel did not object, however, when he later described Green's skull as collapsing like a "deflated basketball" and introduced two additional pictures of the injuries to Green's back. (*Id.* at 411, 416.)

342.     Trial counsel rendered ineffective assistance by failing to move to preclude or to strike the testimony of at least some of these witnesses. The testimony repeatedly covered the same ground and was therefore largely redundant, and the repeated display of photos of Green's body was highly inflammatory. Trial counsel should not have allowed such prejudicial material to be paraded before the jury over and over again. *See, e.g., State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (evidence which is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant).

343.     The Tennessee Court of Criminal Appeals affirmed the Post-Conviction Court's ruling that Robinson was not entitled to relief because the Tennessee Supreme Court ruled the pictures were admissible on direct appeal. It is clear, however, that because of the graphic nature of the photographs and the testimony, there is a reasonable probability that trial counsel's failure to object to the redundant testimony affected the outcome of Robinson's trial and therefore, the Tennessee courts' ruling was an unreasonable application of the clearly established law of *Strickland*.

**Ground No. 14:**   **Trial Counsel Was Ineffective in Failing to Request That Robinson Be Allowed to Sit at Counsel Table and in Failing to Challenge the Local Rule.**

344.    The criminal process presumes that the defendant is innocent until proven guilty. *Deck v. Missouri*, 544 U.S. 622, 630 (2005). For this reason, the Fifth and Fourteenth Amendment of the Constitution prohibits any courtroom arrangement or procedure that "undermines the presumption of innocence and the related fairness of the fact-finding process." *Id.* (citing *Estelle v. Williams*, 425 U.S. 501, 503 (1976)).

345.    In light of this clearly established constitutional rule, Robinson's trial counsel was ineffective under the Sixth and Fourteenth Amendments and *Strickland* because they failed to request that Robinson be allowed to sit at the counsel table and failed to challenge Rule 8.05 of the Rules of Practice and Procedure for Shelby County Criminal Court, which leaves it up to discretion of the trial judge whether the defendant may sit at counsel table with his or her attorney.

346.    In this case, even though there was room at counsel table, Robinson was seated behind his attorneys during both the guilt/innocence and penalty phases of his capital murder trial without any showing that security required it. Robinson's counsel never requested that Robinson be seated at the counsel table with them or challenged Rule 8.05.

347.    The Post-Conviction Court found that trial counsel was not ineffective in failing to challenge local rule 8.05 (P-C 6 at 1007-1008), and the Tennessee Court of Criminal Appeals affirmed that ruling. The Tennessee Court of Criminal Appeals denied Robinson's claim because one of his trial counsel, Schreiner, testified that the seating arrangement did not affect trial counsel's ability to communicate with Robinson and the Tennessee Supreme Court ruled that

Local Rule 8.05 was constitutional in *State v. Rice*, 184 S.W.3d 646, 674–75 (Tenn.2006). *Robinson III*, 2013 WL 1149761, at *79.

348.    In *Deck*, 544 U.S. at 630, the United States Supreme Court found that the United States Constitution prohibits the use of visible restraints during the guilt/innocence phase of a criminal trial, because it undermines the presumption of innocence, interferes with the defendant's ability to communicate with counsel and participate in his own defense, and lessens the dignity of the courtroom.

349.    In addition, the *Deck* Court held that the use of visible restraints during the penalty phase is inherently prejudicial to the defendant because it implies that the defendant is dangerous, inevitably affects adversely the jury's perception of the character of the defendant, and can tip the scales in favor of the death penalty. *Id*. at 632-633. The *Deck* Court found that although restraints may be used for security purposes if the court finds particular reasons to do so, the defendant is not required to show actual prejudice to establish a due process violation when a court without proper justification orders the defendant to wear visible restraints. *Id*. at 627-635. Rather, "[t]he State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" *Id*. at 635 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967).

350.    In Shelby County, it is up to the discretion of the trial judge whether the defendant may sit at the table with counsel. Rule 8.05 of the Rules of Practice and Procedure for Shelby County Criminal Court ("Where space is available and with permission of the Court, the defendant may sit at counsel table with his or her attorney.").

351.    Seating Robinson behind counsel rather than at the counsel table raises the same concerns that visible shackles do and violated Robinson's due process rights under the Fifth and

Fourteenth Amendment of the United States Constitution. During both the guilt/innocence and penalty phases of his trial, the jury saw Robinson seated behind his attorneys. This practice made it appear to the jury that Robinson needed to be separated from the attorneys and posed a threat to them. This undermined the "courtroom's formal dignity, which includes the *respectful treatment of defendants*." *Deck*, 544 U.S. at 631 (emphasis added). Additionally, sitting behind trial counsel certainly made it more difficult for Robinson to quickly communicate with his counsel during the trial.

352. Although Robinson should not be required to show actual prejudice, as in *Deck*, here Robinson was prejudiced as a result of counsel's failure to request that he sit at counsel table because he was relegated to sitting behind trial counsel, as a second-class citizen, making him appear distinct and dangerous to the jury. *Id*. at 627-35.

353. If trial counsel had requested that Robinson be allow to sit at the counsel table, it would have avoided such negative appearances and Robinson would have been readily able to communicate with counsel. Accordingly, the Tennessee Courts' determination that this failure and the failure to challenge Rule 8.05 was not ineffective assistance of counsel was an unreasonable application of *Strickland*.

**Ground No. 15: Trial Counsel Rendered Ineffective Assistance Related to Jury Selection.**

354. Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and *Strickland*, 466 U.S. at 687, because Robinson's trial counsel was ineffective during jury selection in multiple ways. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

355. At Robinson's trial, the impartiality of the jury was undermined by the impaneling of Gina Boyd, a deputy jailer at the Shelby County Justice Complex, the very jail where Robinson was housed prior to and during his trial. Even with a limited and inadequate voir dire examination, Robinson's trial counsel uncovered more than enough information to have Juror Boyd removed from the jury for cause. Moreover, even if trial counsel were unable to strike Juror Boyd for cause, trial counsel failed to use all of Robinson's peremptory challenges. The failure either to seek to strike Juror Boyd for cause or use a peremptory challenge to remove her constitutes ineffective assistance of counsel, thereby denying Robinson the fair and impartial jury guaranteed him by the Constitution.

**A.     Trial Counsel Failed to Adequately Examine and Seek to Excuse a Deputy Jailer From the Jury.**

356. Several specific facts, individually and in combination, are at the root of the risk of bias flowing from Juror Boyd's presence on the jury.

357. First, Juror Boyd was a jailer at the very jail where Robinson was housed. Second, Juror Boyd had worked in the very pod in which Robinson was housed. Third, Juror Boyd's husband, mother, and sister all worked at the jail. (P-C 15 at 144-145.) Fourth, the jail had, in the years preceding Robinson's trial, significant problems with gangs and gang members including members of the Gangster Disciples and the Vice Lords. (*See* P-C 15 at 147-178.). Fifth, a coworker of Juror Boyd's at the jail was murdered by a gang member shortly before Robinson's trial. *See State v. Thompson*, No. W1998-00351-CCA-R10-CD, 2000 WL 912715 (Tenn. Crim. App. Aug. 9, 2001). Sixth, two co-workers of Juror Boyd's had been shot by inmates. (*See* P-C 15 at 150-151.) Seventh, Juror Boyd was aware that Prentiss Phillips, Robinson's co-defendant,

had escaped from jail. (P-C 15 at 166-167.) Finally, at voir dire Juror Boyd said she felt "apprehension" around gang members and believed that the "bottom line" was that gang members were "bad." (Tr. 13 at 568-69.)

358.    None of these highly relevant facts, however, were brought out on voir dire. Trial counsel never sought to examine Juror Boyd outside the presence of the other prospective jurors, even though the court allowed jurors to approach the bench for voir dire when either the prospective juror or trial counsel requested it. (*See, e.g.*, Tr. 4 at 58-62; P-C 16 at 59; Tr. 11 at 212.) Moreover, trial counsel's examination of Boyd consisted of a series of leading questions that never provided Boyd an opportunity to elaborate on her experiences with gang members. (*See* Tr. 12 at 586-91.) For example, counsel did not ask Boyd to elaborate when she explained that she had interactions with gang members, nor did trial counsel follow up on the admission elicited by the prosecutor that Boyd believed gangs to be "bad." (*See* Tr. 13 at 568-69.) Nor did counsel specifically ask whether Boyd worked in the pod of the jail in which Robinson was housed, or whether she had interacted with Robinson at the jail.

359.    Even more significantly, trial counsel never asked Boyd about the fact that one of her co-workers, another deputy jailer, had been murdered by a gang member shortly before Robinson's trial.[19] The failure to raise that murder might have been excusable if trial counsel did not known about it; however, *both* of Robinson's trial attorneys had represented defendants who allegedly participated in that crime. (*See* P-C 15 at 307; P-C 16 at 57.) Thus, it was inexcusable for trial counsel not to question Juror Boyd about the fact that one of her coworkers had recently

---

[19] The murder of Boyd's co-worker, Sergeant Dedrick Taylor, occurred after an inmate at the Shelby County Justice Center, who was a member of the Traveling Vice Lords gang, had an altercation with Sergeant Taylor. The inmate ordered his murder by telephoning a fellow gang member on the outside. *See Thompson*, 2001 WL 912715.

been murdered in a gang killing ordered by an inmate in the same pod where Robinson was housed. That murder should have given rise to a reasonable basis to believe that a deputy jailer like Ms. Boyd might be biased. Even if not, at a minimum trial counsel should have questioned Juror Boyd about whether she would feel comfortable or have any reservations about sitting as a juror in a case in which the defendant was an alleged gang member. (Post-trial proceedings eventually revealed that Boyd felt "apprehension" around gang members.)

360.    Trial counsel also failed to examine with Boyd the fact that her jail was the subject of a pending federal court order regarding intolerable conditions, and identifying a high number of gang member inmates who were responsible for violence, including stabbings and rapes, in the jail. (*See* Tr. 22 at 22-23.) That order was known to Robinson's trial counsel – as Ozment himself said, "I think everybody that has to do with the criminal justice system in Shelby County is aware of that order." (*See* P-C 8, Ex. 20, P-C 16 at 57-58.)

361.    Had trial counsel asked about these issues, and had Juror Boyd answered honestly, counsel would have learned that Juror Boyd had "apprehension" about gang members, in addition to her earlier statement, during the prosecutor's questioning, that gang members were "bad." (*See* P-C 15 at 151; Tr. 13 at 569-70.) Trial counsel also would have found that Juror Boyd had worked on Robinson's pod approximately one month before his trial. (Trial counsel offered such evidence in seeking a new trial. (*See* Tr. 21 at 45-46.) Trial counsel also would have found that Juror Boyd knew enough of Robinson's case to know that Prentiss Phillips was his co-defendant. Even 12 years later, at the Post-Conviction Hearing, Juror Boyd remembered Phillips' name. (P-C 15 at 166-167.)

362.    Even had trial counsel asked whether Boyd worked on Robinson's pod or had ever interacted with him, she likely would have given the same answer as she did at the new trial

hearing – namely, that she was never assigned to Robinson's pod – and her general response in voir dire that she did not know any of the parties to the case. (Tr. 20 at 110-11; Tr. 13 at 558.) That testimony was contradicted by the evidence offered by trial counsel that Boyd *had* in fact worked in Robinson's pod while he was incarcerated there, and the testimony proffered by appellate counsel of other inmates that Boyd had worked in the same pod as Robinson. (*See* Tr. 22 at 16-17.)

363.    It is thus clear that Juror Boyd misrepresented, intentionally or otherwise, her contact with or knowledge of Robinson, and directly admitted her biased opinion that gang members were "bad" and that she felt "apprehension" around them.

**B.    Trial Counsel Conducted Inadequate Voir Dire.**

364.    Robinson's trial counsel failed to pursue a number of highly relevant inquiries during voir dire; even when trial counsel did pursue appropriate avenues, they were frequently insufficient, inadequate, or wrong, and paired with inaccurate statements of law. Specifically:

- Trial counsel described "beyond a reasonable doubt" as a moral certainty. (*See, e.g.,* Tr. 11 at 245.)

- When one potential juror stated that she wasn't sure she would be able to "handle" being on a jury, trial counsel failed to inquire as to what she meant. (Tr. 11 at 213.)

- Juror Newbern told the prosecutor that she had knowledge of gangs through television, but trial counsel never asked what kind of knowledge she had or what opinions she had formed. (Tr. 12 at 372.)

- Juror Holley told the prosecutor that she knew about gangs through television and news, but trial counsel never asked what kind of knowledge she had or what opinions she had formed. (Tr. 12 at 373-74.)

- Trial counsel did not adequately correct or rehabilitate Juror Newbern, who stated that reasonable doubt was not a heavy burden. (Tr. 13 at 479.) Trial counsel provided an explanation and attempted to explain the difference between reasonable doubt and preponderance of the evidence, but Juror Newbern only

stated that the explanation helped her understand "a little bit more better." (Tr. 13 at 479-80, 485.)

- Trial counsel failed to clearly explain the meaning of mitigation to the potential jurors. Trial counsel explained that mitigating evidence "lessens" the offense. (*See, e.g.,* Tr. 13 at 512-13, 529.) Later, trial counsel explained that mitigating evidence is evidence that explains a person's behavior, but failed to connect that explanation to Robinson. (Tr. 13 at 594-95.)

365. More significantly, trial counsel failed to inquire of the venire whether the prospective members of the jury would automatically sentence the defendant to death upon a guilty verdict.

### C. Trial Counsel Did Not Object to Improper Jury Instructions and Information Given to the Jury During Voir Dire.

366. Trial counsel failed to object to incorrect information given to members of the jury during jury selection. Specifically:

- Trial counsel did not object when the court read to the jury all of the possible aggravating circumstances under Tennessee law instead of only the two aggravating factors that the State had given notice of and intended to prove. (*See* Tr. 10 at 68-71.)

- After reading all possible aggravating circumstances, the court explained that "[m]itigating circumstances are any circumstances which you as a jury find from the proof or anything that you can glean from the proof wherever it comes from that is a mitigator and that would mitigate or weigh against the aggravating circumstances involved." (Tr. 10 at 71.) This incoherent and circular explanation provided the jury little to no guidance, and was directly juxtaposed against a list of specific aggravating factors, which suggested that there was a presumption in favor of the death penalty. Accordingly, they were contrary to law (*see ABA Standards for Criminal Justice: Discovery and Trial by Jury* (3d ed.), Standard 15-4.4(a), Jury Instructions ("Instructions to the jury should be [] technically correct [and] expressed as simply as possible and delivered in [] a way that they can be clearly understood by the jury.")), and trial counsel should have objected.

- The court told the jury that it would be appropriate to consider the death penalty if it found that an aggravating factor outweighed "*any* mitigating circumstance" beyond a reasonable doubt. (Tr. 10 at 71-72.) Trial counsel should have objected because the trial court's explanation implied that mitigating circumstances are not considered cumulatively.

**D.** **Trial Counsel Did Not Obtain the Use of a Jury Questionnaires and Did Not Seek to Use the Services of a Jury Consultant.**

367. Trial counsel failed to use jury questionnaires as a method of helping to ensure that a fair and impartial jury was impaneled. The use of jury questionnaires would have been particularly useful in Robinson's case because the trial court had denied individual and sequestered voir dire, and had limited voir dire questioning. (*See* Tr. 4 at 58-62; Tr. 10 at 30-34.) Moreover, in a case like Robinson's, with the sensitivities surrounding alleged gang activity, it was particularly important to provide members of the venire a forum in which they could answer questions privately, and honestly. For instance, trial counsel asked the venire whether they knew anyone who was or had been a member of a gang. No prospective jurors indicated that they did. (Tr. 10 at 76; Tr. 11 at 228.) Because of the sensitive nature of the question, members of the venire would have been likely to give more honest and reliable answers had they been asked the question on a questionnaire. Similarly, trial counsel explained to the venire that most of the witnesses were black and asked potential jurors to indicate, in front of the rest of the venire, whether they thought that Robinson was more likely to commit a crime because he was black. Again, no juror responded affirmatively. (Tr. 11 at 290-91.) Here, too, potential jurors would have been more likely to honestly admit racial bias in an individual questionnaire.

368. Trial counsel also failed to employ a jury consultant. Other courts in Tennessee at the time of Robinson's trial had regularly granted defense requests for jury consultants, and the ABA Guidelines instruct counsel to "consider seeking expert assistance in the jury selection process." (2003 ABA Guidelines ¶ 10.10.2(C).)

**E.    The Court of Criminal Appeals' Ruling Improperly Glossed Over Counsel's Deficiencies At Jury Selection, Contrary to Established Federal Law.**

369.    With respect to trial counsel's failure to excuse Juror Boyd, the Court of Criminal Appeals credited Juror Boyd's post-conviction testimony that she had based her decision at trial on the evidence presented, notwithstanding the revelations during post-conviction that she had not been truthful on voir dire. Based on that testimony and trial counsel's statement that his determination whether to challenge jurors was based on their body language, tone of voice, and other factors not apparent in trial transcripts, the court simply concluded that trial counsel "were not deficient" and that "any deficiency did not result in prejudice." *Robinson III*, 2013 WL 1149761, at *66.

370.    Similarly with respect to the inadequate scope of Robinson's trial counsel's voir dire, the Court of Criminal Appeals determined that "[t]he scope of voir dire is a tactical decision," and that it is "not within the court's province to second-guess strategic or tactical choices made by trial counsel." *Id.* Thus, the court concluded, Robinson was not entitled to relief. The court also rejected Robinson's claims regarding his counsel's failure to object to improper jury instructions and their failure to use a jury questionnaire or a jury consultant. *Id.* at *67-*68.

371.    The fact that Juror Boyd worked at the jail where Robinson was housed alone should have been enough to give rise to questions about her impartiality; when combined with the various other facts specifically pertaining to Robinson, including that Prentiss Phillips was his co-defendant, gang members at the jail, and her feelings about gang members, there is no doubt that Robinson's trial counsel should have sought to remove her from the jury. Their failure to do so, as explained below, constituted ineffective assistance of counsel, as did trial counsel's various other failures with respect to jury selection.

372.     The Court of Criminal Appeals' conclusory decision that Robinson's trial counsel's voir dire was adequate and not prejudicial simply ignores established federal law. As the Supreme Court has explained:

> Voir dire plays a critical function in assuring the criminal defendant that his Sixth amendment right to an impartial jury will be honored. Without an adequate voir dire, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. Similarly, lack of adequate voir dire impairs the defendant's right to exercise peremptory challenges.

*Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981).

373.     Similarly, the Supreme Court has said that "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (citation omitted). "[C]ertain inquiries must be made to effectuate constitutional protections," *id.* at 730, and Robinson's trial counsel simply failed to make them. Counsel's failures on this front denied Robinson an impartial jury, and thus fell far short of *Strickland*'s requirement that an attorney "bring to bear such skill and knowledge as will render the trial a reliable adversarial proceeding." 466 U.S. at 688. This is especially true with respect to trial counsel's failure to inquire as to whether members of the venire would automatically sentence Robinson to death upon a guilty verdict. In *Morgan*, the Supreme Court reversed the death sentence of an Illinois petitioner after the trial court refused to allow questioning as to whether jurors would automatically opt for a death sentence upon a conviction for murder. 504 U.S. at 731. The failure of Robinson's trial counsel to examine the venire along those lines exemplifies the ineffective assistance they rendered.

374.     Governing federal law is even more striking with regard to Juror Boyd's presence on the jury. At trial itself, Juror Boyd revealed that she felt that gang members were "bad" and

that she felt "apprehension" around them. Under Sixth Circuit law, *Strickland* prejudice is presumed where counsel allows a juror to remain on a panel even after she reveals bias. *Miller v. Webb*, 385 F. 3d 666, 675-76 (6th Cir. 2004). Moreover, trial counsel's failure to adequately examine Juror Boyd on voir dire denied Robinson and the trial court access to additional facts which would have been sufficient to strike Boyd from the jury.

F.　**This Court Must Review Robinson's Ineffective Assistance Claims De Novo, Because the Tennessee Courts Applied the Wrong Burden of Proof at Post-Conviction, and Their Decisions Were Therefore Not "On the Merits" and Are Not Entitled to Deference Under AEDPA.**

375.　In rejecting Robinson's claims on this issue, the Court of Criminal Appeals generally invoked the latitude in making strategic decisions that the U.S. Supreme Court has traditionally afforded trial counsel, while declaring the perfunctory and superficial investigation conducted by Robinson's counsel to be "reasonable." *Robinson III*, 2013 WL 1149761, at *65-*68.

376.　AEDPA only requires deference to state court decisions if the habeas claims were "adjudicated on the merits in State court." *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003). One circumstance in which a State's decision is not on the merits is when the State uses a burden of proof that is higher than the federal standard, because in doing so, the State has not necessarily decided that the federal standard was satisfied. *Wilson v. Workman*, 577 F.3d 1284, 1297 (10th Cir. 2009). For the same reasons as articulated in Ground No. 2, this Court should conduct a *de novo* review of the State courts' decision on this issue, because under these circumstances the standard of deference under AEDPA does not apply.

**Ground No. 16:** **Trial Counsel Rendered Ineffective Assistance by Failing to Obtain Expert Testimony to Confirm That the Photo Array Was Unduly Suggestive and by Failing to Prepare Adequately for Robinson's Suppression Hearing.**

377. Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and *Strickland*, 466 U.S. at 687, because his trial counsel failed to obtain expert testimony confirming that the photo array was unduly suggestive and also failed to adequately prepare for the suppression hearing.

378. Trial counsel also failed to provide Mr. Robinson with effective assistance because they did not obtain any expert testimony to support the undue suggestiveness of a photo array that depicted only one light-skinned African-American in the entire array. Instead, without any conceivable strategic justification, they relied solely on the vague lay testimony of Charles Pool, a co-defendant charged with murder whose testimony the court found not to be credible. As a direct result of this deficient preparation, counsel failed to introduce any concrete support for suppression (other than Pool's mere uneducated assertion) that could have enabled Mr. Robinson to suppress what became a key piece of trial evidence – namely, Chris James's identification of Mr. Robinson in photo array GG. Their failure in this regard fell below any reasonable standard of acceptable performance, and ushered highly prejudicial identification evidence against Mr. Robinson unfairly into his trial.

379. Trial counsel argued at the suppression hearing that the photo array shown to various witnesses identified Mr. Robinson was impermissibly suggestive because (i) Charles Pool was prompted to identify Mr. Robinson as a result of Sergeant Ashton's physical nudging and pointing toward Mr. Robinson's photo (Tr. 4 at 6-8.); and (ii) the array improperly singled out and directed improper attention to Mr. Robinson's photo because it was the only photo of a light-skinned African-American in the array. (*Id.* at 44.) As trial counsel contended, skin tone is

an important identifying characteristic, so for one photograph to stand out as distinct would impermissibly lead witnesses to identify that person. (*Id.*) But trial counsel did nothing more to advance that theory than ask Pool for his personal opinion about whether skin tone was an important way to identify people. (*Id.* at 8-10.) Not surprisingly, the trial court was unimpressed by counsel's attempt to elicit such opinion testimony from Pool, and later disparaged Pool's credibility as "about as narrow as it can get." (*Id.* at 47.)

380.    Under *Strickland*, trial counsel must adequately investigate the law underpinning matters of defense. *Strickland*, 466 U.S. at 691; *see also Beasley*, 491 F.2d at 696. Indeed, "it is the essence of attorney incompetence to fail to understand the governing law necessary to formulate [] a strategy." *Edwards v. Lamarque*, 475 F.3d 1121, 1129 (9th Cir. 2007). Here, Counsel's ignorant concession made the suppression issue appear immaterial, and effectively invited the trial court to deny the motion, resulting in harmful prejudice to Mr. Robinson.

381.    In addition to trial counsel's lackluster examination of Pool, counsel were unprepared to make the necessary legal arguments. At one point at the suppression hearing, trial counsel contended that witnesses should not be able to testify that they had identified Robinson in the photo array, but improperly conceded that if witnesses who had been shown the photo spread identified Robinson in court there would be "nothing" that trial counsel could do about it. (*Id.* at 43-45.)

382.    On post-conviction appeal, the Court of Criminal Appeals found that trial counsel had not rendered ineffective assistance by failing to call an expert regarding the photo array and by failing to adequately prepare for the suppression hearing. *Robinson III*, 2013 WL 1149761 at *78. It held that because the trial court did not find the photo array to have been unnecessarily suggestive, there was no prejudice even if Robinson's counsel *had* been deficient in their

preparation for the suppression hearing. With respect to the expert testimony not presented, the court held that Robinson was not entitled to relief because he did not present the expert testimony at the post-conviction hearing. *Id.*

383.     The Court of Criminal Appeals' stated rationale, however, is illogically circular: had Mr. Robinson's trial counsel competently presented essential evidence and avoided misguided legal concessions based on ignorance of relevant law, there is a reasonable probability that the trial court would have held the array to be unduly suggestive.

384.     Under *Strickland*, trial counsel must adequately investigate the law underpinning matters of defense. *Strickland*, 466 U.S. at 691; *see also Beasley*, 491 F.2d at 696. Indeed, "it is the essence of attorney incompetence to fail to understand the governing law necessary to formulate [] a strategy." *Edwards v. Lamarque*, 475 F.3d 1121, 1129 (9th Cir. 2007). When it came to whether witnesses who had been shown the photo array could identify Robinson in court, however, trial counsel insisted that there would be "nothing" they could do about it. That was simply a gross misunderstanding of governing law. A conviction based on an eyewitness identification at trial which follows a pre-trial photographic identification must be set aside if the photographic identification was unnecessarily suggestive. *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967); *see also Simmons v. United States*, 390 U.W. 377, 384 (1968). Tennessee law, too, requires the same result. *See State v. Meeks*, No. 01C01-9308-CC-00248, 1994 WL 548714, at *3 (Tenn. Crim. App. Oct. 6, 1994). By failing to understand these clearly-established precedents, trial counsel fell short of the "reasonabl[e] effective[ness]" required by *Strickland*. *See* 466 U.S. at 687-88. *See, e.g., Sims v. Livesay*, 970 F.2d 1575, 1579 (6th Cir. 1992) (counsel provided ineffective assistance in failing to have piece of evidence examined by expert). Counsel's failure to use an expert witness, like their inability to articulate the governing law on

suppression of identifications, demonstrates the lack of preparation they provided at this crucial point in the lead-up to Robinson's trial.

385.    Moreover, because the question of eyewitness identification goes to the heart of the evidence against a criminal defendant, trial counsel's failure to realize that in-court identifications might have been impermissibly tainted and could be excluded is sufficient to undermine confidence in the outcome of Robinson's trial. Had Robinson's trial counsel properly advanced their theory as to the photo array by using a qualified expert witness, and had counsel adequately understood the law, the photo array and the in-court identifications stemming from it should have been suppressed.

386.    Because trial counsel failed to understand the clearly established law - including U.S. Supreme Court precedent - regarding impermissibly suggestive photographic identifications, the outcome of Robinson's trial is unreliable. *Strickland*, 466 U.S. at 696. And because the Tennessee Court of Criminal Appeals failed to grant relief on this ground, its decision is an unreasonable application of clearly-established federal law. Robinson is therefore entitled to a new trial.

**Ground No. 17:  The Cumulative Effect of Counsel's Errors Constitutes Ineffective Assistance of Counsel.**

387.    The cumulative effect of counsels' errors during the guilt/innocence phase of the state court proceedings violated Robinson's rights under the Sixth and Fourteenth Amendments to the U.S. Constitution, as defined under *Strickland*. *See Strickland*, 466 U.S. at 687, 688 (counsels' performance "fell below an objective standard of reasonableness" and "deprive[d] the defendant of a fair trial, a trial whose result is reliable").

388.    Consideration of the cumulative effect of counsels' error is mandatory under *Strickland*. *See Williams*, 529 U.S. 362, 399 (2000) (granting habeas based on the "entire post

conviction record, viewed as a whole and cumulative"); *see Dobbs v. Zant*, 506 U.S. 357, 359 n.* (1993) (combined errors of counsel could be considered when conducting an ineffective assistance of counsel claim); *United States v. Cronic*, 466 U.S. 648, 657 n.20 (1984) ("counsel's overall representation of respondent, as opposed to any specific error or omission" may be the basis of an ineffective assistance of counsel claim).

389.　The mistakes of Robinson's trial and appellate counsel, viewed against the weakness of the evidence linking Robinson's to Green's death, "alter[ed] the entire evidentiary picture" and, are cumulatively prejudicial under *Strickland*, 466 U.S. at 696.

## OTHER VIOLATIONS OF ROBINSON'S CONSTITUTIONAL RIGHTS BY THE STATE AT THE GUILT/INNOCENCE PHASE OF HIS TRIAL

**Ground No. 18:　The State Violated Robinson's Due Process Rights by Using Inherently Contradictory and Irreconcilable Factual Theories in Robinson and Co-Defendant's Trials for the Same Crime.**

390.　Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth and Fifth Amendments to the United States because the State used inherently contradictory theories of leadership in Robinson's and co-defendant Prentiss Phillips' consecutive trials for the same crime. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

391.　It is clearly established federal law that the State's interest in administering justice, including its interest in protecting the innocent from wrongful conviction, prohibits a prosecutor from using improper means to convict a defendant. *Berger v. United States*, 295 U.S. 78, 88 (1935); *Napue v. Illinois,* 360 U.S. 264, 269 (1969); *United States v. Agurs*, 427 U.S. 97,

110-11 (1976). In accordance with this standard, the prosecution should not have presented a theory of leadership in Robinson's trial that was irreconcilable with the theory of leadership presented at Phillips' trial. The following facts, among others, support this claim:

392.     At Robinson's trial, the prosecution presented evidence that Robinson was the highest ranking member of the Gangster Disciples at the house where the victim was detained and that Robinson was the one who gave the order to kill the victim. Yet, in Phillips' subsequent trial the prosecution argued that it was Phillips, not Robinson, who was the highest ranking member at the house and that he alone gave the order to kill the victim. These theories are contradictory and irreconcilable.

393.     The same prosecutor tried both cases and the same judge presided over both trials.

**A.     The State Presented Conflicting Theories About Who Ordered the Murder at Robinson and his Co-Defendant Prentiss Phillips' Trials.**

394.     In its opening argument in Robinson's trial, the prosecution contended that it would prove the victim was killed "at the direction of Gregory Robinson." (Tr. 14 at 2.) It also asserted that Robinson ordered that the victim be "taken care of." *Id*. at 6.

395.     The prosecution called Chris James as a witness during the guilt/innocence phase of Robinson's trial. James testified that Robinson told the others "[y]'all know what to do" when the other Gangster Disciples left the house with the victim. (Tr. 5 at 119, 122.)

396.     Jarvis Shipp testified on behalf of the prosecution that Robinson "outrank[ed]" the other people in the house. (Tr. 7 at 324-27.) He also testified that Robinson was giving orders and directing other Gangster Disciples. (Tr. 6 at 233, 257, and 293.) He also testified that Robinson outranked Phillips. *Id*. at 270.

397.     In its closing argument, the prosecution argued that Robinson was "the man who was in charge, ultimately." (Tr. 14 at 15.) The prosecutor argued that after Kaos left Robinson

"became the ranking officer" and was "the ranking Gangster Disciple in [the] meeting." *Id*. at 16. She described Robinson as " the man who was calling the orders, who was directing people." *Id*. at 16-17. The prosecution argued that Robinson was the man "responsible for the actions" that ultimately led to the victim's death. *Id*. at 26. On rebuttal, the prosecution called Robinson "[t]he executioner." *Id*. at 91.

398. During Robinson's penalty phase hearing, Shipp testified that Robinson was the "most highly ranked" Gangster Disciple at the house where the victim was detained. (Tr. 18 at 5.)

399. In its closing argument during the penalty phase, the prosecution said that Robinson "gave orders to other people to go out and do his killing." (Tr. 17 at 129.)

400. In a hearing on Robinson's motion for new trial, the prosecution said that Robinson was a "higher up[ ]" compared to Phillips and that Phillips "had to answer to Gregory Robinson." (Tr. 24 at 145.)

401. But at Phillips' subsequent trial, the same prosecutors argued that Phillips, and not Robinson, was the highest ranking officer at the meeting and the one who gave the order to kill the victim. The State's two theories of leadership cannot both be true.

402. In the State's opening argument at Phillips' trial, the prosecutor stated that Phillips "was the ranking Gangster Disciple . . . ." Ex. 4 at 187 (Excerpts from *State v. Phillips*, Transcript of Evidence). The prosecutor also stated that "[h]is word was law," that as a Gangster Disciple "you obeyed his law on pain of death," and that Phillips "said Vernon Green needs to be killed." *Id.* at 187, 189.

403. The prosecution called Chris James as a witness during the guilt/innocence phase of Phillips' trial. He testified that Phillips was a "[c]oordinator" and that, as a coordinator, "[h]e

[had] the highest rank." *Id*. at 367-68. When asked if he knew whether Phillips was "higher or lower in rank" than Robinson, James testified that *Phillips* was "*higher than Greg*." *Id*. at 380. Asked "who would've been the highest ranking person" in the house after Kaos left, James responded: "Prentiss." *Id*. On redirect, the prosecutor asked James "who was the highest ranking person at this meeting" and "who was the person telling Gregory in this meeting what to do after Chaos left?" *Id*. at 406. James responded, "Prentiss," to both questions. *Id*. James also testified that while the victim was being beaten, the victim "asked Prentiss why he tell his folks leave him alone, he ain't done nobody." *Id*. 378-79.

404.    The State at Phillips' trial also asked James questions about who was giving orders in the house. The prosecutor asked if Phillips was "giving orders in your presence" and whether James thought Phillips "was in charge of this meeting." *Id*. at 388. James responded affirmatively to both questions. *Id*. He also testified that Phillips had even given an order to beat James because earlier that day James had failed to help a fellow Gangster Disciple fight a Vice Lord. *Id*. at 381-82.

405.    The prosecution did not call Jarvis Shipp as a witness during the guilt/innocence phase of Phillips' trial.

406.    In closing argument during the guilt/innocence phase of Phillips' trial, the prosecution argued that Phillips was "the one" who ordered the murder and that his "actions" "killed Vernon Green." *Id*. at 561-562, 578. On *nine* separate occasions during her closing argument, the prosecutor repeated the words allegedly spoken by the victim: "Prentiss, why are you doing this to me[.]" *Id*. at 561-562, 564, and 578-79. The prosecution argued that these words meant the victim "knew who his killer was" – namely, Prentiss Phillips. *Id*. at 578. On one occasion, the prosecution emphasized that the victim asked "Prentiss, why are you doing this to

me? Not . . . Greg, why are you doing this to me?" *Id*. Mocking Phillips' defense, the prosecution said "Prentiss Phillips would like you to think and just suppose that he didn't do any of this. Greg did all this . . . ." *Id*. at 565. The prosecutor essentially ridiculed the theory that the State itself had used during Robinson's trial to obtain a conviction and death sentence.

407.    The State's argument during closing at Phillips' trial was that the murder was committed "exclusively for personal reasons" and to "pump [Phillips'] authority up." *Id*. at 579, 580. The prosecutor specified that the reasons were personal to Phillips. *Id*. She argued that "[Phillips'] hand was on the hand that pulled the trigger and killed Vernon Green, because [he] gave the order [that] [the victim] needed killing." *Id*. at 581. The prosecutor said that Phillips "wanted Vernon Green dead" and "[he] is responsible." *Id*. at 580-81.

408.    The prosecution also argued that Phillips: was "the one who called that meeting and he's the one who told them what to do. . . . And he is responsible primarily"; "was . . . in control of this meeting"; "was in charge"; "was calling the shots"'; "gave the order"; and was personally affronted and sacrificed the victim "on the altar of [Phillips'] ego . . . to retain control." *Id*. at 546, 566, 579-81. More simply, the State contended, "[Phillips'] word was law." *Id*. at 580.

409.    The prosecution called Shipp as a witness during the sentencing-phase of Phillips' trial. Shipp testified that Phillips gave orders and instructions. *Id*. at 591-92, 601. When asked if Phillips was "giving orders in the apartment," Shipp said "[y]es." *Id*. at 598. When asked if Phillips had "ever instruct[ed] [Shipp] personally to do anything in the apartment," Shipp said that he was instructed to beat James and selected by Phillips to take the victim to the park. *Id*. at 599-600. He also testified that Phillips called the meeting. *Id*. at 592.

410.    In a bench conference during Shipp's testimony, the prosecution argued that its line of questioning was designed to show that Phillips "had the opportunity as the ranking officer to stop this action at any time." *Id*. at 593.

411.    In its closing argument during the penalty phase of Phillips' trial, the prosecutor said that the victim's death was "[h]einous, atrocious, and cruel, for no particular purpose except to satisfy [Phillips'] ego." *Id*. at 629. Emphasizing that as "the ranking man in that house" Phillips had the decision-making power to order the victim's death, the prosecution repeatedly pounded this point: "[Phillips'] choices led to the death of Vernon Green"; "[Phillips] made choices . . . and he chose a path that led to Vernon Green's death"; Phillips "made the choice that set a course of action that resulted in Vernon Green's death; it was "[Phillips'] choice"; and "[Phillips] took that choice and the choice resulted in Vernon Green's death." *Id*. at 628, 630. The prosecution repeated that Phillips was "the *one* who made those choices" and that "through his words and his actions, [Phillips'] hand was on the hand that shot Vernon Green." *Id*. at 630 (emphasis added).

412.    As the above makes clear, the prosecution at Phillips' trial explicitly and repeatedly contended that Phillips acted alone and not in conjunction with Robinson. This central theory of guilt is inconsistent and irreconcilable with the claim that Robinson issued the order to kill the victim. If these contentions at Phillips' trial were proved by the State beyond a reasonable doubt, then Robinson could not possibly have been the highest ranking Gangster Disciple at the apartment and could not possibly have given the ultimate order to kill Green.

413.    In a hearing on Phillips' motion for a new trial, the prosecution argued that Phillips "set the ball in motion to have the sequence of events put into place that ultimately resulted in the kidnapping and ultimate death of Green." Ex. 5 at 3 (Excerpts from *State v.*

*Phillips*, Transcript of Hearing for New Trial) The prosecutor argued that "it's a direct line, this man's words pointing out Vernon Green to the ultimate result of Green's death." *Id.* at 4.

**B.    The State's Use of Contradictory and Irreconcilable Theories Violated Robinson's Due Process Rights and Rendered his Conviction Unfair.**

414.    On direct appeal, the Tennessee Court of Criminal Appeals found that the State presented "proof and arguments which were inconsistent, contradictory, and factually irreconcilable regarding the relative rank of [Robinson] and Phillips." *Robinson I*, 2003 WL 21946735, at *19. The appeals court was also "troubled" by "the state's inconsistent positions regarding [Robinson's] rank" and "the presentation of witnesses by the state." *Id.* at *19-*20.

415.    Despite finding that the theories were inconsistent, the appeals court concluded that the theories about Robinson and Phillips' relative ranks were "not central to the state's case" such that there was "no showing of a reasonable likelihood of a different result" with respect to his conviction. *Id.* at *20.

416.    However, the appeals court did conclude that the State's contradictory theories deprived Robinson of due process with respect to the sentence of death. *Id.* at *53.

417.    Overruling the appeals court, the Tennessee Supreme Court concluded that the prosecution did not pursue inconsistent theories or offer contradictory proof in the trials of Robinson and Phillips. *Robinson II*, 146 S.W.3d at 496. Instead, the Tennessee Supreme Court found that the prosecution focused each trial on each defendant's culpability, "but [that] the theory remained the same." *Id.* at 497.

418.    Neither the Tennessee Court of Criminal Appeals nor the Tennessee Supreme Court addressed the inconsistency of arguing that Phillips acted alone after prosecuting, convicting, and securing a death sentence for Robinson for the same crime.

419. The government's role in criminal cases is unique. Because the prosecution in a criminal case represents the government's interests, a prosecutor is not at liberty to pursue convictions without regard for the truth. In *Berger*, the Supreme Court explained that a "prosecutor's duty is not only" to use every legitimate means to bring about "a just conviction but to refrain from improper methods calculated to produce a wrongful conviction." *Berger*, 295 U.S. at 633. The "two-fold aim" of the law is "that guilt shall not escape or innocence suffer." *Id*. As a representative of the State, a prosecutor's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Id*. "[W]hile [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones." *Id*. Prosecutors are therefore not free to try cases only with the best strategy for conviction in mind.

420. The *Agurs* court reiterated the *Berger* court's holding, stating: "[T]hough an attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that justice shall be done." *Agurs*, 427 U.S. at 110-11.

421. Additionally, because the prosecutor presented evidence in the two trials that was irreconcilably inconsistent, she knew that she was necessarily presenting false evidence in at least one of the trials. As explained in Ground 1 above, in *Napue v. Illinois*, the Supreme Court held that the Fourteenth Amendment is violated when a conviction is obtained through the knowing use of false evidence by the State. *Napue*, 360 U.S. at 269. Together, *Berger*, *Agurs*, and *Napue* dictate the finding of a due process violation where irreconcilably inconsistent theories have been used. The court need only apply the "well-established constitutional principles" of these cases "to govern a case that is closely analogous" to *Napue*, to reach this conclusion. *Williams v. Taylor*, 529 U.S. 362, 381 (2000).

422.    The prosecution's theories of leadership and authority in the two trials cannot be reconciled. It is inherently contradictory to argue that Phillips acted alone and without the help of Robinson in one trial and then to prosecute Robinson for the same crime. It is also inherently contradictory to argue culpability based on the status of being the highest ranking member present at the meeting and then claim that two different people held that position. Either Phillips outranked Robinson or Robinson outranked Phillips. Both cannot be true. And they could not both have been the "one" who gave the order to kill the victim. Nor can the inconsistency in the theories be reconciled by arguing that both Robinson and Phillips were ranking officers who gave the order to kill since the prosecution specifically argued that Phillips acted alone.

423.    The prosecution itself seemed to recognize that its contradictory theories of leadership were at the core of its cases against Robinson and Phillips. At Robinson's trial Shipp was called during the guilt/innocence phase to testify that Robinson outranked Phillips, but he was not called to testify about rank during the guilt/innocence phase of Phillips' trial. Similarly, the prosecutor did not ask James, who testified in the guilt/innocence phase of both trials, about rank during Robinson's trial but did ask him whether Phillips' outranked Robinson during Phillips' trial.

424.    The inconsistent and manipulated testimony of James and Shipp was the only evidence the prosecution presented of Robinson and Phillips' relative ranks.

425.    Consequently, there is a reasonable likelihood that the outcome of Robinson's trial would have been different had the prosecution not argued that he was the highest ranking member present or had the jury also heard the prosecutor's argument that Phillips was the highest ranking member present.

426.     Similarly, a reasonable likelihood exists that the outcome of Robinson's trial would have been different had the prosecution not argued that he alone gave the order to kill the victim.

427.     The prosecutor's strategy of presenting inconsistent theories of leadership and manipulating testimony to avoid exposing this contradiction was improper because it prioritized convicting both Robinson and Phillips over convicting the actual perpetrator.

428.     In *Stumpf v. Mitchell*, 367 F.3d 594 (6th Cir. 2004) ("*Stumpf I*"), which was reversed on other grounds, the Sixth Circuit sitting en banc in a non-habeas setting, joined the Eighth and Ninth Circuits and held that the use of inconsistent prosecutorial theories was a due process violation. The Sixth Circuit's decision was appealed to the Supreme Court, which remanded this issue back to the Sixth Circuit after deciding the case on other grounds. In *Stumpf v. Houk*, 653 F.3d 426 (6th Cir. 2011) ("*Stumpf II*"), the Sixth Circuit again held that the use of inconsistent prosecutorial theories was a due process violation. Rehearing en banc was granted. The en banc Sixth Circuit court concluded that the prosecutor's theories were not truly inconsistent and reversed. *Stumpf v. Robinson*, 722 F.3d 739 (6th Cir. 2013) ("*Stumpf III*"). To reach this conclusion, the *Stumpf III* court found it necessary to distinguish the case factually from situations involving inconsistent theories that do present a due process violation. *Id*. at 749. Thus, the Sixth Circuit decision in *Stumpf III* endorses the view that, where actually inconsistent theories are presented, the due process clause is violated.

429.     The Sixth Circuit distinguished Stumpf's case from *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000), on the grounds that the prosecution "did not offer different (and contradictory) testimony from the same witness . . . without acknowledging the contradiction" as it had in *Groose*. It distinguished Stumpf's case from *Thompson v. Calderon*, 120 F.3d 1045 (9th

Cir. 1997), on the grounds that the "prosecution did not present a different and incomplete set of facts in support of different theories of culpability for the same crime" as it had in *Thompson*. *Stumpf III*, 722 F. 3d at 749.

430. Here, the prosecution did offer different testimony from the same witnesses without acknowledging the inconsistency. It did so by calling both James and Shipp at each trial but strategically eliciting different testimony from each witness at the two trials. The prosecution also presented an incomplete set of facts in the two trials. At Robinson's trial, the prosecution did not present facts showing that Phillips had acted alone. But the prosecution did present this evidence at Phillips trial and specifically denied Robinson's involvement. These actions distinguish Robinson's case from *Stumpf III* and put it squarely within the holdings of *Groose* and *Thompson*.

431. The *Smith* court concluded that the due process clause forbids a state from using inconsistent, irreconcilable theories to secure convictions against two or more defendants in prosecutions for the same offenses arising out of the same event. It added that "[t]o violate due process an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime." *Smith*, 205 F.3d at 1052. It explained that "[the] system is poorly served when a prosecutor, the states' own instrument of justice, stacks the deck in his favor" and that "[t]he State's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth." *Id.* at 1051. The Eighth Circuit held that its ruling was dictated by the holdings of *Berger v. United States,* 295 U.S. 78 (1935), *United States v. Agurs*, 427 U.S. 97 (1976), *Napue v. Illinois,* 360 U.S. 264 (1959), , and *United States v. Bagley*, 473 U.S. 667 (1985).

432.    The *Thompson* court, emphasizing the prosecutor's unique role to ensure fundamentally fair trials by "seeking not only to convict, but also to vindicate the truth to administer justice," disapproved of the prosecutor for "essentially ridicul[ing] the theory he had used to obtain a conviction and death sentence at Thompson's trial." *Thompson*, 120 F.3d at 1057. The Court held that "[t]he state cannot divide and conquer in this manner [because] [s]uch actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for truth." *Id.* at 1059 (quoting *Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (J. Clark concurring)). The Ninth Circuit described the principles recognized by the Supreme Court in *Berger* and *Napue* as preventing "a prosecutor . . . in order to convict two defendants at separate trials, [from] offer[ing] inconsistent theories and facts regarding the same crime." *Id.* at 1058.

433.    The Second and Fourth Circuits have also stated that the use of inconsistent prosecutorial theories violates due process. *United States v. Boyle*, 283 F. App'x 825, 826 (2d Cir. 2007), *aff'd*, 566 U.S. 938 (2009); *United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003).

434.    As the above makes clear, the prosecution was not permitted to argue one theory at Robinson's trial to secure a death penalty and then attack that theory at Phillips' trial to secure a second conviction. *See Drake v. Kemp*, 762 F.2d 1449, 1478 (11th Cir. 1985) (Clark, J., concurring). If the prosecutor believed Robinson was solely culpable for the murder, he should not have prosecuted Phillips on that basis; or if she came to believe that Phillips acted alone in exercising his sole authority to order the murder, she should have taken steps to correct the conviction and death sentence of Robinson. *Id.*

435.    Because the State did use contradictory theories of leadership in the trials of co-defendants for the same crime, the Tennessee Court of Criminal Appeals and Tennessee Supreme Court decisions were contrary to, or an unreasonable application of, clearly established

federal law and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. Robinson is therefore entitled to habeas relief from his conviction and sentence.

**Ground No. 19: The State Violated Gregory Robinson's Constitutional Rights by Withholding the Transcript of the Hearing on Shipp's Motion to Suppress His Initial Statement to Police.**

436.     The State violated Robinson's due process rights under the Fifth and Fourteenth Amendment and *Brady v. Maryland* by failing to provide Robinson's trial counsel with the transcript of Shipp's own motion to suppress his initial statement to police.

437.     During the hearing on Shipp's own motion to suppress his initial May 1997 Statement to police, Shipp testified that he only made the statement because the police threatened to put him in the same holding cell as members of the Vice Lords. (P-C 7, Ex. 6 at 31-34, 39.) The transcript of the hearing was, however, not turned over to Robinson's trial counsel (P-C 15 at 215-16; 339-40.)

438.     On direct appeal, the Tennessee Supreme Court found that it would have been of little benefit to Robinson to point out that Shipp claimed he gave his statement (at this point the government had not disclosed that Shipp made a second statement, the November 5 Statement, right before the trial) out of fear since at trial Robinson's counsel argued that the May 1997 statement, which did not implicate Robinson, was accurate. *Robinson II*, 146 S.W.3d at 514. The Court also found that the suppression hearing transcript was not material because Shipp was extensively cross-examined during trial. *Id.*

439.     The Tennessee Supreme Court's decision that transcript of Shipp's suppression hearing was a unreasonable application of the clearly established law of *Brady* and its progeny.

440.     The Tennessee courts did not take into account that the transcript from Shipp's suppression hearing would have strongly supported Robinson's argument that Shipp's initial statement was correct and he was lying at trial. If the jury had known that Shipp was terrified of being put in a holding cell with the Vice Lords, Shipp's argument that he coolly revised his story to omit Robinson would not have been persuasive to them.

441.     Additionally, the materiality of all *Brady* evidence that the government fails to turn over must be assessed cumulatively. *See Kyles,* 514 U.S. at 436-437. Therefore, the Court must assess the materiality of the transcript of Shipp's suppression hearing in combination with Shipp's November 5 Statement. *See* Ground No. 2. The combination of those two pieces of *Brady* material would have shown that Shipp was far from the brave and honorable witness who was testifying "on behalf of the victim's family" that the government portrayed him as. Instead, Shipp's motivation for making statements and testifying was to save himself.

442.     Accordingly, there was a reasonable probability that if the transcript of the suppression hearing had been properly turned over by the government, it would have altered the verdict.

**Ground No. 20:   The State Violated Robinson's Due Process Rights by Failing to Instruct the Jury on the Lesser Included Offenses of Facilitation and Solicitation.**

443.     Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth and Fifth Amendments to the United States Constitution because the trial court failed to instruct on facilitation and solicitation of murder and especially aggravated kidnapping. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, and resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in state court.

444.    It is clearly established federal law that a defendant cannot be sentenced to death for a capital offense if his jury was not instructed on a lesser included noncapital offense that was supported by the evidence. *Beck v. Alabama*, 447 U.S. 625 (1980).

445.    At trial, evidence was presented that Robinson instructed six gang members to take Green "fishing." Jarvis Shipp testified that he understood "fishing" to mean to "take him way out somewhere out of the district, rough him up a little bit by physical abuse, and let him get back the best way he could." (Tr. 6 at 279-280.) Shipp had also testified that Kaos told Shipp that, with respect to Green, "[w]hat you all do now is personal." (*Id.* at 154.)

446.    The jury was instructed on first degree murder, second degree murder, especially aggravated kidnapping, aggravated kidnapping, and kidnapping. The jury determined that Robinson's instructions were in fact an order that Green should be kidnapped and killed. The trial court did not instruct the jury on the lesser included offenses of facilitation and solicitation when it instructed the jury on first degree murder and especially aggravated kidnapping.

447.    Tennessee defines facilitation as follows: "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility . . ., the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (1997).

448.    A person is guilty of solicitation when he "by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense ... with the intent that the criminal offense be committed . . . ." Tenn. Code Ann. § 39–12–102(a) (1997).

449.     The Trial Court did not instruct the jury on the lesser included offenses of facilitation and solicitation when it instructed the jury on first degree murder and especially aggravated kidnapping.

450.     On direct appeal, the Tennessee Court of Criminal Appeals found that Tennessee law required the trial court judge to charge the offenses of facilitation and solicitation of first degree murder and especially aggravated kidnapping and held that it could not conclude beyond a reasonable doubt that the failure to instruct the jury on these lesser offenses was harmless error that did not affect the outcome of the trial. *Robinson I*, 2003 WL 21946735, at *38-*40.

451.     The appeals court explained that if the evidence, construed in the light most favorable to Robinson, would have allowed the jury "to conclude that [Robinson], although not acting with the intent to promote premeditated murder [or especially aggravated kidnapping] nor benefit in the results, furnished substantial assistance to the principal actors knowing that they intended to commit premeditated first degree murder [or especially aggravated kidnapping]" the trial court should have instructed the jury on facilitation. *Robinson I*, 2003 WL 21946735, at *37 (internal quotation marks and citations omitted). Similarly, if the evidence would have allowed the jury to conclude that Robinson "by means of oral, written or electronic communication, directly or through another, intentionally command[ed], request[ed] or hire[d] another to commit a criminal offense, with the intent that the criminal offense be committed" but without directing or aiding the commission of the crime, the trial court should have instructed the jury on solicitation of first degree murder and especially aggravated kidnapping. *Id*. at *39 (internal quotation marks and citations omitted). The appeals court held that an instruction on solicitation was warranted "whether the intended crime does or does not occur." *Id*.

452. With respect to facilitation of premeditated murder, the Tennessee Court of Criminal Appeals concluded that Robinson could have known that the other gang members intended to kill Green and provided them with substantial assistance without sharing their intent. Specifically, the appeals court found that "the jury could infer that [Robinson] did not share in the others' intent to kill because it was not 'personal' to [him]" while "nonetheless . . . knowing of *their* intent to kill and substantially assist[ing] by ordering that the victim be taken to a secluded area." *Id*. at *38 (emphasis supplied). This conclusion was based on evidence that Kaos, the highest ranking Gangster Disciple involved in the incident, told Shipp and Phillips that "[w]hat you all do now is personal." *Id*. Accordingly, the appeals court concluded that a charge of facilitation of premeditated murder was warranted.

453. Similarly, because part of Robinson's defense at trial relied on evidence that Phillips was the one in charge of the meeting and giving orders, and that Robinson's order to take Green "fishing" meant to take him to a secluded area, the Court of Criminal Appeals stated that it could not conclude beyond a reasonable doubt that the failure to instruct the jury on these lesser offenses was harmless error that did not affect the outcome of Robinson's trial. *Id*. at *38-*39. The appeals court also concluded that "the failure to charge solicitation to commit premeditated first degree murder was reversible error." *Id*. at *39.

454. With respect to facilitation of especially aggravated kidnapping, the appeals court found that a jury could have concluded that although Robinson participated in the kidnapping by ordering the other gang members to take Green "fishing," he did not intend for the kidnapping to be especially aggravated. Since the jury could have concluded that Robinson offered substantial assistance without intending that the kidnapping be especially aggravated, the appeals court held that an instruction on facilitation of especially aggravated kidnapping was warranted. And

because Robinson's defense relied on his level of participation and the nature of his instructions, the failure to instruct on solicitation was not harmless. *Id*. at *39. Since the jury could have also found that Robinson commanded the gang members to commit especially aggravated kidnapping, with the intent that the offense be committed, the appeals court also held that an instruction on solicitation was warranted and that its exclusion was not harmless. *Id*. at *40.

455.    The Tennessee Supreme Court reversed the Tennessee Court of Criminal Appeals. First, the Tennessee Supreme Court ruled that solicitation was not a lesser included offense. *Robinson II*, 146 S.W.3d at 487. Instructions on solicitation of first degree murder and especially aggravated kidnapping therefore were not warranted. Second, the Tennessee Supreme Court acknowledged that facilitation is a lesser included offense of first degree murder and especially aggravated kidnapping but ruled that the charge was not supported by the evidence. *Id*. at 487-88.

456.    With respect to facilitation of first degree murder, the Tennessee Supreme Court found that the evidence reasonably supported only one of the following conclusions: (1) Robinson was not present or involved in the offenses and is therefore innocent; (2) Robinson was present but gave no orders and is therefore innocent; or (3) Robinson ordered the others to kidnap and kill Green and is therefore guilty by criminal responsibility. *Id*. at 478.

457.    In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court held that a defendant cannot be sentenced to death for a capital offense if his jury was not instructed on a lesser included noncapital offense that was supported by the evidence. Even in the noncapital context, "it has long been 'beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the

lesser offense and acquit him of the greater.'" *Id*. at 635 (citing *Keeble v. United States*, 412 U.S. 205, 208 (1973)).

458. The *Beck* court explained that "providing the jury with the 'third option' of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard." *Id*. at 634 (citing *Keeble v. United States*, 412 U.S. 205, 208 (1973)). With respect to capital offenses, it added that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense–but leaves some doubt with respect to an element that would justify conviction of a capital offense–the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id*. at 637. Failure to instruct a jury on a lesser included offense "may encourage the jury to convict for an impermissible reason–its belief that the defendant is guilty of some serious crime and should be punished . . . [or] may encourage it to acquit for an equally impermissible reason–that whatever his crime, the defendant does not deserve death." *Id*. at 642-43. These two "extraneous factors . . . introduce a level of uncertainty and unreliability into the fact-finding process that cannot be tolerated in a capital case." *Id*. at 643. The Court concluded that a trial court cannot refuse to instruct a jury on a lesser included offense if doing so would enhance the risk of an unwarranted conviction. *Id*. at 638; *cf. Schad v. Arizona*, 501 U.S. 624 (1991), *Palmer v. Bagley*, 330 F. App'x 92 (6th Cir. 2009).

459. Failure to instruct on such lesser included offenses impermissibly presents the jury with a choice between convicting Robinson of a capital crime or acquitting him even though the evidence suggested he was guilty of some serious violent offense. "Such a risk cannot be tolerated in a case in which [Petitioner]'s life is at stake." *Beck v. Alabama*, 447 U.S. 625, 637 (1980). "[I]f the unavailability of a lesser included offense instruction enhances the risk of an

unwarranted conviction, [a State] is constitutionally prohibited from withdrawing that option from the jury in a capital case." *Id.* 637-38.

460. Here, the Tennessee Supreme Court's ruling violates this clearly established rule. The ruling is based on the erroneous conclusion that Robinson could not substantially assist Shipp and Phillips in the murder without sharing their intent. To the contrary, the evidence is entirely consistent with the theory. A jury could have rationally concluded that Robinson facilitated the murder by ordering that the victim be taken "fishing," or be kidnapped and allowed to return from a remote location, without sharing their intent to kill him.

461. Because the trial court was obligated by *Beck* to instruct the jury on facilitation and solicitation of first degree murder and especially aggravated kidnapping, the Tennessee Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

**Ground No. 21: Jury Instructions Defining "Intentionally," "Knowingly," "Direct," "Circumstantial," and "Reasonable Doubt" Lowered the State's Burden of Proof Violating Robinson's Due Process Rights.**

462. Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth and Fifth Amendments to the United States Constitution because the trial court's jury instructions lowered the State's burden of proof below a reasonable doubt standard. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.

463. It is clearly established federal law that in a criminal trial the State must prove its case beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *see Victor v.*

*Nebraska*, 511 U.S. 1 (1994); *Cage v. Louisiana*, 498 U.S. 39 (1991). In accordance with this standard, the trial court's definitions of the terms "intentionally," "knowingly," "direct," "circumstantial," and "reasonable doubt" were improper because they lowered the State's burden of proof. The following facts, among others, support this claim:

464.   The trial court defined "intentionally" as follows: "[A] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result . . . ." (Tr. 15 at 9.)

465.   The trial court defined "knowingly" as follows: "Knowingly means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. The requirement of knowingly is also established if it shown that the defendant acted intentionally." (*Id.*)

466.   The trial court defined "direct evidence" as follows: "Direct evidence is those parts of the testimony admitted in court which referred to what happened and was testified to by witnesses who saw or heard or otherwise sensed what happened first hand. If witnesses testified about what they themselves saw or heard or otherwise sensed, they presented direct evidence." (*Id.* at 13.)

467.   The trial court defined "circumstantial evidence" as follows: "Circumstantial evidence is all the testimony and exhibits which give you clues about what happened in an indirect way. It consists of all the evidence which is not direct evidence . . . . When the evidence is entirely circumstantial, then before you would be justified in finding the defendant guilty, you

must find that all the essential facts are consistent with the theory of guilt, and the facts must exclude every other reasonable theory except that of guilt." (*Id.*. at 13-14.)

468.    The trial court defined "reasonable doubt" as follows: "[R]easonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible or an imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense." (*Id.* at 12-13.)

469.    On direct appeal, the Tennessee Supreme Court concluded that the trial court's instructions on "intentionally" and "knowingly" were incorrect but constituted harmless error. *Robinson II*, 146 S.W.3d at 521. The appeals court also concluded that there was no reasonable likelihood that the jurors interpreted the trial court's definitions of "direct" and "circumstantial" so as to prevent proper consideration of the evidence. *Id.* at 521-22 The appeals court also dismissed Robinson's claim regarding the definition of "reasonable doubt" as without merit. *Id.* at 522.

470.    In its jury charge for the guilt/innocence phase, the Trial Court's definitions of "intentionally" and "knowingly" included what is commonly known as "nature of conduct instructions." The definition of intentionally included the phrase "a conscious objective or desire to engage in the conduct or cause the result." (Tr. 15 at 4.) The charge's definition of "knowingly" included the phrase "is aware of the nature of the conduct or that the circumstances exist." (*Id* at 6.)

471.    It is clearly established under federal law that "nature-of-conduct" instructions lower the State's burden of proof and create an impermissible risk that the jury convicted on less

than a reasonable doubt standard. *In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). The *Winship* Court reiterated the long-held rule that "[n]o man should be deprived of his life under the forms of law unless the jurors who try him are able, upon their consciences, to say that the evidence before them . . .is sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime." *In re Winship*, 397 U.S. 358, 363 (1970) (quoting *Davis v. United States*, 160 U.S. 469, 493 (1895). *See also Victor v. Nebraska*, 511 U.S. 1 (1994); *Cage v. Louisiana*, 498 U.S. 39 (1991).

472.    In evaluating a jury instruction's satisfaction of the reasonable doubt standard, "the proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it." *Victor v. Nebraska*, 511 U.S. 1, 6 (1994) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). If there is a reasonable likelihood that the jury understood the instruction as allowing conviction based on proof less than "beyond a reasonable doubt," Robinson's due process rights were violated. *Victor v. Nebraska*, 511 U.S. 1 (1994); *In re Winship*, 397 U.S. 358, 364 (1970). Using an instruction that allowed the jury to convict on less than a reasonable doubt standard was contrary to clearly established federal law.

473.    Under Tennessee law, murder is a "result-of-conduct" offense and not a "nature-of-conduct" offense. *See State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000); *State v. Page*, 81 S.W.3d 781, 787-88 (Tenn. Crim. App. 2002). "A result-of-conduct offense requires that the culpable mental state accompany the result as opposed to the nature of the conduct. The focus is on whether the actor possessed the required culpability to effectuate the result . . . . Generally, an

offense [is] classified as a result-of conduct offense when the result of the conduct is the only element contained in the offense." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). *See also Page*, 81 S.W.3d at 787. The prosecution was required to prove beyond a reasonable doubt that Robinson had the requisite mental state to cause the result, i.e. the murder. "A jury instruction that allows a jury to convict on . . . murder based only upon awareness of the nature of the conduct or circumstances surrounding the conduct improperly lessens the state's burden of proof." *Page*, 81 S.W.3dat 788 .

474.    At trial, the jury was required to find that Robinson had "a conscious objective or desire to cause the result" beyond a reasonable doubt in order to convict him of criminal responsibility. This understanding is reinforced by the *Page* court, which explained that the appropriate definition of "intentionally" for murder is: "A person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim." *Page*, 81 S.W.3d at790. However, the trial court's definition of "intentionally" improperly instructed the jury that Robinson could be convicted of criminal responsibility for murder upon proof beyond a reasonable doubt that Robinson had "a conscious objective or desire to *engage in the conduct* or cause the result."[20] (emphasis added). Because the trial court's instruction was in the disjunctive, it improperly authorized a conviction based solely upon a desire to engage in conduct without also requiring the jury to find that Robinson had a desire to cause the result of the conduct. *See id.* at 787. If the jury convicted on this basis alone, then the prosecution failed to prove every element of the crime of criminal responsibility beyond a reasonable doubt contrary to clearly established federal law.

---

[20] The trial court defined "intentionally" as follows: "A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result . . . ." (Tr. 15 at 4.)

475.     Similarly, the trial court's definition of knowingly improperly instructed the jury that it could convict Robinson of criminal responsibility for murder upon proof beyond a reasonable doubt that Robinson was "aware of the nature of the conduct or that the circumstances exist" even though a conviction for knowingly causing a murder requires that Robinson was aware that his "conduct is reasonably certain to cause death." [21] *Page*, 81 S.W.3d at 788; *see Ducker*, 27 S.W.3d at 896 (instruction should be limited to "knowingly causes another's death). The *Page* court explained that "allowing the jury to convict based upon awareness of the nature of the conduct or circumstances surrounding the conduct erroneously lessens the state's burden of proof for this offense." *Page*, 81 S.W.3d at 781. The *Page* court explained that the appropriate definition of "knowingly" for murder is: " 'Knowingly' means that a person acts with an awareness that [his] [her] conduct is reasonably certain to cause the death of the alleged victim." *Page*, 81 S.W.3d at, 788. Because the trial court's instruction was in the disjunctive, it improperly authorized a conviction based solely upon an awareness of the nature of the conduct or that a particular circumstance exists without also requiring the jury to find that Robinson was aware that his conduct was reasonably certain to cause death. *Page*, 81 S.W.3d at, 787. If the jury convicted on this basis alone, then the prosecution failed to prove every element of the crime of criminal responsibility beyond a reasonable doubt contrary to clearly established federal law.

476.     This error was not harmless. The likelihood that the jury understood the jury instructions to permit them to convict Robinson without proof beyond a reasonable doubt that he

---

[21] The trial court defined "knowingly" as follows: "[A] person acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." (Tr. 15 at 6.)

had "a conscious objective or desire to cause the [murder]" or was aware that his "conduct [was] reasonably certain to cause death" impermissibly lowered the State's burden of proof contrary to clearly established federal law. Specifically, it created the likelihood that the jury would improperly convict on criminal responsibility where the death of the victim was an unintended or uncertain consequence of Robinson's conduct. Moreover, if the jury convicted based on Robinson's decision to engage in the conduct alone, his conviction should only have been for facilitation or solicitation not for criminal responsibility.

477.    The trial court's definition of "direct" and "circumstantial" also lowered the State's burden of proof because it implied that all testimonial evidence that is not hearsay is direct evidence. These definitions fail to distinguish between direct evidence of a fact and direct evidence of a circumstance from which an inference about a fact may be drawn. Consequently, the trial court's instructions created an impermissible risk that the jurors would convict based on circumstantial evidence without following the cautionary instructions for convictions by circumstantial evidence, which require that all essential facts are consistent with the theory of guilt and exclude every reasonable theory other than guilt.

478.    The trial court's inclusion of the phrase "moral certainty" in the definition of reasonable doubt also impermissibly lowered the State's standard of proof. The prosecution had previously told the jury during voir dire that the phrase "moral certainty" simply meant being able to "look yourself in the mirror and say, I feel right about what I decided." (Tr. 12 at 336.) This falls considerably below the standard of reasonable doubt. Because the trial court did not correct the prosecution's definition or provide its own definition of "moral certainty," a reasonable likelihood exists that the jury understood the phrase to require a mere preponderance of the evidence. After the trial, one juror explained that he understood the State's burden of proof

to be satisfied "as long as the scales tilt." (Tr. 13 at 564.) This error can only be remedied by a new trial.

479.    Because the trial court's definitions of certain terms in the jury instructions lowered the State's burden of proof, the Tennessee Court of Criminal Appeals and Tennessee Supreme Court Decisions were contrary to, or an unreasonable application of, clearly established federal law. As such, Robinson is entitled to habeas relief from his conviction and sentence.

**Ground No. 22:  The Trial Court Erred By Denying Robinson's Motion for a Mistrial After Impermissible Identification Testimony.**

480.    Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth and Fifth Amendments to the United States Constitution because the trial court erroneously denied his motion for a mistrial after impermissible identification testimony was presented. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.

481.    After the State capitalized on an improper "show-up" identification, in which a single photograph of Robinson had been shown to a key rebuttal witness immediately prior to her testimony, the trial court failed to grant a mistrial. To allow the improper identification and fail to grant a mistrial violated Robinson's Fifth Amendment and Fourteenth Amendment rights as well as clearly-established federal law.

**A.    Following a Prejudicial and Impermissible "Show-Up" Identification and Related Testimony, The Trial Court Refused to Grant a Mistrial**

482.    At Robinson's trial, the State called Nichole Black as a rebuttal witness to testify that Robinson was present at her apartment on the night of the murder. Black, however, had

never identified Robinson upon viewing photo arrays shown to her by the police. (Tr. 9 at 651-52.) Nor did she initially identify Robinson in the courtroom. (Tr. 9 at 645.)

483.    Black did, however, identify that the man shown in a photograph known as Exhibit 18 had been present on the night of the murder, and testified that the man shown in Exhibit 18 looked like Robinson, seated behind counsel table. (Tr. 9 at 645-46.)

484.    After a lengthy colloquy at the bench, the State admitted that it had shown Exhibit 18 - a single photograph of Robinson - to Ms. Black that very morning without notification to the defense. (Tr. 9 at 664-65.)

485.    Robinson's trial counsel objected that showing a single photograph of Robinson to a key rebuttal witness was an improper "show-up," and the trial court agreed. (Tr. 9 at 669-70.)

486.    The court declined trial counsel's motion for a mistrial (Tr. 9 at 673) but ultimately ruled that Nichole Black's identification testimony based on the photograph was inadmissible and instructed the jury to "disregard everything that she testified to." (Tr. 9 at 683.)

487.    On direct appeal, the Court of Criminal Appeals acknowledged that the decision whether to grant a mistrial "rests within the sound discretion of the trial judge," but recognized that the circumstances surrounding Nichole Black's testimony were particularly problematic here. While "[u]nder ordinary circumstances, the jury instruction would be deemed adequate to alleviate any prejudice to the defendant," the court wrote, in this case "the identity of the defendant as the person present at the apartment was indeed the most controverted issue at trial." *Robinson I*, 2003 WL 21946735, at *27.

488.    Thus, according to the court, it was "crucial" that the trial court "un-ring the bell" after Nichole Black's prejudicial testimony. *Id.* Noting that it had decided to remand the case for

a new trial due to the trial court's other errors, however, the court declined to determine whether the failure to grant a mistrial was itself reversible error. *Id.* On appeal, however, and in reinstating the trial court's verdict, the Tennessee Supreme Court found that the trial court did not abuse its discretion because viewed as a whole Nichole Black's testimony was vague and uncertain since she had just previously testified that no one in the Courtroom was in her apartment the night of Green's murder. *Robinson II*, 146 S.W.3d at 494.

**B.    The Tennessee Court of Criminal Appeals Misapplied Clear Federal Law Regarding Mistrials Following Improper and Prejudicial Evidence.**

489.    There can be little doubt that the one-photo show-up shown to Nichole Black was improperly suggestive. As the Sixth Circuit has recognized, show-up identifications are "widely-condemned," and the danger of impropriety is "increased if the police display to the witness only the picture of a single individual . . . ." *Carter v. Bell*, 218 F.3d 581, 605-06 (6th Cir. 2000) (quoting *Simmons v. United States*, 390 U.S. 377, 383 (1972)).

490.    That danger is only heightened here, where Nichole Black was shown Robinson's photograph on the very day she would be asked whether she could identify him in court. The trial court implicitly recognized as much in instructing the jury to disregard all of the testimony it had just heard from Nichole Black – testimony that focused entirely on identifying Robinson as having been present on the night of Vernon Green's murder.

491.    The cautionary instruction, however, was not enough. A mistrial and not an instruction to disregard should be granted where the stricken evidence is "so prejudicial that its harmful effect cannot be eliminated." *United States v. Talley*, 164 F.3d 989, 1002 (6th Cir. 1999) (citation omitted). The Sixth Circuit has similarly explained that a mistrial is not necessary where "it does not appear that the government intentionally elicited the [testimony] . . . the government's line of questioning was reasonable; the district court gave an immediate clear

limiting instruction; . . . and the [improper] remark constituted only a miniscule part of the evidence . . . ." *United States v. Harris*, 165 F.3d 1062, 1066 (6th Cir. 1999).

492.    In contrast to the testimony at issue in *Harris*, Nichole Black's testimony was hardly a stray remark. Her *entire* testimony was stricken by the trial court as a result of the improper and previously undisclosed show-up identification, and her entire testimony concerned Robinson's alleged presence at her apartment on the night of the murder. The government intentionally elicited the testimony, intentionally showed Ms. Black the show-up photograph prior to her testimony to "make sure she could identify him" (Tr. 9 at 663), and did so without any prior notification to the defense. Moreover, the government's line of questioning can hardly be said to have been reasonable under the circumstances, stemming as it did from an improper photo identification.

493.    With respect to the court's limiting instruction, although the court did instruct the jury to disregard Nichole Black's testimony, the instruction was neither prompt nor emphatic enough to carry much weight. (Tr. 9 at 683.) Nearly 30 pages of trial transcript - including bench conference and colloquy once the jury was sent to the jury room - passed between the time that counsel approached the bench regarding Nichole Black's testimony and that the judge gave the limiting instruction. That delay could only have heightened the emphasis on Ms. Black's testimony and given the jury extensive time to consider it. *See Wilson v. Morgan*, 477 F.3d 326, 341 (6th Cir. 2007) (court must promptly give curative instruction); *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003) (reviewing court must consider whether limiting instruction was "immediate").

494.    Finally, while Nichole Black's testimony did not constitute a large portion of the State's proof *overall*, she was the *only* rebuttal witness offered by the State, and as noted above,

the entirety of her testimony was stricken as improper. The prejudice stemming from her testimony is thus quite unlike cases in which a stray or passing remark is found not to justify a mistrial. The impropriety that the trial court recognized went to the heart of Nichole Black's testimony, and her testimony that Robinson had been present at her apartment on the night of the murder was a critically important piece of the State's case. (Indeed, the importance of her identification to the State is highlighted by the fact that she was the only rebuttal witness called.) The trial court erred, therefore, and Robinson's rights were violated, by the court's failure to grant a mistrial in light of the improper and prejudicial show-up photographic identification.[22]

**Ground No. 23:   The Trial Court's Admission of the Victim's Skull and Gruesome Photos Violated Robinson's Right to Due Process.**

495.     Robinson's due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution were violated because the Trial Court admitted the victim's skull and inflammatory photos of the victim's body that added nothing of probative value to the prosecution's case.

496.     The State's theory at Robinson's trial was that he was responsible for the death of Vernon Green because he directed others to kill him. It is undisputed that Robinson was not at the scene or the crime. During Robinson's trial, the prosecution argued that Robinson sought to obliterate the victim's identity in an effort to get inflammatory photos admitted into evidence. But the State never introduced any evidence showing that Robinson specified how Green should

---

[22] That the trial court was flippant and rash in considering whether a mistrial might have been appropriate is highlighted by the court's response, just prior to Nichole Black being called as a rebuttal witness, to defense counsel's efforts to locate an additional witness. *See* (Tr. 9 at 641-42.) ("The Court: I will deny that because for the record it's now a quarter to eight on Friday night. We have been in this trial for one week complete, every day, all day long. . . . [I]t's a quarter to eight at night. I'm not going to delay this jury any further . . . .").

be murdered, however, and it became clear that the prosecution was using that argument as a pretext to get prejudicial and irrelevant evidence admitted to bias the jury.

497.    The admission of irrelevant, prejudicial evidence violates the Fourteenth Amendment if its use "so infused the trial with unfairness as to deny due process of law." *Estelle v. McGuire*, 502 U.S. 62, 74 (1991) (citation omitted). Here there is no doubt that the evidence met that standard since the State was never able to produce any evidence that Robinson had any control over the way the victim was killed, rendering all the evidence regarding the manner of his killing irrelevant.

498.    The State opened its case against Robinson with a series of witnesses who testified at length about the discovery and condition of Vernon Green's body and sought to have numerous gruesome photos of Green's body admitted. Raymond Pearson and Coria Williams were in a walking club that found Vernon Green's body in the early morning on May 1, 1997. (Tr. 5 at 8, 10, 12, 23, 41-45.) Three photographs of Green's body were admitted into evidence during Mr. Pearson's testimony. (*Id.* at 8, 10, 12.) Seven additional photographs of Green's body were admitted into evidence during the testimony of Ms. Williams, a police officer who was off duty at the time. (*Id.* at 23, 41-45.)

499.    Defense Counsel objected that the introduction of the last three photographs introduced during Ms. Williams' testimony (Exhibits 8, 9, 10) were unnecessary and prejudicial. Exhibit 10 was extremely gruesome, showing large amounts of spilled brain matter (*Id.* at 29-

31.)[23] ADA Branham argued that it was part of the State's theory that "the intention of the order givers back at the apartment to erase the identity of this person." (*Id.* at 32.)

500.    The Trial Court ruled that those pictures were relevant "in light of the nature of the crime and the fact that the State's got to prove that this was premeditated and in an effort to depict where the injury occurred or the type of the injury, the nature of the injury." (*Id.* at 33-34.)

501.    The State later called Dr. Thomas Deering, a forensic pathologist and assistant medical examiner in Shelby County, who performed the autopsy on the body of Vernon Green. (Tr. 7 at 359-60, 363.) Over trial counsel's objection, Dr. Deering used the victim's actual skull to show the location of the bullet wounds to his head. (*Id.* at 375-79.)

502.    Trial counsel argued that the skull was duplicative of the pictures and that the emotional impact of the use of the actual skull was extremely prejudicial and outweighed the probative value of the skull. The Trial Court acknowledged their point about emotional impact, stating: "well I don't know that I disagree with you," but overruled the objection because "the State has a right to prove its case." (*Id.* at 356-59.)

503.    During his lengthy testimony about the skull, Dr. Deering stated that the skull had been cleared up and reconstructed, but that "there were so many pieces that they all couldn't fit-in-they're too small to fit them all in – they're too small to fit them all in. So I've got several bags of small pieces, mostly from the base of the skull, that we weren't able to fit together." (*Id.* at 375-76). He also showed those bags of small pieces of the jury. (*Id.* at 380.) He went on to say that Green's skull was "just busted completely apart. It loses its integrity to hold its shape and it kind of collapses, which folds up the skin. It looks like a deflated basketball." (*Id.* at 410-11.)

---

[23] This exhibit was later introduced during the penalty phase of Robinson's trial, over Defense counsel's objection. For the same reasons as stated above, Robinson's Fifth and Fourteenth Amendment rights were violated by the introduction of this photograph.

504.    On direct appeal, the Tennessee Court of Criminal Appeals found that the Trial Court admission of the skull and the bags of small pieces was improper. *Robinson I*, 2003 WL 21946735, at *30. The appeals court stated: "we see *no* need for [the skull's] introduction. The defendant was not present at the scene of the murder; there is no indication the defendant instructed anyone as to the manner of killing; and the manner in which the victim was killed was undisputed." *Id.* The appeals court did not determine if this error justified relief because it ordered a new trial for Robinson on different grounds. *Id.* The appeals court also found that the Trial Court should have excluded Exhibit 10 because it was highly inflammatory and its probative value was outweighed by the danger of unfair prejudice. *Id.* at *31.

505.    The Tennessee Supreme Court overturned the Criminal Court of Appeals' ruling, finding that the Trial Court did not abuse its discretion in finding that the skull and Exhibit 10 were relevant. *Robinson II*, 146 S.W.3d at 491. It found that the skull helped Dr. Deering explain his testimony and that Dr. Deering's testimony corroborated Jarvis Shipp's testimony about the order of the gun shots when the victim was shot in the park. *Id.* The Supreme Court found that Exhibit 10 was relevant because it "revealed the brutality of the attack." *Id.* at 492.

506.    The Tennessee Supreme Court's ruling was flawed because information about the brutality of the attack added nothing of probative value to the case. As the Tennessee Court of Criminal Appeals stated: Robinson was not at the scene of the murder and the State ultimately did not introduce any testimony indicating that Robinson instructed a certain manner of killing even though they misleadingly argued to the trial court that they were going to do so. Additionally, the fact that the skull corroborated Shipp's testimony about the order of the shots is insignificant because the order of the shots was completely undisputed.

507.     Additionally, the fact that there were already *seven* pictures of the victim's body admitted before the eighth through tenth pictures and the skull were admitted further supports the fact that the evidence served no purpose other than to inflame the jury.

508.     The Tennessee Supreme Court's decision to let Robinson's conviction stand despite the admission of the photos and the skull violated clearly established federal law because the evidence was both incredibly inflammatory and totally irrelevant and therefore infused the trial with unfairness that denied Robinson due process of law.

**Ground No. 24:   The Trial Court's Denial of Robinson's *Batson* Challenge Violated His Right to Due Process.**

509.     Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth and Fifth Amendments to the United States Constitution because the trial court denied his *Batson* challenge without asking for a nondiscriminatory explanation for the prosecution's strikes. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

510.     In *Batson v. Kentucky*, the Supreme Court clearly established that a prosecutor is prohibited from challenging potential jurors solely on the basis of their race. *Batson v. Kentucky*, 476 U.S. 79 (1986); *see Johnson v. California*, 545 U.S. 162 (2005); *Powers v. Ohio*; 499 U.S. 100 (1991). In accordance with this standard, the trial court should have found that Robinson established a prima facie case of discrimination and required the prosecution to provide a nondiscriminatory reason for its strikes. The following facts, among others, support this claim:

511.     During jury selection, the prosecution struck seven jurors in total. Five of the seven jurors struck were African-American. The five strikes against African-Americans were also consecutive. Robinson's trial counsel raised a *Batson* challenge after the prosecution's fourth strike of an African-American juror, citing a disproportionate use of strikes against a certain race in support of his prima facie showing. The trial court rejected the challenge for failing to establish a prima facie case and refused to ask for a nondiscriminatory explanation for the prosecution's strikes. (Tr. 13 at 554-56.)

512.     During jury selection for Robinson's trial, the only statements made by the trial court in support of its decision were: (1) "Well I can't say that I've seen *what would appear to me* to be racially-biased exclusion of jurors[.]"; and (2) "Well, I'm not going to find that there is a basis for *declaring* that there has been racially-biased exercise of challenges." (Tr. 13 at 555-556) (emphasis added).

513.     The trial court improperly based its decision on whether it could *conclude* rather than *infer* that the strikes were motivated by a discriminatory purpose. *See Id*.

514.     On direct appeal, the Tennessee Supreme Court improperly found that the trial court's determination was not clearly erroneous. In support of its decision, the appeals court cited the following passage from the transcript of the hearing on Robinson's motion for a new trial:

> [I]f all you're standing up and saying is . . . numbers alone, that's my prima facie case, I still–and I know what the case law says–but I'm still of the opinion that at the time of my observations, my being present, listening to the jurors testify, observing the demeanor of the jurors, watching and taking notes of what was going on, I was not *convinced* at that time that there was a systematic exclusion of African-Americans from this jury . . . .

*Robinson II*, 146 S.W.3d at 506 (emphasis added).

515.    *Batson* created a framework for evaluating claims that a juror was struck for a racially discriminatory reason. Under that framework, "[o]nce the defendant makes a prima face showing [of purposeful discrimination], the burden shifts to the State to come forward with a neutral explanation for challenging . . . [the] jurors." *Batson*, 476 U.S. at 97 (1986). In deciding what circumstances give rise to a prima facie showing, *Batson* specifically explained that "a 'pattern' of strikes against black jurors" could give rise to an inference of discrimination. *Id.*

516.    The Tennessee courts' determinations that Robinson's trial counsel did not present a prima facie case of discrimination and that the trial court did not need to ask the prosecution to provide a racially-neutral explanation for its strikes was an unreasonable application of clearly established federal law and an unreasonable determination of the facts. Without any investigation, the trial court assumed that the prosecution's strikes were not racially motivated, but the Supreme Court has explained that *Batson's* burden shifting framework was designed to avoid "needless and imperfect speculation" as to discriminatory purpose "when a direct answer can be obtained by asking a simple question." *Johnson*, 545 U.S. at 172.

517.    The *Johnson* Court explained that *Batson* "did not intend the first step to be so onerous that a defendant would have to persuade the judge . . . that the challenge was more likely than not the product of purposeful discrimination" and that *Batson's* prima facie requirement are satisfied when "a defendant . . . produc[es] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.*at 170. Disproportionate use of challenges against a certain race or use to severely reduce members of a certain group can support a prima facie case. *See Johnson*, 545 U.S. 162.

518.    The trial court judge's conclusory statements that there did not "appear to [him]" and he could not "declare" that the strike were racially motivated reflect that the trial judge was

applying a higher standard to Robinson's prima facie showing than whether there was sufficient evidence to "permit the trial judge to draw an *inference* that discrimination has occurred." *Johnson*, 545 U.S. at 170 (emphasis added). The judge was demanding that Robinson prove that the strikes were racially-biased rather than asking him to present evidence from which discrimination could be inferred in violation of clearly established federal law.

519. Additionally, the Tennessee Supreme Court's reliance on the trial court's statements during the motion for new trial to support its "not clearly erroneous" determination was improper for two reasons. First, these statements were not made during Robinson's trial or at the time of the trial court's ruling on the *Batson* challenge. Second, the trial court again applied the wrong standard for a prima facie challenge. A trial court does not need to be "convinced" that a challenge is racially discriminatory before asking for a racially-neutral explanation for the challenge. This standard would far exceed the "more likely than not standard" that was rejected as exceedingly high in *Johnson*. Again, the question the appeals court should have reviewed was not whether the trial court's observations convinced the judge that discrimination was present but whether there was evidence sufficient to permit an inference of discrimination. The consecutive striking of five African-American jurors permits such an inference.

520. Because the trial court applied an improperly high standard to Robinson's *Batson* challenge, the Tennessee Court of Criminal Appeals and Tennessee Supreme Court decisions concluding the trial court's determination was not clearly erroneous were contrary to, or an unreasonable application of, clearly established federal law and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court**.** As such, Robinson is entitled to habeas relief from his conviction and sentence.

**Ground No. 25: Robinson's Trial Was Rendered Unfair Because of the Presence of a Biased Juror.**

521.     Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth, Sixth, and Fifth Amendments to the United States Constitution because of the presence of a biased juror. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

522.     Evidence of juror bias and perjury - which Robinson attempted to raise before the trial court prior to sentencing, and which were established at hearings on Robinson's Motion for a New Trial - should have resulted in the trial court declaring a mistrial. Without a mistrial, the presence of a biased juror at Robinson's trial violated his constitutional right to an impartial jury.

### A.     A Deputy Jailer on the Jury Perjured Herself During *Voir Dire* and Maintained Improper Extraneous Contacts During Trial.

523.     A juror named Gina Boyd[24] was seated following voir dire which revealed that she worked as a deputy jailer at the Shelby County Justice Complex, the very jail where Robinson was housed prior to and during his trial. *See* (Tr. 13 at 568-69.) During *voir dire*, Juror Boyd shared her view that gangs "are bad," and that she had "apprehension" around gang members with whom she regularly interacted as a jailer. *Id.* Nonetheless, she testified that she did not know Robinson or any of the other parties named during *voir dire*, *see id.* at 558, and that at the time she only had limited contact at "intake" with inmates. *Id.* at 568-69.

---

[24] At times known as Gina Lee or Gina Boyd-Lee.

524.    At hearings on the motion for a new trial, however, evidence revealed that Juror Boyd had been at times assigned to work supervisory duty on Robinson's pod while he was incarcerated there, even though she denied that she had ever worked on his pod, and that several jail inmates would testify that while engaged in a hostile confrontation in Robinson's pod shortly before Robinson's trial, she referred to all the inmates as "punk-ass niggers." *See* Tr. 20 at 83-116 (Boyd's testimony at new trial hearing); Tr. 21 at 6-46 (introduction of records indicating Boyd's work on Robinson's pod); Tr. 22 at 10-34, 78-101, 219-21 (proffer re "punk-ass niggers" comment); Tr. 23 at 6-8, 15-24, 121-22 (testimony on records indicating Boyd's work on Robinson's pod).

525.    Thus, there is little doubt that Juror Boyd (1) was biased against purported gang members, (2) perjured herself regarding whether she had worked on Robinson's pod, and (3) may have exhibited racial animus.

**B.    The State Courts Ignored Key Facts Regarding Juror Boyd's Bias.**

526.    As the Tennessee Supreme Court recognized, under Tennessee law, "[i]f a juror intentionally fails to disclose information on *voir dire* which might indicate partiality, a presumption of prejudice arises." *Robinson II*, 146 S.W.3d at 523 (citing *State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993)). Nonetheless, the court credited the trial court's determination that no "nexus" existed between Robinson and Juror Boyd, and summarily concluded that "this issue is without merit." *Id.* at 41.

527.    The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. Const. amend. VI. And the Supreme Court has recognized that the jury selection process "serves to protect that right" by exposing possible bias on the part of jurors, and that the "necessity of truthful answers

by prospective jurors if this process is to serve its purpose is obvious." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).[25] In order to obtain a new trial based on a juror's non-disclosure during *voir dire*, a defendant "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556.

528.    In this *habeas* action, the trial judge's decision regarding Juror Boyd's bias (made in the context of Robinson's motion for a new trial) resulted in a decision based on an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d)(2).[26] In this case, there can be little doubt that Juror Boyd failed honestly to answer questions posed to her during *voir dire* regarding her connection to Robinson, and the trial court unreasonably construed the facts in declining to find that Robinson's right to an impartial jury had been compromised as a result of Juror Boyd's presence on the jury.

529.    Specifically, Juror Boyd denied during *voir dire* that she knew the parties or anything about the case, and said that she worked in intake and only had limited contact with the inmates at the Shelby County Justice Complex. (Tr. 10 at 45-47; Tr. 13 at 558, 561-71, 590-91.) Robinson's trial counsel took her at her word (itself part of a larger error by which trial counsel rendered ineffective assistance, *see infra.* Ground No. 15), and did not discover until after the trial that she had not been truthful. At hearings on the motion for a new trial, Robinson's counsel introduced evidence - records and logs from the jail - indicating that, in fact, Robinson had been

---

[25] Moreover, the trial judge must play an active role in ensuring a fair and impartial jury. As the Sixth Circuit has explained, "when possible juror misconduct is brought to the trial judge's attention he has a duty to investigate and to determine whether there may have been a violation of the constitutional guarantee." *United States v. Perry*, 438 F.3d 642, 651 (6th Cir. 2006) (citation omitted).

[26] On *habeas* review, juror bias is a factual issue which a reviewing court must address under 28 U.S.C. § 2254(d)(2). *See, e.g.*, *Wainwright v. Witt*, 469 U.S. 412, 412-13 (1985).

housed in jail pod "4-A," fourth floor, where Robinson was housed, even as Juror Boyd testified that she never worked on the fourth floor. (*Compare* Tr. 21 at 11-15 (introduction of records indicating that Juror Boyd worked in pod "4-A" on the fourth floor) with Tr. 20 at 107-09 (Boyd's testimony that she had not been on the fourth floor since years before Robinson was an inmate at the jail).)

530.     The obvious falsity, intentional or not, of Juror Boyd's statement that she never worked on the 4th floor or on pod "4-A" indicates that she had not been truthful on *voir dire* as to her connection to or knowledge of Robinson. Had she answered truthfully, her answer would have been that she *did* have a connection to Robinson by having worked on his floor at the jail even just a month prior to trial. That alone would have given rise to a challenge for cause. *See, e.g., State v. Akins*, 867 S.W.2d 350, 353-58, 356 n.12 (Tenn. Crim. App. 1993) (false answers raise "presumption of prejudice").

531.     Thus, Robinson can satisfy the standard articulated by *McDonough Power Equipment*. And in declining to credit the evidence presented at the hearings on Robinson's motion for a new trial - evidence which indicated that a juror had not been truthful in *voir dire* - the trial court made an unreasonable factual determination justifying *habeas* relief.

**Ground No. 26:   The Trial Court's Denial of Robinson's Motion for Individual and Sequestered Voir Dire Violated His Right to an Impartial Jury and to Due Process.**

532.     Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Sixth, Fifth, and Fourteenth Amendments to the United States Constitution because the trial court denied his request for individual and sequestered voir dire. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

533.    It is clearly established federal law that "the right to jury trial guarantees . . . a fair trial by a panel of *impartial*, 'indifferent' jurors" and that the failure to provide a fair trial "violates even minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citation omitted) (emphasis added); *see Parker v. Gladden*, 385 U.S. 363, 364 (1966); *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965). In *Nebraska Press Ass'n v. Stuart*, the Supreme Court clearly established that "it may sometimes be *necessary* to question on voir dire prospective jurors individually or in small groups, both to maximize the likelihood that members of the venire will respond honestly to questions concerning *bias*, and to avoid contaminating unbiased members of the venire when other members disclose prior knowledge of prejudicial information." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 602 (1976) (J. Brennan concurring) (emphasis added). In accordance with this standard, the trial court should have permitted Robinson's counsel to conduct individual and sequestered voir dire. The following facts, among others, support this claim:

534.    At Robinson's trial, the court denied Robinson's motion for individual and sequestered voir dire. (Tr. 4 at 58-62.) As a result of the trial court's refusal to conduct individual and sequestered voir dire, Robinson's trial counsel was not able to explore whether any jurors were biased against gang members without tainting the rest of the jury pool. For example, Gina Boyd, a deputy jailer at the prison Robinson was being held in and a juror, answered questions about the meaning of various gang tattoos in the presence of the other prospective jurors creating a very high likelihood of prejudice. (Tr. 13 at 570-71.) Robinson's trial counsel was not able to ask additional questions about Ms. Boyd's gang knowledge without tainting the other

prospective jurors. This was especially prejudicial because there was extensive knowledge in the community that a gang-related killing had occurred. This prejudice was further aggravated by the limitations the trial court judge placed on the en masse voir dire.

535.     On direct appeal, the Tennessee Supreme Court found that the decision to allow individual voir dire was within the discretion of the trial court and that Robinson had failed to show that the trial court had abused its discretion. *Robinson II*, 146 S.W.3d at 505.

536.     The trial court erred in not conducting individual voir dire, which would have been a reasonable precaution to insure the impartiality of the jury. *See Davis v. Florida*, 473 U.S. 913, 914 (1985) (J. Marshall dissenting from denial of cert). As such, the non-individualized voir dire failed to meet even minimal standards of due process and rendered Robinson's trial fundamentally unfair. *See Irvin*, 366 U.S. at 722; *see also Trujillo v. Sullivan*, 815 F.2d 597, 607 (10th Cir. 1987) ("An exercise of discretion to deny sequestered voir dire . . . may offend notions of fairness in the context of a capital trial. . . . [E]n masse death-qualifying voir dire may be so egregious and may so taint the jury that the process denies the defendant his constitutional right to an impartial jury.").

537.     Because the trial court's denial of Robinson's request for individual and sequestered voir dire interfered with his right to an impartial jury, the Tennessee Supreme Court decision was contrary to, or an unreasonable application of, clearly established federal law and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court**.** Manifest error such as this renders a trial inherently lacking in due process and warrants the grant of relief from Robinson's conviction and sentence.

**Ground No. 27:   The Trial Court Erred by Permitting Identifications Derived From an Impermissibly Suggestive Photo Array.**

538.     Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth and Fifth Amendments to the United States Constitution because the Trial Court admitted identification derived from an impermissibly suggestive photo array. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

539.     A conviction based on an eyewitness identification at trial which follows a pre-trial photographic identification must be set aside if the photographic identification was unnecessarily suggestive. *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). And a pre-trial photographic identification is itself unlawful if it is impermissibly suggestive in a manner that "g[a]ve rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). The record in Mr. Robinson's case demonstrates that the photo array used in building a case against Mr. Robinson was impermissibly suggestive, and that police conduct related to the photo array was improper. At trial, the defense presented testimony to that effect and moved to suppress the photo array. The trial court misapplied clearly established federal law by denying the motion to suppress and permitting identifications based on the photo array. Habeas relief therefore must be granted.

540.     At Mr. Robinson's suppression hearing, Charles Pool, who had also been charged with the murder of Vernon Green, testified that he had been questioned by Sergeant Ashton and shown a photograph array. When Pool did not initially identify anyone from the array, Sergeant Ashton physically pushed Pool's head in the direction of one side of the array and pointed at the

photograph of Mr. Robinson: "[H]e pushed my head a little bit and . . . he was pointing at the corner where the defendant's face was." (Tr. 4 at 7.) Moreover, Mr. Robinson's photo was the only depiction of a light-skinned African American in the relevant photo array, thereby impermissibly suggesting that viewers of the array should identify him and materially increasing the likelihood of misidentification. (Tr. 4 at 44.)

541.     In evaluating a Robinson's claim of an improper identification, the court must first "evaluate[] the undue suggestiveness of the pre-identification encounters." *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001) (internal quotation marks and citation omitted). The question presented by that first step is "whether the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection." *Id.* Here, there is no doubt that Pool's pre-trial identification of Mr. Robinson in the photo array was unduly suggestive. Pool did not identify Mr. Robinson in the photo array *at all*, and thus had no honest recollection or recognition of Mr. Robinson until Sergeant Ashton directed him to Mr. Robinson's photograph. (*See* Tr. 4 at 7.) It was objectively unreasonable for the trial court not to exclude this improperly suggestive identification despite Ashton's flagrant manipulation of Pool's response to the array.

**Ground No. 28:   The State Violated Robinson's Due Process Rights Because There Was Insufficient Evidence of His Guilt.**

542.     Robinson's trial violated his due process rights under the Fifth and Fourteenth Amendment because the State did not present evidence sufficient to establish his guilt.

543.     The test for sufficiency of the evidence for a state conviction on federal habeas review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

544. Based on that standard, the Tennessee Supreme Court's ruling that that the evidence was sufficient, *Robinson II*, 146 S.W.3d at 506-511, must be overturned.

545. As explained in Grounds Nos. 1 and 2, the testimony of Shipp and James, the only two witness to testify that Robinson was in the Blacks' apartment was highly suspect. Shipp had a strong motivation to lie and James' admitted to lying and to testifying differently in the trial of Robinson's co-defendant, Kevin Wilkins. Additionally, as explained in Ground No. 12, there was no foundation for the Shipp's critical testimony that Robinson was third in command in the Gangster Disciples and James' testimony that Robinson ordered the murder of Vernon Green.

546. Shipp and James' testimony was also suspect because they were both member of the Gangster disciples, yet as discussed in Ground No. 6, Shipp was improperly excluded from the accomplice instruction and Robinson's witnesses were erroneous included even though they were defense witnesses and there was no evidence that they had any greater involvement in the murder than James. Additionally, Shaun Washington was not included in the instruction even though there was significant evidence he was involved in Green's murder.

547. Finally, all of the State's identifications of Robinson were flawed because of a suggestive photo spread (Ground No. 27).

548. Therefore, the Tennessee Courts violated the clearly established law of *Jackson* and Robinson must be granted a new trial.

### GROUNDS RELATED TO THE PENALTY PHASE

**Ground No. 29: Trial Counsel Provided Ineffective Assistance During the Mitigation Portion of the Penalty Phase.**

549. Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and *Strickland*, 466 U.S. at 687, because his trial counsel failed to adequately pursue and present mitigating evidence.

550. Despite the availability of significant leads and a vast array of mitigating evidence, trial counsel failed to adequately investigate the evidence, obtain necessary records, supervise the investigators whom they hired, obtain appropriate expert testimony regarding Mr. Robinson's cognitive functions, and present the mitigation evidence to the jury. This ineffective assistance precluded the jury from having any substantial mitigating evidence to weigh against the aggravating evidence offered by the State. On each of these grounds and cumulatively, Robinson's trial counsel rendered ineffective assistance to their client in the penalty phase of his trial, and Robinson's death sentence therefore must be vacated.

551. Trial counsel made a perfunctory presentation of six witnesses, including Robinson's mother, two of his five sisters, a friend, an investigator, and Robinson himself. (Tr. 17 at 47-53, 58-60 (Patricia Robinson, sister), 60-65 (Stacy Robinson, sister), 65-71 (Ronald Dowell, friend), 72-77 (Debra McNeese, investigator), 80-85 (Annie Robinson, mother), 85-88 (Gregory Robinson).) Trial counsel's ostensible "strategy" was to show that Mr. Robinson should be spared because he came from a close-knit, loving, and nurturing family. (*See e.g.*, Tr. 17 at 50, 59-60, 73-74, 83.) But trial counsel negated any possible mitigating effect of such a strategy by drawing a shocking contrast between the crimes of which the jury had just convicted their client and his supposedly wholesome upbringing, in which Mr. Robinson was "instructed by values of what was right and wrong, what he should do in life," and did not have "any disadvantaged background or anything of that nature." (Tr. 17 at 60.) If anything, the testimony elicited by Robinson's counsel made their client's actions on the night of the murder (as found by the jury) appear all the more inexcusable.

552. As the testimony presented at Robinson's post-conviction hearing demonstrated, this rosy picture of Robinson's childhood and home life was starkly disconnected from the

reality. In fact, Robinson's father, Homorris Robinson, regularly beat his wife and daughters in Robinson's presence; never held steady employment; and indoctrinated his son into a life outside the law. Moves were frequent, and financial and emotional instability was the norm. Drugs and violence pervaded the Robinson family's experience.

553.    Instead of acknowledging the abuse, violence, drugs, gambling, and poverty that Robinson endured as a child, the evidence presented at the penalty phase hearing presented a shallow and implausible whitewash about a boy with a loving mother who taught him right from wrong and grew up in an almost idyllic family environment. Even if counsel reasonably could have adopted this sugar-coated approach had they been fully informed – and that is highly doubtful – trial counsel's presentation did not reflect a strategic choice because it was based on a grossly inadequate and superficial mitigation investigation.

### A.    Robinson's Trial Counsel Relied Upon Unqualified Mitigation Specialists Without Any Supervision and Failed to Obtain an Adequate Mitigation Report.

554.    Mr. Robinson's trial counsel's deficient presentation of mitigation evidence resulted, in the first instance, from their failure to prepare and develop an adequate mitigation report. Without a competent collection and analysis of relevant mitigation material, trial counsel could not make an informed or rational decision regarding mitigation strategy. Debra McNeese and Margaret Hill of PMG spent far less time than was minimally necessary and appropriate to develop a mitigation report, recording a mere 75 hours to a project that necessarily requires time-consuming legwork. (P-C 20 at 56-57; P-C 6 at 952-954.) The deficient report they generated was little more than a farrago of fragmentary and incomplete records.

**B.    Trial Counsel Failed to Prepare Mitigating Witnesses.**

555.    In addition to failing to adequately investigate, Robinson's counsel failed to adequately prepare to examine the witnesses who did testify at the penalty phase hearing, or to prepare the witnesses themselves. For example, Robinson's own testimony fills barely more than three transcript pages. (Tr. 17 at 85-88.) When asked whether he had "anything that [he] would like to say to the jury as to why they should spare [his] life," Mr. Robinson's only response was that he had children and would like to be able to see them one day. (Tr. 17 at 86.) Robinson's sister, Stacy Robinson, testified that no one had met with or prepared her at all for her testimony. (P-C 17 at 116-18.) The Post-Conviction Hearing demonstrated that Robinson's trial counsel – having failed to plan or prepare for an adverse result at the guilt/innocence phase of their client's trial – essentially capitulated, violating Robinson's constitutional right to effective assistance at the penalty phase of his trial.

556.    Having failed to prepare their witnesses or form a reasonably formed strategy for the penalty phase hearing, Robinson's trial counsel left their mitigation witnesses wide open to assaults on their credibility. Several of the witnesses testified on direct examination that Mr. Robinson was a "good student," one who received "A's and B's" and liked ROTC. (Tr. 17 at 62-63, 81.) Yet trial counsel's own mitigation investigator, Debra McNeese, contradicted those accounts by revealing on direct examination that, in fact, Robinson repeated the fourth and seventh grades; dropped out of school entirely after ninth grade; and received mostly D's and F's, including an F in ROTC. (*Id*. at 74-75.) To make matters worse, during cross-examination McNeese testified that she would question the truthfulness of anyone who testified that Robinson "was an A and B student." (Tr. 17 at 77.) Had trial counsel adequately prepared the witnesses, trial counsel would have been aware of these contradictory statements and could have addressed

them before they were made in front of the jury. Thus, not only did trial counsel's failure to investigate result in insufficient proof in the penalty phase, but it also sabotaged the proof presented.

C.   **Robinson's Trial Counsel Failed to Identify the Need for and Conduct Full Neuropsychological Testing.**

557.   Robinson's trial counsel also failed to provide reasonable effective assistance by ignoring clear indications in the materials available to them that Robinson's past history warranted neuropsychological testing for purposes of developing potential additional mitigating evidence. In connection with the penalty phase of Robinson's trial, Dr. Little was only asked to evaluate Robinson's competency to stand trial and sanity at the time of the alleged murder; and that testing took place only one day before jury selection began. (P-C 19 at 258.) In fact, as Dr. Little explained at the Post-Conviction Hearing, neuropsychological testing was not needed to evaluate competence and sanity. Had she been asked to evaluate Mr. Robinson for mitigation purposes, she would have conducted additional tests and would have recommended neuropsychological testing in light of this history of serious head injuries. (*Id.* at 262, 272-273.)

558.   Trial counsel clearly should have understood the difference between evaluations related to assessments for competency and sanity, on the one hand, and testing to measure cognitive functioning for mitigation purposes, on the other. Indeed, Dr. Little's report itself should have prompted trial counsel to request neuropsychological testing, given the extreme discrepancy between Mr. Robinson's verbal skills and visual-spatial reasoning skills. As Drs. Dudley and Auble confirmed at the Post-Conviction Hearing, Mr. Robinson essentially could not perform when confronted with a real life problem requiring open-ended reasoning. (P-C 21 at 25-26; P-C 18 at 169-170.)

559.     Despite the availability of significant leads and a vast array of mitigating evidence, trial counsel failed to adequately investigate the evidence, obtain necessary records, supervise the investigators whom they hired, obtain appropriate expert testimony regarding Robinson's cognitive functions, and present the mitigation evidence to the jury. This ineffective assistance precluded the jury from having any substantial mitigating evidence to weigh against the aggravating evidence offered by the State – evidence that could have caused the jury to conclude that, notwithstanding their guilty verdict, Robinson's life should be spared. Armed with even some of the available mitigating evidence, there is a reasonable probability that the jury would have returned with a lesser punishment.

**D.     This Court Must Review Robinson's Ineffective Assistance Claims De Novo, Because the Tennessee Courts Applied the Wrong Burden of Proof at Post-Conviction, and Their Decisions Were Therefore Not "On the Merits" and Are Not Entitled to Deference Under AEDPA.**

560.     In rejecting Robinson's claims of ineffective assistance at the penalty phase of his trial, the Court of Criminal Appeals generally invoked the latitude in making strategic decisions that the U.S. Supreme Court has traditionally afforded trial counsel, while declaring the perfunctory and superficial investigation conducted by Robinson's counsel to be "reasonable." *Robinson III*, 2013 WL 1149761 at *83-*84. Without addressing federal constitutional requirements, the Court of Criminal Appeals also held that under Tennessee state law trial counsel was "not required to question a diagnosis put forth by a professional expert in the field." *Robinson III*, 2013 WL 1149761 at *85.

561.     AEDPA only requires deference to state court decisions if the habeas claims were "adjudicated on the merits in State court." *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (internal quotation marks and citation omitted). One circumstance in which a State's decision is not on the merits is when the State uses a burden of proof that is higher than the federal standard,

because in doing so, the State has not necessarily decided that the federal standard was satisfied. *Wilson v. Workman*, 577 F.3d 1284, 1297 (10th Cir. 2009). For the same reasons as articulated in Ground No. 2, this Court should conduct a *de novo* review of the State courts' decision on this issue, because under these circumstances the standard of deference under AEDPA does not apply.

**E.    Under Clearly Established Federal Law, Trial Counsel's Preparation of Robinson's Mitigation Case Was Deficient and Resulted in Prejudice to Robinson at the Penalty Phase.**

562.    In *Strickland*, the Supreme Court held that while counsel has a "wide latitude . . . in making tactical decisions," "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91. Any limitation on counsel's investigation "must be directly assessed for reasonableness [under] all the circumstances." *Id*. at 691; *see Wiggins v. Smith*, 539 U.S. 510, 533 (2003). In assessing whether counsel exercised reasonable professional judgment in making a particular decision, courts must "focus on whether the investigation supporting counsel's decision . . . was itself reasonable." *Wiggins*, 539 U.S. at 523 (emphasis in original); *see Strickland*, 466 U.S. at 690-91.

563.    Under *Wiggins,* while counsel is not obligated to pursue every line of inquiry, investigation of mitigating evidence is objectively unreasonable where counsel fails to pursue readily available leads of promising mitigation evidence. *Wiggins*, 539 U.S. at 527. Furthermore, "[w]hen counsel abandons an investigation of the defendant's background after having acquired only a rudimentary knowledge from a narrow set of sources, this choice is not a 'strategic

decision' and does not constitute the reasonable investigation required by *Strickland*." *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir. 2011). In Robinson's case, counsel had a less-than-rudimentary knowledge of the realities behind their client's life. While counsel was not obligated to interview every conceivable witness, *see Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995), as in *Goodwin*, the investigation conducted by counsel barely scratched the surface and was therefore objectively unreasonable.

564.    The 1989 ABA Guidelines, the latest version available to Robinson's attorneys at the time of his trial, state that a proper mitigation investigation "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." 1989 ABA Guidelines § 11.4.1(c), at 93 (emphasis added). The 2003 ABA Guidelines, which are reflective of prevailing norms at the time of Robinson's trial instruct counsel to investigate the defendant's family history, social history, educational history, and employment history in depth. The Guidelines also instruct counsel to interview "the client's family members ... and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others." 2003 ABA Guidelines ¶10.7 (emphasis added) (Commentary at 1024). A cursory investigation that pays only lip-service to the standards is not sufficient. See *Rompilla v. Beard*, 545 U.S. 374 (2005), ("[W]e long have referred [to these ABA standards] as guides to determine what is reasonable") (internal quotation marks and citation omitted). Trial counsel had a duty to pursue any leads discovered from those sources to "mak[e] an informed choice among possible defenses." *Wiggins*, 539 U.S. at 525. Robinson's trial counsel failed to fulfill this duty here.

565.     Tennessee's courts have also emphasized that the duty to investigate is paramount to preparing for both trial and penalty phase hearings. Tennessee has long recognized the duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter v. Rose*, 523 S.W.2d 930, 933 (Tenn. 1975). *See also Cooper v. State*, 847 S.W.2d 521, 531 (Tenn. Crim. App. 1992) (quoting *Commentary to ABA Standards for Criminal Justice: Prosecution and Defense Function* (2d ed.), The Defense Function § 4–4.1, and *Brimmer v. State*, 29 S.W.3d 497, 518-519 (Tenn. Crim. App. 1998)). There can be no doubt that the prevailing norms in the jurisdiction in which Robinson's trial counsel regularly practiced required far more than the cursory, half-hearted investigation that they conducted here.

566.     In a recent case, *Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007), the Sixth Circuit held that trial counsel's failure to conduct and present a thorough investigation of the mitigation evidence amounted to ineffective assistance of counsel. As in Robinson's case, counsel in Mitchell "failed to discover highly relevant mitigating evidence of the petitioner's family background, the existence of which was suggested by other evidence known to counsel," including the petitioner's father's death from a heroin overdose. *See id.* at 712. Although the petitioner had been unwilling at trial to attribute abuse to his parents, and had instead testified that his parents were " 'two of the most beautiful parents you could ever meet,'" the court made clear that counsel's duty to investigate the petitioner's family circumstances remained. *See id.* at 713. And although trial counsel presented an expert to testify about petitioner's mental health, that doctor had only met with the petitioner for an hour and a half and read his medical records. The Sixth Circuit held that counsel's preparation was inadequate: the evidence available to counsel indicated that a more thorough investigation could have yielded useful mitigation evidence and was therefore required. *See id.* at 714-15 n.24. "Petitioner's attorneys were or

should have been on notice that an investigation into Petitioner's family background would have been fruitful." *Id.* at 712.

567.   Here, the Tennessee Court of Criminal Appeals' cited to *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011), and observed that the "[t]he Court in *Cullen* . . . rejected the idea that the only reasonable mitigation strategy in capital cases is to assist the jury in understanding the defendant." *Robinson III*, 2013 WL 1149761 at *89. But this observation misses the point: here, the indolence of Robinson's counsel gave them an insufficient investigative foundation to determine what a reasonable mitigation strategy in Robinson's penalty phase should be. Entirely because of their own lack of effort and failure to supervise or engage investigators and relevant physicians, they lacked a reasonable foundation for making informed choices about mitigation strategy, and Mr. Robinson's Sixth Amendment rights were thus violated.

568.   The Supreme Court has also recognized that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or the introduction of expert evidence" *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011); *see Williams v. Martin*, 618 F. 2d 1021, 1025 (4th Cir. 1980) ("There can be no doubt that an effective defense sometimes requires the assistance of an expert witness. This observation needs little elaboration."). Robinson's case was one where expert testimony was required: without it, the jury could not know about the limitations of Robinson's cognitive abilities, and therefore could not make an informed decision about whether to sentence Robinson to death. The Court of Criminal Appeals' reliance on Tennessee law holding that trial counsel was "not required to question a diagnosis put forth by a professional expert in the field" and cannot be faulted for relying upon an expert's assessment of Robinson, *see Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *54 (Tenn. Crim. App. Apr. 25, 2011), ignores the relevant federal

constitutional requirement. Robinson's trial counsel did not just fail to question a diagnosis or negligently rely on a physician assessment: they failed altogether to engage an expert in the relevant field and failed to request the type of evaluation (not limited merely to competence and sanity) that would have yielded crucial mitigation material. The cited Tennessee law is a red herring in this context, and in any event cannot trump Mr. Robinson's Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

**Ground No. 30:   Robinson's Trial Counsel Was Ineffective Because They Continued Their Representation of Robinson After His Conviction Despite a Conflict of Interest.**

569.    Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and *Strickland*, 466 U.S. at 687, because his trial counsel continued their representation despite a conflict of interest.

570.    After his conviction, Robinson wanted to pursue ineffective assistance claims in his motion for a new trial and on direct appeal. (*See* Tr. 17 at 137.) In light of Robinson's request for new counsel and the corresponding motions to withdraw filed by his trial counsel, the trial court allowed Robinson's trial counsel to withdraw from their representation and appointed new counsel. (*Id.*) At the penalty phase hearing for the especially aggravated kidnapping charge against Robinson, however, the trial court requested Robinson's trial counsel to continue to represent him for purposes of that penalty phase hearing. (Tr. 18 at 3-4.) Because Robinson had already sought to have trial counsel removed in light of the ineffective assistance claims he wished to advance, to allow them to continue to represent Robinson caused an irredeemable conflict of interest: trial counsel would be necessary witnesses at a hearing on Robinson's ineffective assistance claims, and they would necessarily be adverse witnesses to Robinson. In that circumstance, they could not, under the Tennessee Rules of Professional Conduct, continue

to represent Robinson once he had requested that they be replaced in order that he advance ineffective assistance claims against them. *See* Tenn. R. Prof. Conduct 1.7(a) ("A lawyer shall not represent a client if . . . there is a significant risk that the representation . . . will be materially limited . . . by a personal interest of the lawyer.")

571.  On Post-Conviction, the Tennessee Court of Criminal Appeals denied relief on this ground, holding that trial counsel is not required to withdraw because his client complains about his representation of him at trial. *Robinson III*, 2013 WL 1149761 at *91-*92. Where a conflict of interest exists, "prejudice is presumed . . . ." *Strickland*, 466 U.S. at 692 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345-50 (1980)). Trial counsel's performance was deficient because the very fact of the continued representation violated the clear requirement of the Tennessee Rules of Professional Conduct; and because the deficiency resulted in a conflict of interest, Strickland prejudice is presumed. Consequently, Robinson was denied his Sixth Amendment right to effective counsel in this respect as well.

572.  In its most recent opinion, the Court of Criminal Appeals engaged in an inappropriate appellate fact-finding by declaring that there was no "actual" conflict of interest given that counsel "merely" continued to represent Robinson for the purpose of his sentencing on the aggravated kidnapping charge. (P-C 6 at 1022.) But the Tennessee Rules are clear that a conflict exists unless Robinson consented to the continued representation in writing. *See* Tenn. R. Prof. Conduct 1.7(b)(2). Because Robinson did not do so, a conflict existed, regardless of the court's additional factual determinations. Indeed, the court may not make any further factual inquiry: it is the essence of the *Strickland-Cuyler* presumption of prejudice, and of any legal presumption mandated by a higher court, that the presumption relieves a court from the duty to undertake the searching case-by-case factual inquiry that would otherwise be required. "No

showing of prejudice need be made to obtain reversal in these circumstances because prejudice to the defense is presumed." *Flanagan v. United States*, 465 U.S. 265, 268 (1984) (referring to either the denial of counsel to a defendant or defense counsel's conflict of interest).

573. Robinson should be granted a new sentencing because his trial counsel's conflict of interest, compounded by the trial court's failure to timely replace trial counsel, deprived him of his Sixth Amendment right to effective counsel. *See Holloway v. Arkansas*, 435 U.S. 475, 483-84 (1978).

**Ground No. 31: Robinson's Counsel Failed to Object to the Fact that the Jury Instructions Failed to State That the Jurors Could Consider Any Aspect of Robinson's Record.**

574. Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and *Strickland*, 466 U.S. at 687, because his trial counsel failed to object to jury instructions.

575. Trial counsel failed to object to the fact that the jury instructions in Robinson's capital penalty phase hearing omitted the required statement that the jurors could consider "any aspect of the defendant's character or record." (Tr. 15.) In addition, a written verdict form instruction was sent to the jury room with instructions misstating the law and allowing the jury to impose the death penalty without requiring the State to prove that the aggravating circumstances outweighed the mitigating circumstances "beyond a reasonable doubt." Instead the written verdict form with instructions wrongly declared that a pure and simple outweighing of mitigating circumstances by aggravating circumstances would establish that "beyond a reasonable doubt the sentence shall be death."

576. The United States Supreme Court has long held that, in a capital penalty phase hearing, "States cannot limit the sentencer's consideration of any relevant circumstance that

could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." *Blystone v. Pennsylvania*, 494 U.S. 299, 309 (1990) (quoting *McCleskey v. Kemp*, 481 U.S. 279 (1987)). Therefore, it is required that "the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (citation omitted). Furthermore, the sentencing decision must reflect "a reasoned moral response to the defendant's background, character, and crime." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (citation omitted). To that end, "[s]pecial instructions are necessary when the jury could not otherwise give meaningful effect to a defendant's mitigating evidence." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 253 n. 14 (2007).

577.    Tennessee follows this mandate by requiring courts to advise juries that they must consider "[a]ny other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or [penalty phase] hearing; that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence." TPI Crim Sec. 7.04(c) (6th ed.), Mitigating Circumstances, Criminal Homicide, First-Degree Murder (death or life without parole) (for offenses committed on or after July 1, 1995), subparagraph (10). However, there were critical omissions from both the written and oral instructions provided to the jurors in Robinson's case. Robinson's trial counsel failed yet again when they did not act to correct the erroneous jury instructions read aloud to and provided to the jury.

578.    The U.S. Supreme Court has repeatedly held that the Sixth Amendment imposes a duty on counsel "to bring to bear such skill and knowledge as will render the trial a reliable

adversarial testing process." *Strickland*, 466 U.S. at 688. Consequently, counsel have a duty to conduct a "reasonable investigation" into the applicable facts and law that govern the case at issue. *Id.* Pursuant to this duty, the Supreme Court has long recognized that a tactical or strategic decision is unreasonable if based on a failure to research or understand the law. *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (rejecting the 'justifications" given by counsel for his failure to file a timely suppression motion because they "betray[ed] a startling ignorance of the law"). From the very beginning of their counsel's connection with his case, Robinson's counsel displayed an appalling lack of understanding of basic universal trial and evidence procedures. To not <u>read</u> proposed jury instructions and correct them for this most basic error must surely constitute ineffective assistance. *See State v. Carter*, 988 S.W.2d 145, 151-53 (Tenn. 1999); *State v. Stephenson,* 878 S.W.2d 530 (Tenn. 1994). Such error permitted a sentence of death to be imposed on Robinson on substantially less than proof beyond a reasonable doubt, and this error by itself requires a new penalty phase hearing.

**Ground No. 32:  The Prosecutor, and Not Jury, Determined Aggravating Circumstance, and Robinson's Counsel Failed to Object.**

579.    Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and *Strickland*, 466 U.S. at 687, because his trial counsel failed to object to the prosecutor's finding of aggravating circumstances.

580.    During closing argument in the penalty phase, the prosecutor incorrectly told the jury that, having convicted Robinson of especially aggravated kidnapping, they had already found that one of the two proposed aggravating circumstances existed. (Tr. 17 at 122.) In doing so, the prosecutor improperly relieved the jury of its responsibility of finding that the State had proved one of the statutory aggravating circumstances beyond a reasonable doubt.

581. The Court of Criminal Appeals did not find that the prosecutor's statements were improper, and thus did not find trial counsel to be ineffective in failing to object to such statements. *Robinson III*, 2013 WL 1149761, at *91.

582. The Court of Criminal Appeals erred in its finding here as well – the determination as to aggravating circumstances was a decision for the jury, not the prosecutor, to make. *See* Tenn. Code Ann. § 39-13-204(g) (West 1998). Trial counsel failed to object, and thus the court did not give a corrective instruction explaining that convicting Robinson of especially "aggravated" kidnapping is different than determining that the State proved an aggravating circumstance beyond a reasonable doubt. The Tennessee Supreme Court rejected this argument in *State v. Holton*, 126 S.W.3d 845 (Tenn. 2004), in contravention of the clear precedent under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which holds that only the jury, and not the prosecutor, may determine that the death penalty is warranted.

**Ground No. 33: The Cumulative Effect of Counsel's Errors Constitutes Ineffective Assistance of Counsel For the Penalty Phase.**

583. Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth, Fifth, and Sixth Amendments to the United States Constitution because the cumulative effect of counsel's errors constituted ineffective assistance of counsel. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

584. There can be no question that if Schreiner and Ozment had performed in accordance with minimal standards of professional conduct, there is a reasonable likelihood that they could have convinced at least one juror that there were sufficient mitigating circumstances

militating against the imposition of a sentence of death. Consequently, the determination of the Court of Criminal Appeals that Robinson was not prejudiced by trial counsel's failure to present an adequate defense was contrary to, and an unreasonable application of, the *Strickland* prejudice inquiry. Indeed, the cursory prejudice analysis by the Court of Criminal Appeals—in which they cite the aggravating circumstances and Robinson's "inappropriate attitude," and note that Robinson's past may well have led the jury to conclude that Robinson " 'was simply beyond rehabilitation'"—was contrary to, and an unreasonable application of, clearly established Supreme Court authority that requires a more searching evaluation of prejudice. *Robinson III*, 2013 WL 1149761, at *89. When the "totality of the evidence" in Robinson's case is properly considered, as *Strickland* requires, it is clear that his counsel's deficiencies deeply prejudiced Robinson's defense, and warrant relief.

585.    Consideration of the cumulative effect of counsel's error is mandatory under *Strickland. See Williams v. Taylor*, 529 U.S. 362, 399 (2000) (state court properly considered the "entire post-conviction record, viewed as a whole and cumulative of mitigation evidence presented originally" in finding ineffective assistance); *Dobbs v. Zant*, 506 U.S. 357, 359 n* (1993)(combined errors of counsel could be considered when conducting an ineffective assistance of counsel claim); *United States v. Cronic*, 466 U.S. 648, 657 n.20 (1984) ("counsel's overall representation of respondent, as opposed to any specific error or omission" may be the basis of an ineffective assistance of counsel claim). Nevertheless, despite these precedents, the State courts excused trial counsel's deficiencies and condoned the resultant prejudice to Robinson, concluding that "any deficiencies by trial counsel did not result in prejudice when considered either individually or cumulatively in light of the mitigation evidence presented at the penalty phase of the trial and the strength of the evidence supporting the aggravating

circumstances." *Robinson III*, 2013 WL 1149761, at *90. In so finding, however, the Court of Criminal Appeals applied a standard that is contrary to, and an unreasonable application of, the clearly-established prejudice standard enunciated in *Strickland* and its progeny.

586.    Under *Strickland*, the central question in the prejudice inquiry is *not* whether Robinson could definitively prove that his counsel's behavior was deficient. And while Courts should be "highly deferential" in reviewing counsel's performance, as was the Court of Criminal Appeals noted here, *Robinson III*, 2013 WL 1149761, at *83, citing *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000), Courts should not be blind to obvious ineffectiveness. Instead, to prove prejudice under *Strickland*, Robinson is only required to introduce a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Thus, Robinson's new post-conviction mitigation report and the evidence presented at the post-conviction hearing should have been deemed sufficient to show prejudice such that there was "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 513.

## GROUNDS FOR RELIEF BASED UPON APPELLATE COUNSEL'S INEFFECTIVE ASSISTANCE DURING ROBINSON'S DIRECT APPEAL

**Ground No. 34:**   **Appellate Counsel Was Ineffective Because They Failed to Challenge the Tennessee Supreme Court's Finding That the Medical Examiner's Testimony Corroborated Shipp.**

587.    Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at 687, because his appellate counsel failed to challenge the Tennessee Supreme Court's finding that the medical examiner's testimony corroborated Shipp, a finding that gave Shipp's testimony improper weight.

588.     When the Tennessee Supreme Court reinstated Robinson's conviction and death sentence, it agreed with the Tennessee Court of Criminal Appeals' determination that the trial court erred by not instructing the jury that Jarvis Shipp was an accomplice as a matter of law. *See Robinson II*, 146 S.W.3d 469 at 489; *see also Robinson I*, 2003 WL 21946735 at *13 ("Jarvis Shipp was an accomplice to murder and kidnapping and murder as a matter of law."). However, the Supreme Court found that the error was harmless in part because Shipp's testimony about the events on the night of April 30, 1997 was corroborated by the testimony of Dr. Thomas Deering. *See Robinson II*, 146 S.W.3d 469 at 489, 491.

589.     The State called Dr. Deering, a forensic pathologist, to explain the cause of death and the sequencing of the wounds. *See Robinson II*, 146 S.W.3d 469 at 489-90; (*see generally* Tr. 7 at 359-428.) The Supreme Court found that Deering's testimony corroborated Shipp's account of events, noting that Robinson admitted that "Dr. Deering's testimony and use of the skull to explain the order of the gunshots corroborated Shipp's testimony." *See Robinson II*, 146 S.W.3d 469 at 489.

590.     This was a material finding, because the Supreme Court held that Deering's corroboration of Shipp's testimony rendered the evidence "sufficient to support the jury's verdict of first degree murder." *Id.* Robinson did not admit, however, that Dr. Deering's testimony corroborated anything Shipp had to say about Robinson's alleged role in the crime.

591.     The Supreme Court's conclusion that Deering's corroboration rendered the evidence sufficient to support Robinson's conviction ignores the theory of the State's case against Robinson. The State proceeded, and Robinson was convicted upon, a theory of criminal responsibility. here was no testimony that Robinson ordered any particular means by which Green was to be killed, let alone that Robinson directed the order of the gunshots. The

undisputed evidence was that Robinson was not present at the park where Green was shot. Jarvis Shipp's testimony about the events at the park, and Dr. Deering's alleged corroboration of that testimony, thus had virtually nothing to do with the State's allegations against Robinson. To the contrary, they were window dressing designed to inflame the jury.

592.     Both the Post-Conviction Court and Tennessee Court of Criminal Appeals on post-conviction appeal both rejected this claim. The Tennessee Court of Criminal Appeals held that Dr. Deering's testimony sufficiently corroborated Shipp's testimony about the events surrounding the shooting at the park and cited the Tennessee Supreme Court's holding that Robinson had waived the issue by failing to object to the accomplice jury instruction at trial. *Robinson III*, 2013 WL 1149761, at *94.

593.     Appellate counsel was deficient under *Strickland* for failing to challenge the Tennessee Supreme Court's corroboration finding in a motion to rehear or appeal to the United States Supreme Court. The finding gave undue weight to Shipp's testimony and credibility. With the scant evidence about Robinson's role in the crime, that finding should not have been left unchallenged.

594.     Robinson was prejudiced by the finding because the Tennessee Criminal Court of Appeals held, and the Supreme Court agreed, that Shipp was an accomplice as a matter of law, and the jury should have been so instructed. *See Robinson I*, 2003 WL 21946735 at *13; *Robinson II*, 146 S.W.3d 469 at 489.

595.     The Tennessee Court of Criminal Appeals ruling is erroneous because it ignored the undisputed fact that Deering's testimony did not corroborate any of Shipp's testimony about Robinson's involvement, including the critical evidence Shipp supplied about Robinson's supposed status in the Gangster Disciple hierarchy and his presence and actions the night of the

murder. In light of the absence of any nexus between the corroborating evidence and the accomplice's testimony concerning Robinson's conduct, the ruling violated the clearly established law under *Strickland.*

**Ground No. 35:   Appellate Counsel Was Ineffective Because They Failed to Challenge the Inclusion of Robinson's Witnesses in the Accomplice Jury Instruction.**

596.    Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at 687, because his appellate counsel failed to challenge the Inclusion of Robinson's Witnesses in the Accomplice Jury Instruction.

597.    The Post-Conviction court held that trial counsel should have objected to the jury instruction (P-C 6 at 986-987) and the Court of Criminal Appeals agreed. *Robinson III*, 2013 WL 1149761, at *99.

598.    The Criminal Court of Appeals held, however, that Robinson's appellate Counsel was not ineffective in failing to raise this issue because trial counsel waived objection to the instruction and that Robinson was not prejudiced by either Trial or Appellate Counsel's failure to object to the accomplice jury instruction. *Robinson III*, 2013 WL 1149761, at *94.

599.    For the reasons stated in Ground No. 6, this decision was contrary to the clearly established law of *Strickland*, and relief should be granted.

**Ground No. 36:   Appellate Counsel Was Ineffective Because They Failed to Challenge the Trial Court's Rulings Regarding the Admissibility of Lack of Flight Evidence.**

600.    Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and *Strickland*, 466 U.S. at 687, because his appellate counsel failed to challenge the trial court's rulings regarding the admissibility of flight evidence.

601.     As set forth *supra* in Ground 9, Robinson's lead trial counsel was unprepared to present evidence of Robinson's lack of flight, despite his promise to do so in his opening statement. In refusing to allow the proffered evidence, the trial court found that the records could not be authenticated and were not relevant. (Tr. 9 at 601-02; Tr. 8 at 597-600.)

602.     On appeal, appellate counsel failed to challenge the trial court's rulings in the motion for new trial or on appeal. This failure deprived of Robinson of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at 687.

603.     The Post-Conviction Court found that even had trial counsel properly prepared, the trial court still would have found that the evidence was not relevant. (P-C 6 at 978.) The Tennessee Court of Criminal Appeals affirmed this ruling and also found that any error in the Trial Court's ruling was harmless in light of the evidence of lack of flight that Robinson presented and the evidence establishing Robinson's guilt. *Robinson III*, 2013 WL 1149761, at *94.

604.      For the reasons stated in Ground 9, and because the Trial Court's finding was made without the benefit of briefing from appellate counsel, the Tennessee Court of Criminal Appeals' decision was contrary to the clearly established law of *Strickland*.

**Ground No. 37:   Appellate Counsel Was Ineffective Because They Failed to Challenge the Local Rule that Requires Court Permission for Defendants to Sit at the Table with Counsel.**

605.     Robinson was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and *Strickland*, 466 U.S. at 687, because his appellate counsel failed to challenge a local rule requiring court permission for defendants to sit at counsel table.

606. As discussed *supra* in Ground 14., Robinson's lead trial counsel failed to request that Robinson be allowed to sit at counsel table and failed to challenge the local rule which requires permission from the trial judge in order for defendants to sit at counsel table.

607. Appellate counsel similarly failed to challenge on appeal Shelby County's rule, thereby depriving Robinson of his right to effective assistance of counsel under the Sixth Amendment and Fourteenth Amendments to the United States Constitution and *Strickland*, 466 U.S. at 687.

608. On post-conviction, the Tennessee Court of Criminal Appeals held that appellate counsel was not ineffective because the issue would have been deemed waived on direct appeal and the Tennessee courts upheld Local Rule 8.05 as constitutional. *Robinson III*, 2013 WL 1149761, at *95.

609. For the reasons stated in Ground 14, this decision was contrary to the clearly established law of *Strickland*.

**GROUNDS CONCERNING THE SYSTEMIC FAILURE OF THE JUDICIAL SYSTEM**

**Ground No. 38: Tennessee's Rules for Considering Aggravating Circumstances Are Unconstitutional.**

610. Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth and Fifth Amendments to the United States Constitution because Tennessee's rules for considering aggravating circumstances are unconstitutional. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

611. The Supreme Court has held that a state's death penalty scheme must "genuinely narrow the class of persons eligible for the death penalty." *Arave v. Creech*, 507 U.S. 463, 474 (1993) (internal quotation marks and citation omitted). If the criteria used to elevate a murder case to a death penalty case do not "genuinely narrow" the pool of murder cases to a specific subclass, then the criteria are invalid.

612. In Tennessee, this narrowing is allegedly accomplished by applying aggravating circumstances. *See State v. Harris*, 989 S.W.2d 307, 315 (Tenn. 1999). But several of the aggravating circumstances set forth in Tenn. Code Ann. § 39-13-204(i) have been so broadly and disparately interpreted that they fail to provide a "meaningful basis" for narrowing the population of those convicted of first-degree murder to those eligible for the sentence of death.

613. For instance, the aggravating factors that the crime was "heinous, atrocious, or cruel" and that the crime was committed during the course of a felony, see Tenn. Code Ann. § 39-13-204(i)(5) and i(7) have been so broadly construed as to violate the requirements of *Maynard v. Cartwright*, 486 U.S. 356 (1988), *Godfrey v. Georgia*, 446 U.S. 420 (1980); and, most specifically, *Shell v. Mississippi*, 498 U.S. 1 (1990), *Barber v. Tennessee*, 513 U.S. 1184 (1995)(Stevens, J., dissenting from denial of certiorari, discussing infirmities of(i)(5) in light of above case law); *Houston v. Dutton*, 50 F.3d 381 (6th Cir. 1995). Such broad interpretation and application of these statutory aggravating factors evidences the fact that Tennessee fails to meaningfully narrow its class of defendants eligible for the death penalty.

**Ground No. 39: The Under-Representation of Women as Grand Jury Forepersons In Shelby County and the Failure of Counsel to Raise that Issue Violated Robinson's Sixth and Fourteenth Amendment Rights.**

614. Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth and Sixth Amendments to the United States Constitution

because women are under-represented as grand jury forepersons in Shelby Count. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

615.   In Robinson's case, the foreman of the grand jury was chosen by the judge pursuant to Tenn. R. Crim. P. 6(g) (1997). Rule 6(g) bestowed upon the foreman significant duties above and beyond the duty to vote with the 11 other jurors for the issuance of an indictment. Specifically, Rule 6(g) provided that

> It shall be the duty of such foreman of grand juries to assist and cooperate with the district attorney in ferreting out crime, to the end that the laws may be faithfully enforced; and such foremen are directed out of term to advise the district attorney general with respect to law violations and to furnish him names of witnesses, whom the district attorney general may, if he deem proper, order summoned to go before the grand jury at the next term. In term time, the foreman or the district attorney general may order the issuance of subpoenas for witnesses to go before the grand jury. The foreman may vote with the grand jury and his vote shall count toward the twelve necessary for the return of an indictment.

Tenn. R. Crim. P. 6(g) (1997); *see also* Tenn. R. Crim. P. 6(g)(4) (2008) (describing powers of foreperson). Rule 6 bestowed upon the judge unfettered discretion in determining the identity of the foreperson: "The judge of the court authorized by law to charge the grand jury and to receive the report of that body shall appoint the foreman of the grand juries in the counties of their respective jurisdiction." That discretion has resulted in the systematic under-representation and exclusion of women as forepersons of the grand jury in the State of Tennessee. Robinson was indicted by a grand jury which did not have a woman as foreperson. Discrimination against

women violates the equal protection clause of the Fourteenth Amendment,[27] and violates Robinson's Sixth and Fourteenth Amendment rights to a grand jury drawn from a fair cross-section of the community. *See Campbell v. Louisiana*, 523 U.S. 392 (1998); *Duren v. Missouri*, 439 U.S. 357 (1979) (constitutional violation given exclusion of women); *Taylor v. Louisiana*, 419 U.S. 522 (1975). Where, as in Tennessee, a foreperson stands both as a voting member of the grand jury and possesses other non-ministerial, non-administrative powers, discrimination in the selection of the grand jury foreperson is unconstitutional. *See Rose v. Mitchell*, 443 U.S. 545, 548 at n.2 (1979) and *Hobby v. United States*, 468 U.S. 339 (1984). The obligations set out by Rule 6(g) are clearly non-ministerial and non-administrative: the foreperson is obligated to advise the district attorney of law violations and empowered to issue subpoenas independent of the district attorney, which, as *Rose* describes, are non-ministerial duties. *Rose*, 443 U.S. at 548, n.2. The Tennessee Supreme Court erred in characterizing the foreperson's role as merely ministerial and administrative. *See State v. Bondurant*, 4 S.W.3d 662, 675 (Tenn. 1999). *Bondurant* was also wrongly decided in that it requires that a Robinson show discrimination in the selection of the entire grand jury and not only the selection of the foreperson. *Bondurant*, 4 S.W.3d at 674, 675.

616.     Given the settled Supreme Court jurisprudence of *Rose* and *Hobby*, and in light of the fact that *Bondurant* was not decided until 1999, Robinson's trial and appellate counsel were ineffective in failing to challenge Robinson's indictments (and subsequent convictions and sentences) on the grounds that women were systematically excluded and underrepresented as forepersons of the grand jury. In this case, the Post-Conviction Court's determination to follow *Bondurant* was clear error in light of Robinson's arguments and the settled Supreme Court

---

[27]Under *Powers v. Ohio*, 499 U.S. 400 (1991), Robinson has standing to bring such a claim.

jurisprudence of *Rose* and *Hobby*. (P-C 6 at 923-924.) In any event, the Court of Criminal Appeals in this instance should have reviewed these legal questions de novo. Further, the fact of women's systematic exclusion and underrepresentation as forepersons has been factually established; to the extent that this Court deems additional factual proof necessary under the correct constitutional rule discussed above, the case should have been remanded to allow Robinson to present such proof. The fact that it was not is another instance of the State courts' error.

**Ground No. 40:   Death Sentences Are Imposed Arbitrarily and Capriciously In Tennessee.**

617.   Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth and Fifth Amendments to the United States Constitution because death sentences are imposed arbitrarily and capriciously in Tennessee. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

618.   The Supreme Court has held that "[b]ecause of the uniqueness of the death penalty . . . it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188 (1972) (citing *Furman v. Georiga*, 408 U.S.238, 313 (1972) (White, J., concurring)).

619.   Tennessee's death penalty is imposed under sentencing procedures that create a substantial risk that it will be inflicted in an arbitrary and capricious manner. Those procedures include, but are not limited to, the following:

        a)      Tennessee prosecutors have unlimited discretion in deciding whether to seek the death penalty; there are no statewide guidelines or procedures

governing this decision. *See State v. Brimmer*, 876 S.W.2d 75, 86 (Tenn. 1994). As a result, the majority of inmates on death row come from just a handful of counties.

b)    There are inadequate qualification and performance standards for defense counsel. Tennessee Supreme Court Rule 13 provides minimal qualifications for defense counsel in a capital case. Notably, Rule 13 does not require that attorneys demonstrate a commitment to providing zealous advocacy or high quality legal representation in the defense of capital cases. Moreover, although the Rule requires certain capital defense training, the contents of this training are not specified. Under the current standards, there is no assurance that a defendant will receive effective legal counsel.

c)    There are no uniform standards to ensure an open inquiry into potentially prejudicial subject matter during jury selection in capital cases. Individually sequestered voir dire, for instance, is not required in all capital cases. *See State v. Hutchinson*, 898 S.W.2d 161, 167 (Tenn. 1994) (holding that sequestered voir dire is permissible, not mandatory). Some courts allow individual sequestered voir dire—where a defendant can more effectively question prospective jurors about sensitive issues like a juror's knowledge and attitude about pretrial publicity, methods of execution, parole eligibility, the cost of incarceration, or the death penalty generally—while others do not provide defendants with the same ability to effectively question potential jurors on these crucial issues.

d)    The jury selection process excludes the sizeable portion of the community that has scruples against the death penalty. As a result, the death qualification process skews the make-up of the jury and results in a prosecution-friendly, conviction-prone jury.

e)    Tennessee's capital sentencing scheme fails to provide defendants with adequate access to experts. Tennessee Supreme Court Rule 13 limits the hourly rates of compensation for experts and investigators and requires that they live within 150 miles of the courthouse. These restrictions hinder a defendant's ability to retain the experts necessary to present a meaningful defense.

f)    Defendants are prohibited from addressing misconceptions about matters relevant to sentencing. Jurors are generally instructed that they may rely upon their own common knowledge and experiences in reaching their verdict, but this often involves a number of popularly-held mistaken beliefs about the death penalty including, but not limited to, (i) the cost of incarceration compared to the cost of execution, (ii) deterrence, (iii) mode of execution, and (iv) parole ineligibility. *See, e.g., State v. Johnson*, 632 S.W.2d 542, 547-48 (Tenn. 1982) (upholding exclusion of evidence regarding deterrent effect of death penalty); *State v. Taylor*, 771 S.W.2d

387, 397 (Tenn. 1989) (excluding evidence regarding parole eligibility is permissible); *State v. Adkins*, 725 S.W.2d 660, 664 (Tenn. 1987) (upholding exclusion of evidence regarding mode of execution).

g)   Tennessee's death penalty statute mandates that a trial court "shall" allow a victim's representative to testify before the jury in sentencing. Tenn. Code Ann. § 39-13-204(c). This violates separation of powers and injects arbitrariness and capriciousness into capital sentencing by prohibiting the trial court from exercising discretion in whether the prejudicial value of evidence outweighs its probative value and violates due process and equal protection. In addition, a prosecutor may introduce evidence regarding facts and circumstances of prior crimes at sentencing, and the court may not exclude such evidence based on the danger of prejudice. Tenn. Code Ann. § 39-13-204(c).

h)   Tennessee's death penalty statute denies the defendant the final closing argument in the penalty phase of trial, see Tenn. Code Ann. § 39-13-204(d), even though the burden is ultimately on the defense to show that mitigating circumstances outweigh aggravating factors and that the defendant does not deserve a sentence of death.

i)   The jury is required to unanimously agree that the aggravating factors do not outweigh the mitigating factors in order for a life sentence to be imposed. Tenn. Code Ann. § 39-13-204(f)(2). The practical effect is that the jury must unanimously agree to a life sentence in order for one to be imposed. This undercuts the Supreme Court's holding that "each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy v. North Carolina*, 494 U.S. 433, 442-43 (1990).

j)   There is a reasonable likelihood that jurors believe that they must unanimously agree as to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances. Juries are instructed to consider mitigating evidence as they consider aggravating evidence and are not given a separate instruction defining mitigating circumstances. *See State v. Groseclose*, 615 S.W.2d 142, 148 (Tenn. 1981). This, too, is contrary to the Supreme Court's holding that each juror be allowed to give effect to mitigating evidence in capital cases, *see McKoy*, 494 U.S. at 442-43, and creates the likelihood of jury confusion and misapplication of the law.

k)   If the jury determines that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt, they *must* impose the death penalty. *See* Tenn. Code Ann. § 39-13-204(g). This removes the jury's ability to make an ultimate determination that death is or is not warranted in any given case.

l) The death penalty is imposed in a discriminatory manner. Statistics demonstrate that the likelihood of receiving a death sentence depends, inter alia, on the defendant's and/or the victim's race, the defendant's geographic location, and the defendant's sex. *See generally McCleskey v. Kemp*, 481 U.S. 279, 287 n.2 (1987) (citing Baldus study which finds that racial discrimination is a factor in capital punishment).

m) Tennessee does not properly ensure that claims of factual innocence receive adequate judicial review. The current mechanisms to handle claims of factual innocence, such as post-conviction proceedings and writs of error *coram nobis*, do not function as intended. For example, Tennessee courts failed to grant relief on a capital appeal in a matter in which the United States Supreme Court ultimately concluded that "it is more likely than not that no reasonable juror would have found [House] guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537, 553-554 (2006) (citation omitted).

**Ground No. 41: Tennessee's Appellate Review Process In Death Penalty Cases Does Not Ensure That Capital Punishment Is Not Imposed Arbitrarily And Capriciously.**

620. Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Fourteenth and Fifth Amendments to the United States Constitution because Tennessee's appellate review process does not ensure that the death penalty is not imposed arbitrarily and capriciously. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

621. The Supreme Court has held that "meaningful appellate review" of death sentences promotes reliability and consistency, and plays a crucial role in ensuring that the death penalty is not imposed arbitrarily and capriciously. *See Clemons v. Mississippi*, 494 U.S. 738, 749 (1990); *Parker v. Dugger*, 498 U.S. 308, 321 (1991) (noting that the Court has

"emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally").

622.    There is no "meaningful appellate review" in Tennessee for the following reasons, among others:

a)    Tennessee's death penalty statute does not require the jury to make written findings concerning mitigating circumstances. *See* Tenn. Code Ann. § 39-13-204(g)(2). The absence of such findings makes it difficult or impossible for an appellate court to conduct proportionality review or harmless error analysis in the event that one of the jury's findings of an aggravating circumstance is found to be invalid.

b)    In order for appellate courts to perform a comparative review of death sentences, judges are required to fill out forms in every case where a defendant is convicted of first degree murder. *See* Tenn. Sup. Ct. R. 12(1). These forms, are often incomplete or not filled out at all. As a result, appellate courts lack essential information to conduct a meaningful comparative review. *See* Tenn. Code Ann. § 39-13-206(c)(1)(D).

c)    The methodology of comparative review in Tennessee, *see* Tenn. Code Ann. § 39-13-206(c)(1)(D), is flawed because it requires appellate courts to compare cases in which death has been imposed, but improperly excludes cases in which defendants convicted of first degree murder with aggravating circumstances were given a lesser sentence. By excluding this important class of cases, courts cannot accurately place the case under review within the context of all first degree murder cases.

d)    The proportionality review that the appellate courts must engage in pursuant to Tenn. Code Ann. § 39-13-206(c)(1)(D) is deficient, inadequate, and inconsistent with due process considerations for the following reasons, among others: (i) there is no uniformly enforced procedure for collecting data on homicide sentences that is necessary to perform a proportionality review; (ii) the proportionality review does not include homicide cases less than first degree murder or with a sentence of less than life; (iii) the information collected pursuant to Tennessee Supreme Court Rule 12, that provides a basis for comparative review, is incomplete and inadequate; (iv) the jury verdict form does not require findings of mitigating factors thus limiting the ability of courts to conduct a meaningful comparison; and (v) it is impossible to conduct meaningful review unless a sufficient number of cases have been reported so as to provide a basis for comparison. Indeed, none of the other defendants involved in this case received the death penalty, including all six who went to Bellevue Park and participated in the actual killing (whether

authorized by anyone else or otherwise). According to the State's key witness, Jarvis Shipp, the triggerman was co-defendant Antonio Jackson. Jackson received terms of 25 years and 25 years, pursuant to convictions for facilitation, to be served consecutively. Shipp received 15 years upon his plea. He was the person who started the incident that ultimately culminated in the death of the victim. Wilkins received life. Golden and Poole, also at the park, received 15 years. Prentiss Phillips received life without the possibility of parole, although the State presented evidence and argument at his trial that Phillips was the person most responsible, whose motives were "exclusively" responsible, and who gave the order, for the death of the victim.[28]

**Ground No. 42: Administration of Lethal Injection Constitutes Cruel and Unusual Punishment.**

623. Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of the Eighth Amendment to the United States Constitution because the death penalty constitutes cruel and unusual punishment. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

624. The prohibition against cruel and unusual punishment prevents punishment that involves "torture or a lingering death" as well as the "unnecessary and wanton infliction of pain." *In re Kemmler*, 136 U.S. 436, 447 (1890); *see Gregg*, 428 U.S. at 173. The Supreme Court has held that the Eighth Amendment requires that all feasible measures be taken to minimize the risk of administering capital punishment. *See, e.g., Zant v. Stephens*, 462 U.S. 862, 874 (1983). As

---

[28] While the Supreme Court may have determined that proportionality review is not constitutionally required, *see Pulley v. Harris*, 465 U.S. 37 (1984), we preserve the argument that Robinson's constitutionally rights were violated by such a thoroughly inadequate review.

the recent botched execution of Clayton Lockett in Oklahoma demonstrates, a death via lethal injection inherently involves the unnecessary and wanton infliction of pain.

625.    Tennessee's method of lethal injection constitutes cruel and unusual punishment that presents a significant risk of torturing or causing a lingering death. Among other problems, sodium thiopental—a barbiturate that is supposed to induce general anesthesia—may act as an ultra-short barbiturate that may wear off and lead to consciousness. When this happens, the individual suffers a terrifying and excruciatingly painful death. The administration of pancuronium bromide immobilizes his ability to breathe and causes paralysis so that when the potassium chloride is administered to induce a heart attack, the individual is conscious to experience the pain, but unable to move and unable to breathe. In Tennessee, none of the executioners who administer the lethal injection are trained medical professionals.[29]

626.    The prohibition against cruel and unusual punishment also prevents punishment that is arbitrarily inflicted. *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam). The delay associated with the implementation of the death penalty in Tennessee, like that of California, requires that Robinson's death sentence be overturned. *See*, *e.g.*, *Jones v. Chappell*, Case No. CV 09-02158-CJC (C.D. Cal. 2013).

**Ground No. 43:  Tennessee's Use of the Death Penalty Violates International Treaties, Laws, and Norms.**

627.    Robinson's conviction and sentence are unlawfully and unconstitutionally imposed in violation of Article VI of the United States Constitution because Tennessee's use of

---

[29] Since the conclusion of the post-conviction proceedings, Tennessee has modified its lethal injection protocol and has also provided that electrocution is another potential method by which Robinson may be executed. Robinson challenges all subsequent protocols and methods of execution on the grounds that they are cruel and unusual in violation Eighth and Fourteenth Amendments.

the death penalty violates international treaties to which the United States is a party. The adjudication of Robinson's federal claim in the State courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

628.     The use of the death penalty in Tennessee is a violation of the following treaties to which the United States is a party: (a) ICCPR, art. 6, Dec. 16, 1966, 999 U.N.T.S. 171, which the United States signed in 1977 and ratified in 1992; (b) International Convention on the Elimination of All Forms of Racial Discrimination, arts. 5, 6 and 7, Dec. 21, 1965, 660 U.N.T.S. 195, which the United States signed in 1966 and ratified in 1994 ("CERD"); and (c) Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, signed by the United States in 1988 and ratified in 1994. The administration of the death penalty further violates two agreements adopted by the United States in 1948: (a) the American Declaration of the Rights and Duties of Man, OEA/Ser.L/V.II 23, doc. 21, rev. 6 (1948); and (b) the Universal Declaration of Human Rights, G.A. Res. 217A(III), U.N. Doc. A/810 at 71 (1948).[30]

629.     These treaties and agreements explicitly protect an individual's inherent right to life, ban cruel and unusual punishment, and abhor the arbitrary deprivation of life imposed by the death penalty. Each of these treaties and agreements command restrictions on, and safeguards to be observed in, the administration of capital punishment.

---

[30] Although these declarations are not legally binding treaties, they are considered a source of binding international obligations for the member states of the Organization of American States as well as evidence for the determination of customary international law

630.    The imposition of the death penalty in violation of international treaties signed and ratified by the Senate constitutes a violation of Article VI of the Constitution.[31] Indeed, both federal and state judges are bound to the terms of the treaties to which the United States is a party, as it is a long-standing principle that the "treaties of the United States, are as much a part of the laws of every state as its own local laws and Constitution." *Blythe v. Hinckley*, 173 U.S. 500, 508 (1899).

631.    The rights conferred by the United States' obligations under these treaties, to maintain safeguards for the administration of the penalty and prevent the arbitrary deprivation of life, would be violated by the imposition of the death penalty on Robinson.[32] There is a clear conflict between the State of Tennessee sentencing Robinson to death and the federal government ratifying international treaties and agreements that prohibit such an arbitrary deprivation of life. Under the plain language of the treaties and the Senate's ratification of the

---

[31]   The Supremacy Clause of Article VI of the United States Constitution states that: "[A]ll treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

[32]   For example, in 1996, the International Commission of Jurists concluded that racial discrimination in the administration of the death penalty violates the United States' obligations under the ICCPR and CERD. In 2006, the United Nations Commission on Human Rights firmly requested that the United States impose a moratorium on executions due to the racial disparity with which the death penalty is imposed, citing the United States' need to "comply fully" with its ICCPR obligations with regard to ensuring capital punishment is not imposed disproportionately on racial minorities. *See* Human Rights Committee, *Report of the Human Rights Committee, Volume I: Eighty-fifth Session (17 October-3 November 2005), Eighty-sixth Session (13-31 March 2006), Eighty-seventh Session (10-28 July 2006)*, 1 December 2006, A/61/40 (Vol. I). Most recently, in November 2010, when the United States was reviewed under the Universal Periodic Review, the report recommended that the United States review its use of the death penalty and abolish the practice. *See* Amnesty Int'l, *Death Sentences and Executions 2011*, at 15 (2012). Because Robinson is African-American, these concerns warrant serious consideration by the Court.

same, the United States can and must take action to review and correct the imposition of the death penalty.

632.    It is a long-standing principle of federal law that "international law is part of our law and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination." *The Paquete Habana*, 175 U.S. 677, 700 (1900); *see also Restatement (Third) of Foreign Relations Law of the United States* § 111(1)    (1987) ("International law and international agreements of the United States are law of the United States and supreme over the law of the several States."). As such, there is a strong historical relationship and correspondence between international law and the interpretation of rights under the United States Constitution.

633.    There can be no doubt that there is a powerful international trend within the modern international community—especially among Western democracies—towards the abolition of the death penalty. Statistics indicate an acceleration of the one-way international trend toward the disappearance of capital punishment: only 18 of the 193 Member States of the UN carried out executions in 2011. *See* Amnesty Int'l, *Death Sentences and Executions 2011* at 5 (2012). Indeed, in 2011, only China, Pakistan, Iraq, Iran, Egypt, India, Malaysia and Sri Lanka had more reported death sentences than the United States—putting the U.S. on par with, or having more reported death sentences than, Somalia, Myanmar, Kuwait, Sudan and Saudi Arabia. *See id*. at 56.[33]

---

[33] Additionally, the Second Optional Protocol to the ICCPR commits its members to the abolition of the death penalty and—as of September 2011—has 74 parties and 35 additional signatories. Protocol 13 of the Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, Europe.T.S. No. 5; 213 U.N.T.S. 221, also requires the total abolition of the death penalty, and has been ratified by every member state of the Council of Europe (continued…)

634.     In its capital punishment jurisprudence, the Supreme Court has continuously referred to and relied on international law, norms, and standards in considering the permissibility of practices under the Constitution. Specifically, the decisions of the Supreme Court in *Roper v. Simmons*, 543 U.S. 551 (2005), and *Atkins v. Virginia*, 536 U.S. 304 (2002), have clearly indicated that the international trend against capital punishment has informed and may continue to substantiate its decisions restricting the implementation of capital punishment. *See, e.g.*, *Roper*, 543 U.S. at 551 ("The overwhelming weight of international opinion . . . provides respected and significant confirmation for [our own] determination . . . It does not lessen fidelity to the Constitution or pride in its origins to acknowledge that the express affirmation of certain fundamental rights by other nations and peoples simply underscores the centrality of those same rights within our own heritage of freedom.").[34]

635.     In continuing to sanction the administration of the death penalty, the United States has breached its obligations under ratified international treaties and is in violation of duties imposed by international law and norms. As such, the decision of the Court of Criminal Appeals that the imposition of the death penalty does not constitute a violation of treaties ratified by the United States or customary international laws and norms was an unreasonable application of

(except for Poland and Armenia, which have signed but not ratified the protocol, and Russia and Azerbaijan which have not yet signed).

[34] *See also Trop v. Dulles*, 356 U.S. 86, 102-103 (1958) ("The civilized nations of the world are in virtual unanimity that statelessness is not to be imposed as punishment for crime"); *Atkins*, 536 U.S. at 316 n.21 (recognizing that "within the world community, the imposition of the death penalty for crimes committed by mentally retarded offenders is overwhelmingly disapproved"); *Thompson v. Oklahoma*, 487 U.S. 815, 830-831, n.31 (1988)          (noting the abolition of the juvenile death penalty "by other nations that share our Anglo-American heritage, and by the leading members of the Western European community," and observing that "[w]e have previously recognized the relevance of the views of the international community in determining whether a punishment is cruel and unusual"); *Enmund v. Florida*, 458 U.S. 782, 796-97 (1982) (noting that the doctrine of felony murder has been eliminated or restricted in England, India, Canada, and a "number of other Commonwealth countries").

federal law. The United States must correct the conflict between its practices and its obligations under ratified international treaties, and should confirm its role as an international leader and moral beacon by conforming its policy on the implementation of the death penalty to the undeniable international consensus.

## CUMULATIVE ERROR

**Ground No. 44:   Robinson Should be Granted Relief Because of Cumulative Error.**

636.    "Errors which individually might not rise to the level of a constitutional violation may, when considered cumulatively, render a trial fundamentally unfair." *Groseclose v. Bell*, 895 F. Supp. 935, 960 (M.D. Tenn. 1995), *aff'd*, 130 F.3d 1161 (6th Cir. 1997) (citing *Lundy v. Campbell*, 888 F.2d 467, 472-73 (6th Cir. 1989) and *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983)); *see also Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) (considering cumulative error in a 28 U.S.C. § 2254 case).

637.    The Tennessee Court of Criminal Appeals' decision to deny Robinson's claim for cumulative error was an unreasonable application of clearly established law. When taking into account the cumulative effect of all of the errors set forth in the other paragraphs in this petition all pleadings filed in this case previously and to be filed subsequent to the filing of this petition, it is clear that Robinson has been denied a fair trial during the guilt/innocence phase. Specifically, the cumulative effect of all such errors violated Robinson's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. The accumulation of errors renders Robinson's trial fundamentally unfair and his sentence and conviction unreliable. For these reasons, Robinson is entitled to relief.

## PRAYER FOR RELIEF

WHEREFORE, Robinson prays that this Court:

638.    Issue a writ of habeas corpus to have Robinson brought before this Court to the end that he may be discharged from his unconstitutional confinement and restraint and relieved of his unconstitutional conviction and sentence of death;

639.    Require the State to answer the allegations of this petition and bring forth the entire state court record so that this Court can review those parts of the record that are relevant to the issues and defenses raised in this proceeding;

640.    Afford Robinson an opportunity to reply to any responsive pleading filed by the State;

641.    Grant discovery, a sufficient period of time to conduct discovery, and an evidentiary hearing on the allegations of this petition and after such a hearing, grant relief from the unconstitutional convictions and sentences;

642.    Stay his execution pending final disposition of this petition; and

643.    Grant such other and further relief as may be appropriate and dispose of this matter as law and justice requires.

Dated: August 13, 2014                          Respectfully Submitted,

                                                /s/  Robert Hutton
                                                Robert L. Hutton
                                                GLANKLER BROWN, PLLC
                                                6000 Poplar Avenue
                                                Suite 400
                                                Memphis, TN 38119
                                                Ph: 901-525-1322
                                                Fax: 901-525-2389
                                                rhutton@glankler.com

/s  P. Benjamin Duke
P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
Ph: 212-841-1072
Fax: 646-441-9072
bduke@cov.com

**VERIFICATION**

I, Gregory Robinson, declare under the penalty of perjury that the issues raised and facts alleged in the foregoing Petition are true to the best of my own knowledge and I am entitled to relief requested therein.

<u>(Signature Redacted, Original retained by counsel)</u>
Gregory Robinson
Riverbend Maximum Security Institution
Unit 2
7475 Cockrill Bend Industrial Road
Nashville, Tennessee 37209-1048