IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

GREGORY ROBINSON,         )
                            )
       Petitioner,       )
                            )
Vs.                        )          No.  2:14-cv-02630-SHL-tmp
                            )
BRUCE WESTBROOKS, Warden,   )
Riverbend Maximum Security    )
Institution,                )
                            )
       Respondent.     )

---

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT ON GROUNDS 1-3 OF PETITION
FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. vi

INTRODUCTION .............................................................................. 1

STATEMENT OF FACTS .................................................................. 4

I. **Record Facts Supporting Robinson's *Napue* False-Testimony Claim (Ground 1)** ................................................................................. 7

    A. **Shipp's May 1997 Statement Fails to Mention Robinson and Identifies Phillips as the "Say So" in Directing the Murder** ............................................. 7

    B. **Shipp's About-Face in Testifying Against Robinson at Trial** ........................... 8

    C. **The Falsity of Shipp's Denials of "Any Promises," and the Prosecutors' Failure to Correct Them at Trial** ............................... 14

    D. **The State's Deliberate Concealment of Shipp's False Testimony During Robinson's Post-Trial Motions and on His Direct Appeal** ............... 16

    E. **The Critical Importance of Shipp's Testimony in Obtaining Robinson's Conviction at Trial** .......................................... 19

II. **Additional Record Facts Supporting Ground 2 (*Brady* Claim) and Ground 3 (*Strickland* Claim).** ........................................................ 21

    A. **Evidence Concerning the State's Failure to Disclose the November 5 Statement** .......................................................... 21

        1. **Evidence in the Trial and Direct Appeal Record Demonstrating That the November 5 Statement Was Not Disclosed** ................................................. 22

        2. **The Prosecution's Failure to Disclose Other *Brady* Material Relating to Shipp** ......................................... 24

        3. **Post-Conviction Evidence Demonstrating That the November 5 Statement Was Not Disclosed** .................... 25

    B. **Evidence Demonstrating the Materiality of the November 5 Statement Under *Brady*** ................................................ 27

    C. **Post-Conviction Rulings on the Brady Claim** ................................. 30

D.     Other Failures Relevant to Trial Counsel's Ineffective Assistance (Ground 3) ...................................................................... 34

     1.     Failure to object to prosecution vouching by commenting on facts not in evidence ................................................... 34

     2.     Material Error in Trial Court's Jury Instructions on Corroboration of Accomplice Testimony ............................... 34

SUMMARY JUDGMENT STANDARD OF REVIEW ...................... 35

ARGUMENT ............................................................................... 35

I.     Robinson Is Entitled to a New Trial Because Shipp's False Testimony— Knowingly Elicited and Improperly Exploited by the State at Trial—Was Material Under *Napue/Giglio*. ......................................................... 35

    A.     Courts Have Defined Several Key Principles Guiding Their Determination as to Whether a False Statement is Material Under the Strict, "Defense-Friendly" *Napue/Giglio* Standard ......................... 36

     1.     The *Napue/Giglio* Materiality Standard is a Strict, "Defense-Friendly" Standard. ................................................ 36

     2.     A Prosecutor's Conditional Promise to Consider Leniency in Exchange for Testimony Creates a Powerful Incentive to Lie. .......... 37

     3.     A Witness's Admission of a Unilateral Hope or Expectation of Benefit from His Testimony Does Not Render a False Denial of a Prosecutor's Promise Immaterial Under *Napue*. ............................... 39

     4.     The Prosecution's Own Emphasis and Reliance Upon Uncorrected False Testimony Demonstrates Its Materiality Under *Napue/Giglio*. ................................................................ 41

     5.     Under *Napue/Giglio*, Courts Must Assess the Likely Effect on the Jury If It Had Learned that the Witness Testified Falsely .......... 44

    B.     Shipp's False Testimony Was Material Because There Is a Reasonable Likelihood That Exposure of His Perjury and the State's Promise of Consideration Could Have Affected the Judgment of the Jury. ................... 45

     1.     Shipp's Testimony Was the Linchpin of the State's Case. ................. 46

     2.     The State's Promise of Consideration on November 5 Gave Shipp Both a Powerful Incentive and an Implicit Invitation to Lie. .......................................................................... 51

        3.       **Shipp's Admission on Cross-Examination That He Hoped for Some Benefit From His Testimony Did Not Render His False Testimony Immaterial.** ....................................................... 53

        4.       **The Acknowledged Error of the Trial Court's Erroneous Accomplice Instruction Further Compounded the Impact of Shipp's Testimony** ........................................................ 55

        5.       **The Prosecutors' "Word" at Trial—and Their Continuing Deception During Post-Trial Motions and Direct Appeal—Confirms the Materiality of Shipp's Uncorrected False Testimony** ................................................................... 56

**II.**     **Robinson Is Entitled to Summary Judgment on Ground No. 2 Because the State's Failure to Disclose the November 5 Statement Violated *Brady*** ...................... 59

    **A.**     **The TCCA Acknowledged That the November 5 Statement Was *Brady* Material Which the Prosecution Was Required to Disclose Prior to Robinson's Trial.** ........................................................ 60

    **B.**     **The Tennessee Courts' Disclosure Finding Constitutes an "Unreasonable Determination of the Facts" Because It Cannot Be Reconciled With the Clear and Convincing Contrary Evidence in the Post-Conviction Record.** ..................................................... 61

        1.       **The TCCA Failed to Consider the Objective Record Evidence Demonstrating that the Prosecution Failed to Disclose the November 5 Statement.** ..................................................... 63

        2.       **The State Courts' Disclosure Finding Is Unreasonable Notwithstanding the Courts' Reliance Upon Witness Credibility Assessments.** ................................................ 68

    **C.**     **The TCCA's Determination That the November 5 Statement Was Not "Material" Under *Brady* Constituted an Unreasonable Application of Clearly Established Law** ..................................................... 72

        1.       **Materiality Under *Brady* Is a Specific Legal Rule That State Courts Must Apply Within a Narrow Range of Reasonableness.** ...................................................... 72

        2.       **The TCCA's Ruling on Materiality Was Objectively Unreasonable Under the Clearly Established Law of *Brady*.** ............ 74

**III.**    **In the Alternative, Should the Court Uphold the TCCA's *Brady* Disclosure Ruling, Robinson Is Entitled to Summary Judgment on Ground No. 3 of the Petition, Because Trial and Appellate Counsel Rendered Ineffective Assistance in Failing to Use the November 5 Statement.** ........................................... 79

**A.**      **It Has Already Been Determined that Trial Counsel's Failure to Use Shipp's November 5 Statement Constituted Deficient Performance Under *Strickland*.** ................................................................. 80

**B.**      **The TCCA's Ruling that Trial Counsel's Deficient Performance Was Not Prejudicial Constituted an Unreasonable Application of Clearly Established Law Under *Strickland*.** ................................................... 80

**C.**      **The Prejudice Resulting From Robinson's Trial Counsel's Failure to Use the November 5 Statement Was Compounded by Several Other Deficiencies in Counsel's Performance.** ........................................... 81

       **1.**      **Trial Counsel Failed to Object to Improper Vouching and False Statements by the State.** ............................................... 81

       **2.**      **Trial Counsel Failed to Include the November 5 Statement in Robinson's Case File, Preventing a Robust Appeal.** .......................... 82

       **3.**      **Trial Counsel Failed to Object to the Incorrect Accomplice Testimony Instruction.** ................................................... 83

**CONCLUSION** ........................................................................................ 84

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armour v. Salisbury*,
  492 F.2d 1032 (6th Cir. 1974) ........................................................37, 43

*Avery v. Prelesnik*,
  548 F.3d 434 (6th Cir. 2008) ..................................................................80

*Ballinger v. Prelesnik*,
  709 F.3d 558 (6th Cir. 2013) ..................................................................79

*Boone v. Paderick*,
  541 F.2d 447 (4th Cir. 1976) ..................................................................41

*Brady v. Maryland*,
  373 U.S. 83 (1963) .......................................................................... *passim*

*Bragan v. Morgan*,
  791 F. Supp. 704 (M.D. Tenn. 1992) ................................38, 40, 41, 51

*Brumfield v. Cain*,
  --- U.S. ---, 135 S. Ct. 2269 (2015) .......................................................62

*Campbell v. Reed*,
  594 F.2d 4 (4th Cir. 1979) ......................................................................38

*Cullen v. Pinholster*,
  563 U.S. 170 (2011) ................................................................................79

*Eakes v. Sexton*,
  592 F. App'x 422 (6th Cir. 2014) ...........................................................74

*Foley v. Parker*,
  488 F.3d 377 (6th Cir. 2007) ..................................................................50

*Giglio v. United States*,
  405 U.S. 150 (1972) ........................................................................ *passim*

*Goodwin v. Johnson*,
  132 F.3d 162 (5th Cir. 1997) ..................................................................40

*Grindstaff v. State*,
  297 S.W.3d 208 (Tenn. 2009) .................................................................71

*Gumm v. Mitchell*,
   775 F.3d 345 (6th Cir. 2014) ..............................................................73, 74

*Harrington v. Richter*,
   562 U.S. 86 (2011) ...............................................................................72

*Harris v. Lafler*,
   553 F.3d 1028 (6th Cir. 2009) .................................................61, 75, 78

*Horton v. Mayle*,
   408 F.3d 570 (9th Cir. 2005) ...............................................................42

*Jackson v. Brown*,
   513 F.3d 1057 (9th Cir. 2008) ...............................................37, 40, 41, 45

*Johnson v. State*,
   38 S.W.3d 52 (Tenn. 2001)...................................................................42

*Kyles v. Whitley*,
   514 U.S. 419 (1995).................................................................... *passim*

*LaCaze v. Warden of Louisiana Correctional Institute for Women*,
   645 F.3d 728 (5th Cir. 2011), *amended by* 647 F.3d 1175 (5th Cir. 2011) ......................43, 44

*McMullan v. Booker*,
   761 F.3d 662 (6th Cir. 2014) ...............................................................61

*Miller–El v. Cockrell*,
   537 U.S. 322 (2003)..............................................................................62

*Miller-El v. Dretke*,
   545 U.S. 231 (2005)..............................................................................62

*Moldowan v. City of Warren*,
   578 F.3d 351 (6th Cir. 2009) ...............................................................73

*Napue v. Illinois*,
   360 U.S. 264 (1959)...................................................................... *passim*

*Peoples v. Lafler*,
   734 F.3d 503 (6th Cir. 2013) .......................................................2, 44, 45

*Ray v. Rose*,
   371 F. Supp. 277 (E.D. Tenn. 1974)....................................................38

*Renico v. Lett*,
   559 U.S. 766 (2010)..............................................................................73

*Rickman v. Dutton*,
   864 F. Supp. 686 (M.D. Tenn. 1994) ............................................................ 38, 43

*Robinson v. Mills*,
   592 F.3d 730 (6th Cir. 2010) ............................................................................ 74

*Robinson v. State*,
   No. W2011-00967-CCA-R3-PD, 2013 WL 1149761 (Tenn. Crim. App. Mar.
   20, 2013) .................................................................................................... *passim*

*Rosencrantz v. Lafler*,
   568 F.3d 577 (6th Cir. 2009) ......................................................................... *passim*

*Scott v. Foltz*,
   612 F. Supp. 50 (E.D. Mich. 1985) ...................................................... 37, 43, 44, 45

*Shabazz v. Artuz*,
   336 F.3d 154 (2d Cir. 2003) ............................................................................... 40

*Shih Wei Su v. Filion*,
   335 F.3d 119 (2d Cir. 2003) ............................................................................... 37

*Smith v. Cain*,
   --- U.S. ---, 132 S. Ct. 627 (2012) ..................................................................... 72

*Smith v. Lavigne*,
   2003 WL 22358637 (E.D. Mich. Oct. 15, 2003) ................................................. 40

*Smith v. Metrish*,
   436 F. App'x 554 (6th Cir. 2011) ....................................................................... 73

*State v. Phillips*,
   76 S.W.3d 1 (Tenn. Crim. App. 2001) ............................................................ 9, 18

*State v. Robinson*,
   146 S.W.3d 469 (Tenn. 2004) ....................................................................... *passim*

*State v. Robinson*,
   No. W2001-01299-CCA-R3-DD, 2003 WL 21946735 (Tenn. Crim. App.
   Aug. 13, 2003) ........................................................................................... *passim*

*State v. Sexton*,
   No. M2004-03076-CCA-R3CD, 2007 WL 92352 (Tenn. Crim. App. Jan. 12,
   2007) ............................................................................................................... 82

*Strickland v. Washington*,
   466 U.S. 668 (1984) ...................................................................................... *passim*

*Strickler v. Greene,*
    527 U.S. 263 (1999)...........................................................................59, 72

*U. S. v. State of Mich.,*
    653 F.2d 277 (6th Cir. 1981) ..........................................................71

*United States v. Agurs,*
    427 U.S. 97 (1976)...........................................................................36

*United States v. Arny,*
    831 F.3d 725 (6th Cir. 2016) ..........................................................79

*United States v. Bagley,*
    473 U.S. 667 (1985).........................................................................38, 51

*United States v. Bernal,*
    814 F.2d 175 (5th Cir. 1987) ..........................................................55

*United States v. Dado,*
    759 F.3d 550 (6th Cir. 2014) ..........................................................79, 80

*United States v. Gale,*
    314 F.3d 1 (D.C. Cir. 2003)............................................................37

*United States v. Mason,*
    293 F.3d 828 (5th Cir. 2002) ..........................................................41

*United States v. Uwazurike,*
    580 F. App'x. 440 (6th Cir. 2014) ..................................................42

*White v. Woodall,*
    --- U.S. ---, 134 S. Ct. 1697 (2014) ...............................................72

*Williams v. Taylor,*
    529 U.S. 362 (2000).........................................................................72

*Wisehart v. Davis,*
    408 F.3d 321 (7th Cir. 2005) ..........................................................40

*Wogenstahl v. Mitchell,*
    668 F.3d 307 (6th Cir. 2012) ..........................................................44

*Yarborough v. Alvarado,*
    124 S.Ct. 2140, 541 U.S. 652 (2004)..............................................73

**Statutes**

28 U.S.C. § 2254.................................................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 56(a) ...................................................................................................................35

Tenn. R. Crim. P. 26(a)...............................................................................................23, 64, 65, 66

**INTRODUCTION**

Petitioner Gregory Robinson respectfully moves this Court for summary judgment as to Grounds 1, 2, and (in the alternative) 3 of his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Each of these Grounds alone requires, as a matter of law, that Robinson's conviction and death sentence be vacated and a new trial granted. While Robinson submits that habeas relief under § 2254 is also required on the numerous other Grounds set forth in his Petition (for the reasons stated therein), this motion focuses in detail and seeks summary determination on Grounds 1 through 3.

As to Ground 1, this Court previously granted Robinson's motion for *de novo* review of the post-conviction ruling by the Tennessee Court of Criminal Appeals (TCCA) on the materiality of Jarvis Shipp's uncorrected false testimony—knowingly elicited and used by the State at Robinson's trial—under *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and its progeny. (Order Granting In Part and Denying In Part Petitioner's Motion to Apply *De Novo* Review ("Standard of Review Decision" or "SRD"), 43 at 8626-27.)[1] The TCCA's ruling (under the wrong legal standard) therefore receives no deference on this Court's determination as to Ground 1.

Under *Napue*, a violation is material if there is "*any* reasonable likelihood" "that the false testimony *could . . . have affected* the judgment of the jury." *Id.* at 271 (emphases added); *accord Giglio v. United States*, 405 U.S. 150, 154 (1972) ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'") (quoting *Napue*). The Sixth Circuit has recognized that *Napue* violations involve a form of "deliberate

---

[1] All references to the filed record will be abbreviated hereinafter, as follows: ([ECF Document No.] at [PageID]).

deception" by the prosecution that is "incompatible with 'rudimentary demands of justice.'"

*Peoples v. Lafler*, 734 F.3d 503, 515 (6th Cir. 2013) (quoting *Giglio,* 405 U.S. at 153). When a

defendant's trial has been infected by the inherent corruption of a *Napue* violation, the

materiality assessment is therefore "less stringent" and more defense-friendly, *Rosencrantz v.

Lafler*, 568 F.3d 577, 584 (6th Cir. 2009), and a new trial should be more readily granted.

As shown in the Petition and demonstrated more fully below, the undisputed record facts

in this case establish as a matter of law that the low threshold for materiality under *Napue* is

amply satisfied here, and a new trial for Robinson must be granted. In particular, and as

discussed in greater detail below:

- The false testimony was elicited from the State's star witness, Jarvis Shipp, who provided the only evidence at trial concerning Robinson's alleged gang rank and authority—an essential component of the State's theory that Robinson ordered the murder.

- Unbeknownst to the jury, the State had given Shipp an overpowering incentive to lie by telling Shipp (himself under indictment for capital murder at the time) that testifying against Robinson "will" help Shipp "save [his own] life," and that the State would "certainly" take into consideration "anything you do to help us get Gregory [Robinson]."

- By improperly vouching for Shipp's truthfulness in their summations to the jury, and by repeating their false claim that Shipp had received no promises from the State, the prosecutors confirmed their own recognition that Shipp's credibility, and his false denial of any promises by the State, were highly material.

- In post-trial motions and on direct appeal, the lead prosecutor falsely denied that Shipp had received any promises in exchange for his testimony, and failed to disclose to the court the existence of a document proving the falsity of her representations. This brazen misconduct tainted the post-trial and direct appellate proceedings and further confirms the materiality of the false testimony that the prosecution had elicited from Shipp.

Under these circumstances, there can be no doubt that there is some reasonable likelihood that

the exposure of Shipp's lies could have affected the judgment of the jury. The false testimony

was therefore material.

With respect to Grounds 2 and 3 in the Petition, this Court's prior ruling made clear that

the Court's review of those Grounds will not be *de novo*, but rather judged under the standards

set forth in 28 U.S.C. § 2254(d).[2] Even under these deferential standards, however, Robinson's claims on Ground 2 and, in the alternative, Ground 3, should be granted as a matter of law. Although the Tennessee Courts' factual finding concerning whether the State failed to disclose critical *Brady* material is entitled to a "presumption of correctness," that presumption is rebutted here by the overwhelming force of the clear and convincing evidence in the record. The Tennessee Courts' adjudication of the *Brady* issue constituted (i) an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2) as to the finding that the State turned over the 17-page transcript of Shipp's November 5, 1998 meeting with the prosecutors (the "November 5 Statement"), and (ii) an unreasonable application of clearly established law under *Brady* and its progeny as to the TCCA's alternative holding of immateriality.

If the Court denies relief on Ground 2 and upholds the TCCA's baseless finding that the November 5 Statement was disclosed, then the Court should grant summary judgment on the alternative Ground 3, because the failure of Robinson's junior trial counsel to give the November 5 Statement to lead counsel—and the resultant failure of either lawyer to use the November 5 Statement at trial or make it available to counsel for Robinson's post-trial motions and on direct appeal—constituted ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668 (1984). In ruling on this issue, the TCCA held that the first prong of *Strickland*— unconstitutionally deficient performance by trial counsel—had been met. (*See* Petition, 1 at 85.) The only issue for review on Ground 3 is therefore whether the TCCA's failure to recognize the prejudice to Robinson resulting from counsel's deficient performance constituted an unreasonable application of *Strickland* justifying relief under § 2254(d)(2).

---

[2] We address our arguments here solely to the standard of review under § 2254, without waiving Robinson's right to appeal the denial of *de novo* review.

The prejudice caused by counsel's failure to use the November 5 Statement—which contained a critical cache of impeachment evidence against the State's star witness at trial—cannot reasonably be disputed by fair-minded jurists. Moreover, the prejudice resulting from trial counsel's deficient performance must be assessed not only in terms of the prejudicial impact of counsel's failure to use the November 5 Statement (or put it in their files for appellate counsel to use), but also in light of the cumulative harm from the other instances of constitutionally deficient performance by Robinson's trial counsel recognized by the Tennessee Courts, which exacerbated the harm to Robinson's defense inflicted by the failure to use the November 5 Statement. (*See* Petition, 1 at 150-51.) As demonstrated in the Petition and more fully below, Robinson is entitled to summary judgment in his favor on this issue.

## STATEMENT OF FACTS

Gregory Robinson was convicted and sentenced to death in November 1998 for the aggravated kidnapping and first degree murder of Vernon Green in Memphis, Tennessee on the night of April 30 – May 1, 1997. *See* Petitioner's Statement of Facts Pursuant to Local Rule 56.1 at 1. On that night, six members of the gang known as the "Gangster Disciples" took Green by car to Memphis's Bellevue Park and shot him to death. Robinson was *not* one of the six gang members who carried out the murder; he was not even present at the park when the killing occurred. At Robinson's trial, though the prosecutors were allowed (over objection) to present gruesome evidence of Green's gunshot wounds inflicted by others, the State presented no physical evidence whatsoever connecting Robinson to the crime. Nor was there any evidence that Robinson knew or had even met Green prior to April 30, 1997.

Robinson also was not from Memphis's "Hurt Village" neighborhood, where the events leading to Green's murder began earlier that day. *State v. Robinson* ("*Robinson II*"), 146 S.W.3d 469, 474 (Tenn. 2004). A squabble between two small children on a playground led to an

argument between the children's mothers, whose boyfriends were members of the Gangster Disciples and of a rival gang, the Vice Lords. *Id.* This led to a fistfight between Jarvis Shipp, the Gangster Disciples' "chief of security" for Hurt Village, and a member of the Vice Lords, and escalated further to gunfire, causing minor injury to another Gangster Disciple from Hurt Village. *Id.* at 475. Shipp and other Gangster Disciples, including the Hurt Village chief executive, known as "coordinator," Prentiss Phillips, went to a Hurt Village apartment owned by the Black sisters (the "Black apartment") and called an "aid and assist" meeting. This resulted in a congregation of some 40 to 80 Gangster Disciples from all over Memphis at the apartment. *Id.* at 475, 478.

The State did not contend that Robinson lived in Hurt Village, nor was it even suggested that he had been present at or involved in the altercation that led to the "aid and assist" call. Rather, the State contended that Robinson was a member of the Gangster Disciples from another area of Memphis who had gone to the Black apartment in response to the "aid and assist" call on April 30. At trial, the prosecution's theory was (1) that Robinson was the Gangster Disciples' "chief of security" for the entire city of Memphis; (2) that he participated in the seizure and beating of Green after arriving at the Black apartment; and (3) based on testimony that Robinson said to gang members, "Y'all know what to do," as they took Green from the apartment, that he exercised his superior authority as "chief of security" to personally direct other gang members to kill Green.

The testimony of Jarvis Shipp was the sole source of evidence at trial concerning Robinson's alleged membership, rank, and authority in the Gangster Disciples. Shipp was also the only prosecution witness who claimed to know Robinson before April 30, 1997. Chris James—the only other trial witness who testified that Robinson was even present at the

meeting—did not know Robinson and had identified him incorrectly as "Shaun" in his May 1997 statement to police. The Tennessee Supreme Court stated on direct appeal in this case that James gave no testimony concerning Robinson's membership, position, or authority within the Gangster Disciples: "James was not asked about the defendant's rank, did not attribute a rank to the defendant, and stated he had never seen the defendant before April 30, 1997." *Robinson II*, 146 S.W.3d at 496.

Shipp alone testified about Robinson's purported rank and his authority relative to Phillips, as head "coordinator" of Hurt Village, within the Gangster Disciples hierarchy. Robinson's alleged rank and authority were essential to the State's theory of Robinson's guilt, and the prosecution relied heavily on Shipp's testimony during their closing arguments. Assistant District Attorney Wulff told the jury that Robinson was "the man who was in charge, ultimately" and contended that Robinson was "the ranking Gangster Disciple in [the] meeting" even though Phillips—the coordinator of Hurt Village—was also there. (22-14 at 2086-87.) She described Robinson as "the man who was calling the orders, who was directing people." (*Id.* at 2088.) The State argued that Robinson—not Phillips—alone ordered the killing and therefore should be convicted of first-degree murder. (*Id.* at 2073 (prosecutor contending that Green was killed "at the direction of Gregory Robinson").) On rebuttal summation, the prosecution branded Robinson as "[t]he executioner." (*Id.* at 2162.) Thus, the jury was urged to convict—and, thereafter, to sentence Robinson to death—on the basis that Robinson alone exercised his individual authority to order the murder, without regard to Phillips's concurrence or assent.

In finding on direct appeal that there was sufficient evidence to sustain Robinson's conviction for first-degree murder, the Tennessee Supreme Court relied on the testimony of Shipp that Robinson "was a high ranking Gangster Disciple." *Robinson II*, 146 S.W.3d at 507. It

further relied on the fact that "the Gangster Disciples was an organization structured according to rank and that orders given by those of superior rank should be obeyed," thus allowing the crucial inference that the ultimate murderer "carried out the order of [Robinson]" alone. *Id*. at 508.

## I.    Record Facts Supporting Robinson's *Napue* False-Testimony Claim (Ground 1)

### A.    Shipp's May 1997 Statement Fails to Mention Robinson and Identifies Phillips as the "Say So" in Directing the Murder

On May 27, 1997—less than a month after the murder—Jarvis Shipp was arrested by police and confessed his involvement in the Green murder, as set forth in a 10-page statement (the "May 1997 Statement") signed on that date. Shipp admitted that he was the "chief of security" for the Hurt Village unit of the Gangster Disciples, and his child was involved in the confrontation on April 30 that led to the aid-and-assist meeting. (24-8 at 6276.) Shipp further stated that he was present both at the Black apartment on the night of the murder and at Bellevue Park, and he identified numerous other Gangster Disciples, including: (1) Kevin Foley, known by the code name "Kaos," the "governor" of the Gangster Disciples for the entire City of Memphis; (2) Prentiss Phillips, whom he identified as the Gangster Disciples' "coordinator," or top-most leader, for all of Hurt Village; and (3) the six Gangsters who took Green to Bellevue Park, including, himself and another man whom he later identified as Antonio Jackson. (*Id*. at 6277.)

Shipp's May 1997 Statement further affirmed that, after he arrived at the Black apartment, (1) Prentiss Phillips called the "aid and assist" meeting, (*id.*); (2) Phillips directed Shipp to seize Green after he was spotted at a nearby building, (*id.* at 6279); (3) Phillips personally participated in beating Green at the apartment, (*id*. at 6280); (4) Kaos, the governor of the Memphis area Gangster Disciples, "came to the apartment for a brief moment and talked *to Prentiss*," then later "called back and talked *to Prentiss* on a cellular phone," (*id.* at 6277

(emphases added).)[3] Shipp was also shown a photo array containing Phillips's photo, and he selected Phillips's photo from that array, explaining that Phillips "was the say so. He was giv[ing] the orders."[4] (*Id*. at 6281.)

Nowhere in the May 1997 Statement did Shipp make any reference to Gregory Robinson or any alias that has ever been even allegedly connected with Robinson. Shipp also was shown the photo spread labeled "GG," which contained a photograph of Robinson designated as No. 6. However, after examining that photo spread, Shipp identified only photograph No. 3 as a non-Gangster known as "Slim" who was not present at the Black apartment on the night of the Green murder. (24-8 at 6283.) Shipp did not identify Robinson's photo, much less place him at the Black apartment or attribute any conduct on the night of April 30-May 1, 1997, to him. (*Id.*)

After giving the May 1997 Statement, Shipp was charged with first degree murder, and the prosecution filed a notice of intent to seek the death penalty. *Robinson v. State* ("*Robinson III*"), No. W2011-00967-CCA-R3-PD, 2013 WL 1149761, at *8 (Tenn. Crim. App. Mar. 20, 2013). His trial was set for February 22, 1999—less than four months after Robinson's trial in November 1998. (22-6 at 929.)

> **B.     Shipp's About-Face in Testifying Against Robinson at Trial**

Robinson was represented at trial by appointed counsel, Joseph Ozment and Steffan Schreiner. At the time, Ozment, Robinson's lead attorney, had practiced law for only six years

---

[3] At Robinson's trial Shipp testified that Kaos said by phone to take Green "fishing," which, as Shipp understood, meant to rough him up and leave him to find his way home, not kill him. (22-6 at 980-81.)

[4] Although the transcribed statement reads, "He was the say so. He was given the orders," the context of this statement leaves no doubt that the word "giving" was mis-transcribed as "given." The question posed referred to "[w]hen Prentis[s] told you to take Vernon to his destination," and nothing else in the statement suggests that Phillips was a receiver, rather than the giver, of any "orders" that night.

and had never before been the lead attorney in a capital case. (24-17 at 7273, 7279.) Ozment's junior co-counsel, Schreiner, had never handled a capital case. (24-16 at 7194.)

Robinson was tried in Shelby County Criminal Court, Memphis, from November 16 to November 23, 1998. The jury sentenced Robinson to death after a one-day penalty-phase hearing. Of all the defendants charged in connection with Green's death, only Robinson received a death sentence. (*See* Petition, 1 at 38.)[5]

Robinson's trial counsel were not notified until shortly before Robinson's trial was to begin that Shipp would testify for the State against Robinson. (24-17 at 7277-78.) Shipp testified against Robinson on November 19, 1998. Immediately before testifying, Shipp was subjected to *voir dire* by his counsel, Gerald Skahan, outside the presence of the jury. (22-6 at 928-30.) Both ADA Branham and ADA Wulff, were present in the courtroom, as were Robinson's trial counsel. (*Id.*) During the voir dire, Shipp testified that no promises had been made to him regarding his testimony:

> Q.    And I have explained to you that you're still set for trial
>       February 22nd and the State of Tennessee is still seeking
>       the death penalty against you; is that correct?
>
> A.    Yes, sir.
>
> Q.    And at this time there is no other offer, there is no deal or
>       any promises to you regarding your testimony; is that
>       correct?
>
> A.    Yes, sir.

---

[5] At least six defendants other than Robinson were charged and convicted between May 1997 and November 1999 for crimes in connection with the death of Vernon Green. Among those, Prentiss Phillips was convicted of first degree murder and especially aggravated kidnapping in October 1999, and was sentenced to life without the possibility of parole. *State v. Phillips*, 76 S.W.3d 1, 2 (Tenn. Crim. App. 2001). Jarvis Shipp, after testifying in the trials of Robinson, Phillips, and Jackson, pled guilty to facilitation of murder and of especially aggravated kidnapping and received concurrent sentences of 15 and 12 years, respectively. (24-7 at 6035.)

(*Id.* at 929.)

On direct examination conducted by ADA Wulff, Shipp contradicted his May 1997 Statement by testifying that Robinson had been present at the Black apartment on April 30, 1997, and that Robinson, *not* Prentiss Phillips as he had affirmed in the May 1997 Statement, directed other gang members to seize Green from the street corner. (*Id.* at 957-58.) He claimed that Robinson was chief of security for all of Memphis, which he claimed was the third-ranking position in the Memphis Gangster Disciples. (*Id.* at 946, 950-52). Shipp told the jury that Robinson had the authority to direct the murder of Green because Robinson had a higher rank than Phillips even though Phillips was the top-most leader in Hurt Village and the meeting took place within Phillips's territory. (*Id.* at 971.)

Near the end of Shipp's direct testimony, ADA Wulff elicited an explicit avowal from Shipp that he had not received "any promises" in connection with his testimony against Robinson:

> Q.    Okay. You've been very courageous in your testimony. Has everything that you've told the jury today been truthful?
>
> A.    Yes, ma'am.
>
> Q.    Has the State made any promises regarding your testimony?
>
> A.    No, ma'am.

(*Id.* at 996.) Neither ADA Branham nor ADA Wulff made any attempt to correct or qualify the above testimony.

On Shipp's cross-examination, the only prior statement of Shipp to which Robinson's counsel referred was the May 1997 Statement, which made no mention of Robinson and averred that Phillips had directed the kidnapping and murder. Robinson's lead counsel, Ozment, attempted to establish why Shipp suddenly decided to implicate Robinson and inquired as to why

Shipp identified Kevin Foley, Prentiss Phillips, and Kevin Wilkins, all higher-ranking Gangster Disciples, to the police right after the murders, but did not identify Robinson at all. (22-7 at 1027-29.) Shipp admitted that his testimony contradicted his May 1997 Statement, and testified expressly that he had "never said . . . anywhere before" that Robinson had been involved. (*Id.* at 1039.) When Robinson's attorney asked if the State "wanted" him to testify against Robinson, Shipp responded, "[*e*]*vidently*, yes"—implying that he had no knowledge in that regard, other than the fact that he had been called by the State as a witness. (*Id.* at 1014 (emphasis added).)

Lacking any evidence to challenge Shipp's denial of "any promises" to him by the State, the cross-examination by Robinson's attorney could only get Shipp to acknowledge a unilateral "hope" that he might receive some benefit from his testimony:

> Ozment: I'll move on. Let me ask you this. Do you expect some type--although there's not a formal deal, do you expect some type of consideration for your testimony here today?
>
> Shipp: Yes, because the simple fact I'm facing the death penalty.
>
> Ozment: Okay. So you do expect to gain something in your case by testifying here today, correct?
>
> Shipp: If it's in the progress.
>
> Ozment: Okay. I'm sorry. What did you say?
>
> Shipp: If it's in the progress: If it's in the will.
>
> Ozment: Okay. So let me ask you this. You feel like by telling the story that you've told today that that could help you, correct?
>
> Shipp: Yes.
>
> Ozment: In fact, today we're here with Gregory Robinson on trial, correct?
>
> Shipp: Yes.

| | |
|---|---|
| Ozment: | And the State of Tennessee wanted you to testify to help them convict Mr. Robinson, correct? |
| Shipp: | Evidently, yes. |
| Ozment: | And you feel that if you help them convict Mr. Robinson that they might not seek that death penalty against you, right? |
| Shipp: | No, because they still – I still could go to trial and they still get the death penalty. |
| Ozment: | But you're hoping that they consider that, correct? |
| Shipp: | Yes. |
| Ozment: | And you're hoping that that consideration will result in you not looking at a death-penalty situation, correct? |
| Shipp: | Correct. |
| Ozment: | So you expect to have a benefit from this? |
| Shipp: | If it's in the will. |
| *** | |
| Ozment: | Well, you're not up here testifying for your health, are you, sir? |
| Shipp: | I'm up here testifying to tell the truth on my behalf and on behalf of the victim's family. |

(*Id.* at 1014-16.)

Shipp admitted that at the time of his May 1997 Statement, he had not known that the State intended to seek the death penalty against him. (*Id.* at 1016.) When confronted with the inconsistencies between his trial testimony and the May 1997 Statement, Shipp claimed that he had not previously identified Robinson out of fear because "he's a person that they say is not playing with a full deck." (*Id*. at 1037.) Although Ozment attempted to impeach that assertion by Shipp on re-cross-examination, by pointing out that in his May 27 Statement Shipp had

identified "Kaos," who was ranked above Robinson, Shipp's assertion could not be controverted with his own prior inconsistent statement. (*Id*. at 1038-39.)

During their closing and rebuttal arguments, ADAs Wulff and Branham told the jury repeatedly that they did not make any promises to Shipp. ADA Wulff reiterated Shipp's testimony that he was testifying "to help the victim's family." (22-14 at 2088.) Later she declared that "[Shipp] didn't get a deal, but *he told you the truth*." (*Id.* at 2089 (emphasis added).) Wulff also explained Shipp's initial failure to tell the police about Robinson's involvement by citing Shipp's testimony that Robinson does not "operate with a full deck," so Shipp is "scared of him." (*Id*.) During the prosecution's rebuttal argument, ADA Branham continued to vouch for the truth of Shipp's testimony and emphasized that he did not have an agreement with the State:

> [I]f you know what someone can do, if you know the kind of orders they can give and you know what the consequences are, you make that decision to tell the truth and get up there, you know, maybe we should cut him some slack. *We haven't yet*, but maybe we should. That took a lot of guts. And it took a lot of nerve.

(*Id*. at 2163 (emphasis added).) Although Robinson raised this improper vouching as an issue on his direct appeal, the TCCA held that the appellate issue had been waived because Robinson's trial counsel failed to object. *State v. Robinson* ("*Robinson I*"), No. W2001-01299-CCA-R3-DD, 2003 WL 21946735 at \*31 (Tenn. Crim. App. Aug. 13, 2003), *aff'd in relevant part*, 146 S.W.3d at 504, 518. On post-conviction review, the trial court held that this failure to object to the prosecutor's improper vouching for Shipp's veracity violated the constitutionally-mandated

minimum standard of reasonable performance under *Strickland*. *Robinson v. State*, No. 97-13179-80, at *84 (Tenn. Crim. Ct. Feb. 25, 2011).[6]

### C. The Falsity of Shipp's Denials of "Any Promises," and the Prosecutors' Failure to Correct Them at Trial

In fact, it is now above dispute that Shipp's repeated sworn denials of "any promises" made to him by the prosecutors at Robinson's trial were false; and Shipp's sworn assertion that he had "never said . . . anywhere before" that Robinson had been involved in the Green murder was a lie.

In reality—as the post-conviction record of this case has established—Shipp had previewed his testimony against Robinson for Wulff and Branham at a meeting with them on November 5, 1998, as reflected in the 17-page transcript of Shipp's November 5 meeting with the prosecution (hereinafter, "November 5 Statement") that the State prepared before the opening of Robinson's November 16, 1998 trial. (24-8 at 6253.)

The November 5 Statement reflects that Branham expressly promised Shipp consideration of leniency in exchange for his testimony. During the meeting, ADA Branham raised the topic of Shipp's testifying at Robinson's trial:

| | |
|---|---|
| Branham: | Ok, now, we probably will want you to testify at this thing. |
| Shipp: | Yes, Mam. |
| Branham: | Are you up for it? |
| Shipp: | If it going help me save my life? |

---

[6] The trial court held, however, that this deficiency was not prejudicial and therefore did not grant relief. *Robinson v. State*, No. 97-13179-80, at *84-85 (Tenn. Crim. Ct. Feb. 25, 2011). The TCCA affirmed the trial court's denial of relief on this ground, holding that it could not conclude that trial counsel's performance was deficient, and that in any evident there was no prejudice. *See Robinson III*, 2013 WL 1149761 at *79-80.

| | |
|---|---|
| Branham: | *Yeah, it will*. I can't make any deals right now but *we will certainly take it into consideration whatever you do to help us get Gregory* and Prentiss. |
| Shipp: | Thank you. |

(*Id*. at 6267-68 (emphases added).) The November 5 Statement also reflects that Shipp sought protection from other participants in the crime "*if I do any time* or whatever," reflecting his expectation that he would not face the death penalty, or even a lengthy prison term. (*Id*. at 6268 (emphasis added).) Absent from the November 5 Statement is any admonition by the prosecutors that, in order to receive such "consideration," Shipp was required to testify truthfully.

In its decision on Robinson's state post-conviction appeal, the TCCA acknowledged that the November 5 Statement contains an express prosecutorial promise of consideration for Shipp's favorable testimony at Robinson's trial:

> During the November 5th meeting, the prosecutor told Mr. Shipp that she could not "make any deals right now." However, she also told Shipp that his testimony at petitioner's trial would help save his life and that they would take into consideration his actions in helping them "get" petitioner and Phillips. While no formal agreement between the State and Mr. Shipp existed before he testified, the transcript of the November 5th meeting reflects an assurance from the prosecutor that Mr. Shipp's testimony would "help [him] save [his] life." This assurance was contrary to the testimony of Mr. Shipp that was elicited by the State at trial.

*Robinson III*, 2013 WL 1149761 at *63. The TCCA also acknowledged that, notwithstanding this promise, the State falsely "argued during closing arguments that Mr. Shipp did not receive a deal in exchange for his testimony." *Id.* The State has not disputed the TCCA's ruling that Shipp testified falsely in denying that he had received any promises of consideration for his testimony, and that the prosecution knowingly used the false testimony.[7] In its Answer to Robinson's

---

[7] In the state post-conviction proceedings, the State never seriously challenged the falsity of Shipp's testimony, limiting its argument to a single, conclusory sentence in its opening brief (continued…)

Petition here, the State did not deny the Petition's contention that "the first two prongs of Robinson's claim for relief under *Napue v. Illinois*"—namely, false testimony by a state witness and the prosecution's failure to correct it—"have already been adjudicated in Robinson's favor." (*See* Petition, 1 at 40; 26 at 8409-10 (disputing only materiality of false testimony); *cf.* Rules Governing Sec. 2254 and 2255 Cases 5(b) (answer "must address the allegations in the motion").)

### D. The State's Deliberate Concealment of Shipp's False Testimony During Robinson's Post-Trial Motions and on His Direct Appeal

After failing to correct Shipp's false testimony at trial and exploiting that testimony in their summations, the prosecutors in Robinson's case continued to misrepresent and deliberately conceal their promise to Shipp through briefing and hearing on post-trial motions and on direct appeal.

Robinson was represented in his post-trial Motion for a New Trial by his direct appellate counsel, Edmund Carey. At the state post-conviction hearing in November 2009, Carey testified that he had never seen the November 5 Statement while representing Robinson and was unaware of its contents, and that he first saw the November 5 Statement only just before his post-conviction hearing testimony. (24-16 at 7127.) In 1999, however, Carey had been convinced that, given Shipp's abrupt about-face between the May 1997 Statement and his November 1998 trial testimony, there *must have been* an undisclosed agreement between the State and Shipp in exchange for his testimony. (*Id*. at 7133-35.) Carey therefore filed the Motion for a New Trial seeking reversal of Robinson's conviction on that ground (among others). (*Id*. at 7135.)

---

before the TCCA. (*See* 25-2 at 8150). The State also did not challenge the TCCA's ruling or dispute the prosecution's failure to correct the known falsity of Shipp's testimony, in the State's subsequent brief opposing Robinson's Application for Permission to Appeal to the Tennessee Supreme Court. (*See* 25-6.)

At the October 4, 2000 hearing before the trial court on Robinson's Motion for New Trial, Branham flatly denied that the prosecution had made any "offer" or promise to Shipp prior to trial. Among Branham's explicit representations were the following:

> There were no offers made to [Shipp] . . . There were no offers made to him, and that was reflected. There was nothing to be revealed that could have been revealed that wasn't revealed. . . . The facts which were related by Mr. Shipp from the stand were the same as were related in his statement. There was no change in the testimony. There was no change in any evidence, which was being made known to Mr. Robinson and his defense counsel or to the jury. And, in essence, there was no cover-up. There was no secrecy.

(22-20 at 2486-87.) It is clear from the hearing transcript that the one Shipp "statement" Branham referred to above was the May 1997 Statement. No reference to the November 5 Statement appears anywhere in the post-trial motion record or in the record on direct appeal. Neither Branham nor Wulff disclosed that they had met with Shipp on November 5, 1998, or mentioned that a tape of that meeting existed and a 17-page transcript—that is, the November 5 Statement—had been created by the State.

The trial court denied the Motion for a New Trial, rejecting Robinson's contention that the State had an actual agreement with Shipp. (22-22 at 2704-05.) The trial court judge observed, "I don't think that there's any question, but that Mr. Shipp's testimony was devastating in this trial." (22-23 at 3045-46.) But the court denied the Motion for New Trial based on the finding that, although there may have been some sort of "expectation" or "hope" on Shipp's part for favorable treatment if he cooperated and testified, there was no express agreement. (22-22 at 2703-04, 2884; 50 at 8742.) Unaware of the November 5 Statement, the trial court found that "there was nothing that had been given to Mr. Shipp to indicate that" he had such an agreement. (22-22 at 2704.)

On direct appeal, Robinson again raised the argument that there was an undisclosed agreement. *Robinson I*, 2003 WL 21946735 at *22-*23. However, the November 5 Statement was not in the record on direct appeal. Affirming the TCCA's ruling on the issue, the Tennessee Supreme Court held on direct appeal that there was a fundamental difference between "hoping" for something and having an actual promise or agreement with the State, concluding: "While Shipp may have *hoped* that his testimony would result in favorable treatment, *the record does not establish that an agreement existed between the State and Shipp* at the time of [Robinson's] trial." *Robinson II*, 146 S.W.3d at 514 (emphases added). The Supreme Court also noted that that State had "concede[d] that a prosecutor clearly deprives a defendant of Due Process by knowingly using false evidence or argument to obtain a conviction or sentence." *Id.* at 495 (citing *Giglio v. United States*, 405 U.S. 150, 153-54 (1972)). The court rejected Robinson's appellate claim, however, "[i]n the absence of any proof that an agreement indeed existed at the time of Shipp's testimony at [Robinson's] trial." *Id.* at 514.

While Robinson's post-trial motion was pending, the same prosecutors also conducted the capital trial of Prentiss Phillips for, *inter alia*, first-degree murder. At Phillips's trial, the State did not use Shipp as a witness in its direct case against Phillips—at which the State claimed that Phillips, not Robinson, was "calling the shots." *Robinson II*, 146 S.W.3d at 496. At that trial, the State contended that *Phillips*, not Robinson, was "the ranking Gangster Disciple" at the aid-and-assist meeting, (*see* Petition, 1 at 153), and elicited testimony from Chris James that *Phillips* was "the highest ranking person" at the meeting and was "higher than Greg" Robinson, (*id.*at 154). The same ADAs who had prosecuted Robinson went further, ridiculing the claim by Prentiss Phillips's counsel that Robinson had directed the murder and telling the Phillips jury that Phillips was "the one who told the [other Gangster Disciples] what to do," was "in control of this

meeting," and "was in charge." (*Id.*at 155). The prosecutors specifically argued that Phillips "was calling the shots" and "gave the order" to kill Green, and that Phillips's "word was law." (*Id.*) The jury convicted Phillips of first-degree murder on this basis.

### E. The Critical Importance of Shipp's Testimony in Obtaining Robinson's Conviction at Trial

As the sole source of testimony concerning Robinson's alleged rank and authority in the Gangster Disciples, Shipp was the centerpiece of the State's proof at Robinson's trial. The only other prosecution witness who identified Robinson at trial and gave any direct testimony concerning Robinson's involvement in the homicide was Chris James.[8] In its closing argument, the prosecution itself conceded the frailty of James's testimony, admitting that James was "not a rocket scientist" and had "difficulty in understanding things." (22-14 at 2084-85.) On direct appeal, the Tennessee Supreme Court itself observed that James was "a rather inarticulate witness who was prone to cryptic responses." *Robinson II*, 146 S.W.3d at 498. In contrast, as noted above, the trial court referred to Shipp's testimony as "devastating." (22-23 at 3045.)

James was a relatively new member of the Gangster Disciples at the time, and he admitted at trial that, out of the "twenty, thirty" people who crowded into the apartment after the aid-and-assist meeting was called, he personally knew only one of them (Antonio Jackson). (22-5 at 795, 797.) He admitted that he had never met the person he testified was Robinson before that night. (*Id.* at 802.) In his initial statement to police in May 1997, James never referred to Robinson by name and attributed to someone named "Shaun" many of the actions he imputed to

---

[8] Apart from Shipp and James, the only other prosecution witnesses were two members of a walking club who discovered Green's body, two police officers, Green's sister, and a forensic pathologist. None of these witness had any personal knowledge as to whether Robinson (1) was present on the night of the murder, (2) ordered that Green be killed, or (3) was a member of the Gangster Disciples, and they gave no testimony on those points.

Robinson at trial.[9] (24-7 at 6107-09.) Although the State never contended that Robinson was among the group that took Green to Bellevue Park, James told police in May 1997 that "Anthony, Jarvis Shipp, *Shaun*, a big heavy set guy that I don't know his name, Antonio Jackson, and Big Folk" committed the killing of Vernon Green. (*Id*. at 6107 (emphasis added).)

In addition, James himself was severely beaten on the head at the Black apartment by numerous other Gangster Disciples, as a punishment for failing to assist in the earlier altercation with the Vice Lords. (22-5 at 806-7.) The beating occurred right before Green's murder was allegedly ordered. (*Id*. at 808-09.) James testified that he was "jumped on" by six men and pummeled repeatedly on the head. (*Id*. at 797-08.) His eye-witness identification of Robinson as the person he had previously called only "Shaun" was therefore suspect.[10]

James' trial testimony also contradicted his original May 7, 1997 statement in a variety of ways. He initially testified that Robinson had "put a nine [millimeter] in my face, told me if I ever say something about [Green] the same thing going to happen to me." (*Id*. at 805.) Later, though, James recanted his testimony, stating that his original police statement was actually correct, and that *Prentiss Phillips* was the individual who had threatened him with a gun. (22-6 at 856-57.) James also testified that Robinson was upstairs with Green while James was being beaten; in both the statement he made to the police a week after the Green murder and at the earlier Kevin Wilkins trial, however, he avowed that two other people (i.e., not "Shaun" or "Greg") went upstairs with Green. (22-5 at 807-08; 22-6 at 894-95.) James also contradicted his

_____

[9] Shipp testified that a person named Shaun Washington was at the Black apartment that night. (22-7 at 1022.)

[10] According to Shipp's November 5 Statement, James's "head was really big and his eyes were swollen and his mouth was open. There was a knot on his forehead like this, like boxing" as a result of the beating. (24-8 at 6266.) Had Robinson's lead counsel had the November 5 Statement, he could have used that description to further impeach James's credibility.

previous account by testifying that Robinson stayed in the Black apartment after other Gangster

Disciples left with Green; in his statement to police, he had stated that "Shaun" left with Green.

(22-5 at 815; 24-7 at 6110.) When asked by Robinson's trial counsel about the glaring

discrepancies between his testimony at Robinson's trial and at the earlier trial of Kevin Wilkins,

another defendant accused of having been involved in the Green murder, James had no

explanation. Instead, he merely declared: "Man, that's another trial, man. That's a whole new

trial." (22-6 at 894.)

## II. Additional Record Facts Supporting Ground 2 (*Brady* Claim) and Ground 3 (*Strickland* Claim).

There is no dispute that Shipp's November 5 Statement constituted *Brady* material that

the State was obligated to turn over to Robinson's counsel prior to his trial. (*See* Petition, 1 at 64-

65.) However, the post-conviction court found that the November 5 Statement had been turned

over to Schreiner, the junior member of Robinson's trial team, on the basis of Paula Wulff's

November 9, 2009 post-conviction testimony. (24-6 at 5815.) The post-conviction court also

credited the testimony of Robinson's lead trial counsel, Joseph Ozment, that he had never seen or

heard of the November 5 Statement at any time before the document surfaced in Robinson's state

post-conviction proceedings. (*Id.*) As the TCCA affirmed on post-conviction appeal, the post-

conviction trial court essentially found that Wulff provided the November 5 Statement to

Schreiner, but that Schreiner then failed to share it with Ozment or anyone else. *Robinson III*,

2013 WL 1149761 at *60.

### A. Evidence Concerning the State's Failure to Disclose the November 5 Statement

The pretrial, trial, post-trial, and direct appellate record of Robinson's case is devoid of

any evidence indicating that the November 5 Statement was provided to any of Robinson's

counsel at any time. The November 5 Statement is not mentioned in the trial record, nor is there

any reference or allusion to its contents. As noted above, the state post-conviction court credited Ozment's post-conviction testimony and found that Ozment did not receive a copy of the November 5 Statement. He therefore could not have used it on Shipp's cross-examination. The November 5 Statement came to light for the first time in 2007, during state post-conviction proceedings. (Petition, 1 at 39; 24-8 at 6253; 24-1 at 4828.). Since then, the State has not identified any document, testimony, or other material pre-dating the post-conviction proceeding that it contends demonstrates or reflects disclosure of the November 5 Statement.

    **1.    Evidence in the Trial and Direct Appeal Record Demonstrating That the November 5 Statement Was Not Disclosed**

The sole basis of the State's position, and of the post-conviction courts' ruling, concerning disclosure of the November 5 Statement is Wulff's 2009 post-conviction testimony that she recalled giving Schreiner the document over 11 years earlier, in the week before Robinson's November 1998 trial. There is no evidence documenting when the November 5 Statement found its way into the State's post-conviction discovery file, or when and why the tape of the November 5 meeting was lost or destroyed. At the time of Robinson's trial, the prosecution team did not keep a listing of all documents in their discovery case file. (24-15 at 6946.) The prosecutors did not keep track of what papers Robinson's or other defense counsel copied from the State's case file. (*Id.* at 6948.) In post-conviction discovery, the State did not provide any documentary or other evidence indicating when the November 5 Statement was added to the discovery file that Robinson's post-conviction counsel examined for the first time in the fall of 2007.

The transcript of Robinson's 1998 trial reflects that, when the prosecution formally identified on the record so-called "Jencks material" relating to Jarvis Shipp, the November 5 Statement was not identified or disclosed. Rather, immediately after Shipp's direct trial

testimony concluded, Ozment sought to make a record of all prior statements by Shipp that the State had provided as so-called "Jencks material" pursuant to Tennessee Rule of Criminal Procedure 26.2. With Wulff in the courtroom, Ozment announced for the record: "Your honor, I have one 10-page statement of Jencks." (22-6 at 997.) ADA Wulff then confirmed to the trial court on the record, in the presence of Robinson's counsel, that the Jencks material she intended to provide was a "10 page statement" from "May 27, 1997":

> Your honor, I'm about to provide Jencks material to the defense counsel. This would be for a statement made by Jarvis Shipp, and it was made on Tuesday, May 27, 1997, at the conclusion of his direct testimony. It's a 10-page statement. However, it appears that defense counsel already has a copy of this statement.

(*Id*.) The State did not seek to correct defense counsel when Ozment stated that he had only "one 10-page statement of Jencks." (*Id.*)

At the post-conviction hearing, Wulff testified that the State did not announce the November 5 Statement as Jencks material during the trial because the defense "had been given a copy of it the week before." (24-15 at 6989.) However—as Wulff acknowledged on the record at trial—the defense had already been given a copy of the May 1997 Statement, which she nonetheless expressly announced at that time. (22-6 at 997.) Ozment testified at the post-conviction hearing that, if the defense had been given the November 5 Statement as Jencks material at any time prior to the above-quoted colloquy, he "would have announced that on the record certainly." (24-17 at 7279.)

As set forth above, at the hearing on Robinson's post-trial Motion for a New Trial, the State continued to conceal their pretrial promise of consideration to Shipp through explicit misrepresentations to the trial court. As noted above, Robinson's post-trial motion contended that the State had failed to disclose a pretrial agreement between Shipp and the State. *See* Part I.D, above. In response, ADA Branham falsely denied that there were any promises: "There were no

offers made to him." (22-20 at 2486.) In fact, Branham had made *at least* an offer of *consideration* in exchange for Shipp's testimony that would "help me save my life"—which Shipp accepted, saying "Thank you." (24-8 at 6267-68.) Branham's other arguments to the trial court also were premised on the existence of only a *single* Shipp statement: "The facts which were related by Shipp from the stand were the same as were related in *his statement*." (22-20 at 2487 (emphasis added).) In response, Carey argued that Shipp had not related the same facts because Shipp had omitted Robinson from "his statement." (*Id.*) It is beyond reasonable dispute that Branham's and Carey's references were to Shipp's May 1997 Statement, in which Robinson was not mentioned.

The State's misrepresentations about the absence of any pretrial "offers" or promises to Shipp continued through direct appeal. In its brief to the TCCA, the State denied the existence of any "alleged informal agreement not to seek the death penalty." (23-2 at 3989-90.) The TCCA's decision on direct appeal (affirmed by the Tennessee Supreme Court) concluded that the appellate record at that time "d[id] not establish that an agreement existed between the State and Shipp at the time of [Robinson's] trial," and hinged its rejection of Robinson's appellate contention upon "the absence of any proof that an agreement indeed existed at the time of Shipp's testimony at [Robinson's] trial." *Robinson I*, 2003 WL 21946735 at *23 (emphasis added). In fact, the State was aware that the November 5 Statement contained such proof, but did not disclose its existence to the trial court, the TCCA, or the Tennessee Supreme Court on direct appeal.

### 2. The Prosecution's Failure to Disclose Other *Brady* Material Relating to Shipp

The record of Robinson's trial shows that the State repeatedly failed to turn over to Robinson's trial counsel other *Brady* material relating to Shipp.

*First*, after its direct examination of Christopher James, the State failed to provide defense counsel with Jencks material, specifically the written signed statement by James in which he identified a picture of Robinson as "Shaun." (22-6 at 868-881.) The court ruled that the State on re-direct examination could not make any reference to the statement or the fact that James signed a statement with the police related to photo identification. (*Id.*)

*Second*, during the State's redirect examination of Nichole Black, it was discovered upon objection by the defense, that the State failed to tell defense counsel of a photo identification conducted with Black the morning before she testified for the State. (22-9 at 1398.) The State admitted to this failure. (*Id.*) The trial court struck, and told the jury to disregard, Black's testimony. (*Id.* at 1398-99.)

*Third*, the State failed to provide defense counsel with the transcript of a motion to suppress hearing in Shipp's own case, from April 9, 1998. (22-20 at 2537.) During the motion to suppress hearing Shipp testified that his May 27 Statement was coerced because he would be placed in confinement with rival gang members if he did not comply. (*Id.* at 2539.) Robinson's trial court found that the suppression hearing transcript was not, and should have been, provided to defense counsel as *Brady material*; however the court denied the motion on the ground that the State's non-disclosure of the suppression hearing transcript was not material. (*Id.* at 2553-54; *see also* 50 at 8742-44.)

### 3. Post-Conviction Evidence Demonstrating That the November 5 Statement Was Not Disclosed

Robinson's lead trial counsel, Joseph Ozment, testified at the post-conviction hearing that he never saw the November 5 Statement, and that he was "100 percent certain" that the November 5 Statement was not given to defense counsel at the time of trial. (24-17 at 7280.) Robinson's other trial counsel, Steffen Schreiner, testified that he first became aware of the

November 5 Statement in summer 2009. (24-16 at 7217.) He had no recollection of ever being handed the November 5 Statement by the State, and testified that he would not have forgotten it had he received it when the State claimed it provided it six days prior to trial. (*Id*. at 7206-07, 7212.) Schreiner did not recall meeting with any prosecutor between October 16 and start of trial on November 16, 1998. (*Id*. at 7204.) Schreiner testified:

> Schreiner: [T]his is a capital murder case. This is my first capital murder case and it seems a bit late in the day to be picking up statements of witnesses or co-defendants who are about to be testifying in six days for trial.
>
> Q: That's something you would read, correct?
>
> A: Oh, yeah.
>
> Q: And then once you read it, you wouldn't forget it because of the nature of it.
>
> A: This statement would have within days made the rounds through the building to every other lawyer who was interested in our case.

(*Id.* 7258-59.) He underscored the unusual nature of the document: "[T]his Shipp – this November 5th Shipp statement is very very, highly unusual. Because it contains a done deal prior to trial. And that's big. Very big." (*Id*. at 7257-58.)

Edmund Carey, Robinson's counsel on his motion for a new trial and on direct appeal, testified at the 2009 post-conviction hearing that he had never seen the November 5 Statement while representing Robinson. (*Id*. at 7127.) He testified that he did not learn of the November 5 Statement until long  after the direct appeal, and that he first saw the November 5 Statement the day before his post-conviction hearing testimony. (*Id*.) He testified that he could "state unequivocally that this document was not present" in the trial counsel materials he received. (*Id*. at 7128.) Robinson's other appellate counsel, Robert Brooks, testified that he had never seen the

November 5 Statement prior to the day of his own testimony at the Post-Conviction Proceeding. (*Id*. at 7177.)

Robinson also proffered the testimony of three attorneys for Robinson's co-defendants, Antonio Jackson and Prentiss Phillips. Jackson's trial counsel, Howard Waggerman, testified that he was not provided the November 5 Statement by the State. (*Id*. at 7180, 7185.) Phillips's trial counsel, William Johnson, testified that he never received the November 1998 Statement during his representation of Phillips. (24-17 at 7358-59.) Post-conviction counsel for Jackson and Phillips, Juni Ganguli, also testified that he did not see the November 5 Statement during the course of his representation of Jackson and Phillips. (24-16 at 7187, 7190.) Although Shipp testified at those trials in addition to Robinson's, none of the transcripts of his testimony in the Jackson or Phillips cases contains any reference to the November 5 Statement. (24-7 at 5943-6030.)

**B.      Evidence Demonstrating the Materiality of the November 5 Statement Under *Brady***

As described in section I.C. above, the November 5 Statement contained undeniable proof that the State had promised Shipp consideration of leniency in exchange for his testimony, in direct contradiction to Shipp's false testimony elicited by the prosecution at trial. In addition to this agreement, the November 5 Statement transcribed numerous other statements by Shipp that contradicted his trial testimony and consequently provided material for impeachment of that testimony and Shipp's credibility generally.

*First*, during this November 5, 2008 meeting, ADA Branham asked Shipp if he knew Robinson, and Shipp described Robinson as having been involved with the events of the night of April 30th. However, Shipp expressed uncertainty as to Robinson's ranking within the Gangster Disciples relative to Prentiss Phillips. When asked if Robinson was ranked above Phillips, Shipp

said "Well, yeah, but because he was on Prentiss' territory, I think Prentiss was over, but he was actually over Prentiss." (24-8 at 6255.) This statement indicated that, as Hurt Villiage Coordinator, Phillips had the highest authority of any Gangster Disciple at the meeting, even though Robinson had a city-wide rank. At trial, Shipp testified that Robinson was higher than Phillips. (22-6 at 971.)

*Second*, during the November 5, 2008 meeting, Shipp was uncertain about where Robinson was from, telling the prosecutors, "[i]f I am not mistaken [Robinson] is from Mitchell Heights? They say he has an apartment in Frazier." (24-8 at 6259.) At trial Shipp testified to the precise opposite, that Robinson was from Frazier but lived in Mitchell Heights. (22-6 at 950.)

*Third*, during the November 5, 2008 meeting, after Shipp described Robinson's involvement, ADA Branham asked if Shipp remembered the police previously showing Shipp a photo spread and if he remembered seeing Robinson in it, and Shipp responded "Not at the time." (24-8 at 6255.) Branham persisted:

> Branham:     Well if you would have seen him would you have told them who he was?
>
> Shipp:        Yeah.
>
> Branham:     Now, when you gave these statements to the police, were you scared?
>
> Shipp:        Yes, because I did not want to give it on (inaudible)
>
> Branham:     Who is that?
>
> Shipp:        That is Antonio Jackson.

(*Id*.) Branham explained to Shipp that Robinson's photo was in one of the photo spreads Shipp was shown on May 27, 1997, and asked Shipp if he knew why he did not pick Robinson out of the lineup. Shipp simply responded, "I don't know." (*Id*. at 6255, 6257.) In contrast, at trial Shipp claimed that he did not identify Robinson back in May 1997 because he feared that

Robinson was not "playing with a full deck," meaning that Robinson was dangerous and Shipp was afraid to implicate him. (22-7 at 1037.)

At the post-conviction hearing, Robinson's trial and direct appellate counsel unanimously testified that the November 5 Statement contained powerful impeachment material that they would have exploited in depth. Ozment testified that "I guarantee you that . . . had this document been [provided to the defense], Mr. Shipp would have been asked about this document." (24-17 at 7279-80.) Ozment noted the differences between the November 5 Statement and Shipp's testimony at trial that "would have been good fodder for cross-examination" related to his credibility and motivation to testify for the prosecution. (*Id*. at 7282.) Ozment also testified that had he known about the November 5 Statement he would have "hammered that in opening that [Shipp] has a deal with the State" and that Shipp was not credible. (*Id*. at 7292-93.) Ozment testified, "I can't imagine for the life of me leaving that out of the opening or closing statement if I had something like that [November 5 Statement]." (*Id*. at 7292.)

In his testimony, Schreiner emphatically concurred: "If Mr. Ozment had told me that Shipp got a deal, he is singing in order to avoid the death penalty and we got that on tape, there's a transcript of that, I need it for our cross examination. *That would have been a seminal event in the case.*" (24-16 at 7257-58 (emphasis added).) Schreiner testified that the defense would have used the November 5 Statement in its cross-examination of Shipp. Schreiner said the defense would have crossed Shipp on his stated reason for testifying, and would not have allowed to go unchallenged Shipp's testimony, and the State's closing argument, that he was testifying for the benefit of the family of the victim. (*Id*. at 7211-12.) Schreiner also testified that the November 5 Statement would have been used to question Shipp about why Shipp failed to identify the photograph of Robinson in May 2007. (*Id*. at 7211.)

Carey, Robinson's direct appellate counsel, described several ways in which he would have used the November 5 Statement. At the motion for new trial stage, Carey said he would not have argued there was a "wink and a nod agreement" but rather "an agreement that is set down in a transcript of a tape recording a meeting between the prosecutors and the witness in which he is told that they will certainly do things and that they will unequivocally [say] 'Yeah, it will help save his life." (*Id*. at 7143.) He also would have noted that Shipp did not mention Green's family in the November 5 Statement when the State asked if he was willing to testify, and only asked if it would help save his life. (*Id*. at 7144.) Carey reiterated that the cross-examination of Shipp related to his photo identifications, his description of Robinson's and Phillips's ranks, and his description of the placement of individuals during the shooting, could have been impacted by the non-disclosure of the November 5 Statement. (*Id*. at 7149-52.)

Robert Brooks, Robinson's other lawyer on direct appeal, stated that the Statement was "dynamite" for impeachment and that "it would have blown [the 'wink and a nod'] argument out of the water." (*Id.* at 7177.) Brooks testified that "I would have hammered on this mercilessly in closing argument." (*Id.* at 7176.)

### C. Post-Conviction Rulings on the Brady Claim

The sole testimony on which the post-conviction court relied in denying Robinson's Brady claim came from the former ADA Paula Wulff. Testifying 11 years after Robinson's trial, Wulff explained that she had left the District Attorney's office in 2001, and that she had only spoken with ADA Missy Branham twice since then, including that same morning. (24-15 at 6950-51.) Wulff's memory of the trial was very limited. (*See id.* at 6940, 6990, 6994, 7001.) When Wulff was asked generally, "Do you recall this trial?" and replied: "As a memory, yes. I don't remember -- the detail that I've been asked today, I don't remember all of that without reviewing things further." (*Id*. at 7001.) For example, when asked if defense lawyers cross-

examined Shipp about prior inconsistent statements, Wulff said: "Sir, I haven't read the transcript start to finish in years, so I don't -- I don't recall." (*Id.* at 6990.) When asked if she recalled "that you definitely asked him whether he thought his testimony would help save his life?" Wulff replied: "Ma'am, without reading the testimony, I'm at a disadvantage trying to answer your questions today, because I haven't reviewed this and it's been ten years." (*Id.* at 6994.) Wulff also did not recall any of the people she consulted with in the Robinson case. (*Id.* at 6943.)

In contrast, when asked about the November 5 Statement, Wulff's recollection became vivid and detailed. Wulff asserted that both Ozment and Schreiner knew that she and ADA Branham would be meeting with Shipp and his counsel, Gerald Skahan, and that they would be given a copy of the transcript of that meeting. (*Id.* at 6954.) She testified that she called Ozment's office to notify him once the transcript was ready, and that Schreiner came to division ten of the criminal court to meet Wulff and pick it up sometime during the week of November 10, 1998. (*Id.* at 6954-55.) Wulff recalled Schreiner's brown, soft shell brief case and that they discussed the November 5 Statement, Schreiner's feelings about the death penalty, "whether or not it acted as a deterrent," and the complicated nature of Robinson's case. (*Id.*)

Wulff did not know whether the November 5 Statement was placed in the State's discovery file. (*Id.* at 6957.) She stated that, for the later trials of Robinson and Shipp's co-defendants, in which Shipp also testified, the statement would have been given to counsel only if it had been requested, and otherwise "would have been part of the body of information available" to them. (*Id.* at 6957-58.)

Although Wulff reviewed the contents of the November 5 Statement before the post-conviction hearing, she directly contradicted its contents when testifying. (*Id.* at 6949.) When

asked by the post-conviction court if Shipp was testifying for the prosecution because he was trying to avoid the death penalty, Wulff replied, "He had said, Will this save my life, you know. And I believe our response was Tell the truth, you know." (*sic*) (*Id*. at 6990.) In fact, the November 5 Statement shows that the State's response to Shipp's question was "Yeah, it will." (*Id*. at 6991; 24-8 at 6267-68.) In fact, the November 5 Statement contains no admonition to Shipp by anyone telling Shipp that his testimony must be truthful, or that lying to "get Gregory" would risk any sanction by the State.

The post-conviction court entered an order on February 25, 2011, denying Robinson any relief. (24-6 at 5702.) The post-conviction court "credit[ed] the testimony of Wulff," citing certain details of Wulff's testimony, such as her recollection that Schreiner used a "soft shell brief case." (*Id*. at 5814-15.) However, the court found "Ozment credible as well" and credited his testimony. (*Id*. at 5815.) It found that "Schreiner['s] recollection of the events were not as clear." (*Id*.) The court held that there was no reasonable probability that the result of the proceeding would have been different if the November 5 Statement had been disclosed, because the "substance of" the "understanding" between Shipp and the State that the State "will give consideration" to Shipp in exchange for his testimony, "was essentially brought out on cross examination of Shipp who stated that he was testifying to avoid the death penalty."[11] (*Id*.)

Robinson appealed the decision of the post-conviction court to the TCCA, which affirmed the post-conviction court's denial of relief on March 20, 2013. *Robinson III*, 2013 WL 1149761 (Tenn. Crim. App. Mar. 20, 2013). The TCCA did not question that the November 5 Statement was *Brady* material that the State was required to provide to the defense. *Id.* at *59.

---

[11] In fact, Shipp testified only that he "hoped" that his testimony would allow him to avoid the death penalty, but did not disclose any promise or assurance by the State. (22-7 at 1015 ( "I still could go to trial and they still get the death penalty.").)

However, the TCCA affirmed the post-conviction court's finding that the November 5 Statement was not suppressed and agreed with its legal conclusion that the November 5 Statement also was not material. *Id*. at *60-61. The TCCA purported to resolve the inconsistency in testimony by positing that Wulff turned over the November 5 Statement to Schreiner, but that Schreiner failed to share the statement with Ozment. *Id*. at *60. In holding the statement was not material under *Brady*, the TCCA stated:

> At trial, lead counsel's cross-examination of Mr. Shipp established that the State was seeking the death penalty against Mr. Shipp and that he hoped the prosecutors would take his testimony into consideration and withdraw the death penalty as a result. . . . Based upon lead counsel's extensive cross-examination of Mr. Shipp at trial regarding his prior statement to the police and Mr. Shipp's concession that he hoped to save his life by testifying, we cannot conclude that there was a reasonable probability that the outcome of the trial would have been different had lead counsel utilized the transcript at trial.

*Id*. at *60-61. The court addressed the contradictions between the November 5 Statement and Shipp's trial testimony piecemeal, first finding that Shipp's statements in the November 5 Statement regarding Robinson's rank was consistent with his testimony at trial and then finding that the discrepancy in Shipp's statements about where Robinson lived was not material. *Id*. at *60-*61. With respect to the explanation provided in the November 5 Statement about why Shipp had not identified Robinson in the photo array shown to him on May 27th, the TCCA did not directly address the impeachment value of the contradictory November 5 Statement, but instead simply noted:

> Lead counsel also cross-examined Mr. Shipp extensively regarding his failure to identify petitioner in a photograph array shown to him by the police and his failure to mention petitioner in his statement to the police. We note that during the November 5th meeting, Mr. Shipp told prosecutors that he did not know why he did not identify petitioner in the photograph array, but he testified at trial that he did not mention or identify petitioner to the police because he was afraid of petitioner.

*Id*. at *61.

### D. Other Failures Relevant to Trial Counsel's Ineffective Assistance (Ground 3)

#### 1. Failure to object to prosecution vouching by commenting on facts not in evidence

During closing arguments at Robinson's trial, in addition to vouching for the truth of Shipp's testimony and falsely asserting that the State had not made a deal with him in exchange for his testimony, ADA Wulff vouched for the truth of Shipp's testimony by improperly commenting on facts not in evidence—specifically, that "[Chris James and Jarvis Shipp] haven't conferred . . . . They haven't talked. They haven't met . . . . These men have not conferred in their testimony in any way." (Petition, 1 at 127; 22-14 at 2090.) Robinson's counsel failed to object.

#### 2. Material Error in Trial Court's Jury Instructions on Corroboration of Accomplice Testimony

While instructing the jury, the trial court failed to explain that, as an accomplice, the jury must find that Shipp's testimony be corroborated by a non-accomplice. (Petition, 1 at 102; 22-15 at 2179.) Instead, the court instructed the jury that it was a question for them to determine whether Shipp and three defense witnesses were accomplices. (22-15 at 2179.) The court explained that if the jury found that any of these witnesses was an accomplice, then "the defendant cannot be convicted upon the uncorroborated testimony of this witness." (*Id*.) Trial counsel's failure to object to this instruction was found by the TCCA and the Tennessee Supreme Court to be unreasonably deficient, because the court should have instructed the jury that Shipp was, as a matter of law, an accomplice, and because the court should not have included the three defense witnesses in the instruction. (Petition, 1 at 102 (citing *Robinson III* , 2013 WL 1149761 at *82); *see Robinson II*, 146 S.W.3d at 489.) However, the Supreme Court held that Robinson had waived this issue on appeal because his trial counsel failed to object at

trial and that, in any event, any error was harmless because some of Shipp's testimony had been corroborated by Chris James and the medical examiner. *Robinson II*, 146 S.W.3d at 489.

## SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is applicable to habeas corpus proceedings. See McNish v. Bell, 2013 WL 544204, *7 (E.D. Tenn. Feb. 12, 2013) (citing Blackledge v. Allison, 431 U.S. 63, 80-81 (1977)). Pursuant to Fed. R. Civ. P. 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## ARGUMENT

**I.     Robinson Is Entitled to a New Trial Because Shipp's False Testimony—Knowingly Elicited and Improperly Exploited by the State at Trial—Was Material Under *Napue/Giglio*.**

Robinson's due process rights were violated, and his conviction and sentence must be set aside, because Shipp's uncorrected false testimony was plainly material under the firmly established constitutional rule of *Napue* and *Giglio*. The indisputable record of the state court proceedings demonstrates that Shipp was a key witness essential to the State's proof at trial. Shipp was the sole prosecution witness who knew and identified Robinson by name, and he was the exclusive source of evidence concerning Robinson's purported rank and authority within the Gangster Disciples—the keystone of the prosecution's theory of guilt at trial. The State's exploitation of Shipp's false testimony, through both improper vouching for Shipp's credibility at trial and deliberate concealment of the State's agreement with Shipp on post-trial motions and direct appeal, confirms the crucial importance that the State itself placed on shoring up Shipp's credibility and portraying his false testimony as true. On *de novo* review of the state-court record, the materiality of Shipp's false testimony under *Napue/Giglio* is inescapable.

**A.** **Courts Have Defined Several Key Principles Guiding Their Determination as to Whether a False Statement is Material Under the Strict, "Defense-Friendly"** *Napue/Giglio* **Standard**

"A false statement is material under *Napue*, and a new trial is required if there is 'any reasonable likelihood' the false testimony could have affected the judgment of the jury." (SRD, 43 at 8637 (quoting *Napue*, 360 U.S. at 271-72)); *accord Giglio*, 405 U.S. at 154; *Rosencrantz v. Lafler*, 568 F.3d 577, 583 (6th Cir. 2009) (stating that, when *Napue/Giglio* standard of materiality is met, "[a] conviction obtained by the knowing use of perjured testimony must be set aside"). As the U.S. Supreme Court stated in *Giglio*: "[D]eliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with 'rudimentary demands of justice.'" 405 U.S. at 153 (quoting *Mooney v. Holohan*, 294 U.S. 103 (1935)). While the Supreme Court has not enumerated a list of specific factors that courts must weigh in determining materiality under the strict, defense-friendly *Napue/Giglio* standard, *Napue* and subsequent Supreme Court, Sixth Circuit, and other federal case law (all of which may be considered on *de novo* review) articulate several legal principles governing that determination which are of particular relevance here.

    **1.** **The** *Napue/Giglio* **Materiality Standard is a Strict, "Defense-Friendly" Standard.**

A "strict" standard of materiality applies in false testimony cases, "not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *United States v. Agurs*, 427 U.S. 97, 104 (1976).

Accordingly, the *Napue/Giglio* materiality standard is "lower, more favorable to the defendant, and more hostile to the prosecution" than the standard applied in the ordinary *Brady* context. (SRD, 43 at 8637 (citing *Rosencrantz*, 568 F.3d at 587).) Once the prosecution's knowing use of (or failure to correct) false testimony is established, the "less stringent" and more

"friendly-to-the-accused" materiality standard leads to a finding of constitutional error in most cases. *Rosencrantz*, 568 F.3d at 584 . Indeed, the *Napue/Giglio* materiality test is "a veritable hair trigger for setting aside the conviction." *United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003). Consequently, "'if it is established that the government knowingly permitted the introduction of false testimony[,] reversal is virtually automatic.'" *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003) (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)); *accord Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008).

### 2. A Prosecutor's Conditional Promise to Consider Leniency in Exchange for Testimony Creates a Powerful Incentive to Lie.

Particularly when a prosecution witness's credibility is "an important issue in the case," the existence of "'any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury [is] entitled to know of it.'" *Armour v. Salisbury*, 492 F.2d 1032, 1037 (6th Cir. 1974) (quoting *Giglio*, 405 U.S. at 155). *Cf. Scott v. Foltz*, 612 F. Supp. 50, 55 (E.D. Mich. 1985) ("A conviction must fall where the prosecution . . . allows perjured testimony to go uncorrected when it appears *even though it is relevant only on the issue of credibility*.") (emphasis added) (citing *Giles v. Maryland*, 386 U.S. 66, 74 (1966)). As this Court previously noted, *Giglio* reversed the defendant's conviction based on a prosecution witness's uncorrected lies about his conclusive prior agreement with the government "that he would not be indicted if he testified against the defendant." (SRD, 43 at 8637 n.8 (citing *Giglio*, 405 U.S. at 153-54).)

An open-ended or conditional promise by a prosecutor, however, is even more potent: in *Napue*, the witness's false testimony concerned a prosecutor's open-ended promise of consideration, without an agreement as to how much benefit the witness would receive as a result of his testimony. 360 U.S. at 270. The *Napue* Court held that, if the jury had learned of the prosecutor's assurances to the witness, it "might well have concluded that [the witness] had

fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case." *Id.* The contingent nature of the prosecution's promise thus gave the witness an especially powerful incentive to lie.

Following *Napue,* courts in this and other federal circuits have repeatedly recognized that a prosecutor's conditional promise of consideration in exchange for a witness's testimony has greater potential impact on a jury than a specific plea agreement, because it gives the witness "an even more powerful incentive to testify falsely in order to facilitate a conviction and curry favor with a prosecutor." *Rickman v. Dutton*, 864 F. Supp. 686, 705 (M.D. Tenn. 1994) (citing *Campbell v. Reed*, 594 F.2d 4, 7-8 (4th Cir. 1979)). As the Supreme Court has explained, a promise that is "not guaranteed" but is instead "contingent on the Government's satisfaction" (as here) "serves only to strengthen any incentive to testify falsely in order to secure a conviction." *United States v. Bagley*, 473 U.S. 667, 683 (1985) (plurality opinion). A witness's "uncertainty with regard to the status of his pending charges only makes his testimony more suspect since he would be more interested in pleasing the prosecutors who would be determining his fate." *Bragan v. Morgan*, 791 F. Supp. 704, 717 (M.D. Tenn. 1992). As the Fourth Circuit succinctly stated: "[A] tentative promise of leniency might be interpreted by a witness as contingent upon the nature of his testimony. Thus, there would be a greater incentive for the witness to try to make his testimony pleasing to the prosecutor." *Campbell*, 594 F.2d at 7-8; *see also Ray v. Rose*, 371 F. Supp. 277, 279–81 (E.D. Tenn. 1974) (noting that "the credibility of the witness is placed in issue by promises made as well as by 'deals' concluded," and "an unperformed promise might be more influential in persuading desired testimony than would be a concluded agreement"). The impeachment value of such a contingent promise in attacking a witness's credibility is therefore

also greater, increasing the likelihood that its disclosure at trial would affect the judgment of the jury.

### 3. A Witness's Admission of a Unilateral Hope or Expectation of Benefit from His Testimony Does Not Render a False Denial of a Prosecutor's Promise Immaterial Under *Napue*.

*Napue* and other cases also recognize a fundamental distinction between a prosecutor's actual promise to consider leniency in exchange for a witness's testimony, on the one hand, and a witness's unilateral hope or expectation of benefit from that testimony, on the other. A witness's false denial of a prosecutor's promise—contingent or otherwise—remains material under *Napue*/*Giglio*, even when the lying witness admits at trial that he has a subjective hope or expectation that his testimony may yield some leniency or other benefit.

The Supreme Court established this principle in *Napue* itself. The defense in *Napue* showed on cross-examination that the witness "hope[d]" that his own sentence would be reduced, but the prosecutor's actual promise to recommend a reduction of the sentence was not revealed at trial. 360 U.S. at 268 n.3. The Court held that the witness's uncorrected, false denial that the prosecution had promised him consideration remained material, even though (i) the defendant's counsel cross-examined the witness extensively about whether he was going to receive consideration for his testimony, (ii) the witness admitted that he had told the defendant's counsel that he would not testify unless he got consideration for it, and (iii) the witness testified that an unidentified public defender had promised to "do what he could" to help the witness following his testimony. *Id.* at 269. In reversing the conviction and ordering a new trial, *Napue* explicitly rejected the State's reliance upon defense counsel's cross-examination, holding that "the fact that the jury was apprised of *other* grounds for believing that the witness . . . may have had an interest in testifying against petitioner" could not "turn[] what was otherwise a tainted into a fair trial." *Id.* at 270 (emphasis added).

The importance of this distinction between a witness's mere hope or expectation and an actual promise of consideration by the State is firmly entrenched in *Brady/Napue/Giglio* jurisprudence generally. This is demonstrated by the fact that, unlike a prosecutorial assurance or agreement, evidence of a witness's subjective hope or expectation of some benefit need not be disclosed by the prosecution under *Brady*. *See Smith v. Lavigne*, 2003 WL 22358637 at *7 (E.D. Mich. Oct. 15, 2003) (rejecting contention that a "mere 'expectation of leniency'" must be disclosed by prosecution under *Brady*) (quoting *Mastrian v. McManus*, 554 F.2d 813, 823 (8th Cir. 1977)); *accord*, *Wisehart v. Davis*, 408 F.3d 321, 324-25 (7th Cir. 2005); *Shabazz v. Artuz*, 336 F.3d 154, 163-64 (2d Cir. 2003); *Goodwin v. Johnson*, 132 F.3d 162, 187 (5th Cir. 1997). In contrast, "[t]he State must disclose all agreements struck with witnesses, even agreements which are not on a quid pro quo basis, *since this evidence may be highly relevant to the jury's deliberation*." *Bragan*, 791 F. Supp. at 715 (emphasis added) (citing *United States v. Turner*, 490 F. Supp. 583, 605 (E.D. Mich. 1979), *aff'd*, 633 F.2d 219 (6th Cir. 1980), *cert. denied*, 450 U.S. 912 (1981)). This case law recognizes the insignificance of a witness's unilateral hopes or expectations compared to the unique power and influence of an actual promise—especially a contingent one—by a prosecutor who may largely control the witness's fate.

Based on this critical distinction, courts evaluating false testimony claims under *Napue/Giglio* have made clear that undisclosed false statements are no less material merely because the witness admitted on cross-examination that he had some unilateral hope or expectation of benefit from his testimony, or secured other testimony that arguably undermined the witness's credibility. This is because, as the Ninth Circuit stated in *Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008), "evidence of an explicit promise of assistance by the trial prosecutor likely would have carried far greater weight than any speculative benefit [the witness] might

have thought he could achieve on his own." *Id.* at 1077. *See also United States v. Mason*, 293 F.3d 828, 829 (5th Cir. 2002) (rejecting government's argument that false denial of an agreement was not material because witness revealed the "essence" of this agreement by testifying that he "might get leniency or something" for his testimony).

Thus, in *Bragan*, supra*, the Tennessee District Court held that a prosecution witness's false testimony was material under *Napue*, even though defense counsel on cross-examination had made extensive efforts to impeach the witness's credibility and to "unearth any agreement [the witness] may have made with the State." 791 F. Supp. at 709. While falsely denying that the State had made him any promises, and claiming that he was "testifying out of the goodness of [his] heart," the witness did not disagree with defense counsel's assertion that the prosecutor had offered "a helluva lot of hope," and admitted, "I hope for the best all the time." *Id.* at 709. Similarly, in *Boone v. Paderick*, 541 F.2d 447 (4th Cir. 1976) , the Fourth Circuit held that the state's failure to correct the witness's denial of a prosecutorial promise of consideration was material, even though the witness acknowledged on cross-examination that a representative of the State had told him that "it would be better for [him] to help them" and that the witness had not been arrested or prosecuted in connection with an offense that he freely admitted committing. *Id.* at 449 n.2. In both cases, a new trial was required because the State failed to correct false testimony and thereby inform the jury that the witness's subjective expectations were in fact rooted in actual promises by the prosecutor.

### 4. The Prosecution's Own Emphasis and Reliance Upon Uncorrected False Testimony Demonstrates Its Materiality Under *Napue/Giglio*.

The Supreme Court has opined that the materiality of *Brady* evidence is "best understood by taking the word of the prosecutor" concerning the importance of the tainted testimony to the State's case. *Kyles v. Whitley*, 514 U.S. 419, 444 (1995). *Kyles* was a *Brady* non-disclosure case

in which the prosecution had failed to disclose two trial witnesses' previous statements, which would have revealed serious inconsistencies in their eyewitness testimony. *See id.* at 445, 453-54. The Supreme Court held that the "word of the prosecutor" was embodied in the State's closing argument, in which the prosecutor had repeatedly vouched for the two eyewitnesses, including by asserting that the two had been the state's "best witnesses." *Id.* at 444. The likely harm evidenced by this "word of the prosecutor" required a new trial even under the higher "reasonable probability" *Brady* standard, because the undisclosed statements would have helped the defense impeach the credibility of the two witnesses and potentially establish that they were unreliable. *Id.* at 454.

The Supreme Court's reliance in *Kyles* upon the "word of the prosecutor" as proof of the likely harm caused by a prosecutor's misconduct has frequently been relied upon by subsequent courts, including the Tennessee Supreme Court. *See*, *e.g.*, *Johnson v. State*, 38 S.W.3d 52, 58-59 (Tenn. 2001) (relying on "word of the prosecutor" in post-conviction vacatur of death sentence); *Horton v. Mayle*, 408 F.3d 570, 579 (9th Cir. 2005) (finding *Brady*-level materiality based in part on "word of the prosecutor" in closing argument emphasizing importance of witness's testimony). The impact of the word of the prosecutor is reflected in the Sixth Circuit's recognition that "[i]t is well established that a jury may find a prosecutor's statements at trial more influential than it would those of other parties." *United States v. Uwazurike*, 580 F. App'x. 440, 449 (6th Cir. 2014) (citing *United States v. Young*, 47 U.S. 1, 18–19 (1985) ("[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.")). The prosecution's own false statements to the jury thus have a redoubled impact in determining materiality: they both (1) demonstrate the prosecutors' own contemporaneous belief in the witness's importance

to the State's case, and (2) are deemed inherently to inflict a disproportionate harm in influencing the jury's judgment.

The "word of the prosecutor" is no less significant in *Napue*/*Giglio* cases. For example, in *Armour*, *supra*, the Sixth Circuit concluded that "the critical error"—requiring reversal of one count of the state-court verdict—"was that the prosecutor deliberately misled the jury by assuring it that [the witness] had nothing to gain by giving his testimony." 492 F.2d at 1037. In *Scott v. Foltz*, 612 F. Supp. 50 (E.D. Mich. 1985), the District Court granted habeas relief under *Napue*/*Giglio*, relying principally on the fact that "the prosecution specifically asked [the witness] questions for the specific reason to negate any inference of a deal for her testimony *as evidenced by his argument in closing rebuttal*." *Id.* at 57 (emphasis added). Similarly, the Tennessee District Court in *Rickman* emphasized that "the State relied heavily on [its witness's] eyewitness testimony in its closing argument," and the court concluded that the jury might not have relied upon that testimony "[i]f [it] had known that [the witness] was testifying in order to receive consideration from the State and save himself from a death sentence." 864 F. Supp. at 705.

Cases from outside the Sixth Circuit further reinforce this point. For example, in *LaCaze v. Warden of Louisiana Correctional Institute for Women*, 645 F.3d 728 (5th Cir. 2011), *amended by* 647 F.3d 1175 (5th Cir. 2011), the state relied upon the testimony of the actual killer in a murder-for-hire case against the defendant, the victim's wife. *Id.* at 731-32. At trial, the prosecution elicited (and failed to correct) false testimony from the witness that there had not been a "deal" that would give him a reason to lie, and then vouched for his credibility in closing argument, declaring that the jury had "never seen anybody pour the truth out from their soul like I saw him and you saw it too." *Id.* at 737 n.1. In holding that the false testimony was material and

granting a new trial, the Fifth Circuit noted that the materiality of the false testimony was evident because "the State . . . 'capitalized on this misrepresentation in [its] closing argument' by repeatedly arguing that [the witness] had not received a deal that would give him a reason to lie—which itself shows the materiality of the undisclosed deal." *Id.* (quoting *Tassin v. Cain*, 517 F.3d 770, 779 (5th Cir. 2008)). The "word of the prosecutor" in closing argument left no doubt about the materiality of the false testimony.

> **5.    Under *Napue/Giglio*, Courts Must Assess the Likely Effect on the Jury If It Had Learned that the Witness Testified Falsely**

In evaluating materiality under *Napue/Giglio*, courts must ask how the jury would have been affected if the witness's false testimony had come to light at trial, rather than assuming that the false testimony had never been presented in the first instance. In other words, the materiality analysis focuses on whether there is "any reasonable likelihood" that the jury's judgment "could have been affected" if the jury had known that the witness *lied*.

The Sixth Circuit has repeatedly adopted this approach. *See, e.g.*, *Wogenstahl v. Mitchell*, 668 F.3d 307 (6th Cir. 2012) (opining that the jury "might have been more willing to believe Wogenstahl's account of his visit" if it "had . . . been aware that Horn was lying about his history of marijuana trafficking"); *Rosencrantz v. Lafler*, 568 F.3d 577, 588 (6th Cir. 2009) (concluding that "it is reasonable to infer that exposing Lasky as untruthful—thereby tipping the jury to another of Lasky's inconsistencies and her willingness to lie under oath—would have affected the jury's view of [her] credibility" had she been corrected by the prosecutor or "confronted . . . with her false denial" by defense counsel).[12] In granting habeas relief under *Napue*, the Michigan district court in *Scott v. Foltz* also analyzed materiality in the same terms:

---

[12] The contrary suggestion of the court in *Peoples v. Lafler*, 734 F.3d 503, 517 (6th Cir. 2013), is unsupported dictum in a case decided on other grounds, and is not binding here. *Peoples* granted (continued…)

> The jury might very well have hesitated if it had known not only that Murry had in fact plea bargained for her testimony but had also falsely denied it at Petitioner's preliminary examination. Under these circumstances, the Court finds that there was a reasonable likelihood that Murry's false testimony could have affected the jury's judgment. If the present case does not require a new trial under *Napue*, it is hard to conceive of one that does.

612 F. Supp. at 58; *accord Jackson*, 513 F.3d at 1077 (granting habeas relief based on *Napue* violation under similar circumstances, observing that the fact that a key witness "was willing to perjure himself in order to cover up prosecutor Marin's promise would surely have called into question the truth of all of his testimony").

Since the basis of a *Napue-Giglio* claim is that the witness in fact testified falsely before the jury at trial, it follows that the determination of materiality should weigh the likely impact that exposure of the witness's perjurious character would have had on the jury. This logic is consistent with *Giglio*'s teaching that a prosecutor must actually correct false testimony by a witness in front of the jury, *see* 405 U.S. at 153, which would consider the witness's credibility in that light.

**B.      Shipp's False Testimony Was Material Because There Is a Reasonable Likelihood That Exposure of His Perjury and the State's Promise of Consideration Could Have Affected the Judgment of the Jury.**

Shipp's uncorrected false testimony at Robinson's trial was material under *Napue*. The open-ended, conditional promise of consideration conveyed by Branham on November 5 gave

---

a new trial under *Strickland*, *supra*, based upon trial counsel's ineffective assistance in failing to impeach certain witnesses' testimony at trial. *Id.* at 515. In addressing Peoples' additional prosecutorial misconduct claim under *Napue*/*Giglio*, the court stated the relevant standard as "whether there is a reasonable likelihood that the outcome would have been different if the known false testimony had never been presented." *Id.* at 517. Part of this statement ("reasonable likelihood that the outcome would have been different") plainly misstated the *Napue*/*Giglio* standard, which the court correctly recited elsewhere in the opinion, *see id.* at 516, 517. In any event, the court's discussion of this issue was dictum because the court's holding in Peoples' favor under *Strickland* alone required a new trial. *See id.* at 517.

Shipp a powerful incentive to bear false witness against Robinson in an effort to curry favor with Branham and Wulff, who held the power to put Shipp's life at risk in a future capital trial. Furthermore, Shipp was an essential prosecution witness who provided the only testimony or other evidence on a key component of the State's first-degree murder proof against Robinson at trial. As their improper vouching and repeated misrepresentations to the jury and the trial court dramatically attest, the prosecutors were keenly aware that establishing Shipp's credibility in the eyes of the jury was paramount. Had the jury learned the truth about the State's promise to Shipp, it could have rejected his testimony altogether or, at a minimum, concluded that the State had failed to prove Robinson's rank and authority beyond a reasonable doubt—particularly given the presence and involvement of Phillips as top-most gang leader of Hurt Village. The prosecution's exploitation of Shipp's lies—which continued after trial through post-trial motions and direct appeal—caused substantial harm to Robinson's defense and plainly could have influenced the jury's judgment in this case. Under *Napue* and *Giglio*, Robinson's conviction and death sentence cannot stand.

### 1. Shipp's Testimony Was the Linchpin of the State's Case.

Jarvis Shipp was the State's star witness, and his credibility was crucial to securing Robinson's conviction. Given the weaknesses of the State's other evidence, there is plainly some reasonable likelihood that, if the jury had learned that (i) the prosecutors had promised Shipp that helping them "get" Robinson "will" help save his life; and (ii) that Shipp lied to the jury about this promise, it could have affected the judgment of the jury in this case.

Robinson was undisputedly *not* at the scene of the homicide, and there was no physical evidence to tie him to Vernon Green's death. *See Robinson III*, 2013 WL 1149761 at *3, *7. To convict Robinson of first-degree murder, the State had to prove beyond a reasonable doubt that Robinson had ordered the killing by implied oral command ("Y'all know what to do"), and that

he was the ranking officer at the meeting with the authority within the Gangster Disciples to impose such a command. *See id.* at *5, *13, *15. This was a key issue at trial because the defense disputed not only Robinson's gang membership but also whether he had the authority to order Green's murder. *See Robinson III*, 2013 WL 1149761, at *11, *22.

The State presented only two witnesses who identified Robinson as having been present on the night of the murder: Jarvis Shipp and Chris James. If one of these two witnesses had been exposed as having concealed a promise by the State to help save his life if he would help "get" Robinson, the jury would have been left to assess a much weaker case. Given the State's heavy burden of proof beyond a reasonable doubt, the evisceration of the credibility of one of two core witnesses was necessarily material. This easily satisfies—indeed, well exceeds—the *Napue* requirement of "any reasonable likelihood" that the jury's judgment "could" have been affected.

This conclusion is inescapable in light of the fact that Shipp was the centerpiece of the State's case and, as the prosecution itself conceded, a far more important and damaging witness than James. Shipp was the only witness who testified concerning Robinson's membership, rank, or authority within the Gangster Disciples. Indeed, the Tennessee Supreme Court relied on the testimony of Shipp that Robinson "was a high ranking Gangster Disciple" in holding on direct appeal that the evidence to convict Robinson of first-degree murder was sufficient. *Robinson II*, 146 S.W.3d at 507.

Without Shipp's testimony, the State could not prove those contentions beyond a reasonable doubt. Its only other witness to the meeting was Chris James, who "was not asked about the defendant's rank, did not attribute a rank to the defendant, and stated he had never seen the defendant before April 30, 1997." *Robinson II*, 146 S.W.3d at 496. His testimony that "Shaun" said, "Y'all know what to do," before the gang members left the Black Apartment with

Green was ambiguous and indeterminate: those words were consistent with an utterance (i) by someone who believed Green was *not* to be killed or even seriously harmed, or (ii) by a subordinate who knew the nature of the order but had no authority to order it himself. Particularly since there was evidence at trial that the order was to take Green "fishing"—not kill him, but rough him up and leave him to find his way home (22-6 at 980-81)—James's testimony was at best inconclusive and would have been insufficient to prove the State's claim that Robinson actually used his authority within the gang to order the murder. Shipp's testimony concerning Robinson's membership, rank, and authority within the Gangster Disciples was therefore the crucial link in the State's first-degree murder case against Robinson.

Moreover, James's testimony generally was so unclear and contradictory that the prosecutor found it necessary to apologize for their own witness in closing argument, conceding to the jury *three times* that James was "not a rocket scientist" and had "difficulty in understanding things." (22-14 at 2084-85.) On direct appeal, the Tennessee Supreme Court called James "inarticulate" and "cryptic" in his response to questions. *Robinson II*, 146 S.W.3d at 498. James's testimony contradicted both his March 1997 written statement to police and his prior testimony at the earlier Kevin Wilkins trial. Whereas his March 1997 statement claimed that "Shaun" left the Black apartment with the killers and drove off with Green (24-7 at 6107-10), James gave a different account at Robinson's trial, claiming that Robinson had stayed behind and threatened him to stay silent. (22-5 at 815.) James also contradicted his prior testimony at Wilkins's trial by claiming that Robinson had taken Green upstairs; in his March 1997 statement and at Robinson's trial, he stated the opposite. (22-5 at 807-8; 22-6 at 894-95.) He initially claimed Robinson had "put a nine [millimeter] in [his] face" and threatened him, but

then later admitted that Prentiss Phillips, not Robinson, had done that. (22-5 at 805; 22-6 at 856-57.)

These contradictions were not merely incidental. Yet, when confronted with the discrepancies between his prior sworn statements and his testimony at Robinson's trial, James's response was dismissive: "Man, that's another trial, man. That's a whole new trial." (22-6 at 894.) James's response suggested that he could not remember what he had said before or, even worse, was improvising with the facts.

James's reliability as a witness was further undercut by the fact that James himself suffered a severe beating by multiple Gangster Disciples immediately before the murder was allegedly ordered. (22-5 at 807-08.) The jury was therefore asked to believe that James had correctly identified Robinson as the person who committed the acts James previously attributed to "Shaun," even though: (1) James admittedly did not know Robinson and had never seen him before that night; (2) by James's own estimate, there were at least 20 to 30 other Gangster Disciples, nearly all of whom he did not know, at the Black apartment that night (*id*. at 107, 109); (3) during the aid-and-assist meeting, James himself suffered a beating that left his head and eyes swollen; (4) the record at trial reflected that there was at least one person, Shaun Washington, at the Black apartment that night whose name actually was "Shaun" (22-7 at 1022); and (5) as described above, James could not get his own testimony straight and backtracked on his initial assertion that Robinson had put a gun in his face and threatened him. The jurors had ample basis to discount or reject the testimony of this "cryptic," "inarticulate" witness who the prosecutors admitted to them was "no rocket scientist" and had "difficulty in understanding things."

Against this backdrop, there can be no doubt that the jury's acceptance of Shipp's testimony was all-important to the prosecution's case against Robinson at trial, and particularly essential to the State's effort to convict Robinson of capital murder. In the *Napue/Giglio* context, false testimony elicited by the State may be material and require a new trial even if the lying witness is not the exclusive source of evidence against the defendant. Shipp's testimony against Robinson was indisputably a "crucial link in the case against [Robinson]." *Cf. Foley v. Parker*, 488 F.3d 377, 392 (6th Cir. 2007) (finding perjured testimony immaterial because lying witness was not such a "crucial link"). Given the unique content of Shipp's testimony, James's weakness as a witness, and the absence of any other prosecution witnesses who were present at the Black apartment on April 30–May 1, 1998, there can be no doubt that Robinson's "'conviction depended significantly on [Shipp's] testimony.'" *Rosencrantz*, 568 F.3d at 588 (quoting *Shih Wei Su v. Filion*, 335 F.3d 119, 129 (2d Cir. 2003) (holding false testimony material where lying witness was "prosecution's chief witness" and the "conviction depended significantly on [lying witness's] testimony")).

Indeed, even under the *less* defendant-friendly materiality standard applicable in the *Brady* non-disclosure context, "confidence that the verdict would have been unaffected cannot survive" where the State's conduct prevented the jury from learning facts that would have undermined the reliability of half of the State's purported eyewitnesses. *See Kyles v. Whitley*, 514 U.S. at 454 (holding that undisclosed prior statements by two of State's four eyewitnesses were material and required a new trial). The State here cannot diminish the crucial importance of Shipp's testimony merely because James also identified and testified against Robinson at trial.

### 2. The State's Promise of Consideration on November 5 Gave Shipp Both a Powerful Incentive and an Implicit Invitation to Lie.

The materiality of Shipp's false testimony is further demonstrated by the nature and terms of the promise made by the prosecutors, as reflected on the transcript of his meeting with the State contained in the November 5 Statement. The prosecutors' promise to Shipp was plainly conditional upon his "performance" at trial: Branham dangled the assurance to Shipp that his testimony against Robinson "will" help Shipp "save [his] life," before clarifying that she would not conclude a binding agreement with Shipp before Robinson's trial. Instead, she offered a conditional promise that "we will certainly take it into consideration whatever you do to help us get Gregory [Robinson] *and* Prentiss [Phillips]." (24-8 at 6267-08 (emphasis added).) After confirming his acceptance of that offer by saying, "Thank you," Shipp proceeded to inculpate Robinson for the first time, imputing numerous actions to Robinson that Shipp's May 1997 Statement had attributed to Phillips alone.

Thus, Shipp had the most potent incentive to testify falsely against Robinson that the prosecution could have offered: an expressly conditional promise to consider leniency only if Shipp's testimony satisfied the prosecutors' demand to help them "get Gregory." Since Robinson's trial was scheduled to proceed before Phillips's trial, it was clear that his testimony against Robinson would be Shipp's first—and potentially only—chance to win leniency from the State. As shown in Part I.A.2 above, such a promise "contingent on the government's satisfaction" served only to strengthen Shipp's incentive to testify falsely in order to secure a conviction. *See Bagley*, 473 U.S. at 683 (plurality opinion). Had Shipp's lie about this conditional promise been exposed, his testimony would have been "more suspect" in the jury's eyes, since Shipp would be more interested in pleasing the prosecutors who would be determining his fate. *Bragan*, supra, 791 F. Supp. at 717. As in *Napue*, the jury "might well have

concluded that [Shipp] had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case." 360 U.S. at 270.

Even more striking in this case is the thinly-veiled invitation to lie that the prosecutor's transcribed words conveyed to Shipp. Branham promised Shipp that he would "certainly" receive consideration for "*whatever you do* to help us get Gregory and Prentiss." Completely absent from the November 5 Statement is any statement by the prosecutors that, in order to merit consideration of leniency, Shipp's testimony had to be *truthful*. The significance of this omission is highlighted by Wulff's incorrect testimony at the post-conviction hearing that, when Shipp asked if his testimony against Robinson would help him avoid the death penalty, "our response was Tell the truth, you know." (*sic*) (24-15 at 6990.) That would have been the proper and ethical response, but in fact it is not what the November 5 Statement shows Branham actually said. Rather, without any such admonition to tell the truth, Shipp—facing the death penalty, and already a confessed participant in Green's murder at Bellevue Park—was promised consideration for "whatever" he did to help the State "get" Robinson.

If Shipp's false testimony had been exposed at trial, the jury would have learned facts bespeaking a corruption of the truth-seeking process by Shipp and the prosecution that could have shattered his credibility and hobbled the State's case against Robinson. The jury would have been entitled to completely disregard Shipp's testimony: as the trial court instructed, when a witness is impeached "the jury has the right to disregard his or her evidence, and treat it as untrue." (22-15 at 2187.) Moreover, the concealment of the State's promise to Shipp would have placed in a new light Shipp's prior May 1997 Statement, which implicated Prentiss Phillips but not Shipp. The jury would have been entitled to infer that the State's promise to save Shipp's

life, which was conditioned on Shipp helping to "get" Robinson, induced Shipp to falsely implicate Robinson as the person who had ordered Green's murder.

Particularly in light of the egregious nature of the promise afforded Shipp in this case, the State's elicitation and failure to correct Shipp's perjurious denials could have substantially influenced the jury's view of Shipp's credibility and reliability and altered the outcome of Robinson's trial.

>    **3.**     **Shipp's Admission on Cross-Examination That He Hoped for Some Benefit From His Testimony Did Not Render His False Testimony Immaterial.**

On *de novo* review of Ground 1, the reasoning of the Tennessee Courts with regard to the materiality of Shipp's false testimony is accorded no deference by this Court. It is noteworthy, however, that the TCCA's ruling on materiality relied entirely on a legally erroneous conclusion: that the injurious impact of Shipp's false testimony was neutralized by his admission on cross-examination that he "hoped the prosecutors would withdraw the death penalty." *Robinson III*, 2013 WL 1149761 at *63. That analysis ignored the *Napue*/*Giglio* case law confirming the fundamental difference between an actual promise of consideration by the State in exchange for testimony and a witness's mere subjective hope that his voluntary testimony may result in some benefit. *See* Section I.A.3, above.

Indeed, the transcript of Shipp's cross-examination starkly demonstrates that Shipp's false denial of any promises enabled Shipp to misportray himself as a high-minded champion of truth and "the victim's family," rather than the cynical perjurer that he was. It bears emphasis that Shipp did *not* testify that he had any settled "expectation" of benefit from his testimony. To the contrary, as the trial transcript shows, when asked on cross-examination if he "expect[ed] to have a benefit" from his testimony, Shipp responded only, "If it's in the will"—that is, if fate

smiles upon him. There was no suggestion that the State had provided any assurance of

consideration, as the frustration of Robinson's counsel in the ensuing colloquy makes clear:

> Q.    And, also, if there's any way for you to benefit [from your
> testimony] you would expect it, correct?
>
> [Shipp] What do you mean?
>
> Q.    I mean, you're just expecting — you're expecting some
> benefit?
>
> A.    No. I don't understand.
>
> Q.    Well, you're not up here testifying for your health, are you,
> sir?
>
> A.    I'm up here testifying to tell the truth on my behalf and on
> behalf of the victim's family.

(22-7 at 1014-16 (emphases added).) Shipp got the last word in this confrontation, and this self-

serving declaration by Shipp went effectively unchallenged.

Thus, there is no legal or factual basis to hold Shipp's false testimony immaterial merely

because Robinson's counsel managed to get Shipp to acknowledge some subjective hope that he

might benefit by testifying at Robinson's trial. Counsel's cross-examination did nothing to

mitigate the injurious impact of Shipp's false testimony. If anything, it made matters worse for

Robinson: it gave Shipp a convenient opportunity to riff on the prosecutor's improper comment,

on direct examination, that Shipp had been "very courageous" in his testimony, and to cast

himself falsely as a penitent truth-teller, "testifying to tell the truth on my behalf and on behalf of

the victim's family." This was exactly the impression that the prosecution sought to make on the

jury—by failing to correct Shipp's false testimony.

### 4. The Acknowledged Error of the Trial Court's Erroneous Accomplice Instruction Further Compounded the Impact of Shipp's Testimony.

The trial court failed to instruct the jury that Jarvis Shipp was an accomplice as a matter of law, which would have required the jury to seek corroboration of his testimony. Instead, the trial court allowed the jury itself to decide whether it considered Shipp an accomplice. (*See* 22-15 at 2179.) Both the TCCA and the Tennessee Supreme Court held that this was error, because it was undisputed that Shipp participated in the crime. *See Robinson I*, 2003 WL 21946735 at *13, *Robinson II*, 146 S.W.3d at 489.[13] (*See also* Petition, 1 at 105-06.)

A correct instruction would have substantially mitigated the impact of Shipp's critical testimony, because other trial witnesses were able to corroborate only certain aspects of Shipp's testimony. For instance, although Chris James, like Shipp, identified Robinson as having been present at the Black apartment on the night of the murder, *see Robinson I*, 2003 WL 21946735 at *2, no other witness corroborated Shipp's testimony regarding Robinson's alleged position in the Gangster Disciples, even though that testimony was critical to the State's contention that Robinson ordered the murder. Testimony as to Robinson's ability to order the murder was essential to the State's case, as Robinson was not present when Green was murdered. Rather, Robinson's conviction hinged on the allegation that he had the authority to order others to carry out the murder. *See id.* at *3. Because the only such testimony was provided by Shipp, the trial court's failure to instruct that Shipp needed to be considered an accomplice heightened the impact of his testimony, making it all the more likely that Shipp's testimony affected the judgment of the jury. *See, e.g., United States v. Bernal*, 814 F.2d 175 (5th Cir. 1987) (reversing

---

[13] The Tennessee Supreme Court found the issue waived because trial counsel failed to object to the erroneous instruction. That ruling is irrelevant, however, to this Court's *de novo* review under *Napue*, which focuses only on the effect of Shipp's false testimony on a jury that in fact received a flawed erroneous instruction as to its reliance on Shipp's accomplice testimony.

conviction where court's failure to give accomplice testimony instruction may have "materially affect[ed] the jury's decision" given that there was "little other strong evidence" corroborating the testimony of the accomplice).

> **5.** **The Prosecutors' "Word" at Trial—and Their Continuing Deception During Post-Trial Motions and Direct Appeal—Confirms the Materiality of Shipp's Uncorrected False Testimony.**

The "word of the prosecutor" in this case is also unmistakable. *See Kyles*, 514 U.S. at 444. The prosecutors at Robinson's trial not only failed to correct Shipp's false testimony but also went so far as to improperly vouch for the truth of Shipp's testimony in closing statements, urging the jury to accept that testimony as untainted. The trial record leaves no doubt that the prosecution viewed it as mission-critical to shore up Shipp's credibility in the jury's eyes and deny his incentive to curry their favor by giving false testimony against Robinson.

Robinson's conviction hung by the thread of Shipp's testimony, including his accusations and assertions about Robinson's status and authority in the Gangster Disciples. In closing argument, ADA Wulff heavily emphasized Shipp's testimony. (*See* 22-14 at 2087-90)*; see also Robinson III*, 2013 WL 1149761 at *80. She argued to the jury that "no one else" who testified had indicated that they were doing so to "help the victim's family" or because they had "remorse." (*See* 22-14 at 2088.) Wulff vouched for his false testimony about not having received any consideration in asserting—falsely—that he "didn't get a deal, but he told you the truth." (*Id.* at 2088-89.) In rebuttal argument, ADA Branham continued to push the point, lauding Shipp's purported "decision to tell you the truth," and arguing that "maybe [the State] should cut him some slack. We haven't yet, but maybe we should." (*Id.* at 2163.) These repeated efforts to convince the jury that Shipp had not received anything in exchange for his testimony and was telling the truth demonstrate the prosecutors' own recognition that Shipp's false testimony was material.

The "word of the prosecutor" is further evidenced by the State's conduct in connection with Robinson's post-trial Motion for a New Trial, which focused on whether the prosecution made a pre-trial promise to Shipp. The prosecutor's false, adamant denials of "any promises" to Shipp, which were central to the trial court's rejection of that motion, demonstrate that the prosecution recognized the importance of concealing any such promises.

Robinson's Motion for a New Trial highlighted the State's surprise announcement shortly before Robinson's trial that Shipp would testify against Robinson. Robinson's post-trial counsel, Edmund Carey, explained that he filed the motion because he was convinced that the State must have given some undisclosed assurances to Shipp in exchange for his testimony. (24-16 at 7133-35.) The prosecutors responded to Robinson's post-trial motion by continuing to misrepresent the now-established facts to the trial court. In October 2000, Branham falsely denied the existence of any pre-trial promises to Shipp, declaring: "[T]here is no hiding. There is no attempting to keep anything from anybody. It was known to the parties that Jarvis Shipp was going to be a witness. There were no offers made to [Shipp] . . . There were no offers made to him, and that was reflected. There was nothing to be revealed that could have been revealed that wasn't revealed." ( 22-20 at 2486.) In fact, both the post-trial record and Carey's uncontroverted testimony at the post-conviction hearing demonstrate that neither he nor the trial court were informed about the November 5 Statement or its contents. (*See* 24-16 at 7127); *see* Factual Background Section I.D., above.

At no point did Branham or Wulff disclose to the trial court that they had met with Shipp on November 5, 1998, and assured him that his testimony against Robinson "will" help him avoid the death penalty and that the State "certainly will take into consideration whatever you do to help us get Gregory [Robinson]." As Carey and Robinson's other appellate counsel, Robert

Brooks, testified at the post-conviction hearing, such a revelation would have materially altered the basis for the post-trial motion: there would have been no need to argue that there was an implied "wink and a nod agreement" between the State and Shipp, since in fact the prosecutors had made explicit assurances to give Shipp leniency if he provided helpful testimony against Robinson. (24-16 at 7143 (Carey); 24-16 at 7177 (Brooks testimony that actual promise reflected in the November 5 Statement "would have blown [the 'wink and a nod'] argument out of the water").) Branham's false representations to the court denying that any "offers" had been made to Shipp plainly reflect the State's awareness that continued concealment of the actual substance of their promises to Shipp was essential to preserving Robinson's conviction.

Moreover, both the trial court's decision on the Motion for New Trial and the Tennessee appellate courts' subsequent decision on this issue on direct appeal, hinged upon this uncorrected, false contention by the State that the prosecution had not made any agreement with Shipp in exchange for his testimony prior to Robinson's trial. The trial court found that there was no express agreement, and that the proof of Shipp's mere "expectation" or "hope" for favorable treatment was insufficient to warrant a new trial. (*See* 22-22 at 2704-05 (trial court's finding that "nothing . . . had been given to Mr. Shipp" to indicate an agreement). The Tennessee Supreme Court (affirming the TCCA's ruling on the issue) similarly held that, "[w]hile Shipp may have *hoped* that his testimony would result in favorable treatment, the record does not establish that an agreement existed between the state and Shipp at the time of [Robinson's] trial." *Robinson II*, 146 S.W.3d 469 at 514 (emphases added). The reasoning of both the trial and appellate courts firmly support the inference that, had the State honestly acknowledged nature of the actual promise given to Shipp prior to Robinson's trial, the outcome of their determinations on the issue would have been different.

In sum, the "word of the prosecutor" in this case attests unequivocally to the materiality of Shipp's false denial of "any promises" at Robinson's trial. Furthermore, the harm inflicted by the State's failure to correct (and improper vouching for) Shipp's false testimony extended beyond Robinson's trial and incurably infected the post-trial proceedings and direct appeal. The prosecutors plainly had an affirmative duty not to compound their failure-to-correct at trial by misrepresenting to the court the true nature of their assurances to Shipp. Their continuing misrepresentation was instrumental to the reasoning of the trial and direct appellate courts, and it therefore corrupted not only Robinson's trial but also the subsequent proceedings.

Under these circumstances, it could not be more apparent that Shipp's uncorrected false testimony was material under *Napue*/*Giglio* and requires that Robinson be granted a new trial. Accordingly, this Court should enter summary judgment in favor of Robinson on Ground No.1 of the Petition.

## II.     Robinson Is Entitled to Summary Judgment on Ground No. 2 Because the State's Failure to Disclose the November 5 Statement Violated *Brady*.

It is clearly established that, to demonstrate a *Brady* violation of his federal due process rights in connection with the November 5 Statement, Robinson was required to show that the November 5 Statement (1) was favorable to the accused, because it was either exculpatory or impeaching; (2) was suppressed by the State, either willfully or inadvertently; and (3) was "material" under *Brady*. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (re-stating requirements of *Brady* violation requiring a new trial); *see also Brady v. Maryland*, 373 U.S. 83, 87 (1963). Although the TCCA did not question that the November 5 Statement constituted favorable impeachment and/or exculpatory evidence that the State was required to turn over to Robinson, it (a) affirmed the post-conviction trial court's factual finding that ADA Paula Wulff gave the November 5 Statement to Robinson's junior trial counsel, Steffen Schreiner, before

Robinson's trial, and (b) held that, in any event, the November 5 Statement was not material under *Brady*. *Robinson III* , 2013 WL 1149761 at *60-*61.

As demonstrated below, Robinson is entitled to summary judgment on Ground 2 of his Petition because: (1) the TCCA's rote affirmance of the post-conviction court's crediting of Wulff's post-conviction testimony was based upon an unreasonable determination of fact in light of the evidence presented in the State post-conviction proceedings, *see* 28 U.S.C. § 2254(d)(2), and (2) the TCCA's ruling that the November 5 Statement was not material under *Brady* constituted an unreasonable application of clearly established federal law, *see id.* § 2254(d)(1).[14] Even under AEDPA's deferential standard of review, the Tennessee Courts' refusal to acknowledge the clear and convincing record evidence of the State's misconduct in failing to produce the November 5 Statement, and the material harm to Robinson's defense caused by that failure, cannot be sustained. Robinson's conviction and sentence therefore should be vacated, and a new trial should be granted, on Ground 2.

## A. The TCCA Acknowledged That the November 5 Statement Was *Brady* Material Which the Prosecution Was Required to Disclose Prior to Robinson's Trial.

The TCCA's post-conviction ruling assumed, without explicitly stating, that the November 5 Statement constituted *Brady* material that the State was required to disclose to Robinson prior to his trial. As shown in Part I above, it is firmly established that the *Brady* disclosure obligation applies to the type of conditional prosecutorial promise to consider leniency in exchange for testimony which—as the TCCA expressly acknowledged—was recorded in the

---

[14] This Court previously held that it would apply AEDPA standards in reviewing the TCCA's ruling on Robinson's *Brady* non-disclosure claim (Ground 2 of the Petition). (SRD, 43 at 8645.) We assume application of that standard to the *Brady* non-disclosure claim here while reserving Robinson's appellate rights.

November 5 Statement. *See Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir. 2009) (quoting *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (en banc)). In the state post-conviction proceedings, the State did not contest the prosecutors' obligation to turn over the November 5 Statement as *Brady* material, nor is this point disputed in the State's Answer to Robinson's Petition here. (*See* 24-6 at 5671-73; 26 at 8410.) Since neither the Post-Conviction Court nor the TCCA suggested any doubt that the November 5 Statement was favorable to the defense under *Brady*, this prong of the *Brady* disclosure standard has been adjudicated in Robinson's favor. (24-6 at 5810-15); *Robinson III*, 2013 WL 1149761 at *59-*61.

> **B.    The Tennessee Courts' Disclosure Finding Constitutes an "Unreasonable Determination of the Facts" Because It Cannot Be Reconciled With the Clear and Convincing Contrary Evidence in the Post-Conviction Record.**

Under AEDPA, this Court should overturn a state court's decision that is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's determination of facts is deemed to be "unreasonable" when a reviewing court, "applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *McMullan v. Booker*, 761 F.3d 662, 672 (6th Cir. 2014), *cert. denied*, 135 S. Ct. 1534 (2015) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)); (*see* SRD, 43 at 8646 (same)). Under section 2254(e)(1), the state court factual findings are afforded a "presumption of correctness," but this presumption may be overcome "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[15]

---

[15] This Court previously held that the presumption of correctness under 2254(e)(1) applies to its review of the TCCA's determination on this issue. (SRD, 43 at 8646.) The Cout also noted that the U.S. Supreme Court has "not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)," (*id.* at 8645-46 (quoting *Burt v. Titlow*, 571 U.S. ——, ——, 134 S. Ct. 10, 15(2013)), and the Sixth Circuit also declined to do so in *McMullan v. Booker*, 761 F.3d 662, 670 (6th Cir. 2014) ("Our circuit has not opined on the issue, and we refrain from doing so now."), *cert. denied*, 135 S. Ct. 1534 (2015). We assume here that the presumption of correctness (continued…)

The above standard is deferential, but not insurmountable. "'[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Brumfield v. Cain*, --- U.S. ---, 135 S. Ct. 2269, 2277 (2015) (quoting *Miller–El v. Cockrell,* 537 U.S. 322, 340 (2003)). For example, the U.S. Supreme Court has held that the presumption of correctness may be overcome when a state court's determination of a factual issue is based on a "dismissive and strained interpretation" of evidence. *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005). In declining to accept lower court's conclusion that the state engaged in racial discrimination during jury selection, *Miller-El* concluded that the presumption of correctness had been rebutted when "attempts to explain the prosecutors'" actions on grounds of proper conduct "fit the evidence less well than" the alternative possibility. *Id.* at 266.

As to the second prong of the *Brady* standard, the TCCA conducted barely any analysis of the record in affirming the lower post-conviction court's acceptance of Wulff's testimony concerning the November 5 Statement. Instead, it endorsed the post-conviction court's crediting of Wulff's testimony without even considering the other objective evidence in the record that negated any rational basis for the lower court's disclosure finding. *See Robinson III*, 2013 WL 1149761 at *59-*61. As demonstrated below, the Tennessee Courts substituted a wildly speculative fiction that cannot rationally be reconciled with the overwhelming weight of facts in the record. In the face of such clear and convincing evidence, this objectively unreasonable determination must be overturned.

---

under § 2254(e)(1) applies, while preserving his rights with respect to the issue for any future appeal.

1.      **The TCCA Failed to Consider the Objective Record Evidence Demonstrating that the Prosecution Failed to Disclose the November 5 Statement.**

The TCCA affirmed the post-conviction court's ruling on the State's disclosure of the November 5 Statement solely on the basis of the testimony given by Wulff, and referred only to other testimony by Robinson's trial and appellate counsel at the 2009 post-conviction hearing. (25-4 at 8303-04.) The TCCA concluded that "the post-conviction court essentially found that Ms. Wulff gave the transcript of the meeting to co-counsel [Schreiner] but that co-counsel failed to share the transcript with lead counsel [Ozment]." (25-4 at 8303.) The TCCA endorsed this conclusion without reference to or analysis of any other evidence that Robinson presented.

Under § 2254(d)(2), however, the Court must review all of "the evidence presented in the State court proceeding"—not just the testimony of witnesses at a post-conviction hearing. Robinson's post-conviction presentation included, *inter alia*, (1) the trial record, in which Wulff inexplicably failed to produce the November 5 Statement to Robinson's counsel along with Shipp's May 1997 Statement at the formal, on-the-record Jencks exchange; (2) the post-trial motion record, in which ADA Branham misled the court by falsely denying the existence of any pretrial promise or assurance to Shipp, resulting in the denial of Robinson's Motion for a New Trial based on the erroneous finding no such promises or assurances had been given by the State; and (3) the record on direct appeal, in which the State continued to defend that finding while failing to acknowledge the November 5 Statement or the prosecution's explicit promise (proved by that document) to consider leniency for Shipp in exchange for his testimony against Robinson. The TCCA's decision makes no attempt to reconcile Wulff's factual claim with the concrete, objective facts contained in the record of Robinson's trial and direct appeal.

That record contains no reference anywhere to the November 5 Statement. The post-conviction court's ruling acknowledged that both Robinson's lead trial counsel and direct

appellate counsel were unaware of the document's existence. The post-conviction court attempted to rationalize its finding of the prosecutor's disclosure by speculating that the November 5 Statement somehow disappeared down a rabbit-hole: into Schreiner's hands, never to be seen or heard about again until the document was discovered by Robinson's post-conviction counsel in or about 2007. Neither the TCCA nor the lower post-conviction court pointed to any record evidence other than Wulff's naked assertions—over 11 years after the fact at the post-conviction hearing—to support this supposition of Schreiner's mind-boggling incompetence. In fact, the conduct and statements of the prosecutors through Robinson's trial and direct appeal themselves provide clear and convincing evidence that they had not disclosed the November 5 Statement. No rational fact-finder could credit Wulff's claimed recollection in the face of these contemporaneous, objective record facts.

*First*, Wulff's failure to produce a copy of the November 5 Statement on the record at trial when she made a proffer of *Jencks* material relating to Shipp leaves no doubt that both she and Robinson's trial counsel understood that the defense had only one prior statement by Shipp: the May 1997 Statement. Under Tennessee Rule of Criminal Procedure 26.2, the parties were required to provide, after direct examination of a witness other than the defendant, "*any statement of the witness that is in their possession* and that relates to the subject matter of the witness's testimony." Tenn. R. Crim. P. 26(a) (emphasis added); c*f. Robinson II*, 146 S.W.3d at 515 n.3 ("The holding in *Jencks v. United States*, and subsequent congressional action was incorporated into Rule 26.2 of both the Federal and Tennessee Rules of Criminal Procedure, requiring the production of statements of witnesses at trial."). At the conclusion of Wulff's direct examination of Shipp, Ozment announced for the record: "Your honor, I have one 10-page statement of Jencks"—unmistakably a reference to Shipp's May 1997 statement, which is 10

pages in length. (22-6 at 997.) Wulff responded to Ozment's statement by confirming—falsely—

that the Jencks material in the State's possession relating to Shipp consisted of a single

statement:

> Your honor, I'm about to provide Jencks material to the defense
> counsel. This would be for a statement made by Jarvis Shipp, and
> it was made on Tuesday, May 27, 1997, at the conclusion of his
> direct testimony. It's a 10-page statement. However, it appears that
> defense counsel already has a copy of this statement.

(*Id.*) Although Ozment's in-court statement made it obvious that he was unaware of any Shipp

statement in the defense's possession other than the May 1997 Statement, Wulff did not correct

him. Instead, she withheld the November 5 Statement from her in-court disclosure and led both

Ozment and the trial court to believe incorrectly that no other Shipp statements existed.

There can be no dispute that the prosecution was required to produce the November 5

Statement as Jencks[16] material at this point in Robinson's trial, irrespective of whether it had

previously been disclosed to the defense. Tennessee Rule of Criminal Procedure 26.2 required

the prosecution to provide "any statement of the witness *that [was] in their possession*."[17] Tenn.

R. Crim. P. 26(a) (emphasis added). The very purpose of making a record of Jencks material

---

[16] While the federal Jencks Act does not directly apply in Tennessee state court proceedings, it
has been incorporated into Rule 26.2, and the Robinson trial transcript reveals that it was
common parlance for counsel to refer to Tennessee Rule 26.2 disclosures as "Jencks" material.

[17] On Robinson's post-trial motion, the trial court held that the prosecution had violated its
obligations to the defense under *Brady* and Rule 26.2 by failing to provide Robinson's counsel
with a copy of the transcript of the earlier suppression hearing in which Shipp testified. (50 at
8743-44.) However, the trial court held that the suppression hearing transcript was not material,
(*id.*), and the Tennessee Court of Criminal Appeals and the Tennessee Supreme Court affirmed,
*see Robinson I*, 2003 WL 21946735 at *23-24, *Robinson II*, 146 S.W.3d at 514. The point here
is that defense counsel's post-trial motion contended that the suppression hearing transcript was
"one of two statements previously made by witness Jarvis Shipp," *id* at 44—the other being the
May 1997 Statement. Once again, the State failed to disclose the November 5 Statement in the
context of a motion that made absolutely clear both the defense's and the trial court's erroneous
understanding that no third statement by Shipp—i.e., the November 5 Statement—existed.

under Rule 26.2 is to eliminate any doubt concerning what has and has not been disclosed. Wulff's failure to identify the November 5 Statement at this point therefore cannot logically be explained by the excuse Wulff offered at the post-conviction hearing—namely, that the defense "had been given a copy of it the week before." (24-15 at 6989.) The record plainly reflects that Wulff identified and produced a copy of the May 1997 Statement even though that document had previously been produced to the defense. The only reasonable explanation for Wulff's omission of the November 5 Statement—even after Ozment made clear on the record that he did not have it— is that the document had not been disclosed.

*Second*, the prosecution continued to dissimulate and deny the contents of the November 5 Statement throughout the post-trial proceedings on Robinson's Motion for a New Trial. As shown in Part I.B.5 above, the prosecutors aggressively denied that Shipp had received any "offers," much less any promises or assurances of consideration in exchange for his testimony. (22-20 at 2486.) Had the November 5 Statement been disclosed to the trial court, it would have put the lie to the prosecutors' representations. In fact, however, the November 5 Statement is nowhere referred to on the post-trial motion record, and the trial court specifically relied on the State's representations in finding (as we now know, erroneously) that "there was no understanding between prosecutors and [Shipp] to reveal." (50 at 8742.) In so ruling, the trial court also specifically relied on Shipp's testimony "under oath . . . several times that no offer or deal or promises had been given to him regarding his testimony at the time, and that he was testifying freely and voluntarily." (*Id.* at 8741.) As the TCCA's subsequent post-conviction ruling in this case has recognized, Shipp's testimony was false and was contradicted by the State's agreement with Shipp plainly reflected in the November 5 Statement.

It is simply absurd to suppose that the prosecution made these misrepresentations to the court, all the while knowing that Robinson's counsel, Schreiner, had personally received a copy of the November 5 Statement from Wulff and could have made it available to Robinson's other counsel at any time. No fair-minded reviewer of this record could conclude on this record that the prosecutors—despite having previously disclosed the November 5 Statement to the defense— nonetheless engaged in a course of conduct that risked their being exposed as liars if Schreiner suddenly woke up and shared the document. To the contrary, the prosecutors' brazen misconduct in failing to inform the trial court about the existence and content of the November 5 Statement removes any reasonable basis for the inference or presumption that they complied with their earlier obligations to disclose the November 5 Statement to the defense.

*Third*, the State committed other *Brady* disclosure violations in Robinson's case, including: (1) its failure to disclose the transcript of the motion to suppress hearing in Shipp's own case,[18] *see Robinson II*, 2003 WL 21946735 at *23-24, (22-6 at 997); (2) its failure to disclose a written signed statement by James in which he identified a picture of Robinson as "Shaun,"[19] (22-6 at 868-81); and (3) its failure to disclose a photo identification conducted with Nichole Black the morning before she testified for the State.[20] (22-9 at 1398.) While these failures do not directly prove non-disclosure of the November 5 Statement, the prosecution's

---

[18] In its order denying Robinson's Motion for a New Trial, the trial court acknowledged that the transcript should have been provided to Robinson's trial counsel but denied a new trial on the grounds that failure to disclose the transcript alone was not prejudicial. *Robinson II*, 146 S.W.3d at 514-15. The Tennessee Supreme Court affirmed the holding on direct appeal. *See id.*

[19] The court ruled that although the failure was unintentional, the State could not reference the statement on redirect due to its failure to disclose. (22-6 at 868-81.)

[20] The State admitted to this failure, and the Court struck the witness's testimony. (22-9 at 1398-99.)

pattern of repeated lapses in complying with its *Brady* obligations to Robinson reinforces the absence of any other reasonable explanation for the State's conduct in the trial court.

*Finally,* the State never disclosed the November 5 Statement to the TCCA or the Tennessee Supreme Court during Robinson's direct appeal, even though the existence of a pretrial leniency agreement between the State and Shipp remained in dispute before those courts. That the State continued to deny the existence of any such agreement and omit any reference to the November 5 Statement throughout those proceedings only confirms the one rational inference available on this record—namely, that they had never disclosed it to anyone.

2. **The State Courts' Disclosure Finding Is Unreasonable Notwithstanding the Courts' Reliance Upon Witness Credibility Assessments.**

In affirming the post-conviction court's disclosure finding, the TCCA relied exclusively upon the lower court's evaluation of the testimony given by Wulff; it also held that testimony by Robinson's trial and appellate counsel at the 2009 post-conviction hearing had not foreclosed the theory that Scheriner had received the document. (25-4 at 8302-03.) Deference to credibility determinations, however, cannot immunize the TCCA's ruling against reversal under section 2254(d)(2) where, as here, the testimony accredited contravenes the clear and convincing evidence in the state-court record as a whole.

As the TCCA noted, the lower court found Wulff "very persuasive" and credible based on "the details with which she recalled the meeting between herself and [Schreiner]" when she allegedly gave him a copy of the November 5 Statement. *Robinson III*, 2013 WL 1149761 at *60. Wulff's testimony was given over 11 years after the fact, however, and a review of the record reveals that this purported meeting was virtually the *only* incident that Wulff recalled in detail. When Wulff was asked generally, "Do you recall this trial?" she replied: "As a memory, yes. I don't remember--the detail that I've been asked today, I don't remember all of that without

reviewing things further." (24-15 at 7001.) When asked if defense lawyers cross-examined Shipp about prior inconsistent statements, Wulff said: "Sir, I haven't read the transcript start to finish in years, so I don't -- I don't recall." (*Id.* at 6990.) When asked if she recalled "that you definitely asked him whether he thought his testimony would help save his life?" Wulff replied: "Ma'am, without reading the testimony, I'm at a disadvantage trying to answer your questions today, because I haven't reviewed this and it's been ten years." (*Id.* at 6994.) Wulff also could not recall the names of any of the people she consulted with in the Robinson case. (*Id.* at 6943.)

In contrast, when asked about the November 5 Statement, her memory materialized with exceptional specificity: Wulff asserted that she telephoned Ozment's office when the statement was ready, that Schreiner then came to pick it up during the week of November 10, 1998 (the week before Robinson's trial started), (*id.* at 6954), and that she recalled specific details of their conversation during the exchange including Schreiner's opinions on the death penalty and his soft-shell briefcase. (*Id.* at 6998.) However, none of the "details" Wulff associated with her claimed disclosure of the November 5 Statement had any necessary temporal connection with that event: Wulff's memory of Schreiner's briefcase had no connection to any date, and she could have had a conversation with Schreiner about his views on capital punishment at any point. None of these details made it more probable that Wulff actually gave Schreiner the November 5 Statement, nor is there any independent evidence in the record to corroborate any such disclosure.

The post-conviction court's suggestion that Schreiner failed to share the document with Robinson's other counsel or anyone else also has no evidentiary basis. There was no testimony that Schreiner committed such an egregious failure, nor is there any concrete evidence in the record to lend it plausibility, much less corroborate it. To the contrary, such a scenario is wildly

improbable given Shipp's critical importance as a witness and the surprise timing of the alleged disclosure just days before Robinson's trial:

> Schreiner: [T]his is a capital murder case. This is my first capital murder case and it seems a bit late in the day to be picking up statements of witnesses or co-defendants who are about to be testifying in six days for trial.
>
> Q: That's something you would read, correct?
>
> A: Oh, yeah.
>
> Q: And then once you read it, you wouldn't forget it because of the nature of it.
>
> A: This statement would have within days made the rounds through the building to every other lawyer who was interested in our case.

(24-16 7258-59; *see also id.* at 7257-58 ("[T]his Shipp – this November 5th Shipp statement is very very, highly unusual. Because it contains a done deal prior to trial. And that's big. Very big.").) Multiple witnesses at the post-conviction hearing echoed Schreiner's testimony that the State's pretrial disclosure of the November 5 Statement would have been unforgettable. (*See id.* at 7143-44, 7149-52, 7176-77.)

Furthermore, Wulff testified that she told Ozment about the November 5 Statement by telephone. If that were true, Ozment's testimony—which the post-conviction court also generally credited—could not also be true. And it would require one to believe that despite such awareness Ozment never bothered to ask Schreiner for the document at any point. The post-conviction court's ruling is at odds with itself, as well as with the clear and convincing objective evidence in the record.

The post-conviction court's "finding" thus logically requires acceptance of the notion that Schreiner (i) went to pick up the November 5 Statement directly from Wulff days before

Robinson's capital murder trial; (ii) conversed at some length with Wulff when she turned the document over to him; (iii) thereafter, at Robinson's trial, observed the Shipp testimony, including the formal in-court Jencks exchange and Ozment's cross-examination of Shipp without the November 5 Statement; (iv) participated in all other aspects of Robinson's entire capital murder trial, in which his client was convicted and sentenced to death; (v) allowed Carey and Brooks to investigate and pursue a post-trial motion and direct appeal presenting an issue directly focused on the nature of the State's pretrial agreement, but without the benefit of the November 5 Statement (which would have proved the actual existence of a pretrial deal), and (vi) *never mentioned or gave the November 5 Statement to anyone on Robinson's defense team or any other lawyer representing defendants in whose trials Shipp also testified.* It also requires one to accept this fantastical version of reality despite the objective factual record demonstrating that the prosecutors in this case repeatedly failed to refer to or produce the November 5 Statement again when they should have, and acted—throughout Robinson's trial, post-trial motions, and direct appeal—*as if the November 5 Statement had not been disclosed.*

A "reasonable determination of fact" cannot be based upon magical speculation lacking any foundation either in the objective record or in rational common sense. The "clear and convincing evidence" standard under § 2254(d)(2) does not require proof beyond a reasonable doubt, but only a showing that a contrary conclusion is "highly probable" in light of the evidence presented. *See U. S. v. State of Mich.*, 653 F.2d 277, 279 (6th Cir. 1981); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). Here, the post-conviction court and the TCCA failed to evaluate the whole record presented in the state court proceeding and instead ventured into an alternate universe that irrationally re-ordered the history of Robinson's trial to conform with Wulff's

distant, self-interested, and unsupported recollection. This is exactly the kind of extreme miscarriage that federal habeas review is designed to correct.

### C. The TCCA's Determination That the November 5 Statement Was Not "Material" Under *Brady* Constituted an Unreasonable Application of Clearly Established Law.

The TCCA's further conclusion that the November 5 Statement was not "material" under *Brady* "involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1). That conclusion also should be overturned by this Court, and a new trial should be granted on Ground 2.

### 1. Materiality Under *Brady* Is a Specific Legal Rule That State Courts Must Apply Within a Narrow Range of Reasonableness.

A state court decision involves an unreasonable application of federal law if it "identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). An "'unreasonable application" is one that is "objectively unreasonable," *White v. Woodall*, --- U.S. ---, ---, 134 S. Ct. 1697, 1702 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)), that is, "where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Evidence is 'material' within the meaning of *Brady* "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, --- U.S. ---, ---, 132 S. Ct. 627, 630 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469–470 (2009)).[21] Under this standard, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he

---

[21] "In keeping with suggestions in a number of our opinions, the Court treats the prejudice enquiry as synonymous with the materiality determination under *Brady v. Maryland*." *Strickler v. Greene*, 527 U.S. 263, 297 n.2 (1999).

received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

The U.S. Supreme Court has clearly established that materiality under *Brady* imposes "a narrow rule that mandates specific compliance from prosecutors." *Smith v. Metrish*, 436 F. App'x 554, 560 (6th Cir. 2011) (citing *Strickler*, 527 U.S. at 280 and *Brady* 373 U.S. at 87). On habeas review under AEDPA, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 124 S.Ct. 2140, 2149, 541 U.S. 652, 664 (2004); *see also Renico v. Lett*, 559 U.S. 766, 776 (2010) (for purposes of AEDPA "reasonable application" review, state courts have less leeway in reaching case-by-cause determinations under specific rules); *Gumm v. Mitchell*, 775 F.3d 345, 360 (6th Cir. 2014) (applying quoted principle to *Brady* context). Because *Brady* imposes a "specific disclosure requirement" on prosecutors, a federal court on habeas review defers only to the state court analysis, and not to the discretionary actions of the prosecutors. *Smith*, 436 F. App'x at 560-61. In short, "materiality is a legal question," *Moldowan v. City of Warren*, 578 F.3d 351, 388 (6th Cir. 2009), and there is only a narrow range of reasonability in the application of the *Brady* rule. *Cf. Smith*, 436 F. App'x at 560 ("the AEDPA deference accorded the state determinations in *Brady* cases is dissimilar from that accorded state court decisions applying 'general constitutional standards'").

Moreover, materiality under *Brady* "is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434. In other words, a petitioner is not required to "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35. Materiality is established "if the [withheld] impeachment evidence

'would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material.'" *Eakes v. Sexton*, 592 F. App'x 422, 428 (6th Cir. 2014) (quoting *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir.1989)). The materiality of *Brady* evidence must be determined by considering "the value of the undisclosed evidence relative to the other evidence produced by the state." *Eakes v. Sexton*, 592 F. App'x 422, 427 (6th Cir. 2014). However, withheld evidence may be material even if the government disclosed *other* impeachment evidence that the defendant's counsel was able to utilize at trial. *See Robinson v. Mills*, 592 F.3d 730, 737 (6th Cir. 2010) (rejecting argument that "because [the defendant] tried to impeach [the key witness] and failed, any further impeachment evidence would be useless," and concluding it was "more likely that [the defendant] may have failed to impeach [the key witness] because the most damning impeachment evidence in fact was withheld by the government") (internal quotation marks and citation omitted).

Finally, the U.S. Supreme Court has emphasized that the materiality of *Brady* material not disclosed by the prosecution is to be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436. Thus, "[i]mportantly, when viewing the undisclosed evidence, courts are to focus on the cumulative effect of the undisclosed evidence on the jury's verdict." *Gumm*, 775 F.3d at 364.

    2.    **The TCCA's Ruling on Materiality Was Objectively Unreasonable Under the Clearly Established Law of *Brady*.**

Under the above standard, the November 5 Statement was plainly material under *Brady*, and the TCCA's contrary ruling constituted an unreasonable application of clearly established federal law. As demonstrated in Part I.B. above, the undisclosed promise of consideration to Shipp for "whatever you do to help us get Gregory" was alone highly prejudicial because it deprived Robinson's defense counsel of damning impeachment evidence: proof that Shipp had

an overweening incentive to bear false witness against Robinson in order to seize the carrot that Branham had dangled before him in their November 5 meeting. While the State's concealment of its promise through Shipp's uncorrected false testimony easily meets the more defense-friendly standard of materiality under *Napue/Giglio*, the State's failure to disclose the document itself deprived Robinson's counsel of incontrovertible written proof of the State's promises to a witness whose testimony was legally essential to Robinson's capital conviction for first-degree murder. Robinson respectfully submits that, on that ground alone, the State's failure to disclose the November 5 Statement meets the standard of *Brady* prejudice as well.

The material importance of a document proving the existence of an agreement between the State and its witness was recognized in *Harris v. Lafler*, 553 F.3d 1028 (6th Cir. 2009). In *Harris*, the prosecution failed to disclose police statements to a witness assuring him of release from custody, contingent upon testimony against the defendant. The Sixth Circuit held these statements to be material, observing that "[e]ven though a transcript of the hearing shows that Harris's counsel anticipated that [the witness] must have been promised something in exchange for his testimony, he had no way to prove it." *Id.* at 1033-34. Here, the trial transcript demonstrates the prejudice resulting from a defense counsel's *attempt* to establish a promise by the State without a document to prove it: Ozment's cross-examination of Shipp did not establish the existence of an agreement, but instead gave Shipp an opportunity to have the last word, by retorting that he was testifying to "tell the truth" and "on behalf of the victim's family." As in *Harris*, Robinson's conviction hinged upon Shipp's testimony, and Ozment had no way to *prove* the State's promises to Shipp. *Cf. id.* at 1034 ("Considerable authority from the Supreme Court and our court indicates that a defendant suffers prejudice from the withholding of favorable

impeachment evidence when the prosecution's case hinges on the testimony of one witness."). The State's failure to disclose the November 5 Statement was therefore material under *Brady*.

Further, even if materiality under *Brady* required more than the State's undisclosed promise recorded in the November 5 Statement, that document also contained a wealth of other key impeachment material that the defense could have used to destroy Shipp's credibility. Most critically, the November 5 Statement would have exposed Shipp's waffling about the purported authority of Robinson under the gang hierarchy: at the meeting with the prosecutors, Shipp indicated that, as "coordinator" of Hurt Village, Phillips was "above" Robinson in authority at the aid-and-assist meeting because the events at issue arose within Phillips' territory. (24-8 at 6253-54.) At trial, however, Shipp confidently parroted the State's theory that Robinson was above Phillips in both rank and authority. (22-6 at 971.) Without the November 5 Statement, Ozment had no way to challenge Shipp's credibility on this point. The materiality of this deprivation is highlighted by that fact that—as the Tennessee Supreme Court noted on direct appeal—the State did not use Shipp on its direct case against Phillips at his subsequent trial, in which the State contended that Phillips, not Robinson, was "calling the shots" in the Black apartment and "gave the order" to kill Green. *Robinson II*, 146 S.W.3d at 498; Petition, 1 at 53-54. There is a reasonable probability that, if the jury had heard that Shipp in fact believed Phillips was the top-most authority at the meeting, they would have embraced the theory later trumpeted by the State itself at Phillips's trial—namely, that Phillips alone ordered Green's murder.

Moreover, between the November 5 meeting and trial, Shipp changed his testimony about why he failed to identify Robinson in a photo spread to police shortly after the Green murder. At trial, Shipp claimed that he did not implicate Robinson because he feared that Robinson was not

"playing with a full deck"—i.e., it was an intentional omission driven by fear of a dangerous, deranged man. (22-7 at 1037.) In the November 5 Statement, however, Shipp initially asserted that he would have identified Robinson if he had seen him, (24-8 at 6255), but when pressed as to why he did not identify Robinson, he conceded simply, "I don't know." (*Id.* at 6257.) Moreover, Shipp told prosecutors that he was afraid to give statements to the police because he "did not want to give it on"— i.e., incriminate—Antonio Jackson, *not* Gregory Robinson. (*Id.* at 6255.) There is no mention of any fear of Robinson. If Robinson's defense counsel had been able to confront Shipp with these statements, it would have subjected Shipp to powerful impeachment on grounds of recent fabrication—all in an effort to help the prosecution "get Gregory."

The TCCA "noted" the discrepancy between Shipp's explanations for his failure to identify Robinson but did not acknowledge or even comment upon its value as impeachment material against Shipp. *Robinson III*, 2013 WL 1149761 at *61. Nor did the TCCA even address Shipp's demonstrable unreliability on the critical issue of Robinson's authority in light of the November 5 Statement. Instead, the TCCA denied that the November 5 Statement was material based upon Ozment's "extensive cross-examination" of Shipp regarding *the May 1997 Statement* and Shipp's "concession that he hoped to save his life by testifying." (*Id.*)

As demonstrated in Part I.A. above, however, the *Napue/Giglio* cases recognize a fundamental difference between the explicit promise of consideration proved by the November 5 Statement and the subjective hope that Shipp acknowledged, though he then also diminished it with his self-serving claims that he was testifying to speak the truth and "help the victim's family." The TCCA also ignored the uncontroverted testimony of Ozment, Carey, Brooks, and Schreiner that the November 5 Statement would have provided potent impeachment evidence— Brooks called it "dynamite"—against a surprise witness whose unanticipated incrimination of

Robinson was suspicious on its face. (*See* 24-16 at 7143-44, 7149-52, 7176-77, 7211-12, 7257; 24-17 at 7279-80, 7282, 7292-93.) As in *Harris v. Lafler*, Shipp was the "centerpiece of the prosecution," and defense counsel suspected an agreement with the prosecution but "had no way to prove it." 553 F.3d at 1034. "Extensive" cross-examination on the May 1997 Statement was no substitute for proof that Shipp had an actual promise giving him a potent incentive to lie and other critical impeachment evidence undercutting Shipp's credibility on essential components of the State's case. To the contrary, counsel's cross-examination was toothless without the documentary proof of an agreement and prior inconsistent statements by Shipp about Robinson contained in the November 5 Statement.

For these reasons, the State's failure to produce the November 5 Statement was plainly material and the TCCA's contrary conclusion was an unreasonable application of the clearly established law under *Brady*. It also bears emphasis that the materiality of *Brady* non-disclosures must be assessed cumulatively, s*ee Kyles*, 514 U.S. at 436-37. The State's adjudicated failure to provided Robinson's counsel with a copy of Shipp's suppression-hearing testimony only compounded the prejudice resulting from its failure to disclose the November 5 Statement. Shipp claimed under oath at that hearing that he gave police the May 1997 Statement only out of fear, because they had threatened to put him in the same holding cell as members of the Vice Lords. (24-7 at 6082-85, 6090.) The transcript would have given Robinson's counsel additional support for their contention that Shipp was telling the unfiltered truth in the May 1997 Statement when he stated that Phillips was the "say so" and was "giv[ing] the orders" on the night of Green's murder. In conjunction with the November 5 Statement, the transcript would have provided further evidence that Shipp changed his story to benefit himself and thereby further strengthened Robinson's counsel's attack on Shipp's credibility at trial.

In light of the above, this Court should grant Robinson's due process claim on Ground 2 and vacate his conviction and sentence pursuant to § 2254(d).

**III.    In the Alternative, Should the Court Uphold the TCCA's *Brady* Disclosure Ruling, Robinson Is Entitled to Summary Judgment on Ground No. 3 of the Petition, Because Trial and Appellate Counsel Rendered Ineffective Assistance in Failing to Use the November 5 Statement.**

As demonstrated in Part II.B above, the TCCA's ruling as to the State's disclosure of the November 5 Statement was irrational and should be overturned under 28 U.S.C. § 2254(d)(2). Assuming (without conceding) that the State did provide a copy of the November 5 Statement to Schreiner, Robinson should still be entitled to a new trial on Ground 3 of the Petition, because counsel's prejudicial failure to use the November 5 Statement at trial or on post-trial motions or direct appeal constituted ineffective assistance of counsel under *Strickland* , *supra.*

To establish that counsel's performance is unconstitutionally ineffective under *Strickland*, a defendant must show (1) "that counsel's performance was deficient," and (2) that "the deficient performance prejudiced the defense," meaning that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. When combined with the AEDPA standard, a habeas petitioner "must demonstrate that it was necessarily unreasonable" for the state court to conclude that counsel was not ineffective. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *see also Ballinger v. Prelesnik*, 709 F.3d 558, 563 (6th Cir. 2013).

When counsel's representation is deficient in several respects, as in this case, courts do "not measure the result of each individual error, but 'consider the errors of counsel in total, against the totality of the evidence in the case.'" *United States v. Arny*, 831 F.3d 725, 734 (6th Cir. 2016) (quoting *Stewart v. Wolfenbarger*, 468 F.3d 338, 361 (6th Cir. 2006)); *see United*

*States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014). In particular, a "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Dado*, 759 U.S. at 563 (quoting *Strickland*, 466 U.S. at 695-96); *see Avery v. Prelesnik*, 548 F.3d 434, 439 (6th Cir. 2008) (evaluating trial counsel's deficiencies "in light of the otherwise flimsy evidence supporting [habeas petitioner's] conviction").

A.      **It Has Already Been Determined that Trial Counsel's Failure to Use Shipp's November 5 Statement Constituted Deficient Performance Under *Strickland*.**

It is beyond dispute that, if the November 5 Statement was disclosed to Schreiner, then his failure to share the transcript with lead counsel and Robinson's counsel's failure to use that document in Robinson's defense was plainly ineffective. The TCCA came to this conclusion based on its factual finding that "Ms. Wulff gave the transcript of the meeting to co-counsel but that co-counsel failed to share the transcript with lead counsel." *Robinson III*, 2013 WL 1149761 at *60. The State's Answer in this habeas proceeding did not dispute that, under the TCCA's disclosure holding, the performance of Robinson's counsel was deficient. The first prong of the *Strickland* standard is therefore satisfied here.

B.      **The TCCA's Ruling that Trial Counsel's Deficient Performance Was Not Prejudicial Constituted an Unreasonable Application of Clearly Established Law Under *Strickland*.**

The prejudice standard for ineffective assistance under *Strickland* is essentially the same as the materiality/prejudice standard applicable to *Brady* non-disclosure claims. *See* Part II.A & n.14. Thus, whether Robinson's counsel failed to use the November 5 Statement as a result of a *Brady* violation by the prosecution or as a result of defense counsel's deficient performance, the result must be the same: there is ample basis to undermine confidence in the outcome of Robinson's trial, and therefore a "reasonable probability" that the result of Robinson's trial would have been different. For the same reasons explained above, the TCCA's

contrary decision was an unreasonable application of clearly established federal law under *Strickland*. *See* Part II.C.

In a truncated discussion, the Court of Criminal Appeals found that co-counsel's deficiency was not material, essentially because any harm created by co-counsel's deficient performance was cured by lead counsel eliciting on cross-examination that Shipp "*hoped* to save his life" by cooperating with the prosecution. *Robinson III*, 2013 WL 1149761 at *69 (emphasis added). As explained in Part I.A.3 above, however, the TCCA's treatment of a unilateral, subjective hope on Shipp's part as equivalent to an actual promise by the State for purposes of assessing prejudice resulting from *Brady* material violates the clearly established law on this point.

**C.    The Prejudice Resulting From Robinson's Trial Counsel's Failure to Use the November 5 Statement Was Compounded by Several Other Deficiencies in Counsel's Performance.**

Standing alone, the failure of Robinson's counsel to use the November 5 Statement was prejudicial under *Strickland*. No reasonable strategy could possibly justify the failure to use this document in aid of Robinson's defense at trial and through direct appeal. The unreasonableness of the TCCA's contrary conclusion becomes even more clear in light of several additional deficiencies in Robinson's counsel that compounded the harm to Robinson.

**1.    Trial Counsel Failed to Object to Improper Vouching and False Statements by the State.**

During closing arguments, Robinson's counsel failed to object to improper vouching and false statements by the prosecution. ADA Wulff commented that Shipp "didn't get a deal, but he told you the truth." (Petition, 1 at 47 (quoting 22-14 at 2089).) ADA Branham further commented that "maybe [the State] should cut him some slack. We haven't yet, but maybe we should. [His testimony] took a lot of guts." (*Id.* (quoting 22-14 at 2088).) The CCA found that,

absent testimony from trial counsel that their decision not to object to these statements was anything but tactical, it could only presume that the decision was tactical and not ineffective, and further, that any ineffectiveness with respect to closing arguments was not prejudicial. *Robinson III*, 2013 WL 1149761 at *79-80.

This conclusion is unreasonable. The court's presumption that counsel's failure to object was tactical is based on the general principle that a court "may not second-guess *a reasonably based trial strategy* or criticize a sound, but unsuccessful, tactical decision made *after adequate preparation* for the case." *State v. Sexton*, No. M2004-03076-CCA-R3CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007) (emphases added). Here, there is no plausible sound tactical reason to fail to object to a prosecutor who vouches for the truthfulness of the State's star witness by repeating his lie about whether he "g[o]t a deal." This was not a tactic; it was a gross failure to adequately prepare for the case and to recognize that the November 5 Statement proved that the prosecutors were concealing the State's agreement with Shipp and ratifying the lies they had elicited from him on the stand. This failure to object compounded the prejudicial impact of counsel's other failures, because the State's closing arguments further reinforced Shipp's unimpeached false testimony.

### 2. Trial Counsel Failed to Include the November 5 Statement in Robinson's Case File, Preventing a Robust Appeal

The post-conviction court's presumption that trial counsel acted reasonably in failing to object to the State's improper closing statements could have been rebutted on appeal through testimony from trial counsel explaining why they did not raise the objection. *See Robinson III*, 2013 WL 1149761, at *79 (citing *Brooks v. State*, No. M2010-02451, 2012 WL 112554, at *14 (Tenn. Crim. App. Jan. 11, 2012)). However, Robinson's appellate counsel did not raise—and could not have raised—this deficiency on appeal, because co-counsel failed to place the

November 5 Statement in Robinson's case file. As a result, appellate counsel was entirely unaware of trial counsel's deficiencies in this respect, and did not seek to re-open the record to generate evidence from trial counsel explaining why he did not object during closing arguments. As a result of the absence of a complete record, the post-conviction court declined to find that trial counsel's decisions were anything but tactical. *See id.* at *80. Trial counsel's ineffectiveness thus also infected the appeal.

### 3. Trial Counsel Failed to Object to the Incorrect Accomplice Testimony Instruction.

Trial counsel also failed to object to the court's incorrect instruction to the jury that it could determine whether Shipp was an accomplice to the crime and consequently determine whether or not his testimony would need to be independently corroborated in order to convict Robinson. As explained above, this failure compounded the impact of Shipp's testimony. *See* II.B.4. The post-conviction court found that counsel's failure to raise an objection was harmless because Shipp's testimony, along with James's testimony, was sufficiently corroborated by the medical examiner, who had testified regarding how Green had been shot in the park. *Robinson II*, 146 S.W.3d at 489. This conclusion is unreasonable because the medical examiner's testimony plainly could not corroborate Shipp's statement that Robinson gave the order to kill Green, and neither the medical examiner nor James corroborated Shipp's assertion that Robinson was the highest ranking Gangster Disciple at the Hurt apartment the night of the murder.

In light of the above, this Court should vacate Robinson's conviction and sentence and grant him a new trial pursuant to Ground 3 of the Petition.

## CONCLUSION

For the reasons set forth above, Robinson respectfully submits that the Court should grant summary judgment in his favor on Grounds 1, 2, and, in the alternative, 3 of the Petition.

Respectfully submitted,

/s Robert L. Hutton

Robert L. Hutton
Glankler Brown, PLLC
6000 Poplar Avenue
Suite 400
Memphis, TN 38119
Ph: 901-525-1322
Fax: 901-525-2389
rhutton@glankler.com

P. Benjamin Duke
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
Ph: 212-841-1072
Fax: 646-441-9072
bduke@cov.com

Attorneys for Petitioner
GREGORY ROBINSON

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 2, 2016, a true and correct copy of the foregoing document was served by electronic means through the Court's ECF system on all parties of record, including counsel for Respondent, Jennifer L. Smith, Meredith Wood Bowen, and Michael Matthew Stahl.

/s Robert L. Hutton
Robert L. Hutton
